# 23-1023

**IN UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

DAVID J. NASTRI, ESQ.

*Plaintiff-Appellant*

v.

KATIE DYKES,

*Defendant-Appellee,*

_____

On Appeal from the United States District Court for the
Connecticut, No. 3:23-cv-00056-JBA

_____

**APPENDIX OF THE PLAINTIFFS-APPELLANTS
(App.1 – App.271)**

_____

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

October 26, 2023

## <u>APPENDIX TABLE OF CONTENTS</u>

Verified Amended Complaint (1/28/2023)…………………………………App.1

Amended Motion For Preliminary Injunction (1/28/2023)…………………App.87

Defendant's Motion To Dismiss (3/30/2023)………………………………App. 90

Defendant's Mem. Of Law In Support of MTD (3/30/2023)…………..……App.93

Transcript of Preliminary Injunction Hearing – Day One (5/9/2023)…...……App.103

Transcript of Preliminary Injunction Hearing – Day Two (5/10/2023)……App.156

Order Granting Motion To Dismiss And Denying Preliminary Injunction

(7/12/2023)……………………………………………………...….App.209

Notice of Appeal (7/12/2023)………………………………………………App.226

Motion for Reconsideration (7/17/2023)……………………..……App.228

Exhibit A To Motion For Reconsideration – Plaintiff's Interrogatories &

Defendant's Responses……………………………..………………App.230

Order Denying Motion For Reconsideration (8/16/2023)……………....App.254

Judgment (8/22/2023)…………………………………………….…...App.263

Amended Notice of Appeal………………………………………...App.264

District Court Docket Sheet (as of 10/26/2023)…………………………App.266

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | JANUARY 28, 2023 |

## <u>VERIFIED AMENDED COMPLAINT</u>

1.      This is an action for declaratory and injunctive relief that challenges the constitutionality of Connecticut's state regulation that bans the carrying of handguns in Connecticut state parks for the purpose of self-defense. Connecticut's ban on handguns in state parks cannot pass constitutional muster under the historical standard that the Supreme Court announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022), and the Second Amendment requires the Court to put a stop to Connecticut depriving its citizens of the most popular means of self-defense where it is undoubtedly the hardest for first responders to protect them.

## <u>PARTIES</u>

2.      Plaintiff David J. Nastri, Esq. is a United States and Connecticut citizen who maintains his permanent home in Cheshire, Connecticut.

3.      The Defendant, Katie Dykes, is the Commissioner of the Connecticut Department of Energy & Environmental Protection (DEEP), and she is sued in her official capacity only. In her role as DEEP Commissioner, Dykes possesses rulemaking authority to adopt, modify, or repeal regulations pursuant to the procedures established by

Connecticut's Uniform Administrative Procedure Act (UAPA) – codified at Conn. Gen. Stat. § 4-166 et seq. *See* Conn. Gen. Stat. §§ 22a-5 and 23-4. She additionally possesses the authority to enforce the regulations that she promulgates through "conservation officers" – uniformed police officers who are employed by DEEP and empowered to conduct warrantless arrests for violations of the statutes and regulations that the DEEP enforces. Conn. Gen. Stat. §§ 22a-5, 23-4, 26-5, and 26-6.

## JURISDICTION

4.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and § 1651 as well as 42 U.S.C. § 1983. Venue is appropriate under 28 U.S.C. § 1391 because all of the parties are domiciled in Connecticut and all of the factual events giving rise to the cause of action occurred in Connecticut.

## FACTUAL ALLEGATIONS

### *Connecticut's Prohibition On Handgun Possession In State Parks.*

5.      Connecticut has established an official policy

to conserve, improve and protect [the state's] natural resources and environment and to control air, land and water pollution in order to enhance the health, safety and welfare of the people of the state… and to manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations.

Conn. Gen. Stat. § 22a-1.

6.      In line with this policy goal, Connecticut maintains approximately 139 state parks and state forests through the Connecticut DEEP. *See* **Exhibit A**.

7.      Connecticut has taken the position before the Connecticut Supreme Court that maintaining "state parks and forests are an important part of the state's conservation responsibilities." *State v. Ball*, 260 Conn. 275, 284-85 (2002).

8.      The Connecticut Supreme Court also noted that "[f]rom] time immemorial, the state's uninhabited and undeveloped land traditionally has been used for hiking, picnicking, camping, hunting, trapping and fishing." *Id*. at 284. It found that "[a]s the state has developed and become more populated, the state forests and some state parks have been preserved in an undeveloped condition so as to continue to provide opportunities for these traditional uses." *Id*. at 284.

9.      Critically, the Connecticut Supreme Court found that that "[t]he state has conserved and managed its undeveloped land primarily for these traditional purposes, subject to some public safety restrictions." *Id*. at 284-85.

10.     Nothing has changed since *Ball*. Connecticut's state parks and forests remain open for a wide variety of recreational activities, including hiking, camping, hunting, fishing, and picnicking.

11.     While Connecticut does impose licensing requirements for hunting, fishing, and camping, it generally does not utilize a permit system to control entrance to state parks and forests for recreational activities that comport with Connecticut's state park rules.

12.     Instead, Connecticut's state park rules specifically establish that [s]tate parks and state forest recreation areas shall be open for public use daily between sunrise and sunset." Conn. Agencies Regs. § 23-4-1(a).[1]

---

[1] For the Court's convenience, the undersigned has attached the regulation as **Exhibit B** since it is somewhat difficult to locate using a traditional legal research tool.

13.    Connecticut prohibits the carrying of firearms, archery equipment, or other weapons in state parks and forests unless the DEEP specifically authorizes their carrying. Conn. Agencies Regs. § 23-4-1(c).

14.    Violation of this prohibition is an infraction under Connecticut law and is punishable by a $35 fine. *See* Conn. Agencies Regs. § 23-4-5.[2]

15.    The DEEP also possesses the authority to evict a person from a park for twenty-four hours immediately upon their arrest or citation for the infraction. *Id*.

16.    If a person is convicted of such an infraction under the procedures established in Conn. Gen. Stat. § 51-164n, Defendant Dykes possesses the authority to ban the person from entering a state park or forest for up to one year. Conn. Gen. Stat. § 23-4.

17.    Connecticut permits the limited carrying of firearms, archery, and other weaponry for the purpose of hunting in state parks and forests within certain specified seasons. This includes permitting individuals to carry handguns up to .22 caliber rimfire for the purpose of hunting small game on state-owned land. **Exhibit D**, **p. 1.**

18.    Connecticut, however, does not permit non-hunting members of the public who possess valid Connecticut pistol permits to carry handguns for the purposes of self-defense in case of confrontation while using state parks or forests.

19.    Defendant Dykes' subordinates confirmed this reading of Connecticut law when Nastri made inquiries in an effort to determine if he could carry a handgun for the purpose of self-defense while using state parks and forests for lawful recreational purposes. On November 18, 2022, he sent an email inquiry to Defendant Dykes asking

---

[2] This regulation is attached as **Exhibit C**.

her to clarify whether Conn. Agencies Regs. § 23-4-1(c) was a specific provision to regulate hunting and whether there were other rules permitting the carry of handguns by Connecticut pistol permit holders in Connecticut state parks and forests. *See* **Exhibit M, p. 3**.

20.     On November 22, 2022, Deputy DEEP Commissioner Mason Trumble responded to Nastri's inquiry by email, directing him to a web link containing a 2020 report prepared by the Connecticut Office of Legislative Research's Chief Attorney – Janet Kaminski Leduc – and entitled "Carrying Handguns in Connecticut State Parks or Forests." *Id*. at p. 2. The report is attached as **Exhibit N**.

21.     Despite the specific disclaimer that Attorney Leduc placed at the very top of the opinion and which clearly states that the report is not to be considered a legal opinion, Defendant Dykes and Mr. Trumble converted it into the official legal opinion of the state of Connecticut by providing it to Nastri in answer to his questions.

22.     Attorney Leduc's report confirms that a person may legally possess a handgun in a state park or forest "only when carrying the handgun for hunting small game… or participating in other authorized activities, such as at a firearms range or during a hunter education class. **Exhibit N**, **p. 1.**

23.     After receiving and reviewing this information from Mr. Trumble, Nastri emailed him later on November 22, 2022 and brought the United States Supreme Court's decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022) to his attention. **Exhibit M**, **p. 1-2**. He asked Mr. Trumble to convey his request to Defendant Dykes to take immediate steps to amend Conn. Agencies Regs. § 23-4-1(c)

to permit the carrying of handguns in state parks and forests for the purpose of self-defense in compliance with *Bruen*. *Id*.

24.     Neither Defendant Dykes nor Mr. Trumble responded to Nastri's email. Defendant Dykes has also made no effort to amend Conn. Agencies Regs. § 23-4-1(c) to permit the carrying of handguns in state parks and forests for the purpose of self-defense.

### *Plaintiff David J. Nastri, Esq.*

25.     It is hard to find a more responsible and exemplary member of his community than the Plaintiff, David J. Nastri. He is a combat veteran, a financial advisor, an attorney, a kidney donor, and an active member of his community.

26.     In 2001, Nastri donated one of his kidneys to a local school teacher to save her life.

27.     In 2009-2010, Nastri deployed to Afghanistan as a Staff Sergeant in the 1st Battalion, 102nd Infantry Regiment, Connecticut Army National Guard in support of Operation Enduring Freedom. During that deployment, Nastri saw combat. Nastri's awards during his military service included the Afghanistan Campaign Medal with a Campaign Star, the Army Good Conduct Medal, and the Louisiana Emergency Service Medal. He was honorably discharged in March 2012.

28.     As part of his military service, Nastri received comprehensive training on the safe and effective use of firearms, including handguns, and he was required to demonstrate proficiency in their safe and effective use under combat conditions. Nastri then answered his country's call and proved the efficacy of his training in combat. In other words, Nastri has received far more training on the safe and responsible use of firearms

than the average person does, and he has proven his ability to adhere to that training under high-pressure circumstances that the average person will likely never encounter.

29.     Nastri currently holds four FINRA licenses as a financial advisor, including a Series 7, a Series 63, a Series 66, and a Life & Health license. In addition to passing the rigorous background checks required for these licenses, Nastri holds a clean disciplinary record for all of his licenses.

30.     Nastri earned his Master's in Business Administration (M.B.A.) in 2001 and his law degree in 2018 from Quinnipiac University. He became an attorney duly licensed to practice law in Connecticut on November 2, 2018, and he remains in good standing with no record of a disciplinary history.

31.     Since his licensure and in what spare time he has left over from his full-time employment as a financial advisor, Nastri has represented numerous veterans on a pro bono basis in Veterans' Administration matters.

32.     Nastri received his pistol permit approximately 30 years ago, and he completed all of the safety training associated with obtaining it. He subsequently has held it in good standing since receiving it. Since his current permit does not reflect its initial issue date, Nastri cannot say for certain when he first received it, but his best recollection is that he has held it for more than 30 years.

33.     Nastri uses Connecticut state parks and forests on a regular basis throughout the year – most often during the summer. He enjoys hiking with his girlfriend at Sleeping Giant State Park in Hamden, Connecticut and Naugatuck State Forest when their schedules permit.

34. Nastri intends to and will continue to make use of Connecticut state parks and forests in the immediate and foreseeable future for the purpose of recreation such as hiking.

35. Nastri's prospective use of Connecticut state parks and forests is not speculative. The original complaint in this action was filed on January 14, 2023. *See* Dkt. 1. Since it was filed, he has used state parks and forests twice:

   a. On January 14, 2023, he went to Sleeping Giant State Park for a hike by himself.

   b. On January 15, 2023, he went to Sleeping Giant State Park with his girlfriend for another hike.

36. Nastri actively carries his handgun almost every time he leaves his home and almost every place that he goes, but he abides by the laws and rules that govern where he may carry it. When he must go to a place where the law does not permit him to carry a firearm such as a government building, Nastri secures his firearm in a locked safe that he has bolted to the floor of his motor vehicle.

37. While making such regular use of Connecticut state parks and forests, Nastri seeks to carry a handgun for the purpose of self-defense like he does every other place where Connecticut may not prohibit his carrying of firearm in a manner consistent with the Second Amendment.

38. Conn. Agencies Regs. § 23-4-1(c), however, is so strict that Nastri cannot even store his handgun in a locked container in his motor vehicle at a state park or forest parking lot because he is technically within the confines of a Connecticut state park or forest and would be in violation of the law if he possessed a firearm in his motor vehicle.

Thus, every time that Nastri intends to visit a state park or forest, he must leave his handgun at home.

39.     Nastri understands Connecticut's laws pertaining to hunting. He has no intention of using a handgun to hunt at all, let alone hunt outside of a legal hunting season.

40.     Nastri also understands Connecticut's other laws pertaining to conservation. He has no intention of using a handgun to violate those laws.

### *The Nature Of Trails In Connecticut State Parks And Forests*

41.     Connecticut maintains trails in many of its state parks and forests. These trails – often miles in length – facilitate a wide variety of recreational activities, including hiking, wildlife observation, horseback riding, and bicycle riding. They also facilitate access for hunting and fishing.

42.     Since Connecticut's objective in the parks and forests is to preserve natural habitats and undeveloped land, Connecticut's state parks and forests typically offer limited access points for motor vehicles, and a trail may lead a person a mile or more before they can access a roadway or another exit from a state park or forest. Sleeping Giant State Park and Naugatuck State Forest are perfect examples of this.

43.     Sleeping Giant State Park – located in Hamden, Connecticut – has been a Connecticut state park since 1924. *See* **Exhibit E**. It primarily consists of an approximately 32-mile "backcountry trail system" that features various scenic attractions. **Exhibit F, p. 2.**[3] It also offers wildlife spotting, picnicking, a cross country ski trail, camping, fishing, and rock climbing. **Exhibit H**.

---

[3] This exhibit contains information from the Sleeping Giant Park Association, which Connecticut itself recommends as a resource on Sleeping Giant State Park. *See* **Exhibit G**.

44.     According to the official map provided by the Connecticut DEEP, there is no motor vehicle access to the center of Sleeping Giant State Park. **Exhibit I**. Instead, motor vehicle access to the park is limited to strategically placed trail head parking locations around the park's perimeter. *Id*.

45.     The result of this orientation is that a person seeking help from first responders, including law enforcement, could be forced to wait whatever time it takes for first responders to navigate miles of rough and mountainous terrain to reach them. In other words, response times from first responders to a call for help could easily exceed half an hour or more.

46.     Naugatuck State Forest covers an area of land that is part of the towns of Cheshire, Hamden, Naugatuck, Oxford, and Beacon Falls. **Exhibit J, p. 4.** It offers opportunities for *hunting, target shooting*, fishing, hiking, letterboxing, mountain biking, and snowmobiling. *Id*.

47.     Unlike Sleeping Giant State Park, Naugatuck State Forest is much more accessible by motor vehicle due to its smaller size. It contains numerous parking areas at the trail heads around the perimeter of the state forest according to the official map provided by the Connecticut DEEP. **Exhibit K.** Despite its increased accessibility, there are portions of the forest where first responders would have to cover a mile or more on foot to reach someone calling for help, which would necessitate a longer response time.

48.     Naugatuck State Forest is also home to the High Rock Cooperative Shooting Range – one of the state's four public shooting ranges. **Exhibit L**. Patrons can access the range – within Naugatuck State Forest – to shoot pistols, revolvers, and other firearms. *Id*.

## COUNT ONE – CONNECTICUT'S PROHIBITIION ON THE POSSESSION OF HANGUNS IN STATE PARKS VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS

49.    Paragraphs 1 through 48 are incorporated herein.

50.    Nastri has a statutory cause of action to bring this claim under 42 U.S.C. 1983.

51.    The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022) has completely reshaped Second Amendment analysis in the United States.

52.    Prior to *Bruen*, courts employed a combination of a malleable public-policy interest-balancing test and means-end scrutiny (e.g., strict scrutiny) to analyze Second Amendment claims. *See, e.g.*, *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2015).

53.    *Bruen* abolishes the quasi-public policy and scrutiny analyses completely. Its reshaping of the analysis starts and ends with two basic principles:

   a.    "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

   b.    "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

54.    The Second Amendment's plain text indisputably covers the conduct that Nastri seeks to engage in: the carrying of a pistol or revolver for the purpose of self-defense in case of confrontation.

55.    Under *Bruen*, the burden of proof now falls on the Defendant to show a historical analogue to Connecticut's modern regulations that is both "well-established and

representative." *Id*. at 2133. There are no such historical analogues that can save Conn. Agencies Regs. § 23-4-1(c).

56.     The only Second Amendment exception remotely applicable to Conn. Agencies Regs. § 23-4-1(c) is the "sensitive places" exception established in *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) and reaffirmed in *Bruen*, 142 S.Ct. at 2133-34. The Defendant cannot possibly justify Connecticut's outright ban on the carrying of handguns in state parks and forests from that exception though.

57.     *Heller* itself only cited two historical examples of "sensitive places:" "schools and government buildings." 554 U.S. at 626.

58.     *Bruen* built on the specificity of *Heller*'s examples, adding "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133.

59.     Neither these specific examples nor *Heller*'s and *Bruen*'s broader categories are remotely analogous to Conn. Agencies Regs. § 23-4-1(c). Our nation's history is also completely devoid of any suitable analogue to Conn. Agencies Regs. § 23-4-1(c).

60.     Conn. Agencies Regs. § 23-4-1(c) go even further than the test proposed by New York in *Bruen*, which the Supreme Court rejected as defining the category of "sensitive places" "far too broadly." *Bruen*, 142 S.Ct. at 2133-34. New York proposed to define "sensitive places" as "where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'" *Id*. at 2133.

61.     *Bruen* rejected this test on the basis that it "would eviscerate the general right to publicly carry arms for self-defense…." *Id*. at 2134.

62.     Conn. Agencies Regs. § 23-4-1(c)'s prohibition fails even this test. Law-enforcement and other public-safety professionals are rarely present or readily available in state parks or forests. The undeveloped nature of state parks and forests means that vehicular access is extremely limited. In cases readily imaginable, law enforcement would need to traverse miles on foot to reach a person who calls for help, assuming that their cellphones would have sufficient reception to request it. In other words, response times could exceed half an hour or more.

63.     There is simply no justification for Connecticut's continued maintenance and enforcement of the ban. It already permits the carrying of handguns in state parks and forests for hunting, and, in the instance of the four state shooting ranges located in state forests as shown in **Exhibit L**, it even provides for the voluminous discharge of firearms and other weapons in state parks for recreational purposes. Thus, there is no question that Connecticut can still enforce all of its other laws while permitting law-abiding citizens such as Nastri to carry a handgun for self-defense in state parks and forests.

64.     Thus, Connecticut's refusal to allow Nastri to carry a handgun into state parks and forests for the lawful purpose of self-defense and Conn. Agencies Regs. § 23-4-1(c) violate his Second Amendment rights as guaranteed by the Fourteenth Amendment.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff seeks the following relief:

A.     A declaratory judgment that Conn. Agencies Regs. § 23-4-1(c)'s prohibition on the carrying of handguns for the purpose of self-defense in state parks and forests violates the Second and Fourteenth Amendments to the United States Constitution;

B.     A permanent injunction barring the Defendants from enforcing Conn. Agencies Regs. § 23-4-1(c);

C.     Costs and attorneys' fees;

D.     Any such other and further relief that the Court deems just and reasonable.

<div style="margin-left:40%;">

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

</div>

## VERIFICATION OF DAVID J. NASTRI, ESQ.

I, David J. Nastri, Esq., being duly sworn and deposed, hereby state under oath as follows:

1. I am over 18 years of age, and I understand and believe in the obligations of an oath.

2. I have reviewed the amended complaint in this matter, discussed it with my counsel, and I know and believe that all of the factual allegations contained herein are true and accurate.

3. I have also reviewed the exhibits attached to this complaint, and, to the best of my knowledge, they are true and accurate copies of what they depict.

David J. Nastri, Esq.

Subscribed and sworn to before me, this 28th day of January, 2023

Notary Public



JESSE PIRRO
NOTARY PUBLIC
STATE OF CONNECTICUT
MY COMM. EXP.06-30-2026



App.15

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

Additionally, per the undersigned's colloquy with the Court and counsel for the Defendant, the undersigned will have a copy of this filing formally served on the Defendant and/or her representatives as established by law in the normal course of serving process in this action.

<u>/s/ Cameron L. Atkinson /s/</u>

# Exhibit A

Report an accessibility issue.

(/DEEP)

# Connecticut
# Department of Energy & Environmental Protection

CT.gov Home     /() Department of Energy & Environmental Protection     /(DEEP)     State Parks     /DEEP/State-Parks/Connecticut-State-Parks-and-Forests)     Listing of State Parks

## All State Parks



Whether you are looking for a rigorous outdoor activity, a leisurely stroll or a peek into history, Connecticut's parks and forests have something to offer you year round. With 139 state parks and forests statewide, you're sure to find one close to home or just a short trip away.

Above All State Park, Warren/Litchfield (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests) (https://www.ct.gov/cwp/view.asp?a=445284&deepNav_GID=1650#AboveAll)Air Line State Park Trail, Multi-Town (/DEEP/State-Parks/Parks/Air-Line-State-Park-Trail)

Algonquin State Forest, Colebrook (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

American Legion State Forest, Barkhamsted (/DEEP/State-Parks/Forests/American-Legion-and-Peoples-State-Forests) (https://www.ct.gov/cwp/view.asp?a=2716&q=325054&deepNav_GID=1650)Beaver Brook State Park, Windham/Chaplin (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#BeaverBrook)Becket Rock State Park, Old Lyme (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#BecketHill)Beckley Furnace State Park, North Canaan (/DEEP/State-Parks/Parks/Beckley-Furnace-Industrial-Monument)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325172&deepNav_GID=1650)Bennett's Ponds State Park, Ridgefield (/DEEP/State-Parks/Parks/Bennetts-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=478368&deepNav_GID=1650)Bigelow Hollow State Park, Union (/DEEP/State-Parks/Parks/Bigelow-Hollow-State-Park-Nipmuck-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325174&deepNav_GID=1650)Black Rock State Park, Watertown (/DEEP/State-Parks/Parks/Black-Rock-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325178&deepNav_GID=1650) (https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325178&deepNav_GID=1650)Bluff Point State Park, Groton (/DEEP/State-Parks/Parks/Bluff-Point-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325178&deepNav_GID=1650)Bolton Notch State Park, Bolton (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#BoltonNotch)Brainard Homestead State Park, East Haddam (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#BrainardHomestead)Burr Pond State Park, Torrington (/DEEP/State-Parks/Parks/Burr-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325180&deepNav_GID=1650)C.P. Huntington State Park, Redding/Bethel/Newtown (/DEEP/State-Parks/Parks/Collis-P-Huntington-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325222&deepNav_GID=1650)Camp Columbia State Park, Morris (/DEEP/State-Parks/Parks/Camp-Columbia-State-Park-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=435450&deepNav_GID=1650)Camp Columbia State Forest, Morris (/DEEP/State-Parks/Parks/Camp-Columbia-State-Park-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=435450&deepNav_GID=1650)Campbell Falls State Park, Norfolk (/DEEP/State-Parks/Reserves/Campbell-Falls-State-Park-Reserve)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325308&deepNav_GID=1650)Centennial State Forest, Fairfield (/DEEP/State-Parks/Forests/Centennial-Watershed-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=447970&deepNav_GID=1650)Chatfield Hollow State Park, Killingworth (/DEEP/State-Parks/Chatfield-Hollow-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325182&deepNav_GID=1650)Cockaponset State Forest, Haddam/Chester (/DEEP/State-Parks/Forests/Cockaponset-State-Forest)

Connecticut Valley Railroad State Park, Essex (/DEEP/State-Parks/Parks/Connecticut-Valley-Railroad-State-Park)

Dart Island State Park, Middletown (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#DartIsland)Day Pond State Park, Colchester (/DEEP/State-Parks/Parks/Day-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325184&deepNav_GID=1650)Dennis Hill State Park, Norfolk (/DEEP/State-Parks/Parks/Dennis-Hill-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325186&deepNav_GID=1650)Devils Hopyard State Park, East Haddam (/DEEP/State-Parks/Parks/Devils-Hopyard-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325192&deepNav_GID=1650)Dinosaur State Park, Rocky Hill (/DEEP/State-Parks/Parks/Dinosaur-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325194&deepNav_GID=1650)Eagle Landing State Park, Haddam (/DEEP/State-Parks/Parks/Eagle-Landing-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=478672&deepNav_GID=1650)Enders State Forest, Granby/Barkhamsted (/DEEP/State-Parks/Parks/Enders-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=594616&deepNav_GID=1650)Farm River State Park, East Haven (/DEEP/State-Parks/Parks/Farm-River-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=454726&deepNav_GID=1650)Farmington Canal Greenway State Park, Cheshire/Hamden (/DEEP/State-Parks/Parks/Farmington-Canal-State-Park-Trail)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&Q=479526&deepNav_GID=1650)Fort Griswold State Park, Groton (/DEEP/State-Parks/Parks/Fort-Griswold-Battlefield-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325198&deepNav_GID=1650)Fort Trumbull State Park, New London (/DEEP/State-Parks/Parks/Fort-Trumbull-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325200&deepNav_GID=1650)Gardner Lake State Park, Salem (/DEEP/State-Parks/Parks/Gardner-Lake-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=444484&deepNav_GID=1650)Gay City State Park, Hebron (/DEEP/State-Parks/Parks/Gay-City-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325202&deepNav_GID=1650)George Dudley Seymour State Park, Haddam (/DEEP/State-Parks/Parks/George-Dudley-Seymour-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=446328&deepNav_GID=1650)George Waldo State Park, Southbury (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#GeorgeWaldo)Gillette Castle State Park, East Haddam (/DEEP/State-Parks/Parks/Gillette-Castle-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325204&deepNav_GID=1650)Green Falls State Campground, Voluntown (/DEEP/State-Parks/Forests/Pachaug-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325072&deepNav_GID=1650)Haddam Island State Park, Haddam (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#HaddamIsland)Haddam Meadows State Park, Haddam (/DEEP/State-Parks/Parks/Haddam-Meadows-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325206&deepNav_GID=1650)Haley Farm State Park, Groton (/DEEP/State-Parks/Parks/Haley-Farm-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325208&deepNav_GID=1650)Hammonasset Beach State Park, Madison (/DEEP/State-Parks/Parks/Hammonasset-Beach-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325210&deepNav_GID=1650)Harkness Memorial State Park, Waterford (/DEEP/State-Parks/Parks/Harkness-Memorial-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325214&deepNav_GID=1650)Haystack Mountain State Park, Norfolk (/DEEP/State-Parks/Parks/Haystack-Mountain-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325216&deepNav_GID=1650)Higganum Reservoir State Park, Higganum (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#HigganumReservoir)Hop River State Park, Multi-Town (/DEEP/State-Parks/Parks/Hop-River-State-Park-Trail)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&Q=493304&deepNav_GID=1650)Hopemead State Park, Montville/Bozrah (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Hopmead)Hopeville Pond State Park, Griswold (/DEEP/State-Parks/Parks/Hopeville-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325218&deepNav_GID=1650)Horse Guard State Park, Avon (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#HorseGuard)Housatonic  Meadows State Park, Sharon (/DEEP/State-Parks/Parks/Housatonic-Meadows-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325220&deepNav_GID=1650)Housatonic Meadows State Forest, Sharon (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Housatonic)Humaston Brook State Park, Litchfield (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#HumastonBrook)Hurd State Park, East Hampton (/DEEP/State-Parks/Parks/Hurd-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325224&deepNav_GID=1650)Indian Well State Park, Shelton (/DEEP/State-Parks/Parks/Indian-Well-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325226&deepNav_GID=1650)J.A. Minetto State Park, Torrington (/DEEP/State-Parks/Parks/John-A-Minetto-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325242&deepNav_GID=1650)James L Goodwin State Forests Forest, Hampton (/DEEP/State-Parks/Forests/James-L-Goodwin-State-Forest)

Kent Falls State Park, Kent (/DEEP/State-Parks/Parks/Kent-Falls-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325228&deepNav_GID=1650)Kettletown State Park, Southbury (/DEEP/State-Parks/Parks/Kettletown-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325230&deepNav_GID=1650)Killingly Pond State Park, Killingly (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#KillinglyPond)Lake Waramaug State Park, Kent (/DEEP/State-Parks/Parks/Lake-Waramaug-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325232&deepNav_GID=1650)Lamentation Mountain State Park, Berlin (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#LamentationMountain)Larkin State Park Trail, Southbury/Naugatuck/Oxford/Middlebury (/DEEP/State-Parks/Parks/Larkin-State-Park-Trail)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=434808&deepNav_GID=1650)Lovers Leap State Park, New Milford (/DEEP/State-Parks/Parks/Lovers-Leap-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=433316&deepNav_GID=1650)Macedonia Brook State Park, Kent (/DEEP/State-Parks/Parks/Macedonia-Brook-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325234&deepNav_GID=1650)Machimoodus State Park, East Haddam (/DEEP/State-Parks/Parks/Machimoodus-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=478996&deepNav_GID=1650)Mansfield Hollow State Park, Mansfield (/DEEP/State-Parks/Parks/Mansfield-Hollow-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325236&deepNav_GID=1650)Mashamoquet State Park, Pomfret (/DEEP/State-Parks/Parks/Mashamoquet-Brook-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325238&deepNav_GID=1650)Massacoe State Forest, Simsbury/Canton (/DEEP/State-Parks/Forests/Massacoe-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Massacoe)Mattatuck State Forest, Multi-Town (/DEEP/State-Parks/Forests/Mattatuck-State-Forest)

Meshomasic State Forest, East Hampton/Glastonbury/Portland (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Meshomasic)Mianus River State Park, Stamford (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#MianusRiver)Millers Pond State Park, Haddam (/DEEP/State-Parks/Parks/Millers-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#MinnieIsland) (https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325060&deepNav_GID=1650)Mohawk State Forest/ Mohawk Mountain State Park, Goshen/Cornwall (/DEEP/State-Parks/Forests/Mohawk-Mountain-State-Forest-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325060&deepNav_GID=1650)Mohegan State Forest, Scotland (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Mohegan)Mono Pond State Park, Columbia (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#MonoPond)Mooween State Park, Lebanon (/DEEP/State-Parks/Parks/Mooween-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Mooween)Mount Bushnell State Park, Washington (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#MountBushnell)Mount Riga State Park, Salisbury (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#MountRiga)Mount Tom State Park, Litchfield (/DEEP/State-Parks/Parks/Mount-Tom-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325244&deepNav_GID=1650)Nassahegon State Forest, Burlington (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Nassahegon)Natchaug State Forest, Eastford (/DEEP/State-Parks/Forests/Natchaug-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325062&deepNav_GID=1650)Nathan Hale State Forest, Coventry/Andover (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#NathanHale)Naugatuck State Forest, Naugatuck/Oxford/Beacon Falls (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Naugatuck)Nehantic State Forest, Lyme (/DEEP/State-Parks/Forests/Nehantic-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325064&deepNav_GID=1650)Nepaug State Forest, New Hartford (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Nepaug)Nipmuck State Forest, Union (/DEEP/State-Parks/Forests/Nipmuck-State-Forest-Bigelow-Hollow-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325066&deepNav_GID=1650)Nye-Holman State Forest, Tolland (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Nye-Holman)Old Furnace State Park, Killingly (/DEEP/State-Parks/Parks/Old-Furnace-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=435384&deepNav_GID=1650)Osbornedale State Park, Derby (/DEEP/State-Parks/Parks/Osbornedale-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325246&deepNav_GID=1650)Pachaug State Forest, Voluntown (/DEEP/State-Parks/Forests/Pachaug-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325068&deepNav_GID=1650)Pattaconk Lake Recreation Area, Chester/Haddam (https://portal.ct.gov/DEEP/State-Parks/Forests/Cockaponset-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325056&deepNav_GID=1650)Paugnut State Forest, Torrington/Winchester (/DEEP/State-Parks/Forests/Paugnut-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=435626&deepNav_GID=1650)Paugussett State Forest, Newtown (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Paugussett)Penwood State Park, Bloomfield (/DEEP/State-Parks/Parks/Penwood-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325248&deepNav_GID=1650)Peoples State Forest, Barkhamsted (/DEEP/State-Parks/Forests/American-Legion-and-Peoples-State-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325054&deepNav_GID=1650)Platt Hill State Park, Winchester (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#PlattHill)Pomeroy State Park, Lebanon (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Pomeroy)Pootatuck State Forest, New Fairfield (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Pootatuck)Putnam Memorial State Park, Redding (/DEEP/State-Parks/Parks/Putnam-Memorial-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325250&deepNav_GID=1650)Quaddick State Park, Thompson (/DEEP/State-Parks/Parks/Quaddick-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325252&deepNav_GID=1650)Quaddick State Forest, Thompson (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Quaddick)Quinebaug Lake State Park, Killingly (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#QuinebaugLake)Quinnipiac River State Park, North Haven (/DEEP/State-Parks/Parks/Quinnipiac-River-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=438090&deepNav_GID=1650)River Highlands State Park, Cromwell (/DEEP/State-Parks/Parks/River-Highlands-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=434748&deepNav_GID=1650)Rocky Glen State Park, Newtown (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#RockyGlen)Rocky Neck State Park, East Lyme (/DEEP/State-Parks/Parks/Rocky-Neck-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325256&deepNav_GID=1650)Ross Pond State Park, Killingly (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#RossPond)S.L. Pierrepont State Park, Ridgefield (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325310&deepNav_GID=1650)Salmon River Sate Forest, Colchester (/DEEP/State-Parks/Forests/Salmon-River-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325074&deepNav_GID=1650)Salt Rock State Campground, Spragu (/DEEP/State-Parks/Campgrounds/Salt-Rock-State-Campground) e (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=438076&deepNav_GID=1650)Satan's Kingdom State Park, New Hartford (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

Seaside State Park, Waterford

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#ScanticRiver)Selden Neck State Park, Lyme (/DEEP/State-Parks/Parks/Selden-Neck-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=435364&deepNav_GID=1650)Shenipsit State Forest, Stafford/Somers/Ellington (/DEEP/State-Parks/Forests/Shenipsit-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=332506&deepNav_GID=1650)Sherwood Island State Park, Westport (/DEEP/State-Parks/Parks/Sherwood-Island-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325260&deepNav_GID=1650)Silver Sands State Park, Milford (/DEEP/State-Parks/Parks/Silver-Sands-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325262&deepNav_GID=1650)Sleeping Giant State Park, Hamden (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325264&deepNav_GID=1650)Southford Falls State Park, Southbury (/DEEP/State-Parks/Parks/Southford-Falls-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325266&deepNav_GID=1650)Squantz Pond State Park, New Fairfield (/DEEP/State-Parks/Parks/Squantz-Pond-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325268&deepNav_GID=1650)Stillwater Pond State Park, Torrington (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#StillwaterPond)Stoddard Hill State Park, Ledyard (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#StoddardHill)Stratton Brook State Park, Simsbury (/DEEP/State-Parks/Parks/Stratton-Brook-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325270&deepNav_GID=1650)Sunnybrook State Park, Torrington (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Sunnybrook)Sunrise State Park, East Haddam (/DEEP/State-Parks/Parks/Sunrise-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Sunrise)Talcott Mountain State Park, Simsbury (/DEEP/State-Parks/Parks/Talcott-Mountain-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325272&deepNav_GID=1650)Topsmead State Forest, Litchfield (/DEEP/State-Parks/Forests/Topsmead-State-Forest)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325076&deepNav_GID=1650)Tri-Mountain State Park, Durham/Wallingford (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#TriMountain)Trout Brook Valley State Park, Easton (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#TroutBrookValley)Tunxis State Forest, Granby/Barkhamsted/Hartland (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#Tunxis)Wadsworth Falls State Park, Middlefield/Middletown (/DEEP/State-Parks/Parks/Wadsworth-Falls-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325274&deepNav_GID=1650)West Rock Ridge State Park, Hamden/New Haven (/DEEP/State-Parks/Parks/West-Rock-Ridge-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325276&deepNav_GID=1650)Wharton Brook State Park, Wallingford (/DEEP/State-Parks/Parks/Wharton-Brook-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=325278&deepNav_GID=1650)Whittemore Glen State Park, Naugatuck/Middlebury (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#WhittemoreGlen)Windsor Locks Canal State Park, Windsor Locks (/DEEP/State-Parks/Parks/Windsor-Locks-Canal-State-Park-Trail)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=442594&ampdepNav_GID=1650)Windsor Meadows State Park, Windsor (/DEEP/State-Parks/Parks/Windsor-Meadows-State-Park)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=458128&deepNav_GID=1650)Wooster Mountain State Park, Danbury (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

(https://www.ct.gov/deep/cwp/view.asp?a=2716&q=445284&deepNav_GID=1650#WoosterMountain)Wyantenock State Forest, Cornwall (/DEEP/State-Parks/Locate-Park-Forest/Other-State-Parks-and-Forests)

*Content updated June 2021*

# Exhibit B

Regulations of Connecticut State Agencies
    Title 23. Parks, Forests & Public Shade Trees
        Department of Energy and Environmental Protection
            State Park Rules (Refs & Annos)

Regs. Conn. State Agencies § 23-4-1

Sec. 23-4-1. General regulations

Currentness

(a) **Hours of operation.**

State parks and state forest recreation areas shall be open for public use daily between sunrise and sunset. State parks shall be open to public vehicular traffic daily between the hours of 8:00 a.m. and sunset, except as otherwise specifically authorized by the Department of Energy and Environmental Protection. Other state forest areas shall be open between one hour before sunrise and one hour after sunset.

(b) **Vandalism and possession of food or beverage inside historic structures.**

(1) No person shall deface, destroy, alter, remove or otherwise injure in any manner any structures, buildings, vegetation, earth or rock material, trees, or fuelwood, nor shall any wildlife be molested or disturbed except as authorized by the Department of Energy and Environmental Protection. The Commissioner may grant upon written application, permission to collect specimens, take samples and conduct other investigations for scientific or educational purposes. Such permission shall be in writing and shall be subject to such conditions as the Commissioner deems necessary.

(2) No person shall possess food or beverage inside of historic structures unless permitted by the Department of Energy and Environmental Protection.

(c) **Hunting/weapons.**

Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection. All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder.

(d) **Fishing**.

Fishing is permitted in all state parks and forests, except in designated swimming areas and other areas so posted. Fishing where permitted, is allowed from sunrise to sunset unless otherwise posted. All fishing is subject to the provisions of Chapter 490 of the General Statutes and regulations adopted thereunder.

(e) **Alcoholic beverages**.

App. 23

Case 3:23-cv-00056-JBA Document 13-23, Filed 01/28/23, Page 3 of 9

(1) The possession or consumption of alcoholic beverages in the following state parks and state forest recreation areas is prohibited:

(A) Bigelow Hollow State Park;

(B) Black Rock State Park and campground;

(C) Burr Pond State Park;

(D) Eagleville Dam;

(E) Hopeville Pond State Park and campground;

(F) Housatonic Meadows State Park and campground;

(G) Indian Well State Park;

(H) Kent Falls State Park;

(I) Kettletown State Park and campground;

(J) Macedonia Brook State Park and campground;

(K) Mansfield Hollow State Park;

(L) Mashamoquet Brook State Park, East Killingly Pond area;

(M) Miller's Pond State Park;

(N) Nepaug State Forest;

(O) Osbornedale State Park;

(P) Mt. Misery and Green Falls campgrounds in Pachaug State Forest;

(Q) Scantic River State Park;

(R) Silver Sands State Park;

(S) Squantz Pond State Park; and

(T) Sherwood Island State Park.

(2) For any state park or state forest recreation area not listed in subdivision (1) of this subsection, the following requirements apply:

(A) The possession or consumption of alcoholic beverages is prohibited on state park beaches, state forest recreation area beaches, boardwalks and other areas so posted.

(B) The possession of beer in containers larger than one liter is prohibited.

(C) The sale of alcoholic beverages is prohibited, unless authorized in writing by the commissioner.

(D) The Commissioner shall have the authority to temporarily ban, for periods up to a maximum of ninety days, the possession or use of alcohol at specific recreation areas if its possession or consumption is creating public safety issues as determined by the Commissioner.

(E) The possession or consumption of alcoholic beverages by a minor on lands under the Commissioner's control is prohibited.

(f) **Pets and riding animals**.

(1) Pets and riding animals are prohibited in Sherwood Island and Squantz Pond State Parks from April 15 to September 30, inclusive. Except as provided in subdivision (5) of this subsection, riding animals and pets shall be on a leash that is no longer than seven (7) feet in length, and must be under the control of their owner or keeper at all times.

(2) Pets and riding animals, including, but not limited to dogs and horses, are prohibited in the following areas of state parks and forests at all times: all buildings, swimming areas and other areas so posted. No person shall allow any pet or riding animal under their control to enter a waterbody in which there is a Department of Energy and Environmental Protection designated swimming area from anywhere on Department of Energy and Environmental Protection property containing that swimming area from April 1 through September 30, inclusive.

(3) In state forest campgrounds, no more than two pets shall be allowed per campsite. Pets are prohibited from state park campgrounds.

App. 25

(4) Trained service animals, required to perform a specific task and for the ongoing treatment of a disability or health condition, are permitted in all areas not closed to the public while accompanied by the person needing their assistance.

(5) This subsection shall not apply to the proper use of dogs while in the act of hunting, training or deployment of certified search and rescue dogs or to Law Enforcement or Department of Energy and Environmental Protection personnel acting in the course of their employment.

(6) Persons bringing pets or riding animals to state recreation picnic areas, athletic fields, man-made structures, paved surfaces, beaches where permitted and campgrounds, with the exception of horse camps, shall remove and properly dispose of pet waste (feces) left by the pet or riding animal under their control.

(g) **Notices and signs.**

No person shall erect, post or distribute any notice or sign upon state park or forest property unless authorized by the Department of Energy and Environmental Protection manager in charge of such park or forest property.

(h) **Commercial restrictions.**

The use of state park or forest lands or any improvements thereon for private gain or commercial purposes is prohibited, except by concessionaires or vendors with written permission of the Commissioner, or the Commissioner's designee, or by Special Use License issued by the Department of Energy and Environmental Protection.

(i) **Meetings and proselytism.**

Political meetings and proselytism may be conducted only in areas and at times approved by the Commissioner of the Department of Energy and Environmental Protection or the Commissioner's designee. Such approval shall not be unreasonably withheld.

(j) **Littering.**

No person shall dispose of any material in a state park or forest, except in receptacles provided for such disposal.

(k) **Dumping.**

Disposing of any material in a state park or forest which was not accumulated during the use of such facilities is prohibited.

(*l*) **Trails and roads.**

(1) Trails are open to non-motorized, multiple use activities unless posted closed. Use of any trail, road or path posted as closed by the Department of Energy and Environmental Protection is prohibited.

App. 26

(2) Use of Connecticut Blue-Blazed Trails and the National Park Service Appalachian Trail crossing state property shall be limited to hiking except where Department of Energy and Environmental Protection blazed trails supporting other uses coincide.

(3) Public roadways in state parks and forests are open to motor vehicles with a registration, as such terms are defined in Section 14-1 of the Connecticut General Statutes and other non-motorized multiple uses unless posted closed.

(4) Service, logging and other roads closed to public use by motor vehicles are open to non-motorized multiple use activities unless posted closed.

(m) **Boats.**

(1) Boats shall be restricted to areas posted for boating by the Department of Energy and Environmental Protection, and are prohibited in swimming areas.

(2) No person shall fasten a boat to any state park or forest pier or anchor in any launching area so as to prevent free access to the pier or launching area.

(3) Vessels launching from Squantz Pond State Boat Launch are prohibited from using a motor or combination of motors in excess of 25 horse power. Larger motors may be attached to such vessels but the propeller must be removed and the motor inclined out of the water or as high as possible. No motorized vessels may land or offload/unload passengers or equipment on Department of Energy and Environmental Protection owned property outside of the launch area.

(4) Vessels launching from Lake Waramaug State Park are prohibited from using a motor or combination of motors in excess of 12 horse power. Such motor boats may only be launched from the state park property if they can be carried by no more than two individuals into the water. Prior to launching, all such motor boats shall be inspected for the presence of invasive plant material at the town of Washington boat ramp.

(n) **Gambling.**

Gambling in any form on state park or forest property is prohibited.

(o) **Disorderly conduct.**

Disorderly conduct, public nudity, intoxication, and obscene or indecent behavior are prohibited, and all forms of rough play, or activities or contests creating hazards to persons or property, including, but not limited to, the use of paintball guns or other similar devices, are prohibited.

(p) **Picnicking.**

Picnicking is allowed unless otherwise posted by the Department of Energy and Environmental Protection.

(q) **Fires.**

(1) Fires may be kindled only in grills, stoves, fireplaces or other designated campfire facilities.

(2) No person may kindle or maintain a fire within five (5) feet of any tree, building or shrub, except in those locations where the Department of Energy and Environmental Protection has provided fireplaces or grills.

(3) Fire residue shall be properly disposed of in hot coal/ash receptacles, where provided.

(4) Fire residue shall not be disposed of in a manner that may damage property or cause injury to a person.

(5) No fire shall be left unattended.

(r) **Athletics.**

The playing of baseball, football, soccer, golf or other athletic games is allowed unless otherwise restricted.

(s) **Swimming.**

(1) Swimming is allowed except where posted as prohibited by the Department of Energy and Environmental Protection.

(2) All persons in swimming areas shall obey the lifeguards.

(3) Swimming hours are from sunrise to sunset.

(4) No person shall swim in long pants, a long-sleeved shirt, a skirt, a dress or other restrictive clothing.

(5) Washing of persons or articles in the waters of swimming areas is prohibited.

(t) **Glassware.**

The possession or use of glass on the beach or in swimming areas is prohibited.

(u) **Fireworks.**

The possession or use of all classes of fireworks in any state park or forest is prohibited except as authorized by the Commissioner of Energy and Environmental Protection. Such authorization shall be in writing and subject to the applicable provisions of the Connecticut General Statutes and regulations adopted thereunder and such conditions as the Commissioner deems necessary.

(v) **Swimming aids.**

(1) Inflatable or buoyant devices (including, but not limited to, inner tubes, ring buoys, balls, air mattresses and rafts) are prohibited in those areas at state swimming areas that are protected by on-duty lifeguards, except for U.S. Coast Guard approved personal flotation devices when worn by swimmers. The use of U.S. Coast Guard approved personal flotation devices may be required in certain areas as determined to be appropriate by the Department of Energy and Environmental Protection. These areas shall be designated by the posting of conspicuous signs notifying individuals of the required use of the U.S. Coast Guard approved personal flotation devices.

(2) Snorkels are prohibited in guarded swimming areas.

(3) Goggles, facemasks and flippers are permitted in swimming areas.

(w) **Under-water fishing devices.**

Under-water fishing devices are prohibited in designated swimming areas.

(x) **Noise.**

No person shall cause or allow any noise which infringes on the ability of others to enjoy state park or forest property, except as authorized by the Commissioner of the Department of Energy and Environmental Protection or the Commissioner's designee.

(y) **Avoidance of fees.**

The avoidance of fees established in accordance with Section 23-26 of the Connecticut General Statutes at the various state parks and forests is prohibited.

(z) **Buildings and structures.**

(1) No person shall use any building or structure for any purpose other than that for which it is designated.

(2) No person may attach any electrical extension cord to any electrical receptacle unless authorized by the Department of Energy and Environmental Protection manager in charge.

(aa) **Public water facilities.**

(1) The use of public drinking water facilities for the purpose of washing is prohibited.

(2) No person shall attach any item to a faucet without prior approval of the Department of Energy and Environmental Protection manager in charge.

(bb) **Losses or theft.**

The state assumes no responsibility for the loss or theft of any article in any state park or forest.

(cc) **Tents.**

(1) Full coverage tents are not permitted in day-use areas, including, but not limited to, beaches, parking lots and picnic areas.

(2) Rigid frame (event-type) tents are not permitted to be erected on state park or forest property except as authorized in writing by the Commissioner of Department of Energy and Environmental Protection or the Commissioner's designee.

**Credits**

(Added effective June 24, 1986; Amended effective July 13, 1993; July 27, 2007; July 7, 2014; June 7, 2017.)

<Statutory Authority: C.G.S.A. § 23-4>

Current with material published on the CT eRegulations System through 12/6/2022. Some sections may be more current, see credits for details.

Regs. Conn. State Agencies § 23-4-1, CT ADC § 23-4-1

---

**End of Document**                                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:23-cv-00056-JBA Document 42 Filed 06/13/23 Page 176 of 273

# Exhibit C

THOMSON REUTERS
WESTLAW EDGE  ○

ATKINS…    History    Folders    My links    Community    Notifications              Sign out

All content    Enter terms, citations, databases, questions,            Connecticut              Search Tips
                                                                                                  Advanced

**Sec. 23-4-5. Evictions and penalties**
CT ADC § 23-4-5  •  Regulations of Connecticut State Agencies   (Approx. 3 pages)

Document    Notes of Decisions (0)    History (3    Citing References (11    Context & Analysis (0         Fullscreen

Regulations of Connecticut State Agencies
   Title 23. Parks, Forests & Public Shade Trees
      Department of Energy and Environmental Protection
      State Park Rules (Refs & Annos)

Regs. Conn. State Agencies § 23-4-5

## Sec. 23-4-5. Evictions and penalties

Currentness

(a) **Eviction.**

(1) Violation of any provision of sections 23-4-1 through 23-4-4, inclusive, of the Regulations of Connecticut State Agencies shall be sufficient cause for eviction for a period of twenty-four hours.

(2) No person evicted with written notice shall enter any state park or forest during the eviction period.

(b) **Penalties.**

(1) Any person who violates any provision of sections 23-4-1 through 23-4-4, inclusive, of the Regulations of Connecticut State Agencies shall have committed an infraction.

(2)(A) Any person who violates any provision of sections 23-4-1 to 23-4-4, inclusive, of these regulations shall pay a fine of thirty five-dollars ($35.00).

(B) Any person who enters a state park or forest during an eviction period in violation of subsection (a) of this section shall pay a fine of seventy-five dollars ($75.00).

## Credits

(Added effective June 24, 1986; Amended effective July 27, 2007; May 3, 2010.)

<Statutory Authority: C.G.S.A. § 23-4>

1

Current with material published on the CT eRegulations System through 12/6/2022. Some sections may be more current, see credits for details.

Regs. Conn. State Agencies § 23-4-5, CT ADC § 23-4-5

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.



Westlaw Edge. © 2022 Thomson Reuters    Accessibility  •  Privacy  •  Supplier terms

*Thomson Reuters is not providing professional advice*

# Exhibit D

Case 3:23-cv-00056-JBA Document 213-43, Filed 01/28/23 Page 37 of 6
Report an accessibility issue.
(/DEEP)

# Connecticut
# Department of Energy & Environmental Protection

## Frequently Asked Questions About Hunting

**General Hunting** | **Deer Hunting** | **Licensing and Permits** | **Hunter Education Courses and Requirements** | **Hunter Education Certificates** | **Hunting Safety** | **Target Practice** | **Hunters with Disabilities**

New to hunting or interested in taking up the activity again? The **Hunting Roadmap (/DEEP/Hunting/Roadmaps/Hunting-Roadmap)** helps you get started!

### General Hunting and Trapping

**Can I hunt on Sunday in Connecticut?**

Licensed archery deer hunters can hunt on private land only on Sundays in all Deer Management Zones (**zone map (/DEEP/Hunting/Deer-and-Turkey-Management-Zone-Map)**). Wild turkeys CANNOT be taken on Sunday anywhere in the state. All archery deer hunting on Sundays must take place at least 40 yards away from blazed hiking trails. Sunday hunting is also allowed on licensed private shooting preserves and regulated dog training areas when the operator has permission from the town. Hunting may also take place on Sunday at permitted field trial events.

**If you hunt and wound an animal during legal hunting hours, then follow the blood trail after legal hunting hours, can you still search for and harvest the animal?**

Hunters can track and recover game after legal hunting hours, but cannot carry a loaded firearm or bow, or discharge a firearm or bow after legal hunting hours. If a hunter needs to dispatch an animal after hunting hours, contact the State Environmental Conservation Police at **860-424-3333 (tel:8604243333)** for guidance.

**Do I need permission to hunt on private land in Connecticut?**

All deer and turkey hunters must obtain written permission, dated for the current season, from the landowner on a **DEEP Private Land Consent Form**, which is included in the Hunting and Trapping Guide, and must carry this form with them at all times while hunting. All small game and waterfowl hunters must at least have verbal permission from the landowner.

**Can I use a handgun for hunting?**

In Connecticut a handgun used for hunting small game on state-owned land must be no larger or heavier than .22 caliber rimfire. Handguns of any caliber are prohibited on state-leased land and Permit-Required Hunting Areas. Revolvers of .357 caliber or larger may be used to hunt deer on private land during the private land shotgun/rifle deer season if the landowner has authorized such use on the private land consent form. Revolvers may also be used by persons hunting with a free landowner deer permit during the landowner deer season. A person using a handgun for hunting must possess any required permits to carry. The use of handguns to hunt turkey or migratory game birds is prohibited.

**Can a centerfire rifle be used for hunting?**

Rifles using ammunition larger or heavier than .22 caliber rimfire are prohibited on state-owned land. Rifles of any caliber are prohibited on state-leased and Permit-Required Hunting Areas. It is prohibited to hunt on private land with ammunition larger than .22 caliber rimfire during the private land shotgun/rifle deer season. There are two private land exceptions. During private land deer season a centerfire rifle that fires 6mm (.243 caliber) or larger ammunition may be used for deer or coyote hunting only if the landholding is 10 or more contiguous acres and the landowner has authorized rifle use on the DEEP consent form. An individual with written consent from the landowner and a valid private land shotgun/rifle deer permit may also legally harvest coyotes during this season with a shotgun or muzzleloader legal for deer hunting. Remember, during the shotgun/rifle deer private land hunting season, coyote hunters are restricted to ammunition not larger than .22 caliber rimfire without deer permits and written consent. For coyote hunting outside of private land deer season, any legal centerfire rifle may be used, but the hunter must have verbal permission from the landowner.

**Can I use a .17 caliber rimfire or a .22 caliber Magnum rifle to hunt small game on state lands?**

It is legal to use .17 caliber rimfire or .22 caliber Magnum firearms in all situations where it is legal to use rimfire .22 caliber firearms.

**Can I hunt with an "Other" in Connecticut?**

An "Other" is not a rifle, shotgun, muzzleloader, or revolver/pistol. It does not fit the definition of a legal hunting implement in the state.

**Are there any hunting-related opportunities for youth hunters?**

Junior hunter training days are established annually for firearms hunting during specified seasons. On these occasions, only a licensed junior hunter may hunt when accompanied by a licensed adult hunter 18 years of age or older. The adult hunter may not carry a firearm or participate in the hunt. These training days provide junior hunters with an opportunity to learn safe and effective hunting practice from experienced hunters. All hunters must observe regulations regarding permits and stamps for hunting on private and state land, including adults. Junior Hunter Training Days are provided during the following seasons: Spring Turkey, Pheasant, Waterfowl, and Deer. Check out the **Junior Hunter webpage (/DEEP/Hunting/Junior-Hunter-Training-Days)** to learn about special events for junior hunters.

**Where can I find huntable state land in Connecticut?**

Consult the **Hunting and Trapping Guide (/DEEP/Hunting/Hunting-and-Trapping-Information)** or visit the **CT Interactive Hunting Area Map (/DEEP/Hunting/Public-Hunting-Areas)**. Maps of most hunting areas are available online.

**Can I use an ATV for hunting in Connecticut?**

ATVs are not permitted on any state-owned or controlled properties, except by special permit. The use of ATVs for transportation on private lands is not restricted as long as landowner permission is obtained and the vehicle is properly registered. Hunters cannot shoot from any motorized vehicle. Special accommodations are made for handicapped individuals. Please email **deep.franklinwildlife@ct.gov (mailto:deep.franklinwildlife@ct.gov)** for guidance.

**Can a hunter use electronic calls?**

Electronic calls can be used for all species except turkeys and migratory game birds. Electronic calls can be used to hunt crows.

**Where do I find/print my harvest tags?**
Harvest tags and all the information related to reporting harvests can be found on the **Tagging and Reporting Deer and Turkey Harvests (/DEEP/Hunting/Tagging-and-Reporting-Deer-and-Turkey-Harvests)** webpage.

**What do I need to land trap in Connecticut?**
You can only land trap coyotes in Connecticut. A land trapping certification is required and is included as part of the basic trapping course after June 2022. Land trapping certifications are specific to Connecticut. Out of state trapping courses may qualify you to trap in Connecticut, however you will still need to attend a trapping course to land trap in Connecticut.

## Deer Hunting

**What is the minimum acreage required for deer hunting?**
There is no minimum acreage required for hunting with shotguns, muzzleloaders, or archery equipment. A centerfire rifle 6mm (.243 caliber) or larger may be used for deer hunting on private land if the landholding is 10 or more contiguous acres and the landowner has authorized rifle use on the DEEP consent form. Rifles cannot be used on any state land. Hunters must observe the 500-Foot Buffer Zone whenever using firearms for hunting. Regardless of the hunting implement used, a hunter must not shoot toward any person, building, or domestic animal when within range.

**Is it legal to bait animals in Connecticut?**
Baiting is illegal on all public land statewide, and on private land in Zones 1-10. Baiting for deer is permitted on private land in zones 11 and 12 only. (**Zone Map (/DEEP/Hunting/Deer-and-Turkey-Management-Zone-Map)**)

**Can scent attractants be used while hunting deer in Connecticut?**
Most types of scent attractants (i.e., tarsal glands, food smells, smoke pole) may be used that provide no substance for deer to consume. For the safety of Connecticut's deer herd, a state regulation prohibits all use of natural deer urine products. No person shall possess or use, for the purposes of taking or attempting to take or attract deer or for the surveillance or scouting of deer, any product bought or sold that is manufactured or refined that contains or purports to contain deer urine. Products labeled as "synthetic" may still be used. Products with vague descriptions about their contents are not recommended for use. Chronic wasting disease (CWD) can spread through exposure to infected deer urine.

## Licensing and Permits

**How do I obtain a hunting license?**
You must complete a course that is provided by the Conservation Education/Firearms Safety (CE/FS) Program or its equivalent from another state OR have a Connecticut RESIDENT license for firearms hunting that was issued within the past five years. There are special courses for firearms hunting, bowhunting, and trapping. After successfully completing a hunter safety course, your certification will be uploaded to your online license profile and will print directly at the bottom of your hunting or fishing license (you may print your certification without making a purchase). To print your certificate, go to the **Online Outdoor Licensing System (https://ct.aspirafocus.com/internetsales? utm_source=deep_website&utm_medium=frequently_asked_questions_about_hunting&utm_campaign=public_page&utm_content=textlink)**. Hunting licenses, stamps, and permits may be purchased **online (https://ct.aspirafocus.com/internetsales? utm_source=deep_website&utm_medium=frequently_asked_questions_about_hunting&utm_campaign=public_page&utm_content=textlink)** or from a vendor, such as a sporting goods store, or from a town hall or certain DEEP offices.

**What happens if I have multiple Conservation IDs?**
Multiple conservation IDs will inhibit your ability to purchase a hunting license. If you know you have multiple conservation IDs, please email us at (**mailto:franklin.wildlife@ct.gov)deep.franklinwildlife@ct.gov (mailto:deep.franklinwildlife@ct.gov)** with the numbers, and we will rectify it for you.

**How do I create a Conservation ID?**
Conservation IDs can be created by navigating to the **Online Outdoor Licensing System (https://ct.aspirafocus.com/internetsales? utm_source=deep_website&utm_medium=frequently_asked_questions_about_hunting&utm_campaign=public_page&utm_content=textlink)** and clicking the "Create An Account" button under New Customer. Please search for a pre-existing Conservation ID prior to creating a new one. If you are sure you have a Conservation ID but cannot find it, contact the Wildlife Division at **860-424-3011 (tel:8604243011)**.

**I have an NRA Hunter Education certificate issued prior to 1982. Is this valid for obtaining a hunting license?**
The old NRA course does not meet international standards for hunter education and is not valid to obtain a hunting license.

**I have a pistol permit. Do I still have to take the firearms hunter education course?**
Pistol permits have no bearing on hunter safety and are not an acceptable form of training to obtain a hunting license. Although a pistol permit course covers general firearm safety and handling, a hunter safety course covers additional information as it relates to safe, ethical, and responsible hunting that is not covered in pistol permit courses.

**I am a Connecticut non-resident hunter. What do I need to hunt in Connecticut?**
If you took your hunter education out of state and would like to submit it for approval in Connecticut, please submit the following in a single email to **deep.franklinwildlife@ct.gov (mailto:deep.franklinwildlife@ct.gov)**; a copy of your hunter safety certificate issued by another state, a picture of your current driver's license, and your CT Conservation ID number. Emails that are received with missing information will not be processed. Certificates from online hunter education will not be accepted. All hunter safety certificates will be verified with the issuing state to ensure the class meets Connecticut requirements. The process for verification can take multiple weeks. Please do not wait until the hunting season begins to get your information verified.

**How do I get an Archery Deer and Small Game Permit?**
To purchase an Archery Deer or Small Game Permit you must have proof of completion of the CE/FS bowhunting course (since 1982) or its equivalent from another state or country. Certification cards from other states or provinces must specify "bowhunter education" to qualify. Connecticut does not accept certificates obtained through online courses or combination firearm and bowhunting classes.

**What is the minimum age to hunt in Connecticut?**
The minimum age to hunt is 12 years old with proof of completed hunter education and valid licenses and permits.

**If I have already purchased a junior hunter license for the current calendar year, do I need to buy one when I turn 16 this hunting season?**
The Junior Hunting License is valid for a calendar year, as are other hunting licenses. At age 16, the youth may hunt alone with the Junior Hunting License.

**If I do not plan on hunting, but want to help hunt and recover the animal, do I need a license to accompany a hunter or trapper?**
As long as you are not engaged in the pursuit of hunting or trapping game or providing any act of assistance in taking game, you do not need a hunting or trapping license. A hunting license is not needed to assist in the recovery of game. Pursuit is defined as actively hunting, operating calls, and working a dog while hunting.

**I took a hunter safety course in another state that included an introduction to bowhunting. Is this certificate acceptable for a Connecticut Archery Permit?**
Unless the certification specifies "Bowhunting" from a separate bowhunting course that meets the International Bowhunter Education Program content standards, it would not qualify. Connecticut does not accept combination firearms/bowhunting/trapping courses or online hunter safety courses.

**Do I have to buy a Firearms Hunting License to hunt on land that I own?**
Landowners are exempt from buying a Firearms Hunting License if they permanently reside on the property and the property is 10 or more contiguous acres if they possess a Free Landowner Permit. The proper deer permits are required to hunt deer and a Free Landowner Resident Game Bird Conservation Stamp are required to turkey on personally owned land. Hunting on any land other than your own requires the proper licenses and permits. The Free Landowner Permit must be obtained yearly.

**What is the minimum age to hunt or purchase a firearms hunting license or an Archery Deer and Small Game Permit in Connecticut or a trapping license?**
A person must be at least 12 years old to hunt or purchase a firearms hunting license or Archery Deer and Small Game Permit in Connecticut. Persons 12 to 15 years old must purchase a Junior Hunting License and be accompanied by a licensed hunter who is 18 years old or older while hunting. A licensed adult may not supervise more than 2 minors at one time while hunting. Junior Hunters are entitled to their own bag limits. There is no minimum age requirement for trapping in Connecticut, but persons under 16 years old must purchase a Junior Trapping License.

## Hunter Education Courses and Requirements

**How do I find where and when courses are held?**
Consult the **Hunter Education Registration page (/DEEP/Hunting/CEFS/Conservation-Education-Firearms-Safety-Program)** on the DEEP's website for a list of available classes. Classes are added as they are scheduled by our volunteer instructors.

**Do I have to pay a fee for hunting and trapping classes?**
There are no fees for in person classes and materials.

**Can I bring someone else along to accompany me in class?**
Parents and guardians are encouraged to take the courses with their children. Anyone that plans on taking the course for certification must be officially registered for the class prior to attending. Any student under 18 years of age must have a parent/legal guardian present at the start of the class to sign the registration card.

**Are accommodations made for students that have difficulties learning and/or taking tests?**
Anyone who experiences difficulties learning or taking tests is encouraged to let the instructor know privately. Instructors can provide one-on-one assistance taking the test.

**How old do I have to be to take the hunter education course?**
A student must be at least ten (10) years old or reach the age of 10 by the end of the class. A parent/guardian must be present to sign the registration card for any student under the age of 18.

**I am on active duty with the armed services in Connecticut. What do I need to obtain a resident firearms hunting license? Do I have to take the course?**
You will need a certificate of completion for a hunter education course from Connecticut, or a certificate of completion from another state that meets Connecticut requirements. If you do not possess a Certificate of Completion, you must complete the appropriate course for the license you seek to obtain. Any active, full-time member of the U.S. armed forces may purchase a Connecticut hunting, fishing, or trapping license at the same fees as a resident. Proof of full-time membership during calendar year must be carried while using the license.

**What equipment do I need to bring to a hunter safety class?**
No personal firearms or ammunition is allowed in our classes. You are encouraged to bring your personal bow and 5 field tipped arrows (no broadheads) to a bowhunting course. Students should also bring a pencil or pen, eye and ear protection for firearms courses, and a notepad to firearms hunter education courses. Be prepared for the weather as all courses have an outdoor component. For full day classes, students should bring a lunch or be prepared to obtain lunch if it is available from a nearby food service vendor for full day classes.

**Will I shoot a gun or a bow in the course?**
Students must conduct live fire exercises in both firearms and bowhunting classes. In the firearms hunter education courses, all firearms and ammunition will be provided, and every student must complete live fire exercises with a .22 caliber rifle or a 20 gauge shotgun. In bowhunter education courses, students are encouraged to bring their personal bow and arrows (equipped with field points). Personal firearms and ammunition are not allowed in any hunter safety course, including bowhunting.

**Who teaches the courses?**
Courses are taught by certified volunteer instructors with substantial experience in hunting and who are dedicated to sharing their skills and knowledge to promote safe hunting.

**What is the best time to take my hunter education course?**
Hunter education courses should be taken well before a hunting season is set to begin. Classes fill up quickly as hunting season approaches and we cannot guarantee a class is offered in your general area, on a specific day, or at a specific time.

**Do you accept walk-ins at your classes?**
We do not accept walk-in students at our classes. This is due in part to our registration system and our ability to process certifications in a timely manner. All sites are already operating at max capacity for the buildings, instructors, and equipment. Do not put our instructors in the uncomfortable position of denying you entry into the class.

## Hunter Education Certificates

**What should I do if I cannot find or if I have lost my original hunter education certificate?**
Once you have completed hunter education, your certificate will reside in your online profile. Log onto the **Online Outdoor Licensing System (https://ct.aspirafocus.com/internetsales?utm_source=deep_website&utm_medium=frequently_asked_questions_about_hunting&utm_campaign=public_page&utm_content=textlink)** and select "Reprint License". Print

the document, even if you have ~~withheld this information from your Conservation ID~~, as this may hinder your ability to purchase a license in the future. Certifications may take up to a week to appear in the profile for recent course graduates. If it has been longer and your credentials do not appear in your Conservation ID profile, please contact the Wildlife Division at **860-424-3011 (tel:8604243011)**.

### How do I submit out of state hunter education?

If you took your hunter education out of state and would like to submit it for approval in Connecticut, please submit the following in a single email to **deep.franklinwildlife@ct.gov (mailto:deep.franklinwildlife@ct.gov)**: a copy of your hunter safety certificate issued by another state, a picture of your current driver's license, and your CT Conservation ID number. Emails that are received with missing information will not be processed. Certificates from online hunter education will not be accepted. All hunter safety certificates will be verified with the issuing state to ensure the class meets Connecticut requirements. The process for verification can take multiple weeks. Please do not wait until the hunting season begins to get your information verified.

### Another state is requiring proof of hunter education. Where can I get it?

Proof of your hunter education can be reprinted anytime by going to our online sportsmen's licensing system and reprinting your license. You do not need to purchase a current license to reprint your certifications. Your firearm, bowhunting, trapping, and boating certifications will all appear on the license if you have them.

## Hunting Safety

### What should I do when I see another hunter while out hunting?

You should never assume that another hunter is aware of your presence when you are hunting. For everyone's safety, always speak in a clear, loud voice. Do not rely on sounds or other noises that can be misconstrued for animal movement to get their attention.

### What should I do when I am approached by an Environmental Conservation (EnCon) Police Officer or any law enforcement officer when I am hunting with a firearm?

Do the following: (1) keep your firearm or bow pointed in a safe direction; (2) let the law enforcement officer determine what you will do next; (3) do not attempt to unload the firearm by opening the action or removing the magazine, if so equipped. Let the officer take control of the situation.

### Is it legal to use a tree stand on state property?

The use of portable tree stands is permissible. Hunters who use tree stands should always wear a full-body safety harness or fall arrest system to help prevent injuries. Leaving any personal property unattended is not recommended. The Wildlife and Forestry Divisions advise hunters to remove tree stands from all state properties at the end of the deer hunting season every year. The construction of permanent of tree stands involving damage to a tree or shrub is prohibited.

### Does the 500-foot rule apply to bowhunting?

The safety buffer of 500 feet only applies to hunting with firearms or carrying of a loaded firearm when a reasonable person would conclude that the individual was engaged in hunting.

### Does the 500-foot rule apply to use of an air rifle (BB or pellet gun)?

Air rifles are defined as firearms for the purpose of hunting and the 500-foot rule does apply.

### What is the specific requirement for wearing fluorescent orange when hunting in Connecticut?

All hunters must wear hunter orange (fluorescent orange) from September 1 through the last day in February. Please see the **Hunting and Trapping Guide (/DEEP/Hunting/Hunting-and-Trapping-Information)** for exceptions. When fluorescent orange is required, the hunter must wear an article of clothing that has 400 square inches of fluorescent orange material visible above the waist and visible from all sides. Camouflage fluorescent orange is permitted as long as it satisfies the above requirements. Hunters are encouraged to wear a fluorescent cap as an additional safety measure.

## Target Practice

### Where can I go to practice my shooting skills?

The DEEP provides public shooting ranges for firearms target practice at three locations: Glastonbury, High Rock, and Wooster Mountain. The Nye Holman Archery Range provides opportunity for archery shooting practice. These shooting ranges are open for limited hours and may require reservations or a fee. Consult the **Hunting and Trapping Guide (/DEEP/Hunting/Hunting-and-Trapping-Information)** or the **Hunting and Trapping page (/DEEP/Hunting/CT-Hunting-and-Trapping)** on the DEEP website for more information about these ranges. Many private sportsmen's clubs, which are located throughout the state, have **private ranges (/DEEP/Hunting/Public-Shooting-Opportunities)** that are available for a fee to members and guests. No target practice can be conducted on state land.

### Is it legal to conduct target practice on private property?

Consult local regulations which may prohibit discharge of firearms within the municipality's limits. Additionally, the location of the property for target shooting must satisfy concerns for down range safety per local regulations. If local regulations allow target practice, and the property satisfies concerns for down range safety, noise from gunfire may disturb neighbors. To help prevent alarm and misunderstanding, notify neighbors and local law enforcement officials when and where the target practice will occur.

## Hunters with Disabilities

### Does Connecticut offer any special considerations for hunters with disabilities?

A person who has permanently lost the use of a limb may be issued a hunting or trapping license free-of-charge (permits are not included).

Verification of disability signed by a licensed physician must be presented.

Paraplegics may also be eligible to hunt from an ATV (All Terrain Vehicle).

---

The CT DEEP and MassWildlife have finalized a Memorandum of Understanding which establishes that both states (Connecticut and Massachusetts), pursuant to their respective authorities (Section 26-29b of the CGS and Massachusetts GL c 131 Subsection 11), agree to issue free inland fishing and hunting, or combination inland fishing and hunting licenses to a resident of the other state who is the holder of a valid hunting, fishing, or combination inland fishing and hunting license issued to them by their state of residency that specifies that said individual is paraplegic. The individual must, however, still purchase any necessary permits or stamps required by either MA or CT.

Some hunting areas are especially the current **Hunting and Trapping Guide (/DEEP/Hunting/Hunting-and-Trapping-Information)** and the **CT Interactive Hunting Area Map (/DEEP/Hunting/Public-Hunting-Areas)**.

*Content last updated in November 2022.*

# Exhibit E

CT.gov Home (/)   Department of Energy & Environmental Protection   (/DEEP)   State Parks   (/DEEP/State-Parks/Connecticut-State-Parks-and-Forests)

Sleeping Giant State Park   (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park)   Overview/History

# Sleeping Giant State Park

Welcome (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park)

Overview/History (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Overview)

Activities (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Activities)

Camping (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Camping)

Fishing (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Fishing)

Facilities (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Facilities)

Fees (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Fees)

Maps (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Maps)

Getting Here (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Getting-Here)

Related Information (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Related-Information)

In the Area (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/In-the-Area)

Contact the Park (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Contact)

Provided by:
**Department of Energy & Environmental Protection (/DEEP)**

## Overview/History

Two miles of mountaintop resembling a large man lying in repose, the "sleeping giant", is a popular feature of the south central Connecticut skyline. A 1 1/2 mile scenic trail leads to the stone observation tower on the peak of Mt. Carmel which provides an excellent view of Long Island Sound and the New Haven area. In 1924 Sleeping Giant was designated as a state park.

# Exhibit F





# Trails & Maps

Sleeping Giant Park Association constructed and now maintains the 32-mile backcountry trail system at Sleeping Giant State Park. From the challenging Blue Trail, to the moderate Nature Trail, there is something for everyone at the Giant.

The modern-day trail system was designed and constructed by Ned Greist and Dick Elliott from 1957 – 1960, and is one of the best hiking networks in the state. In 1977, the trail system became the first trail in Connecticut to be recognized by the Secretary of the Interior as a National Recreation Trail.



# Popular Trails at the Sleeping Giant

Tower Path

1.5 miles

Easy

A popular trail for first-time visitors, the tower path is the easiest route up the Giant. A wide, gravel path gently climbs to the tower with 360-degree views.

Nature Trail

1.5 miles

Moderate

A hidden gem, the Nature Trail is a moderate loop that makes for a great family outing. With numbered stations along the way, visitors can learn about the natural history of the park's flora and fauna. Learn more **here**.

Red Circle Gorge

0.75 miles

Difficult

Blue Trail

5.1 miles

Very Difficult

From the trailhead on Tuttle Ave, the Red Circle Trail follows one of the most beautiful geologic features on the Giant - an incredible gorge complete with cascades and pools. The gorge ends just before Red intersects with Violet.

The Blue Trail at Sleeping Giant comprises the eastern portion of the 20-mile Quinnipiac Trail, part of CT's 800+ mile Blue-Blazed Hiking Trail. Traversing the Giant from head-to-toe, this is the most difficult trail at the park and rewards intrepid hikers great views along the way.

# Discover Every Trail with Free Maps



![PDF Map] **PDF Map**  DOWNLOAD

SGPA produces and prints trail maps for the park's visitors. Printed trail maps are available at the kiosk near the main parking area, but **we encourage visitors to save paper by downloading a digital version of the map here.**

**Mobile, GPS Map**  DOWNLOAD

A free, mobile-friendly, GPS-enabled map is available for download on the Avenza Maps app. Simply download Avenza Maps, and search for "Sleeping Giant State Park" in the map store. Once downloaded, your location will display on the map and you can track your hikes, all without using cellular data.



# Where to park at Sleeping Giant State Park?

**200 Mt. Carmel Avenue, Hamden** – This is the main parking lot for the park, and provides access to most trails on the Giant, including the Tower Path and Nature Trail. If it is your first time visiting the park, you should plan to park here

**Chestnut Lane** – A popular access point for the eastern side of the park, this parking area is located at the end of Chestnut Road, just before it turns into Blue Trail Road.

**Others** – Additional parking areas are located along **Tuttle Avenue** (at the northern trailhead for the Red Diamond and Red Circle trails); **Mount Carmel Avenue** (at the southern trailhead for the Red Circle and Red Square trails); and on **Mansion Road** (at the northern trailhead of the Red Square trail).



**Parking Fees** – Thanks to Connecticut's **"Passport to Parks"** program, parking is free for all vehicles registered with a Connecticut license plate. From April 1 through October 31, out-of-state vehicles are subject to a $15 parking fee on the weekends, and a $10 parking fee on weekdays.

# Help us improve the Giant

Name

Email

Message

S e n d

# If You See Something, Say Something

The Sleeping Giant **Trail Crew** is committed to keeping all 32 miles of trails clear and open. If you see a hazard or obstacle on your hike, such as a downed tree, damaged bridge, or vandalism, please use this form to report the issue.

Your report will ensure that our volunteers can address the issue as promptly as possible.

## SGPA Information

 **P.O. Box 185340, Hamden, CT 06518**

 **admin@sgpa.org**



SGPA is an all-volunteer 501(c)3 non-profit organization, dedicated to protecting and caring for the Sleeping Giant.

 

## Park Information

 **200 Mt Carmel Ave, Hamden, CT 06518**

 **860-424-3200**

*SGPA thanks Tom Granucci and Aaron Lefland for allowing us to use their photographs and to showcase the beauty of the Sleeping Giant across this website*

© 2022 Sleeping Giant Park Association. All rights reserved.

# Exhibit G

Report an accessibility issue.

CT.gov Home (/)    Department of Energy & Environmental Protection (/DEEP)    State Parks (/DEEP/State-Parks/Connecticut-State-Parks-and-Forests)

Sleeping Giant State Park (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park)    Related Information

# Sleeping Giant State Park

Welcome (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park)

Overview/History (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Overview)

Activities (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Activities)

Camping (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Camping)

Fishing (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Fishing)

Facilities (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Facilities)

Fees (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Fees)

Maps (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Maps)

Getting Here (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Getting-Here)

Related Information (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Related-Information)

In the Area (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/In-the-Area)

Contact the Park (/DEEP/State-Parks/Parks/Sleeping-Giant-State-Park/Contact)

Provided by:
**Department of Energy & Environmental Protection (/DEEP)**

## Related Information

ACCESSIBILITY

This park offers:

 Parking

 Picnic Tables

### HOURS:

The park is open from 8 am to sunset.

### PETS:

Pets on a leash are permitted in picnic areas and on hiking trails.

### Related Links

Connecticut Tourism Information (http://www.ctvisit.com/)
The Sleeping Giant Park Association (http://www.sgpa.org/)
Fishing Information (/DEEP/Fishing/CT-Fishing)

# Exhibit H

Case 3:23-cv-00056-JBA Amended Document 13-8 Filed 01/28/23 Page 27 of 10





# Other Ways to Enjoy the Park

While perhaps best known for its 32-miles of **trails**, Sleeping Giant State Park offers much more than hiking.

Visitors from around the state come to the Giant for birding, fishing, climbing, and other opportunities afforded by this rugged and natural landscape.



# Birding and Wildlife Spotting

Comprising over 1500 acres of pristine woodlands, wetlands, cliffs, and talus, it's no wonder that Sleeping Giant is a paradise for wildlife. Over 125 species of birds have been observed at the park, including a number of threatened and endangered species. In fact, Sleeping Giant has been designated as a **"Hotspot"** on the **Cornell Lab of Ornithology's eBird app.**

Other wildlife sightings are not uncommon, including occasional encounters with deer, bear, bobcat, foxes, and more. Please remember to give wildlife space, observe from a distance, and keep your dog(s) leashed.



# Picknicking & Events

While the park's picnic area was heavily impacted by the 2018 tornadoes, there are still picnic tables, fireplaces, water, restrooms, and a covered pavilion for visitors to enjoy.

Visitors wishing to use the pavilion should rent the space using **CT DEEP's rental page.**



# Cross Country Skiing

In addition to hiking trails, SGPA constructed and maintains a cross country ski trail. While deep snowpack is less frequent than it once was, the trail can still be enjoyed after a good winter storm.

The trail, marked with crossed white skis and poles on a black blaze, is accessible from: the Red Circle trailhead on Tuttle Avenue; the Red Square trailhead on Mansion Road; or the multiple trailheads on Chestnut Lane.

**Click here for a trail map.**



# Youth Group Camping

A limited number of camping areas are available to non-profit, youth-oriented organizations. Youth Group Camp areas are available by written application through CT DEEP. All other camping is prohibited.

For more information, please visit **DEEP's Youth Group Camping** website.



# Fishing

The clean, cold waters of the Mill River flow through the park, and provide habitat for a variety of fish species. The park is a designated Trout Management Area, and all fishing must be licensed and done in accordance with laws and regulations set forth by CT DEEP.



# Rock Climbing

In the early 1900s, Sleeping Giant was the epicenter of climbing in Connecticut. Many legendary climbers established routes here, including Hassler and Roger Whitney, Fritz Wiessner, Jim Adair, John Reppy and Sam Streibert. The state banned climbing in the park following an accident in 1953, but has since reopened the park to climbers.

Rock climbing at the park should only be undertaken by experienced climbers, with appropriate training, on established routes. Climbing on the quarry is prohibited, as there is abundant loose rock from historic blasting and quarrying.



The park is a great place for many other forms of passive recreation, including meditation, snow shoeing, photography, and more.

Whatever activity brings you to Sleeping Giant State Park, please be sure to adhere to the rules of the park, set forth by Connecticut DEEP.

## SGPA Information

 **P.O. Box 185340, Hamden, CT 06518**

 **admin@sgpa.org**



SGPA is an all-volunteer 501(c)3 non-profit organization, dedicated to protecting and caring for the Sleeping Giant.

 

## Park Information

 **200 Mt Carmel Ave, Hamden, CT 06518**

 **860-424-3200**

*SGPA thanks Tom Granucci and Aaron Lefland for allowing us to use their photographs and to showcase the beauty of the Sleeping Giant across this website*

© 2022 Sleeping Giant Park Association. All rights reserved.

# Exhibit I



# Sleeping Giant State Park

*Hamden, Connecticut*

# Exhibit J

Report an accessibility issue.

(/DEEP)

# Connecticut
# Department of Energy & Environmental Protection

CT.gov Home    /()    Department of Energy & Environmental Protection    /(DEEP)    State Parks    (/DEEP/State-Parks/Connecticut-State-Parks-and-Forests)    Other State Parks and Forests

## Other State Parks and Forests

Above All State Park  (31 acres)  Warren/Litchfield

- **Services:**  Walk-in Park (Undeveloped)

- **Location:** From the junction of Route 45 and Route 341 in Warren, proceed north on Route 45 for 0.2 mile and turn left on Sackett Hill Road.  Follow Sackett Hill Road 0.7 mile and turn left on Above All Road.  Follow Above All Road for 1.0 mile to the barred gate on the left.

- **Fee:**  There is no parking fee at this park.

Algonquin State Forest - Colebrook

- **Activities:** Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Wildlife Viewing, Hunting (in some sections of forest)  **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**

- **Location:** From the junction of Route 8 and Route 20 in Winchester, proceed north on Route 8 3.0 miles and turn left on Sandy Brook Road.  Follow Sandy Brook Road 1.1 miles to the pull-off for the White Trail on the right.

- **Fee:**  There is no parking fee at this forest.

Beaver Brook State Park (401 acres) - Chaplin, Windham

- **Activities:** Hunting

- **Services:** Walk-in Park (Undeveloped)

- **Location:** From the junction of Route 203 and Route 14 in Windham Center, follow Route 14 east 0.7 mile and turn left on Back Road.  The pond is 2.5 miles north, on the left.

- **Fee:**  There is no parking fee at this park.

Becket Hill State Park Reserve (260 acres) -  Lyme

- **Services:** Walk-In Park (Undeveloped)

- **Location:** From the junction of Route 82 and Route 156 in East Haddam, proceed south on Route 156 for 4.9 miles.  The entrance is on the left.

- **Fee:**  There is no parking fee at this park.

Bolton Notch State Park  (95 acres) - Bolton

- **Activities:** Hiking, Rock Climbing

- **Location:** At the junction of Route 44 and Route 6 in Bolton.  Heading west on I-384 from Bolton Notch, turn right at end of guardrail and go downhill to parking lot.  Hiking trail is unmarked; trail starts just across from the parking lot.  (Trail is maintained by Bolton Conservation Commission.)

- **Fee:**  There is no parking fee at this park.

- **Park Map**

Brainard Homestead State Park (25 acres) - East Haddam

- **Activities:** Bird Watching, Field Sports, Hiking

- **Services:** Walk-in Park

- **Location:** From the junction of Route 149 and route 82 in East Haddam, proceed north on Route 149 for 0.8 mile and turn right on Landing Hill Road. Follow Landing Hill Road for 0.4 mile and turn right on Maple Avenue. Follow 0.1 mile and turn right on Creek Row (a dirt road). Park on the right by the open fields.

- **Fee:**  There is no parking fee at this park.

Dart Island State Park (19 acres) - Middletown

- **Activities:** Bird Watching, Boating, Fishing

- **Location:** In the Connecticut river in Middletown; Access to this park is by water only.

- **Fee:**  There is no parking fee at this park.

Ferry Landing State Park - Old Lyme

- **Activities:** Fishing, Bird Watching, Crabbing

- **Location:** At Connecticut Marine Headquarters, Ferry Road, Old Lyme. I-95 to exit 70, Route 156, right onto Ferry Road. Follow to the end.

- **Fee:** There is no fee at this park.

<u>George Waldo State Park</u> (150 acres) - Southbury

- **Activities:** Fishing, Hiking, Horseback Riding, Hunting, Mountain Biking, <u>Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)</u>
- **Services:** Walk-In Park
- **Location:** From the intersection of Routes 6 and 67 in Southbury, follow Route 67 (Roxbury Road) west for 2 miles and turn left (south) on Route 172. Follow Route 172 south for 2.1 miles and turn right (west) onto Spruce Brook Road. Follow Spruce Brook Road for 1.25 miles and bear left at the intersection onto Stilson Road. Follow Stilson for 0.6 miles to its end and turn left (south) onto Purchase Brook Road. The park entrance is 1.3 miles south of Stilson on the right (west).
- **Fee:** There is no parking fee at this park.
- <u>**Park Map**</u>

George Waldo State Park enjoys 150 acres of undeveloped, topographically diverse land in southwest Connecticut. A trail of about 7/10 mile leads from Purchase Brook Road to the shore of Lake Lillinonah, drops 140 feet across its length and passes through mixed deciduous and coniferous total forest cover to the water's edge. Look for wetlands by the trailhead and stone walls away from the trail.

<u>Haddam Island</u> - Haddam

- **Activities:** Bird Watching, Boating, Fishing
- **Location:** In the Connecticut River at Haddam; Access to this park is by water only.
- **Fee:** There is no parking fee at this park.

<u>Higganum Reservoir State Park</u> (147 acres) - Higganum

- **Activities:** Boating (car top), Fishing, Hiking, Hunting
- **Services:** Walk-In Park, <u>Car Top Boat Ramp (/DEEP/Boating/Boat-Launches/Higganum-Reservoir-Boat-Launch)</u>
- **Location:** From the junction of Route 154 and Route 81, proceed south on Route 81 for 0.1 miles. Parking lot on right at base of dam. For the <u>boat ramp (/DEEP/Boating/Boat-Launches/Higganum-Reservoir-Boat-Launch)</u>, follow Route 81 1.0 mile south of Route 154 and turn right on Dish Mill Road.
- **Fee:** There is no parking fee at this park.

<u>Hopemead State Park</u> (60 acres) - Bozrah/Montville

- **Activities:** Fishing, Hiking
- **Location:** From the junction of Route 82 and Route 163 in Bozrah, follow Route 82 west and immediately take the first right on Church Road. Follow Church Road to the end and turn right on Doyle Road. Follow 0.2 mile and turn left on Cottage Road. Follow Cottage Road 0.8 mile to the Park on the left.
- **Fee:** There is no parking fee at this park.

<u>Horse Guard State Park</u> (105 acres) - Avon

- **Services:** Walk-in Park (Undeveloped)
- **Location:** From the junction of Routes 167 and 44 in Avon, follow Route 167 south 1.1 miles to wooded area on west side of road.
- **Fee:** There is no parking fee at this park.
- <u>Trail Map</u>

<u>Housatonic State Forest -</u> Sharon

- **Activities:** Hiking, Hunting, <u>Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)</u>, Mountain Biking, Snowmobiling, <u>Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)</u>
- **Location: Mine Mountain Block:** This block is most commonly accessed via the Appalachian Trail. **Sharon Mountain Block:** From the junction of Route 7 and Route 128 in West Cornwall (opposite the Cornwall covered bridge), turn north on Route 7 and take an immediate left on West Cornwall Road. Follow 3.6 miles to the Forest entrance on the right. **Cream Hill Block:** From the junction of Route 7 and Route 128 in West Cornwall, proceed east on Route 128 for 0.2 mile (passing through the covered bridge). Turn left on River Road and follow for 3.9 miles. Turn right on Music Mountain Road and follow 0.9 miles to the parking area on the left. **Canaan Mountain Block:** This block is most easily accessed via Beckley Furnace State Park. **Gold's Pines Block:** From the junction of Route 128 and Route 125 in Cornwall, proceed west on Route 128 for 1.1 miles to the forest entrance on the left.
- **Fee:** There is no parking fee at this forest.
- <u>**State Forest Management Plan for Gold's Pines Natural Area Preserve and Gold's Pine Block of Housatonic Pine Forest**</u>

<u>Humaston Brook State Park</u> (141 acres) - Litchfield

- **Activities:** Fishing, Hiking
- **Services:** Undeveloped
- **Location:** From Route 254 in Northfield, take Knife Shop Road 0.2 mile northeast to the dam. To get to the trail, turn left on Newton Road, left on White Road and park immediately.
- **Fee:** There is no parking fee at this park.

<u>Killingly Pond State Park</u> (Wa...

- **Activities:** Fishing Hiking , Hunting
- **Location:** From the junction of Route 12 and Route 101 in Killingly, proceed east on Route 101 3.9 miles and turn left on Pond Road.  The lake is on the right in 0.8 mile.
- **Fee:** There is no parking fee at this park.
- **Alcoholic Beverages Prohibited**: Please do not bring alcoholic beverages.

<u>Lamentation Mountain State Park</u> (47 acres) - Berlin

- **Activities:** Hiking, Scenic Vistas
- **Location:** From the junction of the Wilbur Cross Parkway (Route 15), Route 691 and Route 66 in Meriden, proceed north on Route 15 (which becomes the Berlin Turnpike). Follow the Berlin Turnpike north 3.1 miles to Spruce Brook Road.  Turn right on Spruce Brook and park at the Mattabesett Trail marker.  Follow the trail south to Lamentation Mountain.
- **Fee:**  There is no parking fee at this park.

<u>Meshomasic State Forest - </u>East Hampton, Glastonbury, Portland

- **Activities:** Fishing, Hiking, Letterboxing, Hunting, <u>Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)</u>
- **Services:** Parking, <u>Public Shooting Range (/DEEP/Hunting/Glastonbury-Shooting-Range)</u>, 8 miles of gravel forest roads seasonally open to the public
- **Fee:**  There is no parking fee at this forest.
- <u>State Forest Management Plan for Meshomasic State Forest</u>

<u>Mianus River State Park </u>(527 acres) - Stamford

- **Activities:** Biking, Fishing, Hiking, Horseback Riding
- **Services:** Limited Parking
- **Location:** From the junction of Route 104 and Route 15 (Merritt Parkway, Exit 34), proceed north on Route 104 for 3.1 miles and turn left on Riverbank Road. Follow this road for 5.1 miles (noting that in 3.4 miles, the name changes to Westover Road.) Turn right on Merribrook Lane and follow 0.2 mile to the small parking areas on either side of the road.
- **Fee:**  There is no parking fee at this park.

<u>Minnie Island State Park </u>(1 acre) - Bozrah/Montville

- **Activities:** Boating, Fishing, Picnicking
- **Location:** The island is accessible only by boat.  It is in Gardner Lake opposite the boat ramp.
- **Fee:**  There is no parking fee at this park.

<u>Mohegan State Forest</u> - Scotland

- **Activities:** Hiking, <u>Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)</u>, Hunting, <u>Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)</u>
- **Location:** From the junction of Route 14 and Route 97 in Scotland, proceed south on Route 97 3.1 miles. Turn right on Waldo Road and park on the left in 0.5 mile.
- **Fee:**  There is no parking fee at this forest.

<u>Mono Pond State Park Reserve </u>(218 acres) - Columbia

- **Activities:** Bird Watching, Boating, Cross-Country Skiing, Fishing, Hiking, Picnicking, Hunting
- Services: <u>Boat Launch (/DEEP/Boating/Boat-Launches/Mono-Pond-Boat-Launch)</u>, Parking
- **Location:** 1.5 miles south of Route 66 on Hunt Road
- **Other:**  Bow hunting is allowed in the fall on the west side of the pond. Check the hunting guide for hours and restrictions. Boating is limited due to shallow water throughout much of pond. There is an 8 mph limit but the pond is best used by canoe, kayak and row boat. Pond depths average 3.5 feet with a small area of 9 feet by the dam. Hiking trails marked by Columbia Conservation Commission.
- **Fee:**  There is no parking fee at this park.

<u>Mount Bushnell State Park</u> (214 acres) - Washington

- **Activities:** Walk-In Park (Undeveloped)
- **Location:** Mount Bushnell is off Tinker Hill Road in New Preston
- **Fee:**  There is no parking fee at this park.

<u>Mount Riga State Park </u>(276 acres) - Salisbury

- **Activities:** Hiking, Hunting (Archery deer/turkey only)

App.69

- **Location:** From the junction ... parking area on the left.
- **Fee:** There is no parking fee at this park.

Nassahegon State Forest - Burlington

- **Activities:** Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:** From the intersection of Route 179 and Route 4 in Burlington, turn west on Route 4 and follow 2.0 miles to the fish hatchery on the left.
- **Fee:** There is no parking fee at this forest.

Nathan Hale State Forest - Coventry/ Andover

- **Activities:** Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Hunting, Connecticut Antiquarian and Landmarks Society operates the nearby **Nathan Hale Homestead (http://www.ctlandmarks.org/index.php?page=nathan-hale-homestead)**, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:** Between Talcott Hill Road in Coventry and Bear Swamp Road in Andover. From the junction of Route 31 and Route 44 in Coventry, proceed south on Route 31. Take second right on South River Road and follow to Case Road. Turn right on Case road and then turn left into Creaser Park for parking and trails.
- **Fee:** There is no parking fee at this forest.
- **State Forest Management Plan for Nathan Hale State Forest.**

Naugatuck State Forest  - Cheshire/Hamden/Naugatuck/Oxford/Beacon Falls

### East and West Blocks (Naugatuck/Oxford/Beacon Falls)

- **Activities:** Fishing, Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Mountain Biking, Snowmobiling, Target Shooting (for updated target shooting information see **Hunting & Fishing Guide (https://www.ct.gov/deep/cwp/view.asp?a=2700&q=556882&deepNav_GID=1633)**), Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:** The East Block of the Forest is north of Beacon Falls on the east side of the Naugatuck River. The West Block is north of Beacon Falls on the west side of the Naugatuck River.
- **East Block:** From the junction of Routes 42 and 63 in Bethany, go west on Route 42 and park on  the right side (north side) at the blue oval sign for the Naugatuck Trail. GPS coordinates:W73 0.55,  N41 27.151. Another entrance to the East Block is off of Andrasko Road in Beacon Falls.  Follow Cross Street (exit 26 off Route 8) to Andrasko Road. GPS coordinates:W73 3.082, N41 28.052. Printer Friendly **Map** .  GPS friendly **Map** .
- **West Block:** There is parking at the end of Hunter's Mt. Rd. in Naugatuck. GPS coordinates:W73 5.105, N41 28.401. There is also parking at the end of Cold Spring Road in Beacon Falls (closed during winter). GPS coordinates:W73 3.768, N41 27.358. **Map** . GPS friendly **map** for use with mobile apps.
- **For access to the Oxford Reservoirs:** There is parking off of Rt. 42 at the  intersection of Old Litchfield Turnpike in Oxford. GPS coordinates:W73 5.289, N41 26.1. There is also parking off of Chestnut Tree Hill Road in Oxford. GPS coordinates:W73 5.549, N41 26.996.
  **Fee:** There is no parking fee at this forest.

### Mt. Sanford Block (Cheshire/Hamden)

- **Activities:**  Hiking, Hunting, Mountain Biking, **Youth Group Camping (/DEEP/State-Parks/Camping/Youth-Group-Camping---CT-State-Parks-and-Forests)**, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:**  There is parking at the south entrance at the end of Downes Road in Hamden.  There is also parking at the north entrance off of Route 42 in Cheshire.
- **South Entrance –** From the intersection of Gaylord Mountain Road and Downes Road in Hamden, follow Downes Road north for 0.5 miles to the cul-de-sac at the end of the road. Park at the cul-de-sac. The YMCA Camp at the end of Downes Road is private property and is off limits to the public. To access the State Forest, take the Blue Trail or the White Trail as shown on the DEEP Trail map for this Block. GPS coordinates:W72 56.803, N41 27.013.
- **North Entrance –** The parking area is on the south side of Rt. 42. GPS coordinates:W72 57.032, N41 28.042.
- **Fee:** There is no parking fee at this forest.
- **Trail Map -** printer friendly map
- **State Forest Management Plan for Naugatuck State Forest - Mount Sanford Block**

### Quillinan Reservoir Block (Ansonia/Seymour)

- **Activities:** Fishing, Paddle Sports, Hiking, Mountain Biking, Snowshoeing and Cross Country Skiing
- **Location:**  There is a parking area on Rt. 313 in Seymour. In Ansonia, there are parking areas on Beaver  Street and at the end of Buswell Street.
- **Fee:** There is no parking fee at this forest.
- **Trail Map -**  printer friendly map
- **Trail Map -** GPS friendly map  for use with mobile apps.
- **State Forest Management Plan for Naugatuck State Forest - Great Hill Block**

Nepaug State Forest - New Hartford

App.70

- **Activities:** Biking, Camping, Fishing, Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Services:** Backpack Shelter
- **Location:** From the junction of Route 202 and Route 44 in Canton, follow Route 202 west 3.1 miles to the Forest entrance on the right.
- **Fee:**  There is no parking fee at this forest.
- **There is an alcohol ban in place at Nepaug State Forest.  Please do not bring alcoholic beverages and plan your visit accordingly.**
- **Trail Map**

Nye-Holman State Forest - Tolland

- **Activities:** Fishing, Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Youth Group Camping, Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Services:** Parking
- **Location:** From the junction of Route 84 and Route 74 in Tolland (Exit 69), proceed east on Route 74 and take the first left into the forest.
- **Fee:**  There is no parking fee at this forest.
- **Trail Map**

Paugussett State Forest - Newtown

- **Activities:** Boating, Fishing, Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Hunting, Mountain Biking, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Services:** Parking, **Boat Launch (/DEEP/Boating/Boat-Launches/Lake-Lillinonah-Pond-Brook-Boat-Launch)**
- **Location: Lower Block:**   From the junction of Route 34 and Route 111 in Monroe, proceed west on Route 34 for 0.1 mile and turn right on Great Quarter Road.  Follow this road to the end (1.4 miles) and park at the trailhead. **Upper Block:** From the junction of Route 6 and Route 25 in the center of Newtown (at the flagpole), proceed north on Route 6/25 for 0.2 mile and turn right on Hanover Road.  Follow Hanover Road 1.1 miles to the end, and turn left on the Boulevard.  Follow the Boulevard 0.5 mile and turn right on Echo Valley Road. Follow Echo Valley Road 1.3 miles to the fork, and bear left. Follow sign into the Forest. **Boat Launch:** For the boat launch, from the corner of Hanover Road and the Boulevard, turn left on the Boulevard and follow 2.3 miles to the Pond Brook boat launch on the right.
- **Fee:**  There is no parking fee at this forest.
- **Trail Map**        (Upper Block)
- **Trail Map**        (Lower Block)
- **Trail Map**        (Lower Block - GPS friendly for use with mobile apps)


Platt Hill State Park (159 acres) - Winchester
- **Activities:** Bird Watching, Hiking, Picnicking, Scenic Vistas
- **Services:** Parking, Walk-In Park
- **Location:** From the junction of Route 44 and Route 263 in Winchester, proceeds south on Route 263 1.5 miles and turn left on Platt Hill Road.  In 1.5 miles, turn left into the park.
- **Fee:**  There is no parking fee at this park.

Pomeroy State Park Scenic Reserve (200 acres) - Lebanon
- **Activities:** Hiking, Hunting
- **Services:** Undeveloped Park
- **Location:** On Route 289 south of Route 32 in Willimantic.
- **Fee:**  There is no formal parking area at this park.

Pootatuck State Forest - New Fairfield

- **Activities:** Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Mountain Biking, Snowmobiling, Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:**  Access is through Squantz Pond State Park.  Additional non-paved parking and access is available off Shortwoods Road and Pine Hill Road.
- **Fee:**  There is no parking fee at this forest.
- **Trail Map**        (included on Squantz Pond Trail Map)

Quaddick State Forest - Thompson
- **Activities:** Hiking, Fishing, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Youth Group Camping, Hunting,
- **Location:** The forest is north of the park on both sides of the lake.  The western block is crossed by Baker and Brandy Hill Roads; the eastern part is served by Baker Road and Quaddick Town Farm Road.

**Quinebaug Lake State Park** (181 acres) - Killingly

- **Activities:** Boating, Fishing
- **Services:** Car-top Boat Ramp (/DEEP/Boating/Boat-Launches/Quinebaug-Pond-Boat-Launch)
- **Location:** From the junction of Route 6 and Route 12, proceed south on Route 12 for 1.1 miles and turn left on Shepard Hill Road.  Following the boat-launch signs take an immediate left and the first right (in 0.2 mile) to the lake.
- **Fee:**  There is no parking fee at this park.

**Rocky Glen State Park** (46 acres) - Newtown

- **Activities:** Hiking
- **Location:** From Route 84, take exit 10 and turn north on Church Hill Road toward Sandy Hook. Follow Church Hill 0.3 mile and turn left on Dayton Street.  Follow 0.3 mile to the bridge.  For the cascade, follow Church Hill Road an additional 0.3 mile and turn left on Glen Road.  An unimproved road on the left in 0.4 mile leads to the trail
- **Fee:**  There is no parking fee at this park.

**Ross Pond State Park** (314 acres) - Killingly

- **Activities:** Boating, Fishing, Hiking, Hunting
- **Services:** Gravel Parking, outhouse
- **Location:** From exit 91 on Route 395, take Route 6 east and an immediate right on South Frontage Road.  Follow 0.4 mile and turn right on Ross Road (follow the boat ramp signs).  Follow 0.4 mile and turn right on the unmarked road; follow 0.6 mile to the ramp.
- **Fee:**  There is no parking fee at this park.

**Satan's Kingdom State Recreation Area** - New Hartford

- **Activities:** Hiking, Canoeing, Kayaking, Tubing
- **Services:** Public Canoe/Kayak/Tube Launch Area,  Vendor on site for tubing rentals.
- **Location:** From the junction of Route 202 and Route 44 in Canton, follow Route 44 west 2.6 miles to the Forest entrance on the right.
- **Fee:**  There is no parking fee at this park.   Vendor charges fee for rentals - additional information (http://www.farmingtonrivertubing.com/)
- **There is an alcohol ban in place at Satan's Kingdom State Recreation Area.  Please do not bring alcoholic beverages and plan your visit accordingly.**
- This park can be quite congested during the summer tubing season.

**Scantic River State Park** (784 acres) - Enfield, East Windsor, Somers

- **Activities:** Birding, Fishing, Hiking, Hunting
- Printer Friendly trail maps
    - **Enfield and Somers**
    - **Enfield**
    - **East Windsor**
- GPS Friendly trail map for use with mobile apps such as Avenza
    - **Enfield and Somers**
    - **Enfield**
    - **East Windsor**
- **Location:** Scantic River State Park has a number of access locations along the Scantic River in the towns of Somers, Enfield and East Windsor.
- **Fee:**  There is no parking fee at this park.
- **There is an alcohol ban in place at Scantic River State Park.  Please do not bring alcoholic beverages and plan your visit accordingly.**

**Seaside State Park** (33.4 acres) - Waterford

- **Activities**: Walking, hiking, fishing, birdwatching
- **Services**: Walk-in, undeveloped. Unmarked parking, portable toilets.
- **Location**: From the north, take CT-2 E towards Norwich/New London
Take CT-11 S via Exit 19. Take exit 4 from CT-11 S
Take CT-85 S, Cross Rd and CT-213 N/ Great Neck Rd to Seaside Dr in Waterford
From the west, get on I-91 N to Rocky Neck in East Lyme. Take exit 72.
Take CT-156 E to Seaside Dr in Waterford
From the east, take state Hwy 614/Allyn St, I-95S and CT-213 N/Great Neck Rd to Seaside Dr in Waterford.

- **Fee:** There is no parking

Stillwater Pond State Park (226 acres) - Torrington

- **Activities:** Boating, Fishing
- **Services:** Paved Parking, **Paved Boat Ramp (/DEEP/Boating/Boat-Launches/Stillwater-Pond-Boat-Launch)**
- **Location:** From the junction of Route 4 and Route 272 in Torrington, go north on Route 272 for 1.4 miles to the parking area.
- **Fee:** There is no parking fee at this park.

Stoddard Hill State Park (55 acres) - Ledyard

- **Activities:** Boating, Fishing, Hiking
- **Services:** **Car Top Boat Launch (/DEEP/Boating/Boat-Launches/Stoddard-Hill-Boat-Launch)**
- **Location:** From the junction of Routes 12 and 214 in Ledyard, travel north 0.5 miles to the park entrance on left.
- **Fee:** There is no parking fee at this park.
- **Trail Map**

This small, 55 acre park in Ledyard is made up of two sections with its main 48 acre segment being the most used. The entranceway leads to a parking area that has a ramp for car-top boat launching on the five acre tidal estuary. The park boasts nearly 2,000 feet of frontage on and, access to, the Thames River, though access to the river is under the railroad bridge which could have restricted use during high tides. While most activity is down by the water, the park's high point of 183 feet above sea level can be reached via a trail from the parking area. The trail leads to the top which was once an Indian lookout during times of conflict. Look for the stone walled Stoddard family cemetery in the woods 500 feet north (upstream) from the parking area.

Sunnybrook State Park (464 acres) -Torrington

- **Activities:** Fishing, Hiking, Picnicking, Hunting
- **Services:** Walk-in Park
- **Location:** From Burr Pond State Park, turn right on Burr Mountain Road and follow 0.5 mile to Winsted Road. Turn right on Winsted Road and follow 4.1 miles to Newfield Road. Turn right on Newfield Road and follow 2.4 miles to the park on the left.
- **Fee:** There is no parking fee at this park.
- **Park Map**

Sunrise Resort State Park (143 acres) - East Haddam

- **Activities:** Hiking, Kayaking
- **Location:** Route 151 (Leesville Road) in East Haddam. One mile south of the intersection with Route 196.
- **Fee:** There is no parking fee at this park.
- **Park Map**

Tri-Mountain State Park (157 acres) - Durham/Wallingford

- **Activities:** Hiking
- **Location:** Access to the Park is via the Mattabesett Trail. The nearest crossing north of the Park is on Durham Road (Route 68) at Reed Gap. On the south, the trail crosses Howd Road west of the intersection with Trimountain Road. There is no road access to the Park.
- **Fee:** There is no parking fee at this park.

Trout Brook Valley State Park Reserve (300 acres) - Easton

- **Activities:** Hiking, Hunting
- **Services:** Walk-In Park
- **Location: As of May 2020, Bradley Road parking area is closed on weekends.** This walk-in park is accessible from north of the gate at Bradley Road in Weston. To reach the Bradley Road gate begin at the intersection of Routes 58 and 136 in Easton and follow 136 south. Follow Route 136 for 0.7 and turn right onto Old Redding Road. Follow Old Redding 1.8 miles to its end and turn right onto Valley Forge Road. Follow Valley Forge 0.2 mile and turn right onto Bradley Road. Follow Bradley to end.
- **Fee:** There is no parking fee at this park.

The 300 acres of Trout Brook Valley State Park in Easton, Connecticut are just a portion of the greater valley preservation effort that encompasses 758 acres in the towns of Easton and Weston. This walk-in park is accessible from north of the gate at Bradley Road in Weston and can be explored by following its dirt roads or cross country through valleys and over rugged hills, always under a mixed deciduous and coniferous forest cover. Look for wildlife, wetlands and watercourses.

Tunxis State Forest - Granby/Barkhamsted/Hartland

- **Activities:** Cross-Country Skiing, Fishing, Hiking, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Mountain Biking, Hunting, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Services:** Parking, **Boat Launch (/DEEP/Boating/Boat-Launches/Howells-Pond-Boat-Launch)** on Howells Pond
- **Location:** All of the major features of Tunxis State Forest are located on or near Routes 20 and 179. From the junction of Route 20 and Route 181 in Hartland, proceed east on Route 20. For Howell's Pond, proceed east 1.0 mile and turn left on West Street; follow for 1.4 miles and turn left on Old Mill Road (on some maps as Dish Mill Road); follow 0.2

mile and turn right at the second marker on Kelly Road. Follow 1.1 miles, go 1/2 mile on dirt road, turn left and go .4 miles and park at the trail marker. For Hurricane Brook, follow 7.7 miles and turn left on Hurricane Brook Road; park so as not to block the gate, and follow the path uphill. For the CCC ski area, follow 8.0 miles and turn right on Balance Rock Road. Follow to the end of the road and park, being careful not to block the cul-de-sac (used by school buses to turn around). Follow the roadbed into the woods. After crossing the Blue Blazed Tunxis Trail, look for the ski cabin on the right. For the northern terminus of the Tunxis Trail, follow Route 20 8.8 miles and turn left on Old Town Road. Follow Old Town Road 0.6 miles, and turn left on Pell Road and go about 2.5 miles north to the end of road.

- **Fee:** There is no parking fee at this forest

Whittemore Glen State Park (242 acres) - Naugatuck, Middlebury

- **Activities:** Hiking, Horseback Riding
- **Location:** From the junction of Route 188 and Route 63, take Route 63 south 1.3 miles and turn right into the parking area.
- **Fee:** There is no parking fee at this park.

Wooster Mountain State Park (444 acres) - Danbury

- **Activities:** Hiking, Skeet, Trap and Target Shooting, Hunting
- **Services: Shooting Range (http://www.woostermountain.com/)**
- **Location:** From the junction of Route 7 and Route 84 in Danbury, proceed south on Route 7 for 2.3 miles and turn right into the Park.
- **Fee:** There is no parking fee at this park.

Wyantenock State Forest - Cornwall, Kent, Warren

- **Activities:** Hiking, Hunting, **Letterboxing (/DEEP/Forestry/Letterboxing/The-Clues-to-Letterbox-Sites-on-Connecticuts-State-Forests)**, Mountain Biking, **Additional Recreational Trail Use Information (/DEEP/State-Parks/Recreation-Information/Recreational-Trail-Use-Information)**
- **Location:** Woodville Block: From the junction of Route 341 and Route 202 in Warren, proceed north on Route 341 and turn right into the Forest. Spectacle Pond Block: From the junction of Route 341 and Route 41, proceed west on Route 341 for 3.2 miles and turn right on Kenico Road. Follow for 0.6 mile and turn right onto the forest road. The Coltsfoot Mountain block: Best accessed from the Mohawk Trail. The nearest trailhead is on the east side of Route 4 at the junction of Route 7 in Cornwall Bridge.
- **Fee:** There is no parking fee at this forest.
- **State Forest Management Plan for Wyantenock State Forest - Woodville Block**

(Portions of this page courtesy of "A Shared Landscape - A Guide and History of Connecticut's State Parks & Forests, by Joseph Leary" and the Friends of Connecticut State Parks) To purchase a copy of "A Shared Landscape", visit the **DEEP Store (/DEEP/About/DEEP-Bookstore/The-DEEP-Store)**

# Exhibit K



# Exhibit L

Report an accessibility issue.

# Connecticut
# Department of Energy & Environmental Protection

CT.gov Home  (/)  Department of Energy & Environmental Protection  (/DEEP)  Hunting and Trapping  (/DEEP/Hunting/CT-Hunting-and-Trapping)  Public Shooting Opportunities

## Public Shooting Opportunities



### State Shooting Ranges

Trap or target shooting on any state property or public hunting area is prohibited unless the area is a designated shooting range. Four state-owned public shooting ranges are available for target shooting, patterning shotguns, and sighting in rifles.

**Glastonbury Public Shooting Range (/DEEP/Hunting/Glastonbury-Shooting-Range)** - Meshomasic State Forest, Glastonbury. Entry at Toll Gate Road. Paper targets only, clay targets not allowed. No range fees. **Reservations required (https://ct.aspirafocus.com/internetsales?utm_source=deep_website&utm_medium=glastonbury_public_shooting_range&utm_campaign=permits&utm_content=textlink)**.

**High Rock Cooperative Shooting Range** - Naugatuck State Forest, Naugatuck. Operated by the High Rock Shooting Association, Inc. Range hours: Saturday, 9:00 am – 5:00 pm; Sunday, 12:00 noon – 5:00 pm (check website for scheduled closures). Range fee: $5.00 for the first hour and $5.00 per hour thereafter. No clay targets allowed. State pistol permit required to shoot handguns. Call **203-720-1101 (tel:2037201101)** or check the **High Rock Shooting Association website (https://highrockrange.com/)** for information.

**Nye Holman Field Archery Range** - Nye Holman State Forest, Tolland, Rte. 74. Entrance on South River Road. Field course available to public at all times unless otherwise posted. Field points only, arrows with broadheads are strictly prohibited. Range hours: sunrise to sunset.

**Wooster Mountain State Park Cooperative Shooting Range** - Wooster Mountain State Park, Danbury. Operated by the Danbury Shooting Sports Association. Located on Route 7, approximately two miles south of the Danbury Mall. Clay target shooting available. Call **203-794-9821 (tel:203794-9821)** or check the **Wooster Mountain Shooting Range website (http://www.woostermountain.com/)** for the daily time and fee schedule.

### Private Shooting Ranges

The following ranges are private sporting clubs and offer limited opportunity for the public with requirements varying by location. The DEEP is not always aware of hours of availability, costs, and/or requirements. Please contact the operator directly with any questions.

*If your club/range offers public shooting hours you would like reflected here, please email **DEEP.FranklinWildlife@ct.gov (mailto:DEEP.FranklinWildlife@ct.gov?subject=Public Shooting Opportunities)**.*

**Manchester Sportsmen's Association -** 612 Merrow Rd. Coventry. Open to the public Wednesday 6:00 pm-8:00 pm, Sunday at 10am for Skeet and Trap fields. Email **msactweb@gmail.com (mailto:msactweb@gmail.com)** or visit **msa-ct.com (https://www.msa-ct.com/)** for fees, requirements, and other information.

**Branford Gun Club -** 40 Red Hill Rd. Branford. Open to the public Sunday 10:00 am-1:00 pm and Wednesday 6:00 pm-10:00 pm. See **www.branfordgunclub.com/public-announcements (https://www.branfordgunclub.com/public-announcements)** for details.

**Ramapoo Rifle and Revolver Club Inc. -** 60 South Street. Ridgefield. Open to the public Mondays 7:00 pm-10:00 pm. Ridgefield residents pay $10, all other non-members $15, payment by cash or check. See **ramapoo.com (http://ramapoo.com)** for details.

*Content last updated in July 2022.*

# Exhibit M

# Cameron Atkinson

| | |
|---|---|
| **From:** | David Nastri <dnastri@dnastrilaw.com> |
| **Sent:** | Tuesday, December 13, 2022 7:23 AM |
| **To:** | Cameron Atkinson |
| **Subject:** | Fw: Regulations regarding firearms in state parks and forests |

> External (dnastri@dnastrilaw.com)

Report This Email  FAQ  GoDaddy Advanced Email Security, Powered by INKY



David J. Nastri, Esq.

Privileged and Confidential/Attorney-Client Communication/Attorney Work Product

Stand Forth!

---

**From:** David Nastri <dnastri@dnastrilaw.com>
**Sent:** Tuesday, November 22, 2022 6:16 PM
**To:** Trumble, Mason <Mason.Trumble@ct.gov>
**Subject:** Re: Regulations regarding firearms in state parks and forests

Mason,

Thank you for your response. It is apparent from the regulation that no distinction has been drawn between carrying a firearm for hunting and carrying a firearm for self defense in state parks and forests.

Under the Supreme Court Decision in New York State Rifle and Pistol Association v Bruen, the Court established a definitive right to carry firearms in public. State parks and forests are public land, therefore people who are properly licensed to carry pistols and revolvers have a constitutionally protected right to bear arms in those locations.

The regulation cited in the article you provided ((Conn. Agencies Regs. § 23- 4-1(c)) requires changes to bring it into compliance with the law as stated in New York State Rifle and Pistol Association v Bruen.

I respectfully request that the commissioner take immediate steps to amend the regulation in such a manner as will make clear that properly licensed individuals have every right to possess firearms in state parks and forests for self-defense.


Thank you,

David


David J. Nastri, Esq.

Privileged and Confidential/Attorney-Client Communication/Attorney Work Product

Stand Forth!

---

**From:** Trumble, Mason <Mason.Trumble@ct.gov>
**Sent:** Tuesday, November 22, 2022 3:46 PM
**To:** David Nastri <dnastri@dnastrilaw.com>
**Subject:** FW: Regulations regarding firearms in state parks and forests


Attorney Nastri,

Thanks for reaching out. Commissioner Dykes asked me to follow up on your inquiry below.

I believe this resource addresses the questions you posed regarding the regulation - Carrying Handguns in Connecticut State Parks or Forests.
If you are looking for more location specific information, we have created this interactive map that shows the state land where hunting is allowed

Thank you,

Mason

**Mason Trumble** he/him/his
Deputy Commissioner
Environmental Conservation
Connecticut Department of Energy & Environmental Protection
79 Elm Street, Hartford, CT 06106
P: 860.488.1087 | E: mason.trumble@ct.gov



**From:** David Nastri <dnastri@dnastrilaw.com>
**Date:** Friday, November 18, 2022 at 10:00 AM
**To:** Dykes, Katie <Katie.Dykes@ct.gov>
**Subject:** Regulations regarding firearms in state parks and forests

You don't often get email from dnastri@dnastrilaw.com. Learn why this is important

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Dear Commissioner Dykes,

I am writing to obtain clarity on DEEP regulations concerning the carrying/possession of firearms in state parks and forests. I have read CGS Section 23-4-1c and find it unclear in its language.  Specifically the language highlighted below.

### (c)Hunting/weapons.

Hunting or **carrying of firearms**, archery equipment or other weapons, including but not limited to air rifles and slingshots, **is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection.** All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder.
I have read the rules regarding the use of firearms for hunting in Connecticut, and those are quite clear.  However, my inquiry is not related to possessing firearms for hunting in state parks and forests, but rather possessing a properly licensed pistol or revolver for the purpose of self-defense in those locations.

I have been unable to find a more specific rule on your website which would explain the circumstances under which carrying a firearm in a state park or forest,  other than those rules which address hunting,  is permitted.  My expectation is that such a rule exists, and specifies that a person who is licensed to carry pistols or revolvers in the state of Connecticut is authorized to do so in a state park or forest.
I look forward to your response.

Thank you,


David J. Nastri, Esq.
██████████████


Privileged and Confidential/Attorney-Client Communication/Attorney Work Product


Stand Forth!

# Exhibit N



## RESEARCH Report

# Carrying Handguns in Connecticut State Parks or Forests

By: Janet Kaminski Leduc, Chief Attorney
October 29, 2020 | 2020-R-0289

## Issue

This report answers a series of questions about a person's ability to legally carry a handgun (i.e., pistol or revolver) in a Connecticut state park or forest. It updates OLR Report 2010-R-0472.

The Office of Legislative Research is not authorized to provide legal opinions, and this should not be considered one.

## *Can a person legally carry a handgun in a state park or forest?*

Department of Energy and Environmental Protection (DEEP) regulations prohibit, with exceptions, hunting or carrying firearms or other weapons in a state park or forest (Conn. Agencies Regs. § 23-4-1(c)).

According to DEEP, a person may legally possess a handgun in a state park or forest only when carrying the handgun for hunting small game (e.g., rabbits, squirrels) or participating in other authorized activities, such as at a firearms range or during a hunter education class. The person may only do so at predetermined times in areas set aside by DEEP and posted for such purposes (Conn. Agencies Regs. § 26-66-2(d)). What is permissible for hunters depends on the location and season. Also, to legally carry a handgun, a person must obtain a permit to do so (CGS § 29-28).

Under state regulations, a person cannot use a handgun using centerfire ammunition to hunt on state-owned land. A person is also prohibited from using, on state-owned lands, handguns with ammunition larger than .22 caliber rimfire long rifle cartridges (Conn. Agencies Regs. § 26-66-2(a)).

www.cga.ct.gov/olr
OLRequest@cga.ct.gov

**Connecticut General Assembly**
Office of Legislative Research
Stephanie A. D'Ambrose, Director

(860) 240-8400
Room 5300
Legislative Office Building

For more detailed information about hunting requirements, see DEEP's [2020 Hunting and Trapping Guide](#).

### What are the penalties for illegally carrying weapons in a state park or forest in violation of Section 23-4-1(c) of the regulations?

Anyone who illegally carries weapons in a state park or forest commits an infraction ([Conn. Agencies Regs. § 23-4-5(b)(1)](#)). Currently, the total amount due for this infraction is $75, as set by the judges of the [Connecticut Superior Court](#).

Additionally, DEEP may evict the violator from the property for 24 hours ([Conn. Agencies Regs. § 23-4-5(a)(1)](#)). State law also allows DEEP to prohibit a violator from entering any state park for up to one year after their conviction date ([CGS § 23-4(a)](#)).

### Does DEEP exercise control over parts of the National Park Service or National Wildlife Refuge System within the state (e.g., the Appalachian Trail)?

According to DEEP, it has authority over the parts of the Appalachian Trail that are on state-owned park and forest property. Other parts of the trail are on federal property and managed collectively under a Memorandum of Understanding between DEEP, the National Park Service, Department of Public Safety, Appalachian Trail Conference, and Appalachian Mountain Club. Trail parts on private property are not under DEEP's control.

### Does federal law allow someone to legally carry a handgun in parts of the National Park Service or National Wildlife Refuge System? Can someone legally carry a handgun while on the part of the Appalachian Trail that passes through a state park or forest?

Federal law allows anyone who can legally possess firearms under applicable federal, state, and local laws, to legally possess firearms on parts of the Appalachian Trail ([16 U.S.C. § 1a-7b](#)). This applies only to land the U.S. government owns and the National Park Service manages. It does not apply to the Appalachian Trail's parts that are on land owned or managed by other federal, state, or local agencies.

State laws and regulations apply to those parts of the Appalachian Trail that pass through state-owned parks and forests (e.g., a person cannot carry a handgun in these areas except as described above ([Conn. Agencies Regs. § 23-4-1(c)](#)). According to DEEP, there are property boundary markers

on state park and forest lands, as well as on the Appalachian Trail. A person is responsible for knowing his or her location and which law applies.

JKL:kc

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | January 28, 2023 |

**PLAINTIFF'S AMENDED EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND, IN THE**
**ALTERNATIVE, TO CONSOLIDATE THE PRELIMINARY INJUNCTION HEARING**
**WITH THE TRIAL ON THE MERITS**

Pursuant to Fed. R. Civ. P. 65, D. Conn. Local Rule 7, and the colloquy between the Court and counsel for both parties on January 27, 2023, the Plaintiff, David J. Nastri, Esq., hereby respectfully amends his motion asking the Court to issue an emergency temporary restraining order and preliminary injunction against the Defendant. Dkt. 8. Nastri requests the following relief:

1. A temporary restraining order barring the Defendant from enforcing Conn. Agencies Regs. § 23-4-1(c)'s prohibition on the carrying of handguns for the purpose of self-defense in state parks and forests until the Court can determine the merits of Nastri's application for a preliminary injunction;[1]

**ORAL ARGUMENT REQUESTED.**

---

[1] Nastri understands that the Court stated at the January 27, 2023 status conference that it will deny this requested relief without prejudice. Its inclusion here does not constitute a renewed request for it.

1

2.      A preliminary injunction barring the Defendant from enforcing Conn. Agencies Regs. § 23-4-1(c)'s prohibition on the carrying of handguns for the purpose of self-defense in state parks and forests until such time as the Court makes a final determination on the merits in this matter;

3.      In the alternative, Nastri moves the Court to order expedited discovery and consolidate the preliminary injunction hearing with the trial on the merits in this matter pursuant to Fed. R. Civ. P. 65.

Finally, Nastri hereby notifies the Court and the Defendant that he is not seeking *ex parte* relief through this motion by styling it an emergency motion. Instead, he respectfully requests expedited consideration of this motion by the Court pursuant to D. Conn. Local Rule 7(a)6. His demonstration of good cause is contained in the accompanying memorandum of law.

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

2

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>/s/ Cameron L. Atkinson /s/</u>

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ. | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, *in her official capacity*, | : | |
| *Defendant* | : | MARCH 30, 2023 |

## <u>MOTION TO DISMISS</u>

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant, Commissioner Katie Dykes, hereby moves to dismiss this lawsuit for lack of subject matter jurisdiction. As set forth in the attached memorandum of law, Plaintiff has failed to plead sufficient facts to establish that he has standing to challenge § 23-4-1(c) of the Regulations of Connecticut State Agencies on a pre-enforcement basis. This lawsuit should be dismissed.

1

Respectfully submitted,

DEFENDANT-COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY:    /s/ *Timothy J. Holzman*
        Timothy J. Holzman (ct30420)
        Blake T. Sullivan (ct30289)
        Thadius L. Bochain (ct31367)
        Assistant Attorneys General
        Attorney General's Office
        165 Capitol Avenue
        Hartford, CT 06106
        860-808-5020 (phone)
        860-808-5347 (fax)
        Timothy.Holzman@ct.gov
        Blake.Sullivan@ct.gov
        Thadius.Bochain@ct.gov
        Attorneys for the Commissioner

2

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2023 a copy of the foregoing was electronically filed.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

*/s/ Timothy Holzman*
Assistant Attorney General

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ. | : | No. 3:23-cv-00056 (JBA) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, *in her official capacity,* | : | |
| *Defendant* | : | MARCH 30, 2023 |

**MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION TO DISMISS**

David Nastri ("Plaintiff") has brought a pre-enforcement challenge to § 23-4-1(c) of the Regulations of Connecticut State Agencies, which provides in relevant part: "Hunting or carrying of firearms, archery equipment or other weapons . . . is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection." Plaintiff claims that this regulation violates the Second Amendment on its face.

As set forth below, Plaintiff has failed to plead sufficient facts to make out a plausible claim that he has standing to challenge § 23-4-1(c). First, he merely alleges a general desire to carry a handgun into State parks and forests in the future, as opposed to an actual intention to do so, and courts have held that that is insufficient to confer pre-enforcement standing. Second, Plaintiff has only vaguely alleged that he has future plans to visit State parks and forests, rather than concrete and imminent plans to do so, which falls short of the imminent and concrete injury-in-fact requirement for Article III standing.

This lawsuit should be dismissed for lack of subject matter jurisdiction.

1

## I.  BACKGROUND

Plaintiff's Verified Amended Complaint ("Complaint"), ECF No. 13, pp. 13-14, alleges that Plaintiff "received his pistol permit approximately 30 years ago" and holds it in good standing.  *Id.* ¶ 32.  Plaintiff alleges that he "uses Connecticut state parks and forests on a regular basis throughout the year—most often during the summer.  He enjoys hiking with his girlfriend at Sleeping Giant State Park . . . and Naugatuck State forest when their schedules permit."  *Id.* ¶ 33.  Plaintiff further alleges that he "intends to and will continue to make use of Connecticut state parks and forests in the immediate and foreseeable future for the purpose of recreation such as hiking."  *Id.* ¶ 34.  Plaintiff posits that his "prospective use of Connecticut state parks and forests is not speculative" because he went to Sleeping Giant State Park twice since commencing this lawsuit.  *Id.* ¶ 35.

Plaintiff "actively carries his handgun almost every time he leaves his home and almost every place that he goes, but he abides by the laws and rules that govern where he may carry it."  *Id.* ¶ 36.  He alleges that he "seeks to carry a handgun for purpose of self-defense" while making "regular use of Connecticut state parks and forests[.]"  *Id.* ¶ 37.  Plaintiff does not allege that he has ever been arrested, fined, evicted, or subject to any other adverse action for carrying handgun in a state park or forest, or that the State has threatened to take any such action against him.

Plaintiff commenced this action in January, 2023.  He claims that § 23-4-1(c) violates the Second Amendment, as incorporated by the Fourteenth Amendment, on

2

its face.  Plaintiff seeks declaratory relief and a permanent injunction.  *Compl.*, Prayers for Relief.

## II.   ARGUMENT

### A.   Legal Standard

Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014); *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022).  An injury-in-fact must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List*, 573 U.S. at 158.

As the Supreme Court has recently observed, "[f]ederal courts do not possess a roving commission to publicly opine on every legal question," and therefore they "do not adjudicate hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separated government." *Id.*

"At the motion to dismiss stage, the complaint must allege enough facts to make it plausible to conclude that the plaintiff has standing." *Beatty v. Tong*, No. 3:22-cv-380, 2023 U.S. Dist. LEXIS 36528, at *12-13 (D. Conn. Mar. 6, 2023) (Meyer,

3

J.) (*citing Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 65-66 (2d Cir. 2021)).  "[A]lthough the plausibility requirement is most commonly applied in the context of evaluating whether a complaint substantively states a claim for relief, there is little reason to suppose that it should not equally govern the evaluation of factual allegations that support federal subject matter jurisdiction." *Beatty*, 2023 U.S. Dist. LEXIS 36528, at *12-13 (*quoting Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155 (D. Conn. 2016)).

Plaintiffs can, under some circumstances, have standing to challenge a law that has not yet been applied to them.  "When an individual is subject to such a threat [of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158-59. Under those circumstances, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  "[A] plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159.

Nevertheless, it is not enough for a plaintiff to simply allege that they want to engage in conduct that it prohibited by a statute in order to have standing to challenge that statute on a pre-enforcement basis.  The threat of future enforcement must also be "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159.

Plaintiff has not met that burden here.[1]

**B. Plaintiff lacks standing to being this pre-enforcement action because he has not alleged either an intention to carry a handgun into a State park or forest, or an intention to do so in the immediate future.**

In *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992), plaintiff sought to challenge a rule promulgated under the Endangered Species Act that rendered the Act inapplicable to locations abroad. Plaintiff alleged that the rule would accelerate the decrease in certain specie populations thereby preventing her from observing them while she was present in those locations. The Supreme Court noted that plaintiff's desire to observe animal species "is undeniably a cognizable interest for purposes of standing," but nonetheless concluded that she lacked standing to challenge the Act because she had not proven an "imminent" risk she would be unable to observe those species in the future. The Court first emphasized that the fact that plaintiff "had visited the areas" in the past "proves nothing." *Id.* at 564. That is because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse

---

[1]Plaintiff has also filed an amended motion for preliminary injunction, which Defendant has separately opposed. Although Defendant challenges standing for purposes of this motion on the basis of the Complaint alone, this Court should assess standing at the preliminary injunction stage under the higher standard applicable to successive stages of litigation. *See Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. . . . When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.").

5

effects." *Id.* (*quoting L.A. v. Lyons*, 461 U.S. 95, 102 (1983)). And although plaintiff had "profess[ed] . . . an intent to return" to those places—at which point they would be deprived of an opportunity to observe the species—that "[was] simply not enough." *Id.* "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*

Courts have applied these principles in the Second Amendment context. Where a plaintiff attempts to challenge a law prohibiting carrying in a particular location, courts have dismissed the claim for two reasons, both of which are pertinent here. The first is where plaintiffs merely allege that they *want* to carry a firearm in the particular locations in the future, as opposed to alleging an actual *intention* to do so. *See Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), 2022 U.S. Dist. LEXIS 157874, at *47, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) (*Antonyuk I*) (dismissing complaint because plaintiff had "alleged and/or sworn that he 'desires,' 'wants,' 'wishes' or 'would like' . . . to carry a concealed handgun" in particular places, but had not "alleged or sworn . . . that he *intends* to do so") (emphasis in original). In such a case, plaintiff has failed to allege an intention to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the law] . . . ." *Id.* at 50 (*quoting Susan B. Anthony List*, 573 U.S. at 159).

The second is where plaintiffs allege an intention to carry in the location, but fail to allege that they intend to do so "in the *immediate* future . . . ." *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944, at *42, 2022

WL 4367410 (N.D.N.Y. Nov. 7, 2022) (*Antonyuk II*). That is because—as held in *Lujan*—"'someday' intentions . . . without any description of concrete plans . . . do not support" standing. *Id.* at *20.

Plaintiff's Complaint fails on both fronts. First, he does not allege that he actually ***intends*** to carry a handgun into State parks and forests. He simply alleges that he "***seeks***" to do so. *Am.Compl.* ¶ 37. That is an expression of a general desire to carry, not an intention to do so. *Antonyuk I*, 2022 U.S. Dist. LEXIS 157874, at *47, 2022 WL 3999791. Plaintiff has therefore failed to allege an actual intention to engage in conduct that § 23-4-1(c) prohibits, depriving him of pre-enforcement standing.

Second, even if the Court were to conclude that Plaintiff had alleged an intention to carry arms into a State park or forest, he has not plausibly alleged that he intends to do so in the immediate future. He alleges that has used Connecticut parks and forests a number of times in the past, including on two occasions on January 14 and 15, 2023. *Am. Compl.* ¶¶ 33, 35. But the mere fact that plaintiff "had visited the areas" in the past "proves nothing." *Lujan*, 504 U.S. at 564. Plaintiff must allege concrete plans to do so in the future.

On that score, Plaintiff's Amended Complaint is lacking. He alleges in conclusory terms that he "intends to and will continue to make use of Connecticut state parks and forests in the immediate future for the purpose of recreation," and that his "prospective use of Connecticut state parks and forests is not speculative." *Am. Compl.* ¶¶ 34, 35. But those kinds of conclusory allegations are not entitled to

the presumption of truth, and are insufficient to confer standing. *Sowell v. Tinley Renehan & Dost, LLP*, 807 F. App'x 115, 119 (2d Cir. 2020) (Summary Order) ("plaintiff's conclusory assertion [of] a chilling effect on her First Amendment rights is not sufficient to establish injury in fact"); *see also Treiber v. Aspen Dental Mgmt.*, 635 F. App'x 1, 3 (2d Cir. 2016) (Summary Order) ("because the allegation is wholly conclusory and unsupported by any facts, it is insufficient to support standing").

The only concrete factual allegation regarding future use appears in paragraph 33, which alleges: "[Plaintiff] uses Connecticut state parks and forests on a regular basis throughout the year—most often during the summer. He enjoys hiking with his girlfriend at Sleeping Giant State Park . . . and Naugatuck State Forest when their schedules permit." That is the very kind of "someday" allegations that are insufficient to confer standing. Plaintiff does not explain what he means by "regular basis," or allege any facts to indicate whether that gives rise to a sufficiently imminent future use. Indeed, the summer months (when Plaintiff uses parks and forests "most often") are not yet here. And the fact that he "enjoys" hiking with his girlfriend "when their schedules permit" does not establish anything about the imminence of his alleged future injury. Again, "'someday' intentions . . . without any description of concrete plans . . . do not support" standing. *Lujan*, 504 U.S. at 564.

## III. CONCLUSION

For the foregoing reasons, the Court should dismiss this lawsuit for lack of subject matter jurisdiction.

8

Respectfully submitted,

DEFENDANT-COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY:   /s/  *Timothy J. Holzman*
        Timothy J. Holzman (ct30420)
        Blake T. Sullivan (ct30289)
        Thadius L. Bochain (ct31367)
        Assistant Attorneys General
        Attorney General's Office
        165 Capitol Avenue
        Hartford, CT 06106
        860-808-5020 (phone)
        860-808-5347 (fax)
        Timothy.Holzman@ct.gov
        Blake.Sullivan@ct.gov
        Thadius.Bochain@ct.gov
        Attorneys for the Commissioner

9

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2023 a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Timothy Holzman*
Assistant Attorney General

10

2

```
 1          UNITED STATES DISTRICT COURT
             DISTRICT OF CONNECTICUT
 2
 3  ------------------------------)
    DAVID NASTRI,                 )
 4                                )  No. 23-cv-00056 -JBA
              Plaintiff,          )
 5                                )  May 9, 2023
    v.                            )
 6                                )  10:15 a.m.
                                  )
 7  KATIE DYKES,                  )  141 Church Street
                                  )  New Haven, Connecticut
 8            Defendant.          )
 9  ------------------------------)

10        PRELIMINARY INJUNCTION HEARING

11
12  B E F O R E :

13       THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

14
15  A P P E A R A N C E S :

16  For the Plaintiff:

17     ATKINSON LAW, LLC
          122 Litchfield Road
18        P.O. Box 340
          Harwinton, CT 06791
19        (203) 677-0782
          E-mail: catkinson@atkinsonlawfirm.com
20     BY:  CAMERON LEE ATKINSON, ESQ.

21
22  (Continued)

23
24          Corinne Thomas, RPR
            Official Court Reporter
25            (203) 809-0848
```

```
 1  For the Defendant:

 2     OFFICE OF THE ATTORNEY GENERAL
          165 Capitol Avenue
 3        Hartford, CT 06106
          (860) 808-5296
 4        E-mail:  blake.sullivan@ct.gov
                   thadius.bochain@ct.gov
 5                 timothy.holzman@ct.gov
       BY:  BLAKE THOMAS SULLIVAN, ESQ.
 6          THADIUS LATIMER BOCHAIN, ESQ.
            TIMOTHY J. HOLZMAN, ESQ.
 7
```

3

```
 1           I N D E X
 2  WITNESS:  PROFESSOR SAUL CORNELL       PAGE
 3
 4  Direct Examination By Mr. Atkinson      12
 5  Cross Examination by Mr. Sullivan       71
 6  Redirect Examination by Mr. Atkinson   106
 7  Recross Examination by Mr. Sullivan    125
 8
 9  WITNESS:  DAVID NASTRI                  PAGE
10  Direct Examination by Mr. Atkinson     130
11  Cross Examination by Mr. Bochain       174
```

4

```
 1       (Call to Order, 10:15 a.m.)
 2       THE COURT:  Good morning, counsel, ladies and
 3  gentlemen.  Please be seated.
 4       We are here for the hearing on the
 5  preliminary injunction sought in Nastri v. Dykes,
 6  23-cv-56.
 7       May I please have appearances of counsel, and
 8  at any time if you are the speaker, you may remove
 9  your mask.
10       MR. ATKINSON:  Thank you, Your Honor.  Good
11  morning.
12       Cameron Atkinson on behalf of the plaintiff,
13  David Nastri, who's to my right at counsel's table.
14       THE COURT:  Good morning.
15       Good morning, Mr. Nastri.
16       MR. BOCHAIN:  Good morning, Your Honor.
17       Thadius Bochain, Assistant Attorney General.
18  I'm joined at counsel table by my colleagues
19  Blake Sullivan, who is to my left here, and
20  Timothy Holzman, at the far end on the left there,
21  and we represent the defendant, Commissioner Katie
22  Dykes.  And also joining us today is Section Chief
23  Maura Murphy Osborne of the special litigation
24  section and one of our colleagues, Keyla Rivera,
25  who's also in the courtroom today.
```

5

```
1        THE COURT:  They're over there?
2        MR. BOCHAIN:  Correct.
3        THE COURT:  You've relegated the women to the
4   back bench.
5        MR. BOCHAIN:  No, Your Honor.  That was not
6   deliberate.
7        THE COURT:  All right then.  There are a
8   number of issues that we need to get through.  We
9   have a hard stop at four o'clock today and we will
10  continue tomorrow.  I'd like to start, if you don't
11  mind -- well, let me ask you if there's anything that
12  you want to update or clarify or advise of agreements
13  on.
14       MR. BOCHAIN:  Yes, Your Honor.
15       THE COURT:  Mr. Bochain.
16       MR. BOCHAIN:  I'm sorry?
17       THE COURT:  I said Mr. Bochain.
18       MR. BOCHAIN:  Thank you, Your Honor.
19       So there are a few housekeeping matters that
20  I think we would like to put on the record.  The
21  first is there has been agreement between the parties
22  with respect to various exhibits that are going to be
23  entered into evidence and so we had provided the
24  Court with copies of those.  And so Defense
25  Exhibits 1 through 132, those are going to be --
```

6

```
1   Attorney Atkinson has agreed that those can come in.
2   Additionally --
3        THE COURT:  Okay.  I'm going to stop you
4   there.  The agreement of counsel that they are
5   unobjected to doesn't admit them.  So you need to
6   identify what you're admitting; otherwise, I get
7   broad swaths of exhibits that, in fact, were not
8   admitted or relied on.  Okay?
9        MR. BOCHAIN:  Okay.  Certainly, Your Honor.
10  So I guess I would defer to Your Honor, how you would
11  like me to go about that.
12       THE COURT:  Just as you get to the exhibits
13  that you would want or perhaps at the end of the day
14  if you want to collectively say which ones you
15  believe relate to the testimony that was given.
16       MR. BOCHAIN:  Okay.
17       THE COURT:  I don't mean to make an obstacle
18  here, but from my standpoint, I don't want a lot of
19  extraneous exhibits in the record.  I just want the
20  ones that you think are directed to any of the
21  issues.
22       MR. BOCHAIN:  The issues in the case, Your
23  Honor, or to the testimony that you're going to hear
24  today?
25       THE COURT:  You can -- we can sort this out,
```

7

```
1   but 1 through 132 of the defendant's exhibits have no
2   objection.  What else?
3        MR. BOCHAIN:  That's correct, Your Honor.
4   Defense Exhibits 133 through 140, those are
5   declarations by various witnesses, some of which are
6   expert witnesses.  Those are not going to be objected
7   to either.
8        THE COURT:  Will the experts testify?
9        MR. BOCHAIN:  We have -- so it's my
10  understanding that Attorney Atkinson will be calling
11  one of those experts today.
12       THE COURT:  Okay.
13       MR. BOCHAIN:  And that's Professor Saul
14  Cornell.  Attorney Atkinson has also agreed -- has --
15  is not objecting to and has agreed to the
16  qualifications of those experts as well.
17       And additionally, Your Honor, there is -- we
18  have provided the Court with an updated exhibit and
19  witness list.  And incorporated within that, there
20  are a few additional exhibits from the defense and
21  that's 141 through 143.  It's my understanding that
22  Attorney Atkinson is not objecting to those as well.
23       And just on the point about the updated
24  exhibit list, I believe I did provide the Court with
25  an updated copy this morning.  It's updated -- it has
```

8

```
1   updated the one that we submitted last night.
2   There's been one addition and a minor change.  So I
3   just wanted to put that on the record as well.
4        THE COURT:  All right.  Thank you.  Anything
5   else from the defendant side.
6        MR. BOCHAIN:  Nothing at this time.
7        THE COURT:  All right.  Mr. Atkinson,
8   anything from your side.
9        MR. ATKINSON:  Yes.  A few things.  First of
10  all, I did -- I do believe I supplied your clerk with
11  a courtesy copy of what we're marking as Exhibit 17
12  today.  That was not included in the bench book I
13  delivered earlier this week.  We have 17 exhibits
14  right now.  I only anticipate entering 9, 10 and 17
15  as full exhibits.  The rest are for ID purposes in
16  the course of the proceedings today.  My
17  understanding is that the defendant is not objecting
18  to the admissibility of 9, 10 and 17.
19       THE COURT:  Okay.
20       MR. ATKINSON:  Your Honor, we also had
21  discussions yesterday about streamlining some of the
22  proceedings.  We did prepare and did file last night
23  a proposed stipulation.  I have a copy here if
24  Your Honor would like me to hand it up to you.  It's
25  at ECF 35.
```

9

1    THE COURT: Okay.
2    MR. ATKINSON: From my perspective, Your
3 Honor, if that stipulation is adopted, those are all
4 of the housekeeping matters that I would have.
5    THE COURT: Okay. One of the concerns that I
6 want to make sure that we address is that Bruen
7 requires consideration of sufficient statutes to
8 demonstrate the history and tradition that is argued
9 to be supportive of the regulation. And so even if
10 there are only references to those in testimony,
11 would you make sure our record has the regulation or
12 whatever is the actual document?
13    MR. ATKINSON: Understood.
14    THE COURT: I can't believe this record does
15 not have them all, but just make sure that we have
16 that. Okay?
17    MR. ATKINSON: I will review my brief and I
18 will see if I can locate as many of the originals
19 that are referenced in that brief, Your Honor.
20    THE COURT: Okay. It's really with respect
21 to the testimony of people who are -- no, I suppose
22 it's not, is it?
23    Okay. All right. Let's just make sure that
24 we are traveling precisely down the path we should.
25    Yes, Mr. Sullivan.

10

1    MR. SULLIVAN: Thank you, Your Honor.
2    So to your point about the building the
3 record of the relevant statutes and ordinances,
4 that's what we're referring to and essentially that
5 the -- there has been a stipulation in place as to
6 the vast swath of those, and that we intend to enter
7 them in full for the Court's consideration in
8 connection with the preliminary injunction motion.
9    There will be a few within there that we may
10 ask, you know, the witnesses about and we will direct
11 their attention to those at the time.
12    THE COURT: That's fine.
13    MR. SULLIVAN: But they were all submitted in
14 our opposition to the preliminary injunction motion
15 and that's true of the declarations as well,
16 Your Honor.
17    THE COURT: All right. So if that is all
18 that you have preliminarily to bring us up to date,
19 I'd like to propose that we start, if it does not
20 disrupt your intended sequence, with testimony
21 evidence on standing since standing is jurisdictional
22 and therefore required to be established.
23    All right. Mr. Atkinson, would you care to
24 begin?
25    MR. ATKINSON: Your Honor, I actually had

11

1 intended to call Mr. Nastri, my only witness as to
2 standing last, primarily because of discussions I had
3 with my colleagues about Professor Cornell being --
4    THE COURT: The scheduling, okay.
5    MR. ATKINSON: Yes.
6    THE COURT: All right. Is Professor Cornell
7 here now?
8    MR. ATKINSON: Yes. Your Honor.
9    THE COURT: You may proceed then and I will
10 expect to hear from Mr. Nastri when you have finished
11 with exhibits -- witnesses who have come here and
12 done so anticipating they'll be called today.
13    MR. ATKINSON: Thank you, Your Honor.
14    THE COURT: Okay.
15    MR. ATKINSON: Would Your Honor prefer me to
16 use the podium?
17    THE COURT: Yes, please.
18    MR. ATKINSON: Thank you. Plaintiff calls
19 Professor Saul Cornell to the stand, please.
20    THE COURT: All right. Sir, if you would
21 kindly stand, raise your right hand, the oath will be
22 administered to you.
23    (Professor Saul Cornell, sworn.)
24    THE WITNESS: Yes, I do.
25    THE CLERK: Please be seated, state your name

12

1 for the record, please spell your last name and state
2 your town of residence.
3    THE WITNESS: Yes. My name is Saul Cornell,
4 S-A-U-L, C-O-R-N-E-L-L.
5    THE COURT: You may proceed.
6    MR. ATKINSON: Thank you, Your Honor.
7 DIRECT EXAMINATION OF PROFESSOR SAUL CORNELL
8 BY MR. ATKINSON:
9    Q.    Good morning, Professor Cornell, and thank
10 you for being here with us. I'd like to start by,
11 can you tell us what your employment is?
12    A.    Yes. I am a Paul and Diane Guenther chair in
13 American history at Fordham University, and I am an
14 adjunct professor of law at Fordham Law School.
15    Q.    And you are here today because you were
16 retained as an expert by the defendant in this case?
17    A.    That's correct.
18    Q.    With respect to the Paul and Diane Guenther
19 chair in American history, is that a -- do you teach
20 in that role?
21    A.    So the Guenther chair is one of three endowed
22 professorships in the history department and one of
23 maybe -- I don't know -- half a dozen endowed
24 professorships in the humanities at Fordham, and it
25 comes with a reduced teaching load, some research

13

1   support, and the definition of the job position was
2   constitutional history.
3       Q.   Okay.  So help me understand your testimony.
4   Do you teach constitutional history right now?
5       A.   I do.
6       Q.   Okay.  And concurrently with that in your
7   role as holding this endowed chair, you conduct
8   research, correct?
9       A.   That is correct.
10      Q.   And the research you conduct is on
11  constitutional history?
12      A.   That is one of several areas that I would
13  work in.  I've also authored a popular American
14  history textbook for college-level American history
15  classes.
16      Q.   Understood.  Do you -- what level do you
17  typically teach, undergraduate?
18      A.   Yes.  I suppose you might say 13th grade
19  through 17th grade, so everything from freshman to
20  graduate students to law students.
21      Q.   Would teaching law students be part of your
22  role as the Guenther chair or more in terms of your
23  role as an adjunct law professor?
24      A.   Well, that's an interesting question because
25  the purpose of the Guenther chair was to hire in

14

1   constitutional history and Fordham Law School has a
2   well-respected tradition in the field of
3   constitutional history.  So I think it was implicit
4   when I was hired that I would build bridges to the
5   law school.
6       Q.   Understood.  Have you taught at any other
7   places during your employment at Fordham?
8       A.   During my employment at Fordham, let me just
9   think.  I've been a visiting research scholar, but
10  that did not have teaching duties.
11      Q.   What would those duties involve?
12      A.   So I was a senior research scholar at Yale
13  Law School, at the University of Connecticut Law
14  School, and I was a fellow at the Floersheimer Center
15  for Constitutional Democracy at Cardoza Law School.
16      Q.   When you say that you weren't a -- those
17  didn't involve teaching responsibilities, what did --
18  what does the position of the visiting research
19  scholar entail?
20      A.   So being a visiting research scholar is nice
21  work if you can get it.  It's involves no teaching,
22  but you have access to all of the intellectual
23  activities, which at a place like Yale or UConn are
24  quite lively.
25          And so you would go to seminars, you would

15

1   participate in brown bag lunches, conferences, and of
2   course you have access to the law library, which for
3   me was particularly important.
4       Q.   Do you receive -- did you receive any
5   compensation for positions as a visiting research
6   scholar?
7       A.   So those were all done while I was on
8   sabbatical, and one of the perks of the Guenther
9   chair is that it has a very generous sabbatical
10  policy.
11      Q.   Maybe I didn't phrase my question clearly
12  enough.  So, for instance, I believe you mentioned
13  earlier that you were a visiting research scholar at
14  Yale Law School.
15          Did you receive any compensation from Yale
16  Law School in that role?
17      A.   No.
18      Q.   And that would be largely true for every
19  other place you served as --
20      A.   Right.
21      Q.   Let's talk about your education.  You -- do
22  you have a PhD right now?
23      A.   I do.
24      Q.   Where did you receive your PhD from?
25      A.   My PhD is from the University of

16

1   Pennsylvania.
2       Q.   When did you receive that?
3       A.   1991.  Hold on.  Sorry.  1989.
4       Q.   I understand.  It was a long time ago.
5       A.   Yeah.
6       Q.   What was your PhD, for lack of a better term,
7   major in?
8       A.   So I was trained as an early American
9   political historian and I wrote my first book about
10  the anti-federalist who were the original opponents
11  of the Constitution and who are sometimes credited
12  with being the driving force behind the Bill of
13  Rights.
14      Q.   I'm a bit confused.  You wrote your first
15  book or were you -- did you mean your dissertation on
16  the anti-federalist?
17      A.   So typically, the typical career path of a
18  history professor would be you write a dissertation
19  which you might sort of view as the rough draft of a
20  book, and success in the field almost always requires
21  turning the dissertation into a published book, which
22  I did.
23      Q.   Congratulations.
24      A.   Well, thank you very much.
25      Q.   And what was the title of your dissertation

17

1   slash book?
2       A.   So the title of the dissertation was "The
3   Political Thought and Culture of the
4   Anti-Federalist."  And the book version, which was
5   published by the Institute of Early American History
6   and Culture, had to be a bit more snappy.  So that
7   was called *The Other Founders:  Anti-Federalism and*
8   *the Dissenting Tradition in America, 1788 to 1828.*
9       Q.   Prior to receiving a PhD from the University
10  of Penn, did you receive a master's degree?
11      A.   Yes.  Typically if you survive a PhD program,
12  they give you a master's along way to give you some
13  hope that the end is in sight.
14      Q.   Okay.  So it's your testimony you obtained
15  your master's degree from Penn as well?
16      A.   Yeah.  So sometimes you have to do exams.
17  Sometimes just doing -- writing a seminar paper.
18  Each university has a slightly different -- so at
19  Penn, it was a combination of passing your oral exams
20  and completing the required research seminars.
21      Q.   Understood.  You also received -- did you
22  also receive a bachelor's degree?
23      A.   Yes.  I got my BA from Amherst College and I
24  graduated magna cum laude.
25      Q.   Were all of these degrees in the area of

18

1   history?
2       A.   Yes.
3       Q.   Did you ever study internationally?
4       A.   So yes.  I spent a year at the University of
5   Sussex in England studying English and American
6   history.
7       Q.   Did you earn a degree from that --
8       A.   No.  I did actually find my wife, though.
9       Q.   Well, that seems like better than a degree.
10          But since you've obtained your PhD in 1989,
11  have you always -- withdrawn.
12          After you obtained your PhD in 1989, what was
13  your first employment?
14      A.   So my first job was at the College of William
15  & Mary and I had a post doc at the Institute of Early
16  American History and Culture, which is generally
17  regarded as kind of the premier post doc in my field.
18  It actually came with a book contract for my
19  dissertation and I spent two lovely years teaching at
20  William & Mary, which is a beautiful place to teach
21  and a great place to study early American history.
22      Q.   As a professor, were you expected to publish?
23      A.   Yes.
24      Q.   And when I say "publish," can you describe
25  for us what that expectation typically looked like?

19

1       A.   So typically to gain tenure, one would
2   typically publish a book, several articles and
3   present papers at suitably prestigious and selective
4   conferences.  So I published one book and about 30
5   articles by the time I had tenure.
6       Q.   And how long did it take you to achieve
7   tenure?
8       A.   So typically, tenure is a seven-year process
9   and I don't -- I was on track.  So I assume I would
10  have done it there my seventh year at Ohio State
11  where I -- was my next job after William & Mary.
12      Q.   What was the general theme of your research
13  at William & Mary?
14      A.   So at William & Mary, I focused primarily on
15  aspects of my work on the anti-federalist.  So I
16  published an article in the *Journal of American*
17  *History* which is the leading journal of American
18  history appropriately enough, published something in
19  the *William & Mary Quarterly* which is generally
20  considered to be the leading journal in early
21  American history, published in the *Law and History*
22  *Review* which is the leading journal in legal history,
23  the *Northwestern University Law Review* which at the
24  time was a little bit out of my normal publishing
25  venue because historians don't typically publish in

20

1   law reviews.  And they were all on various aspects of
2   Anti-Federalism.
3       Q.   Okay.  And when you say, "various aspects of
4   Anti-Federalism," can you give us an idea of what
5   aspects you wrote about?
6       A.   Happily.  So the *Journal of American History*
7   article was a study of how ordinary Americans who
8   opposed the Constitution, how they understood the
9   Constitution and why they opposed it, and it focused
10  on back country Pennsylvania where there's a good
11  deal of agitation around the Constitution.
12          The *Northwestern Law Review* article charted
13  the history of how Anti-Federalism was interpreted
14  from sort of the moment of ratification until the
15  Reagan years, because one of the interesting things
16  where there is a lot of writing about Anti-Federalism
17  during the Reagan years, they were sort of
18  rediscovered.  So I wrote about that.
19      Q.   So would it be a fair characterization of
20  your research during this time that you were
21  commenting generally on the -- for lack of a better
22  term, the political -- the general political culture
23  at the time?
24      A.   Yes.  I was focused on the political thought,
25  political culture, and I was also interested in some

21

```
 1  constitutional ideas, but the main focus was on
 2  political thought and political culture.
 3      Q.   Right.  At that time, what constitutional
 4  ideas were you interested in?
 5      A.   Well, I was very interested in federalism
 6  because the anti-federalist were very interested in
 7  federalism.
 8      Q.   So just to help me understand, you were --
 9  were you interested in the general structure of the
10  Constitution or a specific provision?
11      A.   Well, I was interested in it all really.  I
12  was interested in both the sort of macro-level
13  analysis of how the Constitution fit into Anglo
14  American political and constitutional development.  I
15  was interested in the specific dynamics of why
16  particular parts of the Constitution took the form
17  they did, and I was interested in the early debates
18  over the meaning of the Constitution.
19      Q.   What inspired you as a person to become a
20  historian?
21      A.   Well, that's a great question.  Well, you
22  know, I will tell you a story.  So many people in New
23  York City get false IDs so they can go into bars, but
24  I actually got a false ID so I could go to the New
25  York Public Library and do college-level research for
```

22

```
 1  AP history and I kind of got hooked on the history as
 2  kind of a great intellectual puzzle.
 3      Q.   And what inspired you to select the
 4  Anti-Federalist's influence on the constitutional
 5  adoption process as your research focus at this
 6  point?
 7      A.   Well, I think the anti-federalist were sort
 8  of like the Brooklyn Dodgers of American political
 9  history.  They are sort of the lovable losers who had
10  heart, but didn't quite make it to the pennant.
11      Q.   Understood.  So it appealed to you as an
12  underdog?
13      A.   Yes.  I mean, they were the underdogs, so
14  that appealed to me, yeah.
15      Q.   At some point did you become interested in
16  studying and writing about the Second Amendment?
17      A.   Yes, I did.  The reason I was drawn to the
18  Second Amendment had very little to do with modern
19  debates over guns.  It was almost entirely a function
20  of the fact that I noticed there was a resurgence of
21  interest in Anti-Federalism and a huge part of that
22  resurgence focused on the Second Amendment and I was
23  puzzled by it.
24      Q.   Let's break that down.  When did you first
25  notice that resurgence?
```

23

```
 1      A.   So when I was teaching at William & Mary, I
 2  lived around the corner from the Marshall-Wythe Law
 3  School and I spent a lot of time in the law library
 4  reading law review articles, and I noticed that there
 5  was a remarkable amount of attention to the
 6  anti-federalist in recent law review articles.  This
 7  would have been in the '80s.  This would have been
 8  also at the time that sort of the jurisprudence of
 9  original intent emerged during the Reagan years.  And
10  low and behold, Anti-Federalist texts that I had
11  spent the last ten years studying were suddenly being
12  cited as being highly relevant in the Second
13  Amendment debate.
14      Q.   And so would it be fair to say that something
15  clicked for you and you said I can make another area
16  of research out of this?
17      A.   Well, I sort of backed into it.  I didn't
18  really think I was going to end up spending very much
19  time on it.  I just thought it would be sort of a
20  fun -- I was supposed to be writing a book about
21  Jefferson and Monticello and this was supposed to be
22  kind of a quick, side detour and 25 years later, I'm
23  still working on it.
24      Q.   At what point did you realize you had gotten
25  yourself lost down the rabbit hole of the Second
```

24

```
 1  Amendment?
 2      A.   Well, that's a good question.  I suppose I
 3  was sent a manuscript to read by the University of
 4  Virginia Press and I told them it had potential.  It
 5  was on the Second Amendment, but it needed some more
 6  work.  And I wrote a somewhat detailed report, which
 7  is typical of academic publishing.  And the editor
 8  said, "I don't want to publish their book, but I want
 9  you to turn your reader's report into a book for me."
10  So I said, "Oh, that's interesting."
11      Q.   And when about did this occur?
12      A.   That was about 1999.
13      Q.   So if I'm understanding you correctly, the
14  first piece of literature that you published on the
15  Second Amendment was 1999 or thereabouts?
16      A.   Yes.  It was an article in the *Journal of
17  Constitutional Commentary*.
18      Q.   Okay.  And since then, you've published books
19  about the Second Amendment?
20      A.   Yes.  I have published one monograph and two
21  edited volumes on the Second Amendment.
22      Q.   Just for my purposes, because I might be too
23  young to understand what a monograph is, what is a
24  monograph?
25      A.   I'm sorry.  A monograph is the standard term
```

25

1  that academics use to describe a book that is
2  primarily driven by primary source research and makes
3  an original contribution to an academic debate as
4  opposed to a work of synthesis or a textbook or in
5  the case of law, a case book.
6      Q.   Okay.  So let's talk about the monograph for
7  a second then.  What was the subject of the
8  monograph?
9      A.   So it was a study of the changing meaning of
10  the Second Amendment in American constitutional law
11  between the 18th century and the New Deal.
12      Q.   To write that book, what sources did you
13  consult?
14      A.   Well, I had to -- I looked at what might be
15  called all the usual sources.  So I looked at
16  statutes, cases, treatises, but I also delved into
17  places that hadn't been looked at.
18          So I looked at, for instance, justice of the
19  peace manuals.  I looked at some sensational cases
20  that left unusually detailed trial records, but did
21  not generate appellate decisions, so they are not
22  typically available on Westlaw or Lexus.
23      Q.   At any point did your -- in your research,
24  did you look at legislative history?
25      A.   So what modern lawyers would call legislative

26

1  history generally doesn't exist for really old
2  statutes in most cases.  You don't have committees.
3  You don't have that kind of deep back sources.
4  Sometimes all you have is records of votes.
5      Q.   Let me take a step back, Professor.  With
6  respect -- let's switch gears for a second.  With
7  respect to the ratification of the United States
8  Constitution, am I correct in understanding that
9  there are no transcriptions of those debates?
10      A.   So, no.  In this case -- so the Constitution,
11  of course, is not a statute.  So -- and the
12  Constitution was ratified by what at the time was a
13  unique process, popularly elected ratification
14  conventions.  And those ratification conventions did
15  generate both newspaper coverage and in some cases
16  there were reporters hired, although interestingly,
17  the reporters hired tended to be Federalists who
18  curiously somehow managed to lose some of the
19  Anti-Federalist debates when they were editing.
20      Q.   Understood.  And the Bill of Rights was
21  ratified by Congress, correct?
22      A.   So, yes.  The Bill of Rights was a product of
23  post-ratification and we have detailed debates within
24  the House, but no records of the Senate's
25  deliberations.

27

1      Q.   Did you -- in writing the book we just talked
2  about, did you consult those debate -- the notes of
3  those debates?
4      A.   Yes, I did.
5      Q.   Okay.  Apart from the notes of those debates,
6  did you consult any literature, such as diaries
7  written by the congressional members who were
8  involved in those debates?
9      A.   To the extent that there were other sources
10  that shed light on it, yeah, sometimes letters.
11  There is actually a very, very famous diary by
12  William Maclay that is an important source for the
13  period, but there aren't a lot of diaries.
14      Q.   Understood.  How about contemporary
15  commentary, did you look at that?
16      A.   Sure.  I spent a lot of hours over microfilm
17  machines reading microfilm because those things were
18  not digitized and they were not searchable through
19  digital means.  You had to actually read everything.
20      Q.   Okay.  In 2002, you wrote a law review
21  article entitled, "Don't Know Much About History, the
22  Current Crisis in Second Amendment Scholarship."  Do
23  you recall that article?
24      A.   Yes.  I couldn't cite it to you verbatim, but
25  I do recall writing it.

28

1      Q.   Okay.  And do you recall opening that article
2  by characterizing the historical evidence regarding
3  the meaning of the Second Amendment's right to bear
4  arms as complex?
5      A.   That -- you'd have to show me the text for me
6  to give you a precise answer.  That sounds plausible,
7  but since I'm under oath, I'd want to actually take a
8  look.
9      Q.   That's fair.  That's fair.  I don't have that
10  article with me today, but let me ask it this way:
11  Based on your lifetime of research, your scholarship
12  on the Second Amendment, is it fair to say that the
13  historical evidence regarding the right to bear arms
14  guaranteed by the Second Amendment is complex?
15      A.   Yes.  I think that would be a fair statement.
16      Q.   As a scholar, were you at the time and are
17  you still aware of dominant approaches to
18  interpreting the Second Amendment?
19      A.   I guess I'm not sure what you mean by
20  "dominant."  Dominant in what sense?
21      Q.   Dominant in the sense that most people would
22  espouse one view or the other?
23      A.   Sorry.  Who are the people we're discussing?
24      Q.   Academics, for instance.
25      A.   Well, you'd have to be precise because are we

29

```
1   talking historians, political scientists, law
2   professors?
3      Q.   Let me take a step back.  Are you familiar
4   with the collective rights model interpretation of
5   the Second Amendment?
6      A.   Yes.
7      Q.   Are you familiar with the individual rights
8   model interpretation of the Second Amendment?
9      A.   Yes.
10     Q.   Would you characterize those as being popular
11  views of how to interpret the Second Amendment?
12     A.   Well, considering most of the data we have
13  about the average knowledge of the Constitution and
14  the Bill of Rights of the average American on the
15  street, I don't think "popular" would be the word I
16  would choose.
17     Q.   Let me take a step back.  Within academia,
18  would those be the two -- would those be popular
19  interpretations of the Second Amendment?
20     A.   So I would say among legal scholars, but
21  among historians, there was a considerable amount of
22  dissatisfaction with that simple dichotomy.
23     Q.   Do you share that dissatisfaction, Professor?
24     A.   Yes, I do.  I do believe that if you're going
25  to call something an individual right, it might be
```

30

```
1   useful to define what one means by that.  And of
2   course, that hasn't really happened in the Second
3   Amendment debate.  People just sort of assume
4   everyone knows what an individual right is, but I
5   think most historians would argue that our conception
6   of rights has evolved considerably since the 18th
7   century.  So we need to be historically precise when
8   you use terms like "individual right."
9      Q.   What could be done to make the definition of
10  "individual right" more precise in your opinion?
11          MR. SULLIVAN:  Object.  Outside the scope of
12  his opinions.
13          THE COURT:  Your claim, Mr. Atkinson?
14          MR. ATKINSON:  Pardon me?
15          THE COURT:  Your claim?  I have his
16  affidavit.  I don't recall that within that was his
17  preferred opinion on the right definition.  Tell me
18  what you're offering this for.
19          MR. ATKINSON:  Your Honor, I was simply
20  seeking to get clarification.  I'm not going to claim
21  it.  I'll move on.
22          THE COURT:  Okay.
23          MR. ATKINSON:  Thank you, Your Honor.
24          THE COURT:  Let me ask you this:  Are you
25  asking that as a demonstration of witness bias or
```

31

```
1   inclination or are we moving on?
2          MR. ATKINSON:  I'm moving on, Your Honor.  I
3   just wanted clarification for my own purposes.
4   BY MR. ATKINSON:
5      Q.   Professor, in addition to the -- in addition
6   to the scholar research that you have written and
7   published, have you published your views on the
8   Second Amendment in any other setting?
9      A.   So, yes.  I wear several hats.  I have
10  published popular journalistic venues.  I have
11  participated as a niche in front-of-the-court
12  filings.  I've been interviewed by, you know, the
13  media in various contexts from here and abroad.  I've
14  done podcasts.
15          Yes.  So I have opined in many forums, you
16  know, with many different hats as it were, as
17  scholar, as an individual, as a historian, citizen,
18  all kinds of things.
19     Q.   When you opine in a nonacademic setting, do
20  you write the same way or talk the same way that you
21  would in an academic paper?
22     A.   No.  I don't think I'd get anything published
23  if I did that.
24     Q.   How would -- withdrawn.
25          Can you give us an example of a journalistic
```

32

```
1   forum in which you've published which was not
2   academia?
3      A.   Sure.  I've published in the Washington Post,
4   The New York Times, The New Republic, The Atlantic,
5   The Nation, Salon, Slate.  Those are the ones that
6   come to mind most readily.
7      Q.   By publishing in those forums, do you
8   understand yourself to be engaging in a political
9   dialogue?
10     A.   So in those forums, I consider myself to be a
11  public intellectual and I see myself as trying to
12  bring the perspective of a student of early American
13  history to a wider audience.
14     Q.   Okay.  Professor, have you ever attended a
15  political protest?
16          MR. SULLIVAN:  Objection as to relevance.
17          MR. ATKINSON:  I believe I have the
18  ability --
19          THE COURT:  I'm going to permit the question.
20  You may go ahead.  I think that they have bearing on
21  the weight.
22  BY MR. ATKINSON:
23     Q.   Professor, have you ever attended a political
24  protest?
25     A.   Of -- well, my first act was to put up
```

33

1  McGovern for president stickers when I was 12.  So I
2  would certainly view that as a political act.
3      Q.   How about a protest as in people coming
4  together to voice their opinions?
5      A.   So I walked a picket line with my mom when I
6  was in high school.  That would certainly be
7  political.
8      Q.   How about in your adult life?
9      A.   In my adult life, that's a good question.  I
10 guess it sort of depends what you mean by political
11 protest.  I'm trying to think.
12     Q.   Let me help you.  Have you ever attended a
13 political protest in support of gun control?
14     A.   So I live one town over from Newtown and I
15 have -- I was asked by the Newtown Action Alliance to
16 speak -- I don't know if you call that -- what you
17 would call that.
18     Q.   All right.  Well, let's break that down.
19          When did you speak at that event?
20     A.   So that was about a year after the Sandy Hook
21 massacre.
22     Q.   Okay.  Was that event a memorial service?
23     A.   It was -- no.  It wasn't a memorial service,
24 but it was a discussion of, you know, what the
25 current state of the debate over gun policy was and

34

1  what the historical traditions of gun regulation in
2  America were.
3      Q.   Have you ever donated money to an
4  organization that advocates for gun control?
5      A.   So I don't donate money to any political
6  organization, although I'm sure my wife has.
7      Q.   Well, your wife's an independent person.
8      A.   Okay.  She would certainly agree with that
9  characterization.
10     Q.   You have -- have you submitted -- going back
11 to something you said earlier.  Have you submitted
12 amicus briefs to the U.S. Supreme Court in Second
13 Amendment cases?
14     A.   Yes.  I participated in Heller, McDonald and
15 Bruen.
16     Q.   Okay.  Were you alone on those briefs?
17     A.   No.  All of those briefs were collective
18 efforts on the part of, I would say, an elite group
19 of historical -- legal historical scholars.
20     Q.   Were these all people that you knew -- know
21 fairly well professionally?
22     A.   Yes.
23     Q.   Okay.  Who's -- withdrawn.
24          Let's talk about Heller for a second.  When
25 you submitted -- this group of professors submits the

35

1  brief in Heller, whose idea was it to have that brief
2  submitted, if you recall?
3      A.   So the lead author on that brief was
4  Jack Rakove of Stanford, who is a Pulitzer
5  Prize-winning historian.  And my recollection is Jack
6  said, "I'm doing a brief.  Do you want to
7  participate?"
8      Q.   Okay.  When you say, "participate," what was
9  that nature of your participation in preparing that
10 brief?
11     A.   Well, that's an interesting question because
12 Jack has a policy where when he -- he'll only sign
13 briefs that he writes.  So he took the lead in
14 writing it and he sent it to all of us and said,
15 "Given your subfields of expertise, do you think the
16 argument, you know, is cogent?  How would you suggest
17 I alter it?  Are there sources I should be citing?"
18 So it was that kind of thing.
19     Q.   Okay.  Do you recall making any suggestions
20 about the content of that brief?
21     A.   Yes.  I remember saying that I think we
22 should have a section on the police power and Jack
23 said, "Nah, we don't need to do that, everyone knows
24 about the police power."
25     Q.   Did you win that discussion with Jack?

36

1      A.   I don't think I've ever won a discussion with
2  Jack.  He outranks me.
3      Q.   Understood.  What would you characterize as
4  the argument made by that brief?
5      A.   So that brief, of course, and I think it's a
6  general principle among amicus briefs, that in
7  contrast to something you might write for a magazine
8  or even a scholarly article, when you write as a
9  friend of the Court, you're operating within the
10 confines of what the existing legal doctrine is.  So
11 that was a brief that was written with Miller as the
12 controlling precedent.
13          So the substance of that argument was that
14 Miller was more right than it was wrong and the Court
15 ought to adhere to the Miller precedent.
16     Q.   Do you recall the brief arguing that private
17 aspects of the ownership of firearms never crossed
18 the threshold into being constitutionally significant
19 in the founding era?
20     A.   So my recollection is that -- let me think
21 about that for a moment.  So my recollection is there
22 was broad agreement among the signers that the right
23 of individual self-defense was well-established under
24 common law, but that the right instantiated in the
25 Second Amendment was primarily about the allocation

37

1  of power between the states and the federal
2  government.  And so those two different rights, which
3  we now see as one right in the 18th century, were
4  distinct.
5      Q.    When you say that it was more about the power
6  dynamic between the state and the federal
7  governments, are you referring to the right for
8  states to maintain a militia?
9      A.    So I suppose that's one way of characterizing
10 it.
11     Q.    How would you characterize it?
12     A.    So I would characterize the right is the
13 dominant understanding in the 18th century was that
14 it was a right of the people to keep and bear arms so
15 that it would be possible to maintain a
16 well-regulated militia and the panoply of other
17 rights, such as the right of self-defense, were part
18 of the background of that, but were not at the center
19 of the congressional debates over the structure of
20 the Second Amendment.
21     Q.    Understood.  Let's move to Bruen.  Did you
22 have any -- I believe you testified earlier that you
23 submitted an amicus brief in Bruen as well, correct?
24     A.    Yes.  So the Bruen amicus brief -- so if the
25 Heller amicus brief started with the assumption that

38

1  Miller was the controlling precedent, the Bruen brief
2  started with the assumption that Heller and McDonald
3  were the controlling precedents.  So you know, the
4  task before us was to marshal historical evidence to
5  help guide the Court and to do so within the
6  framework set out by Heller and McDonald.
7      Q.    Okay.  And were you alone on that brief?
8      A.    No.  I also participated with another group
9  of impressive academics.
10     Q.    And were these all personal -- were all of
11 these academics professionally known to you?
12     A.    Yes.
13     Q.    Similar to what I asked you earlier, whose
14 idea was it to have the brief submitted?
15     A.    So in that case, my standing in the
16 profession had risen a bit.  So I actually initiated
17 that one and asked Jack if he would sign it.
18     Q.    Okay.  Did you take the Jack approach and
19 write the brief yourself?
20     A.    No.  I'm much more of a collaborative author.
21 So I asked people to take a pretty active role in
22 helping to draft it.
23     Q.    Who did you ask to take an active role in
24 drafting it?
25     A.    Everyone who signed it read multiple drafts.

39

1      Q.    Were those drafts prepared by attorneys?
2      A.    So the typical process in drafting an amicus
3  brief, which I think I've gotten better at, I usually
4  or a group of scholars will sort of draft a memo.
5  Then we usually seek outside counsel because it's
6  expensive to file amicus briefs and things like blue
7  booking can be quite, you know, arduous, as I'm sure
8  you know.
9          So typically we would do a memo.  Based on
10 the memo, they would then do a draft sort of both
11 formatting it in the correct form for the Supreme
12 Court and, you know, making advice -- offering advice
13 about, you know, phrasing and, you know, what needed
14 to be below the line in the footnotes, what needed to
15 be in the text, sort of those strategic kind of
16 things that lawyers are much better at than
17 historians.
18     Q.    Understood.  So somebody had to start this
19 project.  Were you the one who started the initial
20 memo?
21     A.    Yes.
22     Q.    And then if I'm understanding you correctly,
23 everybody else who signed the brief worked on
24 multiple drafts of it?
25     A.    Yes.

40

1      Q.    Okay.  Do you recall making the argument that
2  neither English nor American history supported a
3  broad right Second Amendment right to carry firearms
4  or other dangerous weapons in public based on a
5  generic interest in self-defense?
6      A.    So the argument of that brief was there was a
7  long history of limits on public carry under Anglo
8  American law.
9      Q.    Do you think the Supreme Court agreed with
10 you in its Bruen decision?
11         MR. SULLIVAN:  Just object to the extent it
12 calls for a legal conclusion just as phrased.
13         THE COURT:  Well, I assume you are referring
14 to the text of Bruen and whether or not that contains
15 a reflection of whether the premises of their amicus
16 was adopted, rejected or ignored.
17         MR. ATKINSON:  I'm simply asking him for his
18 perception of that, Your Honor.  I understand what
19 Bruen says is the province of the court to decide.
20 I'm simply asking him what his perception was of
21 Bruen.
22         THE COURT:  I'll permit that.  Go ahead.
23         MR. ATKINSON:  Thank you.
24 BY MR. ATKINSON:
25     Q.    So Professor, I'll ask it again for you, do

41

```
1  you think the Supreme Court agreed with you in its
2  Bruen decision?
3      A.   So I think there are aspects of the Court's
4  decision that are consistent with our brief and there
5  are aspects of it that are not.
6      Q.   All right.  Can you describe to us what
7  aspects you think are consistent with our brief?
8      A.   So our brief looked at the history and
9  tradition of firearms regulation and the framework
10 that the Bruen court decided to implement was a
11 history text tradition framework.  So
12 methodologically, there was substantial agreement.
13          MR. ATKINSON:  May I have a moment, Your
14 Honor?
15          THE COURT:  Yes.
16          MR. ATKINSON:  Thank you.
17 BY MR. ATKINSON:
18     Q.   What aspects of Bruen do you think the
19 Supreme Court didn't agree with you on?
20     A.   Sorry.  Did or didn't?
21     Q.   Didn't.
22     A.   Did not.
23     Q.   The negative, yes.
24     A.   The negative, thank you.  Well, I think that
25 in our brief, we produced evidence from the
```

42

```
1  territories from Texas, from most of the major cities
2  of restrictions similar in nature to New York's
3  Sullivan law, and the Supreme Court decided that they
4  were outliers.  So they didn't dispute our
5  characterization of laws; they disputed how to weigh
6  them.
7      Q.   Are you familiar with a journalistic outlet
8  known as SCOTUSblog?
9      A.   Yes.  SCOTUSblog is the top of the heap in
10 terms of Supreme Court punditry.
11     Q.   Okay.  After Bruen, did SCOTUSblog, to your
12 knowledge, did they hold a symposium asking for
13 commentary on Bruen?
14     A.   Yes.  They asked me and several other people
15 to contribute.
16     Q.   Did you contribute?
17     A.   I did.
18     Q.   Okay.  Do you recall the name of the piece
19 you submitted to SCOTUSblog?
20     A.   Well, I don't think I've memorized it, but,
21 you know, I have a vague recollection of the title I
22 came up with.
23     Q.   If I showed you the article, do you think
24 you'd recognize it?
25     A.   Oh, of course.
```

43

```
1          MR. ATKINSON:  Your Honor, may I approach the
2  witness to show him what is marked as Plaintiff's
3  Exhibit 14 for ID only?  And I'm going to show it to
4  my colleagues first before I approach him.
5  BY MR. ATKINSON:
6      Q.   Do you recognize that, Professor?
7      A.   Yes.  That is the genuine article.
8      Q.   Okay.  What is the title of that article?
9      A.   So the title is "Cherry-Picked History and
10 Ideology-Driven Outcomes:  Bruen's Originalists
11 Distortions."
12     Q.   Okay.  Would it be -- let me ask you this:
13 Were you disappointed in the Bruen decision,
14 Professor?
15     A.   No.  I don't think I was because I wasn't
16 surprised.  I think to be disappointed, you'd have to
17 be surprised.
18     Q.   Okay.  But you were -- were you critical of
19 the interpretive methodology that was applied?
20     A.   Yes.  So this particular piece, of course, is
21 by definition not written within the Bruen framework.
22 It was written in opposition to the Bruen framework.
23     Q.   And is it true that you characterized the
24 Bruen test as, quote, fiction, fantasy and mythology?
25     A.   That is correct.
```

44

```
1          MR. ATKINSON:  May I approach the witness
2  again, Your Honor?
3          THE COURT:  You may.
4          MR. ATKINSON:  I'm going to take that back.
5  BY MR. ATKINSON:
6      Q.   Professor, let's turn to your testimony or
7  your opinion you supplied in this case.  Do you
8  recall submitting an affidavit to the Court or --
9  withdrawn.
10         Do you recall providing an affidavit at the
11 request of the defendant in this case?
12     A.   Yes.
13     Q.   And you understood you were being called to
14 provide an expert opinion?
15     A.   Yes.
16     Q.   And did you provide that expert opinion?
17     A.   I did.
18     Q.   Okay.  Prior to taking the stand to testify
19 today, did you review that affidavit?
20     A.   I did.
21     Q.   Okay.  Do you recall stating in your
22 affidavit, and I quote, "there were no modern style
23 parks in the era of the Second Amendment"?
24     A.   Yes.
25     Q.   By "the era of the Second Amendment," do you
```

45

```
1    mean the time around the year 1791?
2        A.   Yes.
3        Q.   You did -- did you reference urban --
4    withdrawn.
5            Did you reference urban public spaces
6    throughout your affidavit?
7        A.   I discussed both urban, state-controlled and
8    federal parks.
9        Q.   Okay.  But you did reference urban public
10   spaces throughout your affidavit?
11       A.   I did.
12       Q.   All right.  And in particular, you
13   mentioned -- did you -- withdrawn.
14           In particular, did you mention the Boston
15   Common?
16       A.   Yes.  I did discuss the Boston Common.
17       Q.   Okay.  Did you describe the Boston Common as
18   the oldest public space in America?
19       A.   I did.
20       Q.   As you sit here today, what is your
21   recollection of the year the Boston Common was
22   established?
23       A.   I'd have to check my declaration.  I vaguely
24   recall it might have been 1638.
25           MR. ATKINSON:  I will -- if I may, Your
```

46

```
1    Honor, approach the witness again?
2            THE COURT:  You may.
3            MR. ATKINSON:  Thank you.
4            I am showing my colleagues and for the
5    Court's convenience, I am showing what's been marked
6    as Exhibit -- Plaintiff's Exhibit 4, which is also a
7    full exhibit without -- without objection on the
8    defendant's list, Your Honor.  I'm unaware of the
9    number off the top of my head.
10   BY MR. ATKINSON:
11       Q.   Professor, I've just placed what's been
12   marked as Plaintiff's Exhibit 4 for identification in
13   front of you.  Please take some time to review that.
14           THE COURT:  You're offering this as a full
15   exhibit?
16           MR. ATKINSON:  I was just using it for ID.  I
17   believe the defendants have it as a full exhibit on
18   their exhibit list, but I don't have that in front of
19   me right now.  I'll check.
20           THE COURT:  So is that --
21           MR. ATKINSON:  Your Honor, on the list that
22   we have, it's marked as Defendant's Exhibit -- full
23   exhibit.
24           THE COURT:  Is it 11?
25           MR. ATKINSON:  135.  For us, it's Plaintiff's
```

47

```
1    Exhibit 4 for ID.  We did not object to the state
2    offering or the defendant offering it as a full
3    exhibit.
4            MR. SULLIVAN:  Your Honor, if we can just
5    clarify the numbers.  I think there is some
6    confusion.
7            THE COURT:  So I have 135 as Professor
8    Cornell's declaration on the defendants, and then I
9    have --
10           MR. ATKINSON:  Your Honor, I apologize.  I
11   just -- I believe I gave Mr. Cornell the wrong
12   exhibit and I apologize.  May I approach him?
13           THE COURT:  Are you talking about Professor
14   Cornell's declaration?
15           MR. ATKINSON:  Yes.  That's what I attempted
16   to hand him.
17           THE COURT:  Shall we just use the designation
18   of 135?
19           MR. ATKINSON:  That's fine with me, Your
20   Honor.
21           THE COURT:  Let's do that and that's a full
22   exhibit without objection.
23           MR. SULLIVAN:  Yes, Your Honor.  No
24   objection.
25           MR. ATKINSON:  Correct.  Your Honor, I'm
```

48

```
1    going to hand him my copy of that.  I accidentally
2    handed him somebody else's declaration and I
3    apologize.  I apologize, Professor.
4            THE WITNESS:  It was interesting reading.
5            Yes.  This looks more familiar.
6    BY MR. ATKINSON:
7        Q.   Okay.  Professor, I've just handed you what
8    has been admitted as Defendant's Exhibit 135.  Do you
9    recognize that?
10       A.   That's this thing?
11       Q.   Correct.
12       A.   That's my declaration.
13       Q.   We were discussing the Boston Common and the
14   year.  Would you look at page 16 of that exhibit,
15   paragraph 30, please?
16       A.   Sorry.  I was off by four years, 1634.
17       Q.   Just so the record is clear, the year 1634 is
18   when the Boston Common was established?
19       A.   Yes.
20       Q.   You also -- in your affidavit, you listed --
21   did you list what the common uses of the Boston
22   Common were?
23       A.   Yes.
24       Q.   Okay.  What were those common uses?
25       A.   So the Common was used as a pasture, a place
```

49

```
1   of execution, site for militia musters and drills.
2      Q.    Apart from what you listed in your affidavit
3   or your declaration, are you aware of any other uses
4   for the Boston Commons in that initial 1634 period?
5      A.    I'm sure people strolled on the Boston
6   Common.
7      Q.    If we fast-forwarded to 1791, would you be
8   aware of any other uses apart from the ones that you
9   listed in your affidavit and the one that you just
10  gave to us?
11     A.    Well, I have not made a careful study of the
12  changing uses of the Boston Common.  So I would be
13  hesitant to offer an opinion under oath about what
14  activities were going on in it without further
15  research.
16     Q.    Understood.  Fair enough.  But you also just
17  testified that you're sure people strolled on the
18  Boston Common, correct?
19     A.    Well, I'm guessing they did.  I'm making an
20  educated guess.
21     Q.    Okay.  What would be the basis for making an
22  educated guess like that?
23     A.    Well, it's hard to pasture an animal without
24  you walking occasionally and checking on the animal.
25  I grew up in Brooklyn, so I'm not going to present
```

50

```
1   myself as an expert on farming or sheep grazing.
2      Q.    I was just about to go there, but thank you.
3      A.    I'm sorry.
4      Q.    No, I'm joking.
5            Would you characterize strolling as
6   recreational?
7      A.    That would be one context in which you would
8   stroll.
9      Q.    What would other contexts of strolling be?
10     A.    Well, I'm speculating here.  If my dog ran
11  away, I'd probably stroll after it.
12     Q.    Would you run after it?
13     A.    Are we talking me now or me in my blazing
14  youth?
15     Q.    I'm not going hold you to that.  Let's move
16  on.
17           You also stated that, quote, even when used
18  for militia purposes, these public spaces were
19  tightly regulated, correct?
20     A.    Yes.  You couldn't actually come to muster
21  with a loaded firearm or discharge it.
22     Q.    Do you know the purpose of that law?
23     A.    That is a public safety measure.
24     Q.    What basis do you rely on for your opinion
25  that it's a public safety measure?
```

51

```
1      A.    Well, having read the statute, I don't have
2   the statute in front of me, but the statute clearly
3   was -- the goal was to facilitate militia training,
4   but to do so in a safe manner, so ergo public safety.
5      Q.    And that was a law -- was that law passed by
6   the Massachusetts legislature to your understanding?
7      A.    Yes.
8      Q.    Okay.  Outside of that law from the period of
9   1634 to 1834, are you familiar with any other law
10  that prohibited the carrying of firearms on the
11  Boston Common?
12     A.    Well, there were general laws in the state of
13  Massachusetts that prohibited public carry.
14     Q.    Can you give us an example of those?
15     A.    Yes.  So in 1834, I believe, Massachusetts
16  thoroughly revised its criminal code as part of a
17  broader process called codification where common law
18  was transformed into statutory law and the
19  Massachusetts statute or series of statutes enacted
20  in 1834 prohibited carrying firearms in public.
21           I've also done some research on the
22  enforcement of that by the Boston Police and we have
23  a really quite remarkable case where two individuals
24  were prosecuted for carrying a gun in public.  So I
25  feel pretty confident that you could not do that in
```

52

```
1   19th century pre-Civil War Boston.
2      Q.    When you say carrying in public, do you mean
3   in a -- withdrawn.
4            When you say carrying in public -- withdrawn
5   again.
6            Are you familiar with the Statute of
7   Northampton, Professor?
8      A.    I am indeed.
9      Q.    Okay.  The law, the 1834 law you just
10  described and the codification, did it bear any
11  similarities to the Statute of Northampton?
12     A.    So the Statute of Northampton, which was
13  enacted in 1328, was the foundation for several laws
14  enacted in the era of the Second Amendment, notably
15  Virginia and North Carolina.  The Massachusetts'
16  statute, which was enacted in 1794, three years --
17  the first version of the statute three years after
18  the Second Amendment departed in its language from
19  the Statute of Northampton.
20           I'd have to have the two in front of me to
21  give you the exact differences between the two, but
22  it was part of a process that we call the
23  Americanization of the common law where aspects of
24  English common law were adapted and we enacted either
25  by legislatures or by court decisions and
```

53

```
1   incorporated into the law of the individual states.
2      Q.   So understanding that you don't have the
3   statute in front of you, is your understanding as you
4   sit here today -- I'm not trying to pin you down on
5   this is an absolute.  I'm just asking about your
6   understanding today.  Is your understanding today
7   that it -- that Massachusetts law in 1834 was a
8   general prohibition on the carrying of firearms in
9   public?
10     A.   So it was a prohibition, but it had certain
11  exceptions for imminent threat.
12     Q.   We talked about five minutes ago about the
13  purpose of the law prohibiting men from coming to
14  militia muster with loaded firearms.  Are you
15  generally familiar with the type of firearms in use
16  around 1791?
17     A.   Although I wouldn't claim to be a firearms
18  expert, I do have some knowledge of the relevant
19  types of firearms that were common in the 18th and
20  19th century.
21     Q.   Okay.  Do you have any knowledge of what a
22  militiaman would typically be expected to carry?
23     A.   Yes.  The standard weapon of a militiaman
24  would have been a Brown Bess musket which would have
25  had to have been capable of taking a bayonet.  It
```

54

```
1   would have also included a ramrod lading for the
2   bullets, a cartridge box, gun powder and a powder
3   horn.
4      Q.   Are you familiar with how that Brown Bess
5   musket was loaded?
6      A.   Yes.  It was a rather cumbersome process.
7      Q.   Okay.  Can you describe your understanding of
8   that process to us?
9           MR. SULLIVAN:  I would just object as to
10  relevance and also he had earlier testified that he's
11  not a firearms expert.
12          MR. ATKINSON:  Your Honor --
13          THE COURT:  Well, so he did say that.  He
14  itemized what he would assume was the standard
15  carrying -- standard equipment carried by a militia
16  person.  What is your question and its purpose of
17  cumbersomeness?
18          MR. ATKINSON:  Your Honor, we were -- the
19  line of questioning that I was pursuing was as to the
20  purpose of the law prohibiting a man from coming to
21  militia muster with a loaded firearm.  He did testify
22  earlier that it also went to the safety of how
23  militia drilled, if I recollect correctly.
24          What I'm getting at in terms of the -- him,
25  one, saying that it was cumbersome to load implies he
```

55

```
1   has some knowledge of the process of how it was
2   loaded, and what I'm trying to do is get at how
3   militia drilled in that time and whether there was
4   another purpose for the law prohibiting someone to
5   come to militia apart from -- with a loaded firearm
6   apart from a public safety.
7           THE COURT:  Why don't we focus the question
8   on that.  Okay?
9           MR. ATKINSON:  Okay.
10  BY MR. ATKINSON:
11     Q.   Professor, you -- you're familiar that
12  militias typically drilled in the founding era,
13  correct?
14     A.   Yes.
15     Q.   Given the cumbersomeness of loading a
16  founding era Brown Bess musket, was it important for
17  militias at the time to drill loading their muskets?
18     A.   It was.  And also we know from newspaper
19  reports that people do get shot on muster days.  So
20  the state having laws that said you can't travel to
21  muster or you can't discharge your firearm until
22  ordered by an officer would have been consistent with
23  public safety.
24     Q.   Okay.  What is your understanding on why
25  militias drilled regularly by practicing loading
```

56

```
1   firearms?
2      A.   Well, unlike modern firearms, it takes quite
3   a bit of skill to learn how to load and fire black
4   powder, you know, muzzle-loading weapon.
5      Q.   Okay.  Given the time that it took to -- and
6   the skill that it took to load a black powder musket
7   as you describe, would you agree with me that a unit,
8   a militia unit that could load relatively quickly had
9   an advantage in combat?
10          MR. SULLIVAN:  I just object again to
11  relevance.  We're getting outside the scope of the
12  declaration.
13          THE COURT:  It is outside the scope of the
14  declaration.  So tell me what your purpose is.
15          MR. ATKINSON:  What I am attempting to do is
16  to establish the importance of the militia drilling,
17  and in this context, the reason why they were being
18  required to come to muster without muskets -- without
19  loaded muskets would defeat some of the purpose of
20  drilling.
21          THE COURT:  That's not what your question
22  sounded like to me.  Do you want to rephrase?
23          MR. ATKINSON:  I will attempt to do so and if
24  I can't, Your Honor, I'll move on.
25  BY MR. ATKINSON:
```

57

```
1    Q.    Professor, are you aware of any way to unload
2  a black powder musket in the founding era?
3    A.    Well, discharging it would be the most direct
4  way of doing that.
5    Q.    Are there any other ways that you're aware
6  of?
7    A.    Well, again, we're sort of stretching my
8  expertise, but there are these auger things where you
9  can actually remove a musket ball if you had to.
10 It's somewhat dangerous and cumbersome, but if it had
11 to be done, you could do it.
12   Q.    And by saying "cumbersome," do you mean that
13 it would take time?
14   A.    Yes.
15   Q.    I am ready to move on.
16         I want to go back to your characterization of
17 the Boston Common as an urban space.  Was it
18 prototypical in the founding era for large cities to
19 have space similar to the Boston Common?
20   A.    So it really depended on what region of
21 American you were in.  If you were in the back
22 country, you wouldn't have had need for anything like
23 the Boston Common.  In the South, you don't have
24 nucleated villages, so you wouldn't have had commons.
25 So the idea of a common is a distinctively
```

58

```
1  New England form of land use.
2    Q.    Okay.  By the term "urban space," the term
3  that you used, "urban space," did you also mean to
4  encompass what we would refer to now as a town green?
5    A.    Yes.  That -- but the town green is something
6  you associate with nucleated villages in New England.
7  You don't have town greens in Virginia or South
8  Carolina.
9    Q.    Okay.  The founding era, based on your
10 research, et cetera, would smaller communities have
11 public spaces -- smaller New England towns actually,
12 would they have public spaces similar to the Boston
13 Common but smaller in size?
14   A.    In New England where you had nucleated
15 villages, yes.
16   Q.    And the purposes for those public spaces
17 were -- would they be largely similar to the purposes
18 that you've outlined for the Boston Common?
19   A.    Yes.
20   Q.    In your affidavit, you -- withdrawn.
21         In terms of common public spaces, are you
22 familiar with founding era taverns?
23   A.    Yes.  I lived in Colonial Williamsburg and
24 spent a good deal of time in several of those.
25   Q.    Would you agree with me that those taverns
```

59

```
1  existed in the colonial and the founding era?
2    A.    Yes.  Certainly taverns are a venerable part
3  of the American tradition.
4    Q.    Would you also agree with me that they were
5  places of recreation in the founding era?
6    A.    Well, of course they were, but taverns were
7  privately owned.
8    Q.    Are you aware of any government laws that
9  prohibited the carrying of firearms in taverns during
10 the founding era?
11   A.    Typically you don't get government
12 regulations of how people can use their private
13 spaces.
14   Q.    In the founding era --
15   A.    No.  As a general rule under Anglo American
16 law, private property is pretty esteemed value, and
17 typically people have considerable autonomy over
18 their lands and property.  So you do, for instance,
19 in Boston have a -- have a law that says you can't
20 have a loaded firearm in your -- any domestic
21 dwelling in the city.
22   Q.    What era was that law?
23   A.    1786.
24   Q.    Okay.  Let's move on.
25         You also stated in your affidavit that the
```

60

```
1  creation of modern parks as we know them today began
2  in the middle of the 19th century, correct?
3    A.    Correct.
4    Q.    If I recall correctly, you also stated that
5  Henry David Thoreau was a primary influence in that
6  creation, correct?
7    A.    So what we call modern parks were certainly
8  influenced by both romanticism and transcendentalist,
9  and Thoreau is certainly one of the leading
10 transcendentalists luminaries.
11   Q.    And in pursuant of various romanticized and
12 transcendentalist ideals, you also stated that urban
13 planners, architects and government officials began
14 to look towards creating state parks, right?
15   A.    That's right.  We have -- the earliest parks
16 are municipal, but then state and federal parks
17 follow somewhat later.
18   Q.    Okay.  I understand.  I misspoke there and
19 thank you for clearing me up.
20         What was the first American municipal park,
21 to your knowledge?
22   A.    New York Central Park, 1858.
23   Q.    Okay.  To your knowledge, was Central Park
24 open for business before the Civil War?
25   A.    So I would have to confirm that.  I don't
```

61

```
1   recall whether 1858 is when they broke ground or when
2   it was opened to the public.  So I'd have to confirm
3   that before I could swear to it.
4       Q.   That's fair.  That's fair.  And from the --
5   in your understanding, from the start, Central Park
6   had a prohibition on carrying firearms in it?
7       A.   Yes.  Virtually all of the major parks in
8   America from their inception had such prohibitions.
9       Q.   Let's just focus on Central Park for now.
10      A.   Okay.
11      Q.   Who created the Central Park rule?
12      A.   So, well, the -- the person who designed
13  Central Park is Frederick Law Olmsted.  New York City
14  created Central Park.
15      Q.   And they also created the law that prohibited
16  carrying firearms in it, correct?
17      A.   Correct.
18      Q.   And when about did they create that law?
19      A.   It was part of the earliest regulations of
20  the use of the park.
21      Q.   Do you have a recollection as you sit here
22  today when those earliest regulations were
23  promulgated?
24      A.   1858.
25      Q.   After New York creates Central Park, is it
```

62

```
1   your understanding that other major cities followed
2   suit fairly quickly thereafter?
3       A.   Yes.  Within about a decade, you had a number
4   of other parks created.
5       Q.   Okay.  Do you recall, as you sit here today,
6   which cities created other parks?
7       A.   So in my declaration I have a table that
8   lists the earliest -- well, sorry.  The creation of
9   parks in the nation's five largest cities and whether
10  or not they had gun prohibitions.  And in the
11  footnote, I list a number of other early parks also
12  from the sort of era of reconstruction.
13      Q.   Let's focus on the table for a second.
14      A.   Yes.
15      Q.   The first city that you list is Chicago after
16  New York, actually.  And when did Chicago create a
17  public park, if you recall?
18      A.   1873.
19      Q.   At the time they created a public park, was
20  the first time they promulgated a regulation that
21  functionally said thou shall not carry a firearm in a
22  public park?
23           MR. SULLIVAN:  I would just object to the
24  characterization to the extent that's --
25           MR. ATKINSON:  I'll rephrase, Your Honor.
```

63

```
1            THE COURT:  All right.  The affidavit talks
2   about gun prohibition in parks.  When did Chicago
3   have a gun prohibition in its park, started in 1873.
4            MR. ATKINSON:  Correct.
5   BY MR. ATKINSON:
6       Q.   To the best of your knowledge, Professor,
7   Chicago's first gun prohibition in a park was 1873?
8       A.   I believe so, yes.
9       Q.   Philadelphia is the third one you list there.
10  When did it create its first public park?
11      A.   I would have to -- I don't know if I actually
12  listed that in my report.  So I'd have to confirm
13  that.
14      Q.   Okay.  But you do have on the table that they
15  imposed a prohibition on carrying a firearm in a
16  public park in 1868, correct?
17      A.   Yes.  The table focuses on post-Civil War
18  reconstruction era given Bruen's emphasis on that as
19  an important date in understanding the scope of the
20  legitimate regulation.
21      Q.   Perhaps we can simplify this.  Apart from New
22  York's Central Park prior to the Civil War, are you
23  aware of any other public parks being created prior
24  to the Civil War?
25      A.   You know, I -- I could not tell you without
```

64

```
1   doing some further research.  I didn't focus on the
2   founding date of all the parks.
3       Q.   Okay.  That's fair enough.  I'll move on.
4            To this point, we've been talking about
5   municipalities and their regulations.  Based on your
6   research, when was the -- when -- which statement --
7   withdrawn.
8            Based on your research, do you recollect, as
9   you sit here today, which state government was the
10  first one to impose a similar prohibition on carrying
11  firearms in public parks?
12      A.   So Olmsted took a leading role in
13  establishing the first state park in California, but
14  California had problems funding the maintenance.  So
15  the park was turned over to federal control and under
16  federal control, a similar prohibition was enacted.
17      Q.   So I understand what you're testifying there.
18  What I'm asking you is very specific.
19           What -- as you sit here today, do you have a
20  recollection of which state was the first one to
21  follow through with imposing a similar prohibition?
22      A.   So I did not examine that question in detail
23  because state parks were not common in this period.
24      Q.   Okay.  To your knowledge, when did they
25  become common?
```

65

```
1    A.    State parks are more of an early 20th century
2  phenomenon.
3    Q.    When you say, "early 20th century
4  phenomenon," can you be more precise in term of years
5  or decades?
6    A.    Well, again, without doing some additional
7  research, it's more of a progressive era, Teddy
8  Roosevelt era development than it is a reconstruction
9  era development.
10   Q.    Fair enough.  Let's go back to the laws that
11 were enacted around the time of the Civil War and
12 thereafter.
13       Are you aware, based on your research of
14 those laws, of any legal challenges to them that
15 relied on the Second Amendment as a basis for
16 challenging them?
17   A.    I'm sorry.  Legal challenges to --
18   Q.    I'll rephrase the question for you.
19       For laws that -- prohibitions on carrying
20 firearms in state parks before the Civil War and
21 thereafter, are you aware of any legal challenges to
22 those laws that relied on the Second Amendment to
23 state the legal challenge?
24   A.    Well, the Second Amendment would not have
25 applied to the states in pre-Civil War America
```

66

```
1  because of the Supreme Court's ruling in Barron v.
2  Baltimore.  So there would have been no foundation
3  under American law to make a Second Amendment claim
4  against a state regulation.
5    Q.    How about after the Fourteenth Amendment was
6  adopted?
7    A.    Well, of course, it takes a while for
8  incorporation doctrine to work itself out, but I'm
9  not aware of any challenges to parks in the era of
10 the Fourteenth Amendment.
11   Q.    Okay.  In the pre-Civil War era, are you
12 aware of any legal challenges to prohibition such as
13 the Central Park prohibition that relied on a state
14 constitutional provision that was similar to the
15 Second Amendment?
16   A.    Not as it pertains to parks, no.
17   Q.    Okay.  How about after the Civil War, are you
18 aware of any such challenges?
19   A.    Not from the era of the Fourteenth Amendment.
20   Q.    How about the early 1900s, are you aware of
21 any challenges in that era?
22   A.    Well, I did not look at that period because
23 Bruen gives less attention to that.
24       MR. ATKINSON:  Your Honor, may I have a
25 moment to confer with Mr. Nastri, please?
```

67

```
1        THE COURT:  Yes.
2        MR. ATKINSON:  Thank you, Your Honor.
3  BY MR. ATKINSON:
4    Q.    I have one more line of questioning,
5  Professor.  Going back to what we discussed earlier
6  regarding the Boston Common law about the discharge
7  of -- or regarding coming to muster with a loaded
8  firearm, are you aware of -- withdrawn.
9        To the best of your knowledge, do you know
10 when -- if the militia was drilling on the Boston
11 Common, for instance, they would discharge their
12 firearms in the course of drilling?
13   A.    I must confess that I don't recall.  I do
14 know, obviously, in many militia musters there would
15 be discharge of firearms when ordered to do so.  But
16 I don't remember specifically looking at what the
17 practice was of the muster militia in the city of
18 Boston.
19   Q.    Understood.
20       MR. ATKINSON:  No further questions, Your
21 Honor.
22       THE COURT:  All right.  Do you want to begin
23 cross-examination?  Do you want to take an early and
24 brief lunch break?  What's your pleasure?
25       MR. ATKINSON:  I'll defer to my colleagues,
```

68

```
1  Your Honor.
2        MR. SULLIVAN:  Your Honor, we'd be open to a
3  break, a short lunch break.
4        THE COURT:  Let's take a short break in which
5  it will be assumed that you have something to eat and
6  we will be back -- is half an hour enough?
7        MR. SULLIVAN:  Half an hour, thank you.
8        THE COURT:  Half an hour.  Thank you very
9  much.
10       I'll ask our witness, Professor Cornell,
11 please don't discuss your testimony with anyone until
12 you are back on the stand.  Thank you very much.
13       We stand in recess.
14       (Recess taken.)
15       (Call to Order, 12:36 p.m.)
16       THE COURT:  Please be seated, counsel.
17       Mr. Nastri, would you mind checking and
18 seeing if Mr. Atkinson --
19       MR. ATKINSON:  I apologize, Your Honor, if I
20 kept everybody waiting.
21       THE COURT:  Not very long.  All right.  We
22 need Professor Cornell.
23       MR. SULLIVAN:  We can check the hallway for
24 him, Your Honor.
25       MR. BOCHAIN:  Your Honor, can I just have one
```

69

1  moment with Attorney Atkinson?
2          THE COURT:  Yes.
3          Okay.  Professor Cornell, if you would kindly
4  return to the stand and recall that you are under
5  oath.
6          MR. ATKINSON:  Your Honor, as a brief
7  housekeeping matter, can I get Exhibit 14 back from
8  Professor Cornell, please?
9          THE COURT:  Have you stolen Exhibit 14?
10         MR. ATKINSON:  I instructed him to leave it
11 there.
12         THE COURT:  All right.  We're all set?
13         MR. ATKINSON:  Yes, Your Honor.
14         MR. BOCHAIN:  Actually, Your Honor, if we
15 could just have one other quick housekeeping matter,
16 I know earlier this morning there was a brief
17 discussion about exhibits, and perhaps there was a
18 misunderstanding on my end and I just want to clarify
19 the record if I may.
20         So Exhibits 100 through 143, the ones that I
21 had referenced this morning, we are offering them
22 today in connection with the preliminary injunction
23 hearing for your consideration.  And so Exhibits 1
24 through 132 we had submitted in connection with the
25 preliminary injunction opposition that we had filed,

70

1  and we had discussion with counsel and I believe with
2  Your Honor regarding these exhibits.
3          So I guess I'm looking for a little bit of
4  clarity from Your Honor how you would like to proceed
5  with this, because it's my understanding that there's
6  no objection for Exhibits 1 through 143 coming into
7  evidence, and we would be offering those for
8  consideration for Your Honor in connection with the
9  preliminary injunction hearing.
10         So I guess I'm just looking for a little bit
11 of clarity from Your Honor how you would like us to
12 go forward with that and the declarations, but those
13 are part of the exhibits that I just referenced, Your
14 Honor.
15         THE COURT:  We can do it this way:  Why don't
16 we proceed assuming that 1 through 143 will be a part
17 of the record without objection.  At the end of the
18 hearing, you will call out the exhibits you did not
19 use or do not need.
20         MR. BOCHAIN:  I believe -- we can proceed
21 like that, Your Honor, but I'm -- I just am telling
22 the Court that we do intend to rely on all of those.
23         THE COURT:  Okay.
24         MR. BOCHAIN:  And so would you like me to
25 still proceed in that fashion or can we say that it's

71

1  admitted today at this time?
2          THE COURT:  We can say that 1 through 143 are
3  admitted without objection and will that clarify our
4  proceeding?
5          MR. ATKINSON:  Yes, Your Honor.
6          THE COURT:  All right.  Let's proceed.
7          I'm sorry.  Are you finished, Mr. Atkinson,
8  with your examination?
9          MR. ATKINSON:  Yes, Your Honor.  If the
10 record didn't reflect that, I apologize.
11         THE COURT:  Cross-examination.
12    CROSS-EXAMINATION OF PROFESSOR SAUL CORNELL
13 BY MR. SULLIVAN:
14    Q.    Good afternoon, Professor Cornell.
15    A.    Good afternoon.
16    Q.    How was your lunch?
17    A.    I love New Haven, good coffee, good eats.
18 It's awesome.
19         THE COURT:  You can come back any time.
20         MR. SULLIVAN:  We'll try to get done with you
21 today at least.  So just as we were -- actually, Your
22 Honor, if I may have some leeway to go outside the
23 scope of plaintiff's examination.
24         THE COURT:  That's fine.  He's being offered
25 by both sides, perhaps not for completely congruent

72

1  reasons.  So yes is the answer.
2          MR. SULLIVAN:  Thank you, Your Honor.
3          Furthermore, although he's been separately
4  recognized by myself and plaintiff's counsel as an
5  expert in his field, I would like to, in light of his
6  testimony directed to plaintiff's counsel on
7  examination, I would like to tender him as an expert
8  witness under Rule 702 as a legal and constitutional
9  historian.
10         THE COURT:  He certainly seems to be that
11 expert.  I will certainly certify him as an expert
12 under -- for constitutional history; is that the
13 offer.
14         MR. SULLIVAN:  That's the offer, Your Honor.
15         THE COURT:  Thank you.
16 BY MR. SULLIVAN:
17    Q.    Now, Professor Cornell, as we begin, I'd like
18 to just take a moment and clarify, you're not a
19 lawyer, are you?
20    A.    I am not a lawyer, no.
21    Q.    You never attended law school?
22    A.    No, I did not.
23    Q.    But you are a constitutional legal historian,
24 correct?
25    A.    Yes, I am.

73

```
1   Q.  So as we are here today in a courtroom, what
2   do you understand your role to be as a witness
3   offering opinions as a constitutional and legal
4   historian?
5   A.  Sure.  My role as an expert witness is to
6   give the state my expert opinion about the relevant
7   history of gun regulation and the relevant context to
8   understand those regulations consistent with Bruen's
9   history, text and tradition framework.
10  Q.  And on plaintiff's examination, you were
11  asked about your work in other fields, which I
12  believe you had -- in your response, you
13  characterized as, you know, work as a public
14  intellectual, work as an academic, and then work more
15  directed to legal work; is that correct?
16  A.  Yes.  And I often tell my students that for
17  any given constitutional question or constitutional
18  text, you can ask what a particular text meant at a
19  particular moment in American history, you can ask
20  what does it mean in American culture today, and then
21  you can ask what does it mean as a matter of law, and
22  then, of course, the latter one is shaped by the
23  decisions of the Supreme Court.
24  Q.  All right.  And when you were writing in more
25  popular media, for instance, the SCOTUSblog venue,
```

74

```
1   what did -- in what capacity were you writing for
2   that article?
3   A.  So there I was acting as a public
4   intellectual unconstrained by the decisions of the
5   Court, offering my own views as a historically
6   informed private citizen.
7   Q.  And do you understand there to be constraints
8   on your testimony today?
9   A.  Oh, absolutely.  There are arguments that are
10  simply taken off the table by Heller, McDonald and
11  Bruen.  I'm quite aware of that.
12  Q.  All right.  Now, just before we get to the
13  specifics of your opinion in this matter, I'd like to
14  step back and get a sense of your general practices
15  as an academic historian.
16  A.  Sure.
17  Q.  Now, are there standards that govern the
18  practice of historians in your field?
19  A.  Yes.  There are best practices, well-accepted
20  methodological precepts, rules about evidence, rules
21  about argumentation, rules about style, and perhaps
22  the best place to see those would be in the recent
23  three-volume Cambridge History of Law in America
24  which I think is recognized as kind of the standard
25  history of American law, and I wrote the chapter in
```

75

```
1   that on the Bill of Rights and the Marshall Court
2   era.  I'm sorry, cowrote it.
3   Q.  All right.  And how are those academic
4   standards enforced in your field?
5   A.  So those academic standards require you to
6   not cherry-pick evidence, but to actually immerse
7   yourself in the full range of sources that one can
8   identify as relevant to any particular historical or
9   constitutional topic.
10      So when I do my research, I try to cast as
11  wide a net as possible both in terms of primary
12  sources, but also in terms of secondary sources so
13  that, for instance, I would look at the history of
14  material culture to understand something about
15  firearms, military history, social history, all of
16  these fields which don't speak directly to the Second
17  Amendment, but I think are important to understand
18  what Americans thought they were doing when they
19  passed various pieces of legislature or why various
20  pieces of legislation might not have been on their
21  minds.
22  Q.  And when you are reviewing the history and
23  those sources, do you do so with any preconceived
24  notions about, as you identify those sources, which
25  ones may be relevant and which ones may be
```

76

```
1   irrelevant?
2   A.  Well, no.  In fact, the most remarkable thing
3   about this whole process of being an expert witness
4   is there's really no reason given my scholarly focus
5   to have looked at the history of gun regulations in
6   parks, it wouldn't have come up, but obviously the
7   facts of this case meant that that was relevant.  So
8   I had to dig into the history of parks, the history
9   of the regulation of parks, and the history of
10  firearms regulation in parks.
11  Q.  All right.  As you're identifying those
12  sources, how do you as a historian weigh them in
13  arriving at a conclusion about their impact on
14  constitutional history?
15  A.  Sure.  Well, the -- one of the most important
16  things you do as a historian is you try and
17  understand why a particular text was written, who
18  authored it, what the intended audience for the text
19  was, how different groups in society might have read
20  that text, and particularly important, the limits of
21  the archive.
22      Not every -- not every situation gets
23  recorded.  Not every piece of evidence gets saved.
24  And it's sort of maddening as a historian, but you
25  are stuck with what people decided to save.  And not
```

77

```
1   surprisingly, we know an awful lot of about what
2   Thomas Jefferson did almost every moment of his day.
3   We know a lot less about what was going on, you know,
4   if you were, you know, a young woman living in rural
5   New England, although we know a lot about that, much
6   more than we used to know about that, but still the
7   papers of Jefferson fill many, many, many shelves in
8   the library.
9       Q.   So does the absence of a primary source or
10  contemporary source regarding -- that may touch on a
11  given topic prevent you from performing an analysis
12  of the scope of constitutional history surrounding
13  that topic?
14      A.   Well, it depends on the particular topic and
15  how much other material is available.  The one thing
16  you have to be very careful about is not interpreting
17  silence beyond what the silence will suggest.  Like
18  for instance, at any given moment, legislatures will
19  not enact laws if there is no pressing social need
20  for a law.
21          So the fact that you don't legislate in any
22  particular moment may tell us something or it may
23  tell us nothing about what is the state of the law at
24  a particular moment in American history.  So that is
25  among the most complicated judgments I think you have
```

78

```
1   to make as a historian.
2       Q.   You mentioned earlier that there are laws
3   about constitutional provisions for which a
4   legislature history does not exist; is that correct?
5       A.   I'm sorry.  Can you just say that again?
6       Q.   I believe you testified earlier that there
7   are legislative histories that do not exist for
8   particular laws and constitutional provisions; is
9   that correct?
10      A.   Yes.  I think, you know, the closer you get
11  to the modern period, the biggest problem historians
12  have is figuring out what not to read, and the bigger
13  problem you have when you go further back in time is
14  trying to find something to read.
15      Q.   So in light of the absence, there may be
16  certain legislative histories that were not available
17  or were not available to you as you conduct your
18  research, does that prevent you from understanding --
19  historical understanding -- the common historical
20  understanding of a given constitutional provision?
21      A.   So fortunately, in the context of this case,
22  I didn't know what I would find when I set out, but I
23  was really surprised in some sense and really quite
24  pleased that there was such detailed historical
25  documentation of what the regulations were in these
```

79

```
1   early parks.
2           We have a very detailed set of historical
3   documents about the regulations of early parks.  And
4   if you had asked me without having looked at the
5   sources did I think I would find anything, I would
6   have said I really don't know, we could find a
7   treasure trove or we could find a real dearth of
8   sources.  So we actually found quite a lot, which I
9   was quite happy about.
10      Q.   All right.  So in light of the work you did
11  in this case and developing your opinions that you're
12  being -- that are being offered today, can you please
13  describe your methodology that you engaged in when
14  you were conducting your academic analysis given the
15  Supreme Court's holding in Bruen?
16      A.   Sure.  Well, Bruen makes it quite clear that
17  history texts and tradition are the proper framework
18  for evaluating the history of the -- evaluating the
19  constitutionality of contemporary gun laws.
20          And so the role of the historian in this is
21  to help courts find what is the documentary record,
22  give some sense of why certain things are well
23  represented in documentary record, and why certain
24  things might be underrepresented, and how to weight
25  and contextualize those sources so that you're
```

80

```
1   reading them with some understanding of the very
2   different world that our Americans of an earlier
3   generation lived in.
4       Q.   And did you engage in that analysis despite
5   disagreeing with portions of the Bruen decision?
6       A.   Yes.  You know, it's interesting because the
7   final paper for my students this term is to actually
8   adjudicate a live case in the aftermath of Bruen.
9   And I told them quite expressly that obviously you
10  have to follow Bruen's framework, but you may find
11  that the outcome is one that you don't personally
12  agree with and interestingly, you may also find that
13  you can make the best argument for something that you
14  don't necessarily agree with.
15          So what your personal views are and what
16  arguments the sources and doctrine will allow you to
17  make don't always line up perfectly.  And I tell them
18  if you want to be a lawyer, you better get used to
19  that.
20      Q.   And is that true if you want to be a
21  historian as well?
22      A.   Well, yeah.  I mean, if you want to be a
23  historian, you have to get used to that too, but I
24  don't think historians typically feel as invested
25  necessarily.  I mean, for me it's a big intellectual
```

81

1   puzzle.  I work on this topic not so much because of
2   any political -- as I suggested in my earlier
3   testimony, any political commitments, although like
4   any American, I have my views on public policy.  I do
5   it because I just love doing history.  I suppose
6   lawyers love doing law.  So maybe we're not that
7   different.
8       Q.   So can you give me a sense of the types of
9   primary sources that you looked at in arriving at
10  your opinions in this case?
11      A.   Sure.  So really the sources that turned out
12  to be most relevant were the regulations of early
13  parks.  And of course in order to understand why
14  those sources come into the historical record in the
15  middle of the 19th century, I had to figure out
16  something about the history of parks.
17           And it's very clear that at the time of the
18  Second Amendment, you don't have these modern-style
19  parks which are really created because America is
20  losing the kind of wilderness that the first
21  generations of Americans encountered.  I mean, you
22  don't really have a need for a park if you're living
23  in a forest or if you're living in -- you know, in a
24  situation where there are very few urban areas.
25           So as is often the case, you have to sort

82

1   of -- you know, you do some research, something
2   becomes clear to you, then you have to ask the
3   question, well, now I need to know something about
4   the history of parks to understand why all these
5   sources date to this period and not to an earlier
6   period.
7       Q.   So when you're engaging in this analysis
8   regarding the Second Amendment and the framework set
9   forth by the Bruen Court, would you be doing that
10  without any reference to any other constitutional
11  doctrine?
12      A.   Well, no.  Because, of course, all the
13  Constitution matters and one of the -- one of the
14  bodies of law that's highly relevant to understanding
15  the issues in this case were issues about the
16  understanding of private property, understanding
17  about trespass, and I think American legal history
18  going back to the very earliest days of America,
19  indeed going back to sort of the Anglo American roots
20  of our law, there's this strong Lockean tradition of
21  sort of life, liberty and property, which, of course,
22  gets reframed in the Declaration as life, liberty and
23  the pursuit of happiness.
24           And so in the process of looking at these
25  things, I went back and looked at Blackstone and his

83

1   discussion of trespass, which, you know, I had done
2   in the past, but hadn't done recently.  And, of
3   course, it just made it clear how significant and how
4   powerful the rights of private property are, and then
5   I started to look at some First Amendment scholarship
6   to understand the difference between sort of the
7   application of the First Amendment when government's
8   a proprietor versus when it's just a private citizen.
9           And so, you know, looking at that body of
10  scholarship made me realize, oh, I need to go back
11  and I need to really understand 18th century property
12  law a little bit better than I did when I began this
13  enterprise.
14      Q.   All right.  So I'd like to just take a moment
15  to frame the time periods that were identified by the
16  Court in Bruen.  And so first of all, in the Bruen
17  decision, there's a discussion of, you know, laws
18  that were in existence in medieval to modern England;
19  is that correct?
20      A.   Right.  So obviously, America doesn't really
21  enter the game until the 17th century and the Boston
22  Common and the rules governing it would probably be
23  the oldest kinds of statutes that I encountered.
24      Q.   And just in terms of the framework of what
25  years we're talking about, so at what point does the

84

1   kind of time line when we're looking at the medieval
2   to modern English laws and as you understand it in
3   the Bruen framework?
4       A.   Well, in the most technical sense, obviously
5   July 4, 1776, marks a pretty clear break with certain
6   aspects of Anglo American law, although virtually
7   every one of the new states in one form or another
8   either by judicial decision, by express act in the
9   Constitution or by a statute absorbs those aspects of
10  the common law that were in force in the colonies at
11  the moment that independence was declared.
12           So knowing what the common law was in the
13  14th century is not all that relevant, but knowing
14  what the common law, how it was understood in
15  Virginia 1774 is actually somewhat relevant.
16      Q.   All right.  On that note again just in terms
17  of framing the time period, what is your
18  understanding of the dates that the time -- the Court
19  is looking at when it's talking about laws that
20  existed during the American colonies and early
21  republic?
22      A.   Right.  So it's interesting that the Court
23  did fuse together the colonial period and the
24  revolutionary period.  Those are typically treated as
25  interconnected, but distinct because the revolution

85

1  does -- for one thing, we get rid of monarchy and
2  aristocracy, which is really two parts of the British
3  mix constitution almost overnight.
4       So there are some profound changes, but they
5  offer profound continuity.  So those are both clear
6  within the 18th century.
7       Q.    And again, just for the benefit of the Court,
8  can you just give the years that you would give to
9  that period?
10      A.    Sure.  So as I said, most historians would
11 divide that in two.  That period would include the
12 period under what we call the imperial crisis which
13 is once parliament starts heavily regulating the
14 colonies in the late 1750s through 1760s and would
15 probably go up to Jefferson's election in 1800.
16      Q.    All right.  And what is the time period as
17 you understand it as being referred to when the
18 Supreme Court is talking about Antebellum America?
19      A.    So again, you know, historians love to dice
20 and slice things in quite precise terms.  So
21 typically we talk about a Jeffersonian era, a
22 Jacksonian period, and sort of a sectional conflict
23 leading up to the Civil War.  I think the Court sort
24 of put all those distinct periods together and so
25 that would roughly go 1800 to the firing on Fort

86

1  Sumter in 1861.
2       Q.    All right.  And on that line, what is the
3  period that you would describe as reconstruction?
4       A.    So reconstruction is a pretty hotly debated
5  topic in terms -- and the chronology gets debated as
6  well.  I think everyone agree that the period between
7  the Fourteenth Amendment in 1868 and the withdrawal
8  of northern troops in 1876 is clearly covered by
9  reconstruction, but many scholars today would say
10 that reconstruction extended through the 1890s
11 because all of the important Supreme Court decisions
12 on the meaning of the Fourteenth Amendment date to
13 that sort of period from the 1870s to the 1890s.
14      So scholars make their money, if there is any
15 money to be made, by disagreeing and by redefining
16 fields.  So there's a little bit of that going on.
17      Q.    All right.  And just kind of marching through
18 the time line, how would you describe the
19 significance of the periods of law that are being
20 enacted like those parks laws that were coming into
21 existence in the late 19th century and early 20th
22 century?
23      A.    Well, of course, what becomes clear when you
24 look at this story is that there's very little need
25 for -- you know, when Thomas Jefferson decides he

87

1  wants to go experience nature, he just walks out his
2  door and he can walk for about 5,000 acres until he
3  finds his nearest neighbor.  I dare say that very few
4  people in Boston in the 1860s would have the same
5  experience.
6       So what we call the sort of parks movement is
7  a result of the fact that more Americans live in a
8  situation similar to that Bostonian and fewer and
9  fewer Americans are living in that situation similar
10 to Jefferson in the 1780s.
11      Q.    And so that said, those parks regulations
12 prohibiting firearms that you came across that may
13 have been implemented in the late 19th, early 20th
14 century, do they still have relevance to you when
15 you're reaching an opinion regarding the application
16 of the Bruen analysis in the case?
17      A.    Yes.  Well, Bruen very clearly, although it's
18 complicated, makes the period of reconstruction
19 relevant.  There is some -- you know, there's the
20 concurrence of Justice Barrett which raises some
21 interesting theoretical questions about how you would
22 weight, you know, 1868 versus 1791.
23      I think in general, there is a recognition
24 that 1868 is very important, and in particular, if
25 it's a new problem that didn't exist in 1791 and

88

1  there is evidence from 1868, it makes that evidence
2  highly probative.
3       Q.    So you had mentioned, I think this -- the
4  Lockean conceptions of property rights.
5       How did those Lockean concepts -- how are
6  they understood by the founders when they were
7  implementing regulations or guiding the course of
8  conduct on government property?
9       A.    Sure.  Well, to me, one of the most
10 interesting illustrations of that is Thomas Jefferson
11 who offered his own alternative to the Virginia
12 Constitution, very in keeping with Jefferson's
13 personality rewrote the Bible to exclude the things
14 he thought were not appropriate to the Bible which is
15 a very Jeffersonian concede, I suppose.  So his
16 provision on arms bearing actually cabins the right
17 to one's lands and tenements.  So, you know, that's
18 very interesting I think.
19      If you look at the general order -- the
20 general orders issued by General Sickles as a prelude
21 to the Fourteenth Amendment, this is a set of orders
22 responding to the black codes in South Carolina, he
23 very clearly talks about the need to protect the
24 right to keep and bear arms of African Americans, but
25 he also goes on to say that protecting that right

89

1  should not be understood to prohibit regulation of
2  firearms in public, nor should it be understood to
3  allow individuals to carry guns on other people's
4  property.
5       So, you know, a very robust understanding of
6  the right to keep and bear arms I think has always
7  coexisted with a fairly robust view of regulation.
8    Q.   All right.  And I believe earlier you gave as
9  an example the Massachusetts Acts and Resolves of
10  1794 as indicating a regulation of the right to carry
11  in public; is that correct?
12   A.   Yes.
13   Q.   And that's been entered in evidence as
14  Defense No. 142.
15       Now, I believe you also testified the
16  Massachusetts Acts and Resolves of 1794 were part of
17  a lineage of cases from the Statute of Northampton in
18  England; is that correct?
19   A.   Right.  Not so much cases, but yes, of
20  regulations.
21   Q.   All right.  And in your opinion, does that
22  evidence an ability and intent of the State of
23  Massachusetts to regulate the carry of firearms on
24  public lands?
25   A.   I think there's very strong evidence that

90

1  Massachusetts carried forward that a conception
2  implicit in the Statute of Northampton that there
3  were certain places in public that one had to
4  exercise greater regulatory control over arms,
5  because the Statute of Northampton expressly mentions
6  fairs and markets, for instance.
7    Q.   And so are you aware of the Supreme Court's
8  discussion and treatment of the Statute of
9  Northampton and its opinion in Bruen?
10   A.   Yes.  I have to say there are very few
11  statutes from the era of Richard III that have
12  received the same attention.
13   Q.   All right.  And so did you understand the
14  Court to be dismissing the Statute of Northampton
15  outright or merely discussing its relevance as it
16  weighed in on the problem of public carry in the law
17  as was issued in Bruen?
18   A.   Right.  I think the focus was certainly on
19  public carry, and the one thing that is clear is
20  that -- both from Heller and Bruen is that the
21  sensitive places doctrine, which of course is a
22  modern gloss on the ability to regulate firearms in
23  certain public locations, clearly emerges in part out
24  of that tradition in the Statute of Northampton.
25       The question of what counts as a sensitive

91

1  place is obviously something that courts are now
2  wrestling with, but the idea that there are such
3  places and one can regulate firearms pretty robustly
4  in them I don't think is in dispute.
5    Q.   All right.  So the fact that that statute
6  kind of retained the ability to regulate firearms in
7  specific locations is still relevant to your opinions
8  as a historian in this case?
9    A.   Yes.
10   Q.   All right.  So generally speaking, what types
11  of public lands existed at the time of the founding?
12   A.   So the number of -- excuse me.  There were a
13  number of different examples of public land.  We've
14  already talked about the Boston Common.  In some
15  states, you had colleges such as University of
16  Virginia, University of Georgia, University of North
17  Carolina, all of which date -- well, Virginia is the
18  early 19th century.  The other two are founding era.
19  And obviously, you do have, you know, places like --
20  what's the name of the one down the street -- Yale,
21  right, so...
22   Q.   And how would you describe from a
23  constitutional perspective what the -- what power the
24  government was relying on when it was regulating the
25  use of those lands?

92

1    A.   So clearly, I mean, the case of University of
2  Virginia is fascinating because, of course, Jefferson
3  and Madison are both on the board of overseers and
4  they are deeply involved in crafting every aspect
5  down to literally Jefferson was involved in
6  everything from the curriculum to hiring the
7  professors, and he viewed the University of Virginia,
8  and it's one of three things he actually puts on his
9  tombstone as part of his epithet.  He doesn't mention
10  being president, but he does mention being the
11  founder of the University of Virginia.  And clearly,
12  he viewed the University of Virginia as a place the
13  government needed to exercise a fairly strong hand in
14  regulating.
15       MR. SULLIVAN:  So if I may, I'd like to
16  approach the witness with what's been marked and
17  entered in full as Exhibit 143.  First of all, I'll
18  show that to counsel.
19       THE WITNESS:  Thank you.
20  BY MR. SULLIVAN:
21   Q.   Professor, can you take a moment to read that
22  document or to review that document?
23       MR. SULLIVAN:  Your Honor, just as a
24  housekeeping matter, I have a transcription of the
25  document as well that was taken from the same digital

3592752, Page128 of 273

93

```
 1  archive that the handwritten document was downloaded.
 2  If it's easier perhaps to the Court and the witness,
 3  I'd be happy to provide a copy of that transcription
 4  as plaintiff has an opportunity to review.
 5          THE COURT:  Sure.
 6          MR. ATKINSON:  Your Honor, may I be heard as
 7  to the transcription, please?
 8          THE COURT:  Do you need to be heard as to the
 9  transcription right now or shall we let the witness
10  testify from the original?
11          MR. ATKINSON:  My preference would be for the
12  witness to testify to the original primarily because
13  I have not had -- while I concede that this original
14  is difficult to read, I've not had an opportunity to
15  compare the transcription versus what I can make out
16  for the original.
17          THE COURT:  Let's proceed with the original
18  and then when Mr. Atkinson has had a chance to
19  compare the two, then this can be submitted which
20  will be of -- could be of assistance to the Court.
21          MR. ATKINSON:  Thank you, Your Honor.
22          MR. SULLIVAN:  May I approach the bench?  At
23  this time, I'd like to mark this for ID as
24  Exhibit 144.
25          THE COURT:  Yes.
```

94

```
 1  BY MR. SULLIVAN:
 2      Q.   Professor Cornell, have you completed your
 3  review of the --
 4      A.   Yes.
 5      Q.   Were you able to read the handwritten
 6  exhibit?
 7      A.   Yeah, yeah.
 8      Q.   With adequate clarity?
 9      A.   Yeah.
10      Q.   So first, can you tell me what Exhibit 142
11  is?
12      A.   So --
13      Q.   I'm sorry.  Strike that.  143.  I'm referring
14  to Exhibit 143.
15          Can you describe for me what is Exhibit 143?
16      A.   Sure.  So these are the rules for the
17  University of Virginia that the visitors of the
18  university, which would be like the board of trustees
19  for a university today, drafted.
20          And present at the meeting were Thomas
21  Jefferson, James Madison, James Breckinridge, John
22  Cook, George Loyall and Joseph Cable.  And although
23  we're obviously familiar with Jefferson and Madison,
24  those are all the important political figures in the
25  state of Virginia at the time.
```

95

```
 1      Q.   And certainly as to Jefferson and Madison,
 2  they'd been involved in the founding period?
 3      A.   I think everyone would concede those guys
 4  count as founders.
 5      Q.   And can you describe the types of rules that
 6  these boards -- that the board of visitors' minutes
 7  are setting forth?
 8      A.   So --
 9      Q.   Just as a general matter.
10      A.   Sure.  It's everything from whether or not
11  you can consume spiritus liquors, engage in riotous,
12  disorderly, intemperate, and indecent conduct.  It
13  bans fighting with any weapons that are capable of
14  inflicting death.  It includes a fairly broad
15  recognition that any offenses cognizable by the laws
16  of the land will be left to the -- the civil
17  magistrate.
18          So being a student at the University of
19  Virginia is not a get-out-of-jail card for law in the
20  state of Virginia.  And finally, no student shall
21  within the precincts of the university introduce,
22  keep or use any spiritus or -- that one is a little
23  hard to read, liquors, some kind of liquors, or keep
24  or use weapons of any kind.
25      Q.   And Professor Cornell, just for the sake of
```

96

```
 1  clarity, we're looking at the bottom of page 6 of
 2  Exhibit 143; is that correct?
 3      A.   Right.  So yes, they take a very
 4  uncompromising view of weapons on campus.
 5      Q.   All right.  And does that sentence continue
 6  onto page 7?
 7      A.   Yes.  Also, obviously, gun powder is
 8  prohibited, any stick or any weapon --
 9      Q.   I think that's sufficient.  Thank you,
10  Professor.
11          So to be clear at the time, were the lands --
12  were these regulations and these limits on the carry
13  of firearms implemented to regulate conduct on the
14  lands of the University of Virginia?
15      A.   Yes.
16      Q.   And were those public lands?
17      A.   Yes.
18      Q.   And was the University of Virginia a state
19  school?
20      A.   Yes.
21      Q.   So if your -- so in your opinion, does this
22  reflect an exercise of government power to regulate
23  the conduct on its own lands?
24      A.   Yes.
25      Q.   And that conduct here was prohibiting the
```

97

```
1   carrying of firearms?
2      A.  Yes.
3      Q.  Is there any significance in your opinion to
4   the fact that private schools, like Harvard or Yale,
5   prohibited the carry of firearms during the period of
6   the founding?
7      A.  Yes.  I mean, I think it speaks to issues
8   about the scope of legitimate regulation of arms on
9   private property.  It speaks to the view of the
10  founding generation that outside of supervised
11  context, young people having arms could be
12  potentially problematic.  So there was a big
13  difference between being an 18-year-old in the
14  militia and being an 18-year-old Harvard student
15  carrying a gun.
16         MR. SULLIVAN:  All right.  And so, Your
17  Honor, it's been marked for admission as Defendant's
18  Exhibit 118, the 1655 Laws of Harvard College.
19  BY MR. SULLIVAN:
20     Q.  Professor Cornell, are you generally familiar
21  with those laws?
22     A.  Yes.  In an article I wrote for the Yale
23  Journal of Law and Policy, I discuss these early
24  statutes of the various universities in some detail.
25     Q.  All right.  And so are you also familiar with
```

98

```
1   the 1745 laws of Yale College?
2      A.  Yes.
3         MR. SULLIVAN:  I'll submit that that's been
4   marked as a full exhibit as Defendant's 119.
5   BY MR. SULLIVAN:
6      Q.  And so in your opinion, those laws are
7   examples of public regulation and prohibition of
8   firearms on property in the time of the founding?
9      A.  So again, I would distinguish the situation
10  where the legislature or an entity created by the
11  legislature would write the regulations for a public
12  university and the relevant body at Harvard or Yale
13  that would have written the regulation, although both
14  Harvard and Yale have charters by the state, so they
15  are complicated semipublic, semiprivate institutions
16  in this period.
17     Q.  Did Harvard and Yale have the ability to
18  regulate conduct on their own lands at that time?
19     A.  Yes.
20     Q.  All right.  So moving into the Antebellum
21  period, Professor, what, if any, relevance would
22  Antebellum juris prudence on, say, police powers have
23  on your understanding of the legitimate scope of the
24  government's regulation of firearms?
25     A.  Well, the first cases we have challenging
```

99

```
1   regulations of firearms are all from the Antebellum
2   period, mostly from the slave south.  And the
3   dominant paradigm, if you will, the dominant model
4   that courts employ is the new doctrine, of course now
5   it's not new, it's one of the most fundamental
6   doctrines in American law, is the police power.  And
7   the police power comes into American juris prudence
8   in Antebellum case decided by John Marshall about
9   regulation of gun powder.
10         And the basic framing is consistent with the
11  text of the Second Amendment which talks about
12  infringement.  And infringement, let's say in
13  contradistinction to the language of the First
14  Amendment which uses the phrase "abridgment," abridge
15  in 18th century English of course means to lessen,
16  whereas "infringe" means to destroy.
17         So the police power framing in the Antebellum
18  period is legitimate exercises of regulation are
19  permissible as long as they don't destroy the right.
20     Q.  So can you point to examples apart from maybe
21  the cases that you mentioned that the government's
22  exercise of that power through legislature?
23     A.  Yes.  Well, again, one of the places that
24  I've looked at most closely is Massachusetts.  And
25  clearly in Massachusetts, people are being prosecuted
```

100

```
1   for violating that 1336 revision of the 1794 law for
2   carrying arms, what they might have described
3   promiscuously or habitually.
4      Q.  And I believe you testified that there are
5   parks ordinances that began to appear even as applied
6   to modern parks in what we would consider to be the
7   Antebellum period?
8      A.  Yes.  The Antebellum period, you start to see
9   the beginnings of this concern that America is
10  becoming industrialized, that we're losing connection
11  with our -- you know, the primitive beauty that
12  always defined American esthetics.  That's where sort
13  of Thoreau and the transcendentalists come in.
14  That's where you get the first great -- you know,
15  things like nonurban cemetery, you know, of course
16  Thoreau writes Walden which is a great ode to the
17  sort of redemptive power of the wilderness.  And in a
18  way, Central Park is the result of that -- those two
19  movements and the recognition that New York really
20  needs some nature to sort of recivilize it
21  inhabitants.
22     Q.  All right.  So I mean -- and the ordinance
23  governing the prohibition of firearms in Central Park
24  in 1858 has been entered into evidence as Exhibit 1.
25  And so that's consistent with the government's --
```

101

```
1    A.    Yes.
2    Q.    -- powers at the time; is that correct?
3          You were asked earlier about state exercises
4    of powers banning the carry of firearms in public
5    parks.  Do you recall that line of questioning by
6    plaintiff's counsel?
7    A.    Yes.  It's not surprising that urban areas
8    are the first places where there's really compelling
9    perception that the public needs -- that governments
10   need to create these spaces.  If you were living in
11   almost anywhere in Connecticut outside of New Haven
12   in the 19th century, you would only be a few minutes
13   away from some kind of green space.
14         So, you know, the idea of a state park in the
15   Antebellum period doesn't make quite as much sense,
16   whereas I think anyone who was in downtown New York
17   or downtown Boston would pretty much say there's not
18   a lot of green around here.
19   Q.    Are you familiar with the 1868 Pennsylvania
20   laws governing parks?
21   A.    Yeah.  So what's interesting about that, I
22   mean, one of the great 19th century parks besides New
23   York's Central Park is Fairmount Park in
24   Philadelphia, but because of the structure of
25   Pennsylvania government, the legislation governing
```

102

```
1    Fairmount Park was done by the state legislature, not
2    by ordinance by the Philadelphia local government.
3          You'd have to be more of a student of the
4    history of local government to know why New York's
5    structure of authority was so different from
6    Pennsylvania's, but clearly they were because two
7    different entities were responsible for regulating
8    the parks.
9    Q.    All right.  And so the 1868 Pennsylvania laws
10   that have been entered into evidence as
11   Defendant's 3, is that an example then of the state
12   legislature acting to approve a firearms ban --
13   A.    Yes.  From a legal point of view, it's a
14   state acting.  You know, from a geographical point of
15   view, I suppose you might argue it's still an urban
16   area they're regulating.  But from a legal point of
17   view, clearly it's the state who is the actor.
18   Q.    It's an exercise of power at the state level;
19   is that fair to say?
20   A.    Yes.
21   Q.    Now, there's been some discussion about
22   municipal ordinances versus state-level legislation.
23   So as a historian, how would you weigh the
24   significance of a municipal ordinance versus a state
25   legislature as evidence of the government's
```

103

```
1    regulation of conduct on its lands?
2    A.    Sure.  Well, what's interesting about
3    Antebellum police power doctrine is it doesn't really
4    make much of a distinction between the exercise of
5    that power by both the state or the locality.  One of
6    the really interesting things is that almost any town
7    our -- that gets incorporated will have a provision
8    that essentially says that whatever the legislative
9    body of the town, whether it's a town council or
10   something, enjoys full police power authority within
11   that locale.
12         So the state grants the locality or cedes
13   part of its police power to the locality and it's not
14   until much later where you start to see any effort to
15   curtail that.
16   Q.    All right.  So is there any reason to
17   disregard the significance of a local ordinance as
18   evidence of regulation of conduct on public lands in
19   your opinion as a historian?
20   A.    No.  I think it was understood to be
21   consistent with state regulation and in some cases
22   expressly delegated authority by the state.
23   Q.    All right.  And entering into the
24   reconstruction period, did that understanding change?
25   A.    It only changed when some states decided to
```

104

```
1    develop something called the home rule doctrine which
2    is associated with Dillon's law, which you may
3    remember from law school, is this principle about how
4    much authority localities have, and that happens in
5    the late 19th century and it's part of the evolving
6    struggle over federalism between states and
7    localities.
8    Q.    So would you -- would you consider those to
9    be relevant evidence of demonstrating a historical
10   tradition of the regulation of firearms on public
11   lands?
12   A.    Yeah, absolutely.
13   Q.    Now, we've discussed the history of firearms
14   regulation in this case.  Have you had an opportunity
15   to review the regulation at issue which is
16   Connecticut Agency Regulation Section 23-4-1(c)?
17   A.    Yes.
18   Q.    All right.  And have you reviewed its
19   predecessor regulations pertaining to Connecticut
20   state parks and forests?
21   A.    Yes.
22   Q.    All right.  And applying the methodology
23   required by Bruen, you have concluded whether
24   Connecticut Agency Regulation Section 23-4-1(c) is
25   consistent with the nation's historical tradition of
```

105

```
1   firearms regulation?
2           MR. ATKINSON:  Objection, Your Honor.  That's
3   an opinion on an ultimate issue.
4           MR. SULLIVAN:  Your Honor, he's been --
5           THE COURT:  Well, have you concluded means is
6   it your opinion whether the Connecticut agency does
7   what.  I think that's certainly what expert witnesses
8   do.  So I'm going to overrule that objection whether
9   it is an ultimate question for the Court or not.
10          MR. SULLIVAN:  Thank you, Your Honor.
11  BY MR. SULLIVAN:
12      Q.   Do you recall the question?
13      A.   Yes.  So I would say that based on my
14  expertise, I concluded that the Connecticut
15  regulations are consistent with the history of
16  regulation, but I didn't make any conclusion about
17  its current legality under Bruen because that's
18  obviously the job of the Court.
19      Q.   In your opinion as an expert historian, is it
20  analogous to laws that existed at the time of
21  reconstruction?
22      A.   Yes.
23      Q.   And it's analogous to laws that existed at
24  the time of -- in the Antebellum period?
25      A.   Yes.
```

106

```
1       Q.   And is it analogous to laws or government
2   practices that may have existed at the time of the
3   founding?
4       A.   Yes.
5           THE COURT:  Time what?
6           MR. SULLIVAN:  Of the founding.
7           That's all the questions I have at this time.
8   Thank you, Professor.
9           THE COURT:  Any redirect?
10          MR. ATKINSON:  Yes, Your Honor.
11  REDIRECT EXAMINATION OF PROFESSOR SAUL CORNELL
12  BY MR. ATKINSON:
13      Q.   Good afternoon, Professor Cornell.  You
14  testified on cross-examination that you employ a
15  methodology as a historian, correct?
16      A.   Correct.
17      Q.   And part of that -- the purpose of that
18  methodology is to give you structure to conduct a
19  historical inquiry, correct?
20      A.   So structures, I suppose you can frame it
21  that way.  So the -- maybe if you rephrase the
22  question I can sort of have a better sense of what
23  you're trying to --
24      Q.   Sure.  You were approached in this case to
25  offer an expert opinion about history, correct?
```

107

```
1       A.   Yes.  That's correct.
2       Q.   And you understood the purpose of that expert
3   opinion to be focused towards private property
4   ownership, regulation of private property?
5       A.   So I was asked about the history of firearms
6   regulations as they would illuminate Connecticut's
7   laws governing firearms in parks.  And I concluded
8   that in addition to looking at the regulation of
9   firearms in parks, it would be important to look at
10  regulation of firearms on private property because
11  government sometimes acts as a property owner or
12  proprietor and, therefore, the relevant body of law
13  would at least -- I should say the relevant
14  regulations, history of regulation, would be drawn
15  from regulations of private property.
16      Q.   So bottom line, you were given a question,
17  correct?
18      A.   Well -- I was given -- yes.  I mean, to
19  evaluate the history of firearms regulations as they
20  pertained to the issues in this case.
21      Q.   And to answer that question, you just didn't
22  go running off into whatever history book you could
23  lay your hands on, you followed a methodology,
24  correct?
25      A.   Right.  Although I would say that I was very
```

108

```
1   deliberate.  I wouldn't describe it as running off.
2       Q.   Correct.
3       A.   But I acidulously and diligently formulated
4   research strategy, implemented it, and gathered the
5   relevant sources and then interpreted them.
6       Q.   And the way you formulated your research
7   strategy was informed by the professional standards
8   of your methodology?
9       A.   Yes.
10      Q.   And it was also informed by what you
11  described as your understanding of the rules set
12  forth by a Supreme Court precedence, correct?
13      A.   Yes.
14      Q.   And that includes Bruen?
15      A.   Yes.
16      Q.   You also mentioned earlier that there are
17  rules about argumentation for historians.  Can you
18  describe what that principle means, please?
19      A.   Sure.  So, for instance, it's a pretty
20  well-accepted historical practice that if you're
21  going to quote a historical source, it should be
22  accurate, you should to the best of your ability
23  identify who wrote it if it's possible and why they
24  wrote it, know something about who might have had
25  access to it beyond the author, and if it's possible,
```

109

1 though sometimes it's the most difficult thing for a
2 historian to reconstruct, how others in that society
3 beyond the author of a particular text might have
4 understood that text or document.
5 Q. Is that -- is that evaluation objective or
6 subjective?
7 A. Well, this may be one of the oldest debates
8 among historians about whether history is more art or
9 social science and I think it's a little bit of both.
10 Q. And you've heard the expression I believe
11 attributed to Napoleon that history is a pack of lies
12 agreed upon?
13 A. I've heard so many different quips and
14 altruisms about history, but that is certainly --
15 that is certainly one that I've come across at some
16 point or another.
17 Q. So when you're looking at history, in reality
18 when you're taking your own look at history, you have
19 to make judgments about what to credit, correct?
20 A. Well, so I think -- I think what historians
21 do is really beautifully captured by sort of John
22 Dewey's theory of knowledge. So Dewey's theory of
23 knowledge basically says we have, you know, groups
24 and communities that are credentialed, they formulate
25 rules, those rules are then enforced by that

110

1 community. Critics of the rules emerge occasionally
2 saying that rule is flawed, that rule unfairly
3 excludes certain kinds of things, and then the rules
4 are revised and that's how knowledge is produced in
5 our world.
6 Q. Within the community of historians and the
7 rules that they have developed either implicitly and
8 explicitly, would you characterize yourself as
9 somebody who generally follows those rules?
10 A. Yes. I would say I definitely try to follow
11 those rules.
12 Q. Have you ever been a critic to those rules?
13 A. Have I ever criticized those rules?
14 Q. Yes.
15 A. That's a very interesting question. I would
16 have to really sit and think about that for a while.
17 I mean, I've certainly criticized some particular
18 pieces of scholarship. I'm trying to think if I've
19 ever written sort of a wholesale critique of the
20 historical profession. I don't think I have.
21 Q. Have you written piecemeal criticisms of the
22 profession?
23 A. Well, I've certainly criticized some
24 interpretations of things.
25 Q. You also, I believe, testified earlier about

111

1 not cherry-picking sources, correct?
2 A. Yes. That is one of our cardinal rules.
3 Q. And from your personal perspective, you're
4 super careful about that, correct?
5 A. I am -- I am extremely aware of the dangers
6 of confirmation bias and something called
7 availability risk where you tend to go to the sources
8 you're most familiar with and not necessarily the
9 best sources to answer the questions. So I'm very
10 self-conscious about that, yes.
11 Q. Are you -- withdrawn.
12 Is it possible for you as one single
13 individual human being to know every possible source
14 in existence?
15 A. I don't think I've ever claimed I'm -- and I
16 don't think any historian that I know has.
17 Q. And the limitations on your ability to -- on
18 your awareness of what sources are in existence,
19 you'd agree with me are informed by a number of
20 considerations, correct?
21 A. Yes. I think by definition that would have
22 to be true, that --
23 Q. And so that would be time, correct?
24 A. Time is certainly one of the constraints on
25 research, sure.

112

1 Q. Human energy, your personal human energy?
2 A. That certainly is also another constraint.
3 Q. The archives that are available to you?
4 A. Also a constraint.
5 Q. When you received the question -- withdrawn.
6 When you -- withdrawn.
7 You testified, if I heard you correctly,
8 earlier that prior to being asked to take the role of
9 an expert in this case, you had never really studied
10 state parks firearm regulation. Did I hear you
11 correctly?
12 A. That specific question, no. I mean, because
13 I -- because I wrote this American history textbook,
14 for instance, I -- I did include a pretty detailed
15 discussion of the transcendentalist movement, you
16 know, the parks, the development of parks, like
17 Central Park, and other things, but I never thought
18 to look at firearms regulations in them, in that
19 context.
20 Q. So basically, if I'm understanding you
21 correctly, you had a prior reserve of knowledge that
22 might have been -- that was in your mind related a
23 little bit to the subject but wasn't exactly on
24 point?
25 A. Yeah. I think it's fair to say I wasn't a

113

1  historian of American parks.
2     Q.   Okay.  Approximately when were you contacted
3  to be an expert for this case?
4     A.   That's a good question.  I'd have to check my
5  e-mail.  Sometime in the fall or the summer I'm
6  guessing, but I'd have to check my e-mail.  I'm sure
7  counsel could fill us in.
8     Q.   Let me see if I can assist you with that.
9  It's currently May 2023, correct?
10    A.   Right.
11    Q.   And did you review documents in this case?
12    A.   When?
13    Q.   Since you've been retained as an expert.
14    A.   Yes.
15    Q.   Did you review the -- did you review the
16 amended complaint in this matter?
17    A.   Yes, I did.
18    Q.   Would you recognize that if I showed it to
19 you?
20    A.   You know, if you showed it to me, yes, I
21 think I would.
22         MR. ATKINSON:  May I have a moment, Your
23 Honor?
24         THE COURT:  Yeah.  Are we getting a little
25 beyond cross-examination?

114

1         MR. SULLIVAN:  Your Honor, I'll make the
2  objection.  We're going outside the scope of cross.
3  I can wait for a question if you'd like.
4         MR. ATKINSON:  Your Honor, rethinking this a
5  little bit, I will withdraw that last line of
6  questioning and I'll see if I can do this somewhat
7  simpler.
8         THE COURT:  Okay.
9  BY MR. ATKINSON:
10    Q.   Professor, regardless of whether you remember
11 the exact date when you were contacted to be a
12 witness for this case, were you given to understand
13 in this case that it was -- the case was proceeding
14 on an accelerated time period?
15    A.   God, I must confess, I'm involved in so many
16 cases now, I don't recall that -- you know, those
17 kind of procedural issues are very lawyerly.  So I
18 don't tend to pay attention to them.
19    Q.   Understood.  I guess what I'm getting at is
20 were you ever given the impression that you needed to
21 provide an opinion sooner rather than later in this
22 case?
23    A.   I never felt rushed, if that's what you're
24 getting at.
25    Q.   Okay.  Would you have liked more time to

115

1  research this -- the history that underlies your
2  opinion?
3         MR. SULLIVAN:  I'll object that we're beyond
4  the scope.
5         THE COURT:  Sustained.
6  BY MR. ATKINSON:
7     Q.   Would you -- withdrawn.
8         I believe you testified earlier that you
9  don't enter a historical inquiry with preconceived
10 notions, correct?
11    A.   Yes.  To the best of my ability as a person
12 who undoubtedly has been shaped by all of his
13 experiences, education, I try to set aside whatever
14 preconceived notions I'm aware of, yeah.
15    Q.   But to guide your search, you did use the
16 rules established by Bruen, correct?
17         MR. SULLIVAN:  I'll just object.  This has
18 been asked and answered.
19         THE COURT:  Sustained.
20         MR. ATKINSON:  I'll move on.
21 BY MR. ATKINSON:
22    Q.   If I remember your testimony correctly from
23 earlier during your cross, you stated that you looked
24 at First Amendment precedence to inform your study of
25 your research in this case?

116

1     A.   Yes.
2     Q.   Okay.  What First Amendment precedence did
3  you look at?
4     A.   Well, Second Amendment juris prudence which
5  is evolving and relatively young oftentimes
6  references First Amendment cases.  So I have over the
7  course of researching it looked at a number of First
8  Amendment cases and the question of government as a
9  proprietor was one of the cases.  I also looked at
10 *Konigsburg v. California* because it's actually
11 mentioned in Bruen.
12    Q.   When you looked at First Amendment
13 precedence, did you look into the law regarding
14 forums?
15    A.   That is part of the -- that is part of the
16 body of case law that sort of relates to government
17 as proprietor and its use of speech, yeah.
18    Q.   Did you -- did you apply your understanding
19 of what the forum doctrines were to your -- giving
20 your opinion in this case?
21         MR. SULLIVAN:  Objection, Your Honor.  That's
22 outside the scope.
23         MR. ATKINSON:  Your Honor, if I may, he
24 testified that he looked at this.  I'm trying to
25 probe what he looked at and how he applied it here.

117

```
1   That testimony was elicited on direct and I'd like to
2   explore it -- on cross-exam, my apologies.
3       THE COURT:  You're actually on redirect.
4       MR. ATKINSON:  Yes.  I got turned around for
5   a second there.  It was brought out on
6   cross-examination that he looked at First Amendment
7   precedent.  He's just testified that he looked at
8   forum, the forum doctrine.  I'd like to explore what
9   he looked at and how he applied it.
10      THE COURT:  The how he applied it is of
11  greater interest than whether he looked at it, but I
12  suppose one follows from the other.  I'm going to
13  permit that, but I didn't quite understand the basis
14  for your objection.
15      MR. SULLIVAN:  Your Honor, recognizing that
16  he mentioned the First Amendment in his
17  cross-examination, this is, I believe is beginning
18  discursive.  It wasn't a broad inquiry into the First
19  Amendment.  So I think exploring the contours of that
20  doctrine is frankly beyond the scope of his
21  declaration.
22      THE COURT:  I'm going to overrule you.  I am
23  overruling him and you may proceed.
24  BY MR. ATKINSON:
25      Q.    Professor, did you apply what you understood
```

118

```
1   from First Amendment precedence regarding the forum
2   doctrine to giving your opinion in this case?
3       A.    No.  What I did was I sort of looked at the
4   First Amendment doctrine sort of at a very high level
5   of generality to sort of think about is there a sense
6   in which you can talk about Second Amendment
7   regulation by the government as having some analogy
8   to First Amendment regulation.  So therefore, I
9   needed to understand what the history of the
10  regulation of guns on property that the government
11  controlled.
12      So it wasn't really applying doctrine.  It
13  was like reading the doctrine to say is there another
14  body of sources I need to dig into to illuminate
15  this.
16      Q.    Understood.  You testified that -- you
17  testified about the University of Virginia and if I
18  recollect, you stated that was a public college,
19  correct?
20      A.    Yes.
21      Q.    Do you know, as you sit here today, what body
22  was responsible for governing the University of
23  Virginia?
24      A.    So the -- again, I'll preface this by saying
25  I'm not a historian in the University of Virginia or
```

119

```
1   of higher education, but the University of Virginia
2   was created by the State of Virginia and the document
3   that we talked about establishes certain regulations
4   for students, faculty, and the grounds that the
5   university is on.  It also makes clear that the
6   university is not exempt from laws generally
7   applicable in the state of Virginia.
8       So it's a good example of sort of a hybrid
9   space where there are certain aspects of life on the
10  University of Virginia in which it is in total
11  control of the regulations and certain aspects where
12  it's subject to the laws of the State of Virginia.
13      Q.    Would you agree with me that the University
14  of Virginia had a specific purpose?
15      A.    It had, I suppose, a specific general
16  purpose, yes.
17      Q.    And what was that purpose?
18      A.    To educate the citizens of the state of the
19  Virginia.
20      Q.    To your knowledge, were there any other
21  purposes for the University of Virginia?
22      MR. SULLIVAN:  Object.  It calls for
23  speculation.
24      THE COURT:  Presumably from his research if
25  he has found any.  Overruled.
```

120

```
1       THE WITNESS:  Well, they were quite
2   interested in shaping the character of Virginians.
3   BY MR. ATKINSON:
4       Q.    Would that be part and parcel of education?
5       A.    I think Jefferson had a very capacious view
6   of education which would include character formation.
7       Q.    I'm not sure that I heard your -- every
8   aspect of your testimony earlier regarding Fairmount
9   Park.  Do you recall testifying about that earlier?
10      A.    Yes.
11      Q.    And if I recollect, you testified that the
12  Pennsylvania legislature enacted the firearms
13  prohibition for Fairmount Park, correct?
14      A.    Yes.
15      Q.    To your knowledge, why did the legislature
16  enact that instead of a municipality?
17      MR. SULLIVAN:  Object.  It's been asked and
18  answered.
19      THE COURT:  I don't remember the answer, so
20  you can go ahead.
21      MR. ATKINSON:  I don't remember it either,
22  Your Honor.
23  BY MR. ATKINSON:
24      Q.    Can you please, Professor?
25      A.    Yes.  So the division of authority between
```

121

1  states and municipalities was different in every
2  state because the specific constitutional tradition
3  and the specific regulatory history of different
4  states meant that some things were within the sphere
5  of the municipalities and some things were retained
6  by the state.
7       So, you know, Pennsylvania and Ohio
8  localities were subject to fairly extensive
9  regulation by the state, but New York and
10 particularly New York City had a fairly robust
11 tradition of local self-rule from its earliest
12 settlement.
13   Q.   Do you know if Fairmount Park at the time of
14 this prohibition being passed was owned by the State
15 of Pennsylvania?
16   A.   You know, I don't know.  I don't know that.
17   Q.   Okay.  To the best of your knowledge as you
18 sit here today, was the Central Park prohibition on
19 the carrying of firearms the only prohibition that
20 you're aware of prior to the Civil War?
21   A.   In a park?
22   Q.   Correct.
23   A.   I guess what makes it difficult to answer is
24 I'm trying to think what other parks existed that --
25 I mean, Central Park is the first of modern-style

122

1  parks.  So there couldn't have been any regulation of
2  modern-style parks before there were modern-style
3  parks.
4      Q.   Understood.
5           MR. ATKINSON:  No further questions, Your
6  Honor.
7           THE COURT:  Is there any recross?
8           MR. SULLIVAN:  Just one moment, Your Honor.
9           Your Honor, no further questions from the
10 state.
11          THE COURT:  The original regulation of our
12 banning of firearms from parks or commons or that
13 kind of public land, was that an exercise -- a
14 conscious exercise of police powers or what was that?
15          THE WITNESS:  I do think it would have been
16 understood as a core exercise of police power, yes.
17          THE COURT:  And is there a difference, a
18 material difference, that we should understand
19 between a commons or green or modern park for the
20 purposes of understanding exercise of authority to
21 ban firearms in those spaces?
22          THE WITNESS:  Well, I think the -- I think
23 the -- in trying to understand what defines a
24 category of, quote, a sensitive place, the question
25 of what kind of public activity occurs in that place

123

1  and what is the societal value of that activity and
2  why that particular activity might be adversely
3  affected by what in the 19th century they would call
4  habitual or promiscuous carry of firearms, that's the
5  key aspect of why parks are different because they
6  have a specific role to play in American society and
7  American culture, and the belief was that it was
8  important to restrict firearms so that parks could
9  function the way they were understood that they
10 needed to function to sort of promote the civil
11 virtues and values that society wanted to cultivate
12 in its citizens, if that's clear.
13          THE COURT:  And you've also discussed the
14 states as proprietors, states owning the land, and
15 compared that at least in part to the proprietor's
16 right to control the use of their land.
17          Where, if at all, do those two -- did those
18 two overlap before we got to modern parks and then
19 after?
20          THE WITNESS:  So I think there is a long
21 tradition of robust authority of proprietors of
22 property to control who can enter them and what kind
23 of activity could be engaged.  For instance, you
24 couldn't hunt on somebody else's land.  You had to
25 ask for permission.  So there is that long-standing

124

1  tradition.
2           And then there's been a recognition that
3  there are certain spaces that because of what
4  transpires in them, that firearms are -- ought to be
5  excluded.  For instance, there's a long tradition of
6  excluding them from around polling places because of
7  a concern that they might intimidate the exercise of
8  suffrage.
9           You know, the Statute of Northampton which
10 talks about fairs and markets, fairs and markets are
11 also places of commerce, places where people go to
12 congregate, you know, it's a place where
13 entertainment occurs, places where public notices
14 would have been posted, so it has a civic function.
15          So I think there's always been a recognition
16 that there can be important values that the state
17 needs to protect, and that regulating firearms to
18 protect those values and create the kind of spaces
19 where those values can flourish is deeply rooted in
20 our tradition.
21          THE COURT:  Any questions on my questions?
22          MR. ATKINSON:  None from the plaintiffs, Your
23 Honor.
24          MR. SULLIVAN:  Just briefly.
25

125

```
1    RECROSS-EXAMINATION OF PROFESSOR SAUL CORNELL
2    BY MR. SULLIVAN:
3      Q.   So Professor Cornell, just to be clear, when
4    looking at the founders' understanding of their
5    power, as well as the -- looking at the founders'
6    understanding of their powers, did their conception
7    of the states' rights as a proprietor factor into
8    their regulation of public spaces?
9      A.   I think, yes, I think it did.  And I also
10   think that the entire success of the Constitution
11   rests on an assumption that state police power would
12   not be unduly cabined by the new federal constitution
13   that if there had been a perception that the adoption
14   of the Constitution would have eviscerated state
15   police power, we wouldn't have a Constitution.
16     Q.   All right.
17     A.   Or Bill of Rights for that matter.
18          MR. SULLIVAN:  That's all I have.  Thank you.
19          THE COURT:  Thank you very much, Professor
20   Cornell.  This has been very interesting and you may
21   step down and you are excused.
22          THE WITNESS:  Thank you very much.  Should I
23   leave the exhibit for someone to collect?
24          THE COURT:  Yes, please.
25          Let me ask who the next witness will be.
```

126

```
1          MR. ATKINSON:  May I have a moment to
2    confer --
3          THE COURT:  I'm going invite us to take a
4    five-minute recess.
5          MR. ATKINSON:  Thank you, Your Honor.
6          (Recess taken.)
7          THE COURT:  All right.  Are we ready to
8    proceed?
9          MR. ATKINSON:  Yes, Your Honor.  May I
10   address a couple of housekeeping matters first?  With
11   respect to the -- to the transcript of the
12   defendant's exhibit, I did have a chance to compare
13   that.  What I would ask -- what we -- we would have
14   no objection to it being submitted in as an
15   evidentiary exhibit, but to the extent there are any
16   discrepancies between the transcription and --
17          THE COURT:  The original prevails.
18          MR. ATKINSON:  Correct.
19          THE COURT:  So that's 143.
20          MR. SULLIVAN:  Your Honor, I'll just make a
21   brief note that the transcription is Exhibit 144.  So
22   Exhibit 133 of the -- the actual document, that's
23   pages 1 through 10 of the actual document, this
24   transcription actually goes to pages 1 through 15.
25   We hadn't taken it out.  So I would say in fairness,
```

127

```
1    the transcription from where it discusses pages 11
2    onwards should probably not be considered at all.
3          THE COURT:  Why don't you cut it out?
4          MR. SULLIVAN:  I'd be happy to do so, Your
5    Honor.
6          THE COURT:  Okay.  Let's do that so the
7    transcription will correlate with the original and
8    just be pages 1 through 10.  Good.
9          MR. ATKINSON:  Also, Your Honor, I do intend
10   to call Mr. Nastri next to get to the standing
11   matter.  I believe that my conversations with my
12   colleagues, we do have Colonel Lewis from the
13   Department of Energy and Environmental Protection
14   here.  We'd ask that he be excused because we don't
15   anticipate getting to him for the rest of the day.
16          THE COURT:  Is there any possibility of
17   finishing him today if we did get to him?
18          MR. ATKINSON:  We could possibly finish
19   Colonel Lewis today, Your Honor, but I think the
20   discussion we were having is whether we could
21   prioritize the standing issues based on what Your
22   Honor said at the start of proceedings today.
23          So we honored that Professor Cornell
24   needed -- was on a tighter schedule.  My
25   understanding is that the same -- neither of the same
```

128

```
1    constraints apply to either Mr. Nastri or Colonel
2    Lewis.  So we were prioritizing getting to the
3    jurisdictional issues first.
4          I'm happy and prepared to go forward with
5    either Mr. Nastri or Colonel Lewis.  It's Your
6    Honor's preference.
7          THE COURT:  Is there any reason to choose one
8    over the other?
9          MR. BOCHAIN:  I don't believe so, Your Honor.
10   I know Your Honor is interested in addressing the
11   standing issue.  Colonel Lewis is available.
12          THE COURT:  Well, eventually that will be in
13   the analysis.
14          MR. BOCHAIN:  Colonel Lewis is available
15   tomorrow.  And in speaking with Attorney Atkinson, it
16   appears either way which we address today, it's going
17   to run over until tomorrow most likely.  So I believe
18   we'd be asking to go in the order that he is
19   suggesting.
20          THE COURT:  And we will be able to finish by
21   four o'clock tomorrow?
22          MR. BOCHAIN:  Yes.  With the testimony, I
23   believe that's correct.
24          THE COURT:  With this hearing.
25          MR. ATKINSON:  I believe my estimate right
```

129

```
1   now is we'll finish testimony somewhere around noon
2   to one o'clock, Your Honor, maybe two o'clock.  And
3   if we want to take a break and then prepare for oral
4   argument, we would be able to complete oral argument
5   by four o'clock tomorrow.
6          THE COURT:  We have to.  Okay?
7          MR. BOCHAIN:  If I can just have one moment,
8   Your Honor.
9          Your Honor, I believe that's fine.  The only
10  thing I would note, I think we can get all this done
11  in the time frame that you've just laid out.  The
12  only point that I would raise that in the event that
13  something does arise, we would like to have the
14  opportunity to call someone back in our own case.
15         THE COURT:  All right.  You might be doing
16  that in two weeks, though.
17         MR. BOCHAIN:  Understood, Your Honor.
18         THE COURT:  That's fine.  All right.  Then I
19  guess we'll start with Mr. Nastri.
20         MR. ATKINSON:  Yes, Your Honor.
21         THE COURT:  Okay.  Remain standing and raise
22  your right hand, please.
23         (David Nastri, sworn.)
24         THE CLERK:  Please be seated.  State your
25  name for the record and spell your last name.
```

130

```
1          THE WITNESS:  My name is David Nastri.  My
2   last name is spelled N-A-S-T-R-I.
3          THE COURT:  And your town of residence?
4          THE WITNESS:  I'm sorry, Your Honor?
5          THE COURT:  Your town or city of residence?
6          THE WITNESS:  Cheshire, Connecticut.
7          THE COURT:  Thank you.  You may proceed.
8          MR. ATKINSON:  Thank you, Your Honor.
9          DIRECT EXAMINATION OF DAVID NASTRI
10  BY MR. ATKINSON:
11  Q.   Good afternoon, Mr. Nastri.  Please tell the
12  Court where you were born.
13  A.   I was born in Cheshire, Connecticut.
14  Q.   Where did you grow up?
15  A.   I as a small child lived in Waterbury and
16  then we returned to Cheshire, Connecticut and I grew
17  up there.
18  Q.   Where did you go to school as a child?
19  A.   Elementary school in Cheshire and high school
20  also in Cheshire.
21  Q.   When did you graduate high school?
22  A.   1979.
23  Q.   Okay.  What did you do after you graduated
24  high school?
25  A.   I spent a very brief amount of time in
```

131

```
1   college and then I joined the Army.
2   Q.   Where did you go to college?
3   A.   I started at Central Connecticut State
4   University.
5   Q.   Okay.  And what was your reason for leaving
6   Central State -- Central Connecticut State?
7   A.   I was not focused on school, so I sought
8   something else.
9   Q.   Okay.  And what prompted you to join the
10  Army?
11  A.   It seemed like a better option than going to
12  college.  My father had been a soldier during the
13  Korean War.  So I think probably both of those things
14  factored in.
15  Q.   Okay.  How long did you serve in the Army?
16  A.   I was on active duty for a little bit less
17  than a year.
18  Q.   Okay.  And when did you leave the Army?
19  A.   Approximately, I'm going to say, sometime
20  around September of 1981.
21  Q.   Okay.  Why did you leave the Army?
22  A.   I was medically discharged.
23  Q.   Okay.  What did you do after you were
24  discharged from the Army?
25  A.   I worked.  I got jobs.  I went to school
```

132

```
1   sporadically and did that for quite a long time.
2   Q.   Okay.  What jobs did you pursue at that time?
3   A.   Owned a liquor store at one point.  I worked
4   for a property management company.  I went into sales
5   for an answering service company, made furniture.
6   There were a lot of jobs.
7   Q.   So sort of a jack-of-all-trades, basically?
8   A.   Yes.
9   Q.   You just testified that you went back to
10  school sporadically.  When did you start going back
11  to school?
12  A.   So I probably went on and off from the early
13  '80s and then ultimately got a bachelor's degree and
14  an MBA.
15  Q.   Let's talk about your bachelor's degree.
16  Where did you get your bachelor's degree from?
17  A.   From Quinnipiac University.
18  Q.   And what year, approximately?
19  A.   I believe it was 1990.
20  Q.   Okay.  What year did you get your MBA?
21  A.   I believe that was 2001.
22  Q.   In the interim between 1990 and 2001, what
23  did you do in that period?
24  A.   My employment at that time was working for
25  the answering service company and I believe making
```

133

```
1   furniture also.
2       Q.   At some point did you -- withdrawn.
3            At some point did you join the national --
4   the Army National Guard?
5       A.   I did.  I joined the Army National Guard in
6   2003.
7       Q.   Why did you join the National Guard?
8       A.   Well, we had -- we were at war and I felt I
9   had an obligation to my country.
10      Q.   What was your job in the National Guard?
11      A.   I was an infantry soldier.  I'm sorry.  Full
12  disclosure, I was an infantry soldier as a primary
13  military occupational specialty, and my secondary was
14  forward observer for artillery.
15      Q.   Is the National Guard a full-time job?
16      A.   It is not.
17      Q.   What did you do -- withdrawn.
18           You had the -- did you have the ability to
19  maintain another job concurrent with your service in
20  the National Guard?
21      A.   I did.
22      Q.   And at that time in 2003, what was your
23  occupation at that point?
24      A.   In 2003, I think I was making furniture at
25  that point.  I may also have had a job with an
```

134

```
1   insurance company in there.  It's a little jumbled as
2   far as the time frame goes.
3       Q.   What's your occupation now?
4       A.   I'm a financial adviser.
5       Q.   When approximately did you start that
6   occupation?
7       A.   I started in this particular role in 2006.
8   Before that, I was working for Mass Mutual.
9       Q.   And that was -- the Mass Mutual job was the
10  insurance job, just to be clear?
11      A.   That is correct.
12      Q.   And what type of job was that with Mass
13  Mutual?
14      A.   Insurance sales.
15      Q.   At some point did you deploy overseas as part
16  of the National Guard?
17      A.   I did.
18      Q.   When was that?
19      A.   Our activation was the fall of 2009 and we
20  got in country in January of 2010.
21      Q.   When you say "in country," does that mean
22  returning to the United States or deploying overseas?
23      A.   No.  That means arrival in Afghanistan.
24      Q.   Where were you deployed in Afghanistan?
25      A.   I was on a forward operating base called
```

135

```
1   Metherlon (phonetic).  We were in a region called RC
2   East.  We were generally on the eastern side of the
3   country not too far from the Pakistan border.
4       Q.   Okay.  What was your rank when you deployed
5   to Afghanistan?
6       A.   I was a staff sergeant.
7       Q.   What were your responsibilities?
8       A.   At that point, my responsibility was as the
9   personal security detail for our battalion commander.
10      Q.   Can you describe for us briefly what that
11  involved?
12      A.   I was responsible for his personal safety.
13      Q.   As part of your service with the National
14  Guard, were you ever trained on the use of firearms?
15      A.   I was.
16      Q.   What firearms were you trained on the use of?
17      A.   My primary weapon was an M4 carbine and my
18  secondary weapon was an M9 handgun.
19      Q.   Okay.  You were trained on both, correct?
20      A.   Correct.
21      Q.   Did you have to pass tests to demonstrate
22  proficiency with the M4 carbine?
23      A.   Yes.
24      Q.   Did you have to pass a test to show
25  proficiency with the nine-millimeter handgun?
```

136

```
1       A.   I did.
2       Q.   Did you pass those tests?
3       A.   I did.
4       Q.   During your service in Afghanistan, did you
5   see enemy action?
6       A.   I did.
7       Q.   Did you ever fire your weapon at another
8   person in an enemy action?
9       A.   No.
10      Q.   Did there come a time where you were
11  evacuated from Afghanistan?
12      A.   I was, yes.
13      Q.   Why were you evacuated from Afghanistan?
14      A.   It was medical evacuation for a noncombat
15  injury.
16      Q.   Where were you evacuated to?
17      A.   Initially to -- started Bagrum Airfield, a
18  hospital there, and then to Landstuhl, Germany.
19      Q.   What was the nature of your noncombat injury?
20      A.   My kidney failed.
21      Q.   Did you pursue your recovery in Germany or
22  were you returned to the United States?
23      A.   No.  I was returned to the United States and
24  stationed at West Point.
25      Q.   How long did it take you to recover?
```

137

1   A.   Approximately six months.
2   Q.   Were you discharged as a result of your
3   injury?
4   A.   I was not.
5   Q.   When did you complete your service with the
6   National Guard?
7   A.   March of 2012.
8   Q.   Were you discharged?
9   A.   I'm sorry?
10  Q.   Were you discharged?
11  A.   I was.
12  Q.   Was it honorable?
13  A.   It was.
14  Q.   After you left the National Guard, did you
15  continue your career as a financial adviser?
16  A.   I did.
17  Q.   Did you pursue any further education?
18  A.   I did.
19  Q.   What education did you pursue?
20  A.   I went to law school.
21  Q.   Okay.  When did you -- did you obtain a law
22  degree?
23  A.   I did.
24  Q.   When did you obtain your law degree?
25  A.   2018.

138

1   Q.   Are you still a financial adviser today?
2   A.   Yes.
3   Q.   Do you practice law at all?
4   A.   My practice of law is limited to acting as an
5   attorney for veterans who are seeking compensation
6   claims before the Veterans Administration.
7   Q.   Do you accept compensation for that practice
8   of law?
9   A.   I don't.
10  Q.   Approximately how many hours a week do you do
11  that?
12  A.   It's probably hours a month, maybe two hours
13  a month.
14  Q.   Fair enough.  Do you currently hold a
15  Connecticut State Pistol Permit?
16  A.   I do.
17  Q.   When did you first obtain that pistol permit?
18  A.   I don't recall when it was, but it was at
19  least 30 years ago.
20  Q.   Have you held it consistently since then?
21  A.   I have.
22  Q.   You've kept up with the annual renewals?
23  A.   Yes.  Though I --
24  Q.   The regular renewals?
25  A.   Yes.

139

1   Q.   Does a Connecticut Pistol Permit allow you to
2   purchase firearms?
3   A.   It does.
4   Q.   Does it allow you to purchase ammunition?
5   A.   Yes.
6   Q.   Does it permit you to carry a handgun in
7   public?
8   A.   It does.
9   Q.   Do you own a handgun?
10  A.   I do.
11  Q.   Do you own more than one handgun?
12  A.   I do.
13  Q.   What handguns do you own?
14  A.   I own a Glock 17, a Glock 19, a Glock 48, a
15  Glock 42, a Smith & Wesson Model 659, a Ruger Mark 2,
16  a Beretta 950 and a Taurus 85.
17  Q.   Of all those firearms that you just
18  described, are all of those pistols?
19  A.   They are.  One is a revolver.
20  Q.   Do you carry a handgun when you venture into
21  public?
22  A.   I do.
23       MR. BOCHAIN:  Your Honor, if I may, I have
24  given Attorney Atkinson quite a bit of leeway here.
25  A lot of these questions are leading.  These are

140

1   preliminary matters, so I'd ask that the form of the
2   question be rephrased.
3        THE COURT:  Do you carry a handgun when you
4   venture into public is not a leading question, but be
5   aware that you should not lead your witness after
6   this.  Okay?
7        MR. ATKINSON:  Understood, Your Honor.
8        THE COURT:  Okay.  So the question that's
9   pending is do you carry a handgun when you venture
10  into public.
11       THE WITNESS:  I do.
12  BY MR. ATKINSON:
13  Q.   The handgun that you carry into public, is it
14  one of the handguns that you've previously listed
15  here today?
16  A.   Yes.
17  Q.   Of the handgun that -- of the handguns you
18  listed, do you have a preferred one to carry in
19  public?
20  A.   Yes.
21  Q.   Which handgun is that?
22  A.   The Glock 42.
23  Q.   Why do you prefer to carry that handgun in
24  public?
25  A.   It's a combination of concealability and I

141

```
1   think effectiveness is -- it's better with that than
2   any of the others.
3       Q.    How often do you carry that Glock 42 into
4   public?
5       A.    Daily.
6       Q.    Why do you carry that Glock 42 daily in
7   public?
8       A.    For self-defense.
9       Q.    In the entire time -- withdrawn.
10          Prior to obtaining a Connecticut Pistol
11  Permit, did you own a handgun?
12      A.    I'm sorry.  I don't think I heard your
13  question.
14      Q.    I apologize.  Prior to obtaining a
15  Connecticut Pistol Permit, did you own a handgun?
16      A.    No.
17      Q.    After you acquired a Connecticut Pistol
18  Permit, did you acquire a handgun?
19      A.    I did.
20      Q.    Have you consistently owned a handgun since
21  you -- withdrawn.
22          When did you -- when approximately did you
23  acquire the handgun after you obtained your pistol
24  permit?
25      A.    It would have been shortly thereafter.  I
```

142

```
1   mentioned the Smith & Wesson Model 659 which I
2   believe was the first pistol that I purchased, and it
3   would have been right around the same time I got the
4   permit.
5       Q.    So more than 30 years ago?
6       A.    More than 30 years ago, yes.
7       Q.    Okay.  And in those 30 years, have you
8   owned -- have you always owned a handgun during that
9   time?
10      A.    Yes.
11      Q.    During those 30 years where you've owned a
12  handgun, have you typically carried your handgun into
13  public?
14      A.    Yes.
15      Q.    During the times that you've -- during that
16  period, that 30-year period we've been discussing,
17  have you ever been -- have you ever had to use your
18  firearm -- your handgun in self-defense?
19      A.    No.
20      Q.    Have you ever had to make a showing of your
21  handgun for the purposes of self-defense?
22      A.    No.
23      Q.    When you carry your handgun in public, do you
24  try to obey laws regulating how you may carry it?
25          MR. BOCHAIN:  Objection, Your Honor.
```

143

```
1   Leading.
2           THE COURT:  Sustained.
3   BY MR. ATKINSON:
4       Q.    Mr. Nastri, when you -- are you aware that --
5   withdrawn.
6           Mr. Nastri, as part of obtaining your pistol
7   permit, did you have to undergo any -- any
8   educational classes?
9           MR. BOCHAIN:  Objection, Your Honor.
10  Leading.
11          THE COURT:  Overruled.
12          THE WITNESS:  It was a long time ago and I do
13  remember attending a class at the police department
14  and then demonstrating proficiency by shooting at
15  targets.
16  BY MR. ATKINSON:
17      Q.    If you recall as you sit here today, what did
18  the class at the police department entail?
19      A.    I have no recollection of it.
20      Q.    Since you obtained your pistol permit and
21  took that initial class, have you taken any other
22  class or have you taken any classes with respect to
23  handguns?
24      A.    Not outside of the military.
25      Q.    If -- withdrawn.
```

144

```
1           With respect to carrying your handgun in
2   public, are you aware of whether there are any laws
3   that govern how you may carry it?
4       A.    I am.
5       Q.    Okay.  What laws are you aware of on -- that
6   regulate how you may carry your handgun in public?
7       A.    I think the statute is silent on whether it
8   is carried concealed or open, but I believe it
9   references that you may not carry it in such a way as
10  to cause alarm to another person.
11      Q.    Are you aware of any other laws besides that
12  one that you just described to us?
13      A.    As far as carrying, I can't think of one.
14  You have to have your permit with you when you carry.
15  Then there are storage requirements if you're not
16  able to carry it on your person.
17      Q.    Do you comply with the laws that you are
18  aware of regulating how you may carry your handgun in
19  public?
20      A.    I do.
21      Q.    Are you aware of any laws in the state of
22  Connecticut that regulate where you may carry your
23  handgun in public?
24      A.    I am.
25      Q.    What laws are you aware of?
```

145

```
1     A.    There are restrictions about certain
2  locations such as courthouses, schools, polling
3  places, and then I became aware last year of the
4  restriction on state parks and forests.
5     Q.    How did you become aware of these laws?
6     A.    I had gotten a hunting license and I was
7  reading the regulations about where you can hunt, for
8  what, with what and when, and I came across the
9  regulation that prohibits firearms in state parks and
10 forests.
11    Q.    And just so the record is clear, the
12 regulation that you are referring to, can you provide
13 us the number if you're aware of it?
14    A.    I can't remember what the number is.
15          MR. ATKINSON:  Your Honor, if I may show
16 Mr. Nastri what's been marked as Plaintiff's Exhibit
17 No. 1, the amended complaint.
18          THE COURT:  You may.  So Number 1 says
19 ordinances and laws about parks, 1858 Central Park.
20 Do we have the right one?
21          MR. ATKINSON:  Plaintiff's Exhibit 1 for ID.
22          THE COURT:  Yeah.
23          MR. ATKINSON:  Are you looking at the
24 combined exhibit list?  Because what you just
25 described sounds like the state's first exhibit.
```

146

```
1          THE COURT:  You're correct.  Let me go to
2  yours.  I have Number 1 has an amended complaint.
3  BY MR. ATKINSON:
4     Q.    Mr. Nastri, do you recognize the document I
5  just handed you?
6     A.    I do.  It's the verified amended complaint.
7     Q.    Okay.  What is your understanding of a
8  verified complaint?
9     A.    As -- I think it's the last and complete
10 complaint that's filed in this action.
11    Q.    Well, did you -- do you recall signing it in
12 front of a notary public -- well, withdrawn.
13          May I direct your attention, Mr. Nastri, to
14 the final page of the complaint that bears the ECF
15 stamp Document 13, page 15 of 16?
16    A.    Yes.  I do see that.
17    Q.    What is that, Mr. Nastri?
18    A.    That is the verification that I signed and
19 had notarized.
20    Q.    What do you understand that verification to
21 be?
22    A.    It means that I verified the truth of the
23 allegations in the complaint.
24    Q.    Did you do so under oath?
25    A.    I did.
```

147

```
1     Q.    If I may now direct your attention to the
2  fourth page on the ECF stamp for Document 13,
3  paragraph 13.
4     A.    I see that.
5     Q.    After reviewing that paragraph, you -- you
6  recall the number of the reg- -- the state regulation
7  that prohibits you from carrying a firearm in state
8  parks that you referenced earlier?
9     A.    I do.  It's Section 23-4-1(c).
10    Q.    When did you become aware of that regulation?
11    A.    After I had received my hunting permit and I
12 was reading the regulations on the DEEP website about
13 where hunting is permitted, for what and when.
14    Q.    When did you receive your hunting permit?
15    A.    I think it was -- it was definitely in 2022,
16 sometime in the summer, I think.
17    Q.    Why did you obtain a hunting permit?
18    A.    I had a nephew who asked me to go bird
19 hunting with him a few years ago and I obviously
20 needed a hunting license to do that.
21    Q.    Had you ever been -- withdrawn.
22          Had you ever held a Connecticut hunting
23 license prior to that occasion?
24    A.    No.
25    Q.    Prior to obtaining your hunting license, did
```

148

```
1  you use state parks and forests?
2     A.    I did.
3     Q.    Which state parks and forests did you use
4  prior to obtaining your hunting license?
5     A.    Sleeping Giant State Park in Hamden, the
6  Farmington Canal Trail which is through most towns in
7  the state but primarily in Cheshire, and then
8  Naugatuck State Forest.
9     Q.    Do you still use those same parks today?
10    A.    I do.
11    Q.    How often do you use Sleeping Giant State
12 Park?
13    A.    I probably would say on average, once a month
14 during the course of the year.
15    Q.    For what purpose do you use Sleeping Giant
16 State Park?
17    A.    Hiking.
18    Q.    Pardon me?
19    A.    Hiking.
20    Q.    How often do you use Naugatuck State Forest?
21    A.    Probably once or twice a year.
22    Q.    What do you use Naugatuck State Forest for?
23    A.    Hiking.
24    Q.    How often do use the Farmington River Canal
25 Trail?
```

App.139

149

1    A.    Probably on average, three times a week. I'm
2  sorry. Let me qualify that. Probably four or five
3  times a week total.
4    Q.    What do use the Farmington River Canal Trail
5  for?
6    A.    I run on it and I then also walk on it.
7    Q.    For each of the parks listed,
8  approximately -- well, pardon me. Withdrawn.
9        For Sleeping Giant State Park, how long
10  approximately have you been using it?
11    A.    Since I was 15 years old probably.
12    Q.    For Naugatuck State Forest, how long
13  approximately have you been using it?
14    A.    Probably 40 years.
15    Q.    For the Farmington River Canal Trail,
16  approximately how long have you been using it?
17    A.    I would say at least ten.
18    Q.    I'm not sure if I asked you this yet, but for
19  what purpose do you use the Farmington River Canal
20  Trail?
21    A.    For both running and then also for walking.
22    Q.    How often do you use it for running?
23    A.    Probably three to four times a week.
24    Q.    How often do you use it for walking?
25    A.    Probably two to three times a week.

150

1    Q.    You testified earlier that you only became
2  aware of the prohibition established by 23-4-1 when
3  you -- after you obtained your hunting license.
4        Prior to learning of that regulation, did you
5  carry a handgun into state parks and forests?
6    A.    Yes, I did.
7    Q.    Which state parks and forests did you carry
8  your handgun into?
9    A.    Sleeping Giant, the Naugatuck State Forest
10  and the Farmington Canal Trail.
11    Q.    Approximately how many times did you carry
12  your handgun into Sleeping Giant State Park?
13    A.    Every time I went there.
14    Q.    Approximately how many times did you carry
15  your handgun into Naugatuck State Forest?
16    A.    Every time I went there.
17    Q.    Approximately how many times did you carry
18  your handgun into -- on the Farmington River Canal
19  Trail?
20    A.    Approximately three times a week when I was
21  walking on it.
22    Q.    After you became aware of the regulation that
23  prohibited you from carrying a firearm in state parks
24  and forests, did you stop carrying a firearm in state
25  parks and forests?

151

1    A.    I did. But that was only after inquiring of
2  the commissioner of the DEEP if there was some other
3  regulation that permitted people with firearm's
4  permits to carry them in state forests.
5    Q.    Let's hold that thought for a second and I
6  want to circle back to something.
7        Prior to the learning of the regulation for
8  why you -- that prohibited you from carrying firearms
9  in state parks and forests, why did you carry a
10  handgun in Sleeping Giant State Park?
11    A.    For self-defense.
12    Q.    Why did you carry a firearm for the -- based
13  on the same time period in Naugatuck State Forest?
14    A.    Self-defense.
15    Q.    And the same for Farmington River Canal
16  Trail?
17    A.    Also self-defense, yes.
18    Q.    Did you have any specific reason to believe
19  that you would need to carry a firearm in Sleeping
20  Giant State Park?
21    A.    No.
22    Q.    Did you have any specific reason to believe
23  that you would need to carry a firearm for
24  self-defense in Naugatuck State Forest?
25    A.    No.

152

1    Q.    Did you have any specific reason that you
2  would feel the need to carry a firearm for
3  self-defense on the Farmington River Canal Trail?
4    A.    Yes.
5    Q.    What was that reason?
6    A.    I know that there are -- there's a lot of
7  criminal activity on the canal. I'm aware of sexual
8  assaults that have taken place. There was one
9  particularly egregious event with a Yale law student
10  who was assaulted on the Canal Trail.
11    Q.    How did you become aware of those incidents?
12    A.    Some of them --
13        MR. BOCHAIN: Objection, Your Honor. Calls
14  for hearsay.
15        MR. ATKINSON: Your Honor, I'm not
16  offering --
17        THE COURT: Does it matter?
18        MR. ATKINSON: It's going to his impression
19  of why I need -- why he felt the need to carry for
20  self-defense on the Farmington --
21        THE COURT: I'll permit the question. Go
22  ahead.
23  BY MR. ATKINSON:
24    Q.    Do you need me to ask the question again,
25  Mr. Nastri?

153

1    A.    Yeah, please.
2    Q.    Now I've lost my train of thought.
3         THE COURT:  Let me ask Ms. Thomas to read
4    that back.
5         (Record read by the Court Reporter.)
6         THE WITNESS:  So some of them I was made
7    aware by my brother who is a police officer in
8    Cheshire, investigations that he had been a part of.
9    Some were in discussions with you about criminal
10   background on -- or criminal events on the Farmington
11   Canal Trail.
12   BY MR. ATKINSON:
13   Q.    Okay.  What effect did those -- what effect
14   did hearing those stories have on you?
15   A.    I think it would be a fair statement to say
16   that it made me more committed to be able to defend
17   myself in those areas.
18   Q.    You -- let's circle back to what you
19   referenced earlier about contacting, I believe you
20   testified you contacted Commissioner Katie Dykes, the
21   defendant in this action, to see if there was another
22   regulation or law that permitted you to carry a
23   handgun in state parks and forests?
24   A.    That's correct.  When I saw the 23-4-1, I did
25   research to try and find some other counterpart to

154

1    that regulation which made an exception to that rule
2    for people who had pistol permits and I couldn't find
3    one.  So I e-mailed Commissioner Dykes and asked if I
4    was just missing it or if, in fact, it was the case
5    that no one was allowed to carry firearms in state
6    parks and forests.
7    Q.    When approximately did you e-mail
8    Commissioner Dykes?
9    A.    I don't remember the exact date.  I think it
10   was in the fall.
11   Q.    Okay.  One second, please.  You still have in
12   front of you what's marked as Plaintiff's Exhibit 1,
13   the verified amended complaint.  I would direct your
14   attention to paragraph 19 on page -- the page bearing
15   the ECF stamp 4 of 16 and then that runs over onto
16   page 5 of 16.
17   A.    I see that.
18   Q.    Okay.  Have you read that paragraph?
19   A.    Yes.
20   Q.    Does that refresh your recollection on when
21   you sent that or when you made that inquiry with
22   Commissioner Dykes?
23   A.    Yes.  I did it on November 18, 2022.
24   Q.    Do you recall if Commissioner Dykes ever
25   responded to you?

155

1    A.    Commissioner Dykes did not respond to me.  A
2    deputy commissioner did.
3    Q.    Who was the deputy commissioner who responded
4    to you?
5    A.    Deputy Commissioner Mason Trumble.
6    Q.    What was the content of his response as you
7    understood it?
8         MR. BOCHAIN:  Objection, Your Honor.  Calls
9    for hearsay.
10        THE COURT:  Sustained.
11   BY MR. ATKINSON:
12   Q.    Mr. Nastri, did you -- withdrawn.
13        Mr. Nastri, you received responses from
14   Commissioner Trumble, correct?
15   A.    Yes.
16   Q.    And on the basis of those responses, did you
17   form a conclusion about whether carrying a handgun in
18   a Connecticut state park or forest was permitted?
19   A.    I did.
20   Q.    What was your conclusion based on your
21   conversation with Mr. Trumble?
22        MR. BOCHAIN:  Objection, Your Honor.  That's
23   hearsay.
24        THE COURT:  Overruled.  It's his state of
25   mind.

156

1         THE WITNESS:  In his response, I received an
2    attachment which was a link to an Office of
3    Legislative Research report about firearms in state
4    parks and forests.
5         THE COURT:  The question is what was your
6    conclusion based on your conversation.
7         MR. ATKINSON:  Your Honor, will it be helpful
8    if I rephrase the question.
9    BY MR. ATKINSON:
10   Q.    Mr. Nastri, did you reach a conclusion based
11   on your conversation with Mr. Trumble on whether
12   carrying a firearm in a state park or forest was
13   permissible?
14   A.    I did.
15   Q.    What was your conclusion?
16   A.    Based on our communication, it is not
17   permitted to carry firearms in state parks and
18   forests.
19        MR. BOCHAIN:  Objection, Your Honor.  I have
20   to raise the hearsay objection again.  It's based on
21   the content of an e-mail that he's forming an
22   opinion.
23        THE COURT:  The e-mail may say something
24   else.  His opinion is this.
25        MR. BOCHAIN:  I think it still goes to the

157

```
1   substance.  I maintain my objection.
2        THE COURT:  If somebody wants to put the
3   e-mail in, that's fine, to show that his opinion is
4   different from or modified by the e-mail, but for the
5   time being, he thinks that was not permitted to carry
6   firearms in state parks or forests.  Go ahead.
7   BY MR. ATKINSON:
8        Q.   Mr. Nastri, can I direct your attention to
9   the document labeled 13 dash 13 on the ECF stamp in
10  the exhibit -- Plaintiff's Exhibit 1 that you have in
11  front you and it consists of four pages beginning
12  with one bearing the cover exhibit M.  Do you see
13  that?
14       A.   I'm sorry.  Exhibit 1 what?
15       Q.   Exhibit M.
16       A.   M, yes.
17       Q.   Can you review that, please, Mr. Nastri?
18       A.   Yes.
19       Q.   What is that document, Mr. Nastri?
20       A.   This is -- these are copies of the e-mails
21  that I -- the e-mail I sent to Commissioner Dykes,
22  Deputy Commissioner Trumble's response and my
23  response to Deputy Commissioner Trumble as well as
24  the legislative research report on carrying handguns
25  in state parks -- Connecticut parks and forests.
```

158

```
1        Q.   Are those copies true and accurate copies of
2   the e-mails between you and Mr. Trumble?
3        A.   Yes.
4        MR. ATKINSON:  Your Honor, I did not
5   previously mark these but I would offer them as a
6   full --
7        THE COURT:  Are they attached to the
8   complaint?
9        MR. ATKINSON:  Yes.  Which was marked as
10  Plaintiff's Exhibit 1.
11       THE COURT:  All right.  I think they're
12  included in that then already.
13       MR. ATKINSON:  Thank you, Your Honor.
14       MR. BOCHAIN:  Your Honor, if I could just
15  clarify the record briefly.  I don't believe
16  Plaintiff's Exhibit 1 is in evidence at this time.
17  It was offered for identification.  I think the
18  record should be clear on that.
19       THE COURT:  I thought that you told me --
20       MR. ATKINSON:  I would concur with
21  Attorney --
22       THE COURT:  I think that's right, that we
23  have 17, 19, 10, and -- 9, 10 and 17 without
24  objection.  All right.  The verified complaint is
25  Exhibit 1.
```

159

```
1        MR. ATKINSON:  Correct, Your Honor.
2        THE COURT:  Can't I take judicial notice of
3   this as a document filed in the Court by the
4   plaintiff?  I don't know where that goes in terms of
5   the treatment of its exhibits, but why is -- why can
6   I not take judicial notice of this as a document
7   filed at the Court.
8        MR. BOCHAIN:  I believe the Court could take
9   judicial notice of it, Your Honor.  The only thing I
10  would say is -- there's still this allegation in the
11  complaint which we have not submitted an answer to
12  yet.  So to the extent the Court is going to rely on
13  that as evidence, I would just note again it's
14  allegations at this point.
15       THE COURT:  Right.  And when we take judicial
16  notice, it has nothing to do with acceptance of the
17  contents.  It's just noting that it was filed, but I
18  don't think that's your purpose.
19       MR. ATKINSON:  Your Honor, I -- I was
20  attempting to just put the Exhibit M into --
21       THE COURT:  Is there an objection to
22  Exhibit M?
23       MR. ATKINSON:  Can I finish, Your Honor,
24  please?  What I would also note is this is -- this
25  complaint was made under oath.  This is a sworn
```

160

```
1   statement that was deliberately prepared in that form
2   in order to -- in order to support his preliminary
3   injunction and temporary restraining order paperwork.
4   I think at least my understanding would be that it's
5   already properly in the record for your consideration
6   on the overall merits of the preliminary injunction.
7        The fact that it was marked just for ID today
8   was a logistical thing.  I think it's clearly already
9   been submitted to you as evidence.
10       THE COURT:  All right.  It's been verified?
11       MR. BOCHAIN:  Correct.
12       THE COURT:  You can cross-examine on it.
13  What more do we need to consider about this?
14       MR. BOCHAIN:  The only thing I would note is
15  I would have no objection to Exhibit M which I think
16  is the e-mail that he's referring to which I think is
17  what he had been asking Mr. Nastri about.
18       THE COURT:  All right.  Recognizing M is part
19  of the verified amended complaint, should we
20  separately admit it as an exhibit?
21       MR. ATKINSON:  I have no objection to that,
22  Your Honor.
23       THE COURT:  We'll call it A sub 1 -- I mean 1
24  sub A.
25       MR. ATKINSON:  That works for me.
```

161

```
1          THE COURT:  And then it will be M and it will
2     be thoroughly confused.  Okay.  One -- Exhibit 1A,
3     Plaintiff's Exhibit 1A is Exhibit M to the verified
4     compliant.  Okay.  Let's go.
5          MR. ATKINSON:  Thank you, Your Honor.
6     BY MR. ATKINSON:
7     Q.   Mr. Nastri, in the e-mails that you exchanged
8     with Mr. Trumble, what was the purpose of those
9     e-mails?
10    A.   The purpose, as I stated in my original
11    e-mail, was to clarify the regulation and to find out
12    if there was another regulation that allowed the
13    carrying of firearms in the state parks and forests.
14    Q.   Why did you seek that clarification,
15    Mr. Nastri?
16    A.   Because I had a hard time believing that a
17    restriction on the ability to carry arms in public
18    could be on the books in such a manner.
19    Q.   Personally -- withdrawn.
20         Did you have a personal -- did you have a
21    personal interest in that answer?
22    A.   I'm not clear what you mean by "personal
23    interest."  Is it my background?  Do I understand
24    something about it?
25    Q.   Were you looking to do something as the
```

162

```
1     result of that answer?
2          MR. BOCHAIN:  Objection, Your Honor.
3     Leading.
4          THE COURT:  Sustained.
5          MR. ATKINSON:  Let me rephrase or attempt to
6     at least.
7     BY MR. ATKINSON:
8     Q.   Prior to you sending that e-mail to
9     Commissioner Dykes and then hearing back from
10    Mr. Trumble, you had -- did you carry your firearms
11    into state parks and forests?
12    A.   I did.
13    Q.   Were you looking to continue to carry your
14    firearms into state parks and forests?
15         MR. BOCHAIN:  Objection, Your Honor.
16    Leading.
17         THE COURT:  Sustained.
18         I'm going to change my mind on that.  It does
19    not suggest its own answer.  You may ask that
20    question.
21         MR. ATKINSON:  Thank you.  Can the court
22    reporter please read it back.  Thank you.
23         (Record read by the Court Reporter.)
24         THE WITNESS:  Yes.  When I discovered this
25    regulation and inquired about, for lack of a better
```

163

```
1     term, a corollary regulation that would allow pistol
2     permit holders to carry firearms in state parks and
3     forests and based on Mr. Trumble's response, seeing
4     that there was no corollary that would allow that and
5     that, in fact, there is a prohibition on firearms in
6     state parks and forests outside of the very specific
7     permitted activities, it was my intent with my final
8     response to Mr. Trumble to draw his attention to
9     Supreme Court decisions that clarified that we have a
10    right to carry firearms in state parks and forests
11    and I directed him to the Bruen decision and asked
12    that he ask Commissioner Dykes to amend that
13    regulation so that it's in compliance with the Bruen
14    decision.
15    BY MR. ATKINSON:
16    Q.   After your conversation with Mr. Trumble, did
17    you stop carrying your handgun in state parks and
18    forests?
19    A.   As a result of the communication that I had
20    with Mr. Trumble and discovering that, in fact, there
21    is no allowance for pistol permit holders to carry
22    them in state parks and forests, I did stop carrying
23    them in state parks and forests.
24    Q.   Why did you stop carrying them?
25    A.   Because I wasn't going to violate a law.
```

164

```
1     Q.   Okay.  At that time did you have any
2     knowledge that there would be consequences for
3     violating that law?
4     A.   I was aware that carrying a firearm in a
5     state park or forest carried a $35 fine.  I believe
6     there's a continuum of punishments to include being
7     banned from state parks and forests for 24 hours and
8     also up to a year you can be banned from state parks
9     and forests.  In addition to those, a violation of
10    this type I thought could potentially jeopardize my
11    pistol permit.
12         It conceivably could go on -- any --
13    actually, it's not conceivable.  If I had received
14    any of those penalties, I would have had to report
15    those to the regulators in my industry and that would
16    go on my U4 which is our version of a permanent
17    record.
18    Q.   Just to clarify, by your industry and U4 for
19    a second, could you clarify those two terms?
20    A.   So in my industry, our regulatory body is
21    called FINRA.
22    Q.   So can I stop you for a second?
23    A.   Yes.
24    Q.   What industry are you referring to?
25    A.   In the financial services industry.
```

165

```
1    Q.    Continue, please.
2    A.    So FINRA is the Financial Institution
3  Regulatory Authority and it's called an SR,
4  self-regulatory authority, and it is under the
5  auspices of the Securities and Exchange Commission
6  and they are the agency which is charged with
7  compliance and making sure that we are operating
8  within the regulations of our industry.
9    Q.    And what is the U4 that you referred to?
10   A.    U4 is your permanent record.  It contains
11  lists of licenses, employers, complaints that have
12  been filed against you, arrests, you know, things of
13  that nature.
14   Q.    Does it also contain a disciplinary history?
15   A.    It does.
16   Q.    As you sit here today, have you ever been
17  disciplined as a financial adviser?
18   A.    I have not been disciplined.  I have one
19  complaint on my record, but I was not disciplined for
20  it.
21   Q.    How was that complaint resolved?
22   A.    It was denied.
23   Q.    What does denied mean?
24   A.    It means that -- so this takes a little bit
25  of background.  So I work for Webster Investments.
```

166

```
1  Webster Investments hires a firm called a broker
2  dealer and the broker dealer is essentially the
3  platform on which all of our investments are
4  maintained.  They are also our immediate compliance
5  authority.  So they would do audits.  They would
6  investigate complaints.
7       They are sort of an arm of FINRA in that
8  regard to make sure that we are in compliance with
9  all the regulations that we are subject to and when a
10 complaint is made, it goes to several levels.  One is
11 internally at Webster and then it goes to the
12 compliance department at LPL, and then that is
13 investigated.  They usually bring in an attorney to
14 do an investigation.  And a determination is made as
15 to the truth of the allegation and they make a
16 decision about whether they are going to deny the
17 complaint or settle the complaint or forward it for
18 further adjudication.
19   Q.    In making your decision not to carry a
20 handgun in state parks and forests because of this
21 law and the possibility that you might need to report
22 this to FINRA and the other proper authorities, did
23 you contemplate the effect that such a violation
24 would have on your career?
25       MR. BOCHAIN:  Objection, Your Honor.
```

167

```
1  Leading.
2       THE COURT:  I'm going to sustain that because
3  it assumes there would be such an effect.
4       MR. ATKINSON:  Okay, Your Honor.  Thank you.
5  BY MR. ATKINSON:
6    Q.    Mr. Nastri, if you -- if you were to violate
7  the state parks prohibition on carrying firearms in a
8  state park or forest and you received punishment or
9  discipline for that, would you have to report that to
10 the regulatory bodies that oversee you as a financial
11 adviser?
12   A.    Yes.  I have an annual compliance
13 questionnaire that I'm obligated to fill out and
14 there are questions on there about arrests, charges,
15 penalties, et cetera.
16   Q.    And can you remind us how long you've been a
17 financial adviser?
18   A.    I have been in the role for 17 years.
19   Q.    Based on your knowledge of -- withdrawn.
20       Based on the length of time that you have
21 been a financial adviser, have you acquired a
22 knowledge of the disciplinary system that oversees
23 financial advisers?
24   A.    I have.
25   Q.    Have you encountered or have you acquired a
```

168

```
1  knowledge of what certain consequences could look
2  like -- what certain discipline could look like if
3  imposed on a financial adviser?
4    A.    I am.  I'm aware of people who had violated
5  various different rules in our industry, broken laws
6  relative to our industry, and licenses can be
7  suspended and I am aware of people who have had that
8  happen.  We just had an adviser resign after
9  allegations that he committed a very egregious
10 violation which he admitted to.  So a complaint of
11 this type or an incident of this type would go on my
12 U4 and it could lead to my discharge.
13   Q.    You -- withdrawn.
14       MR. ATKINSON:  May I have a moment, Your
15 Honor?
16       THE COURT:  Yes.
17       MR. ATKINSON:  Thank you.
18 BY MR. ATKINSON:
19   Q.    Based on your belief that these consequences
20 might result from a violation of the state park
21 prohibition on carrying in state parks and forests,
22 do you intend to carry a handgun in state parks and
23 forests in the future?
24       MR. BOCHAIN:  Objection, Your Honor.
25 Leading.
```

169

```
 1        THE COURT:  Do you want to break that into
 2  two things?
 3        MR. ATKINSON:  I can try, Your Honor.
 4        THE COURT:  Because otherwise, you have put
 5  it together as a question that suggests its answer.
 6        MR. ATKINSON:  I'll try to break that apart,
 7  Your Honor.
 8  BY MR. ATKINSON:
 9     Q.  Mr. Nastri, when you concluded that carrying
10  a handgun into state parks and forests was no longer
11  permissible in your understanding of the law, did you
12  contemplate the consequences that would result from
13  that?
14     A.  Yes.  I think certainly I would be subject
15  some kind of discipline professionally.  I think my
16  law license might be in jeopardy at that point and
17  made a determination that I was going to obey that
18  law for as long as it stayed on the books and that's
19  what led to filing this action, that until such time
20  that this regulation is overturned, that I will not
21  carry a firearm in a state park or forest.  I'm an
22  officer of the court.  I will not willfully disobey a
23  law, but as an officer of the court, it is my
24  obligation to make sure that the laws that are on the
25  books are constitutionally sound, and when this one
```

170

```
 1  is repealed, then I will carry firearms in state
 2  parks and forests again.
 3     Q.  Why would you -- withdrawn.
 4        In -- withdrawn.
 5        You testified earlier that you researched a
 6  lot about the laws pertaining to firearms and you
 7  also testified about your interactions with
 8  Commissioner Dykes and Commissioner Trumble.
 9        Are you aware based on -- or do you have any
10  knowledge based on any research you did or any
11  conversations you had whether there's a way that you
12  could get permission to carry a handgun in state
13  parks for self-defense?
14     A.  I am aware that there is a procedure where
15  you can request permission to carry firearms into a
16  state park or forest.  I believe the context is
17  normally not self-defense.  I think that context --
18  the one incident I read about was a reenactment
19  group, a civil war reenactment group, that wanted to
20  bring Civil war era weapons into a state park or
21  forest.  I am not aware that it's something you can
22  ask to carry a firearm for self-defense.
23     Q.  Okay.  Do you have any knowledge of how a
24  process for making such an application as that
25  would -- what that process would look like?
```

171

```
 1     A.  I believe there's a form that you submit
 2  identifying what you want to do and bring it to the
 3  park.
 4     Q.  Have you ever seen that form?
 5     A.  I recollect seeing one in maybe one of these
 6  exhibits.
 7     Q.  Do you know where you could find such a form?
 8     A.  I don't.
 9        MR. ATKINSON:  May I have a moment, Your
10  Honor?  I think I'm close to wrapping up.
11  BY MR. ATKINSON:
12     Q.  Mr. Nastri, you testified that you regularly
13  used Farmington River Canal Trail, correct?
14     A.  Yes.
15     Q.  Where do you do access the Farmington River
16  Canal Trail?
17     A.  I can walk to the trail from my home.  I can
18  walk to one end of my street and the canal intersects
19  with a road called Higgins Road.  I can take a right
20  out of my driveway and access it on North Brooksvale
21  in Cheshire.
22     Q.  Do you typically access it by foot?
23     A.  Yes.
24     Q.  And just to circle back to your testimony
25  earlier, when you access it, it's typically for
```

172

```
 1  walking or jogging?
 2        MR. BOCHAIN:  Objection, Your Honor.  This
 3  has been asked and answered.
 4        THE COURT:  Sustained.
 5        MR. ATKINSON:  Withdrawn.  I'll move on.
 6  BY MR. ATKINSON:
 7     Q.  Do you schedule when you're going to go to a
 8  state park or forest, Mr. Nastri?
 9     A.  No.
10     Q.  Do you have a calendar that you keep track of
11  when you go?
12     A.  No.
13     Q.  How far is Sleeping Giant State Park from
14  your house?
15     A.  Sleeping Giant is probably three miles from
16  my house.
17     Q.  How do you typically go to Sleeping Giant
18  State Park?
19     A.  I would drive there.
20     Q.  Do you have any knowledge of how long
21  approximately it would take you to drive from your
22  house to Sleeping Giant State Park?
23     A.  I want to amend my earlier answer.  It may be
24  more than three miles.  It's a five- or ten-minute
25  ride.
```

173

```
1     Q.   Do you plan -- do you put a date on a
2  calendar when you're going to go to Sleeping Giant
3  State Park?
4     A.   No.
5     Q.   How far is Naugatuck State Forest from your
6  house?
7     A.   Approximately a mile.
8     Q.   How long -- how do you typically access
9  Naugatuck State Forest?
10    A.   I would drive down the street and there is a
11 town park calling Roaring Brook and I would hike up
12 to the top of Roaring Brook and once you get to the
13 top, you're in the Naugatuck State Forest.
14    Q.   Approximately how long does it take you to
15 get from your house to Roaring Brook state park?
16    A.   Less than a minute.
17    Q.   How long does it take you to hike from the
18 entrance to Roaring Brook state park to where you
19 enter Naugatuck State Forest?
20    A.   Fifteen minutes.  It's a steep hill that you
21 have to climb up.
22    Q.   Do you plan or mark your visits to Naugatuck
23 State Forest on a calendar?
24    A.   No.
25    Q.   Do you feel that you live close enough to
```

174

```
1  Sleeping Giant State Park that you could visit at any
2  time you get a hunch to?
3     A.   Yes.  It's always impromptu.  If we have a
4  gap in our afternoon and we're looking to fill it,
5  that's a good way to do it.
6     Q.   With respect to Farmington Valley --
7  withdrawn.
8          With respect to the Farmington River Canal
9  Trail, do you typically plan when you're going to go
10 to visit?
11    A.   No.  I would say it's more than impromptu
12 because it's part of my running route.  So there's
13 regularity with that.  And then it's the same thing
14 as far as walking, you know, we have a block of time
15 and decide to go for a stroll.  You know, I did it
16 yesterday afternoon.  I did actually both.  I ran and
17 then I took a cool-down walk.
18         MR. ATKINSON:  I have no further questions at
19 this time, Your Honor.
20         THE COURT:  Okay.  Thank you.
21         Cross-examination.
22         MR. BOCHAIN:  If I can have one quick moment,
23 Your Honor.
24         CROSS-EXAMINATION OF DAVID NASTRI
25 BY MR. BOCHAIN:
```

175

```
1     Q.   Hi, Mr. Nastri.
2     A.   How are you?
3     Q.   Good.  How are you?
4     A.   Thanks.
5     Q.   My name is Thadius Bochain.  I represent the
6  defendant, Commissioner Katie Dykes, along with my
7  colleagues.
8          Have we met before?
9     A.   Yes.
10    Q.   Was that at your deposition on April 27th of
11 this year?
12    A.   Yes, it was.
13    Q.   It's nice to see you again.  As you know,
14 your lawyer just asked you some questions.  It's
15 going to be my turn to ask you some questions.  I
16 hope my questions will be clear, but I'm human.  So
17 if I say something you don't understand, just let me
18 know and I'll try to rephrase it.  Okay?
19    A.   Okay.
20    Q.   Now, there were some questions during direct
21 that you served in the military, right?
22    A.   That is true, yup.
23    Q.   And you started in the Army around 1980, did
24 I hear that correctly?
25    A.   That is correct.
```

176

```
1     Q.   And after that, you served for a period of
2  time in the Army National Guard, correct?
3     A.   Yes.
4     Q.   And was that approximately 2003 when you
5  started?
6     A.   Yes?
7     Q.   And you were discharged, right, in about
8  2012?
9     A.   Yes.
10    Q.   And I think I heard correctly that you served
11 overseas for a period of time when you were in the
12 Army National Guard; is that right?
13    A.   Yes.
14    Q.   Isn't it true that when you're in the
15 military, there's quite a few rules and regulations
16 that you need to follow?
17    A.   Yes.
18    Q.   And when you were also deployed overseas for
19 a period of time, it was about year, did I hear that
20 correctly?
21    A.   It was less than a year, but yes.
22    Q.   Less than a year.  And when you were there,
23 did you follow all the rules and regulations while
24 you were overseas?
25    A.   When I was overseas, yes.
```

177

```
1     Q.   Okay.  And for a period of time, you served
2   in the Army National Guard, you came back to the
3   states, correct?
4     A.   Yes.
5     Q.   And did you serve -- you served for a period
6   of time in the United States while you were in the
7   Army National Guard, correct?
8     A.   Yes.
9     Q.   And while you were there, isn't it true that
10  you followed all of the rules and regulations while
11  you were in the Army National Guard?
12    A.   Are you referring to when I came back from
13  overseas?
14    Q.   When you came back from overseas, we'll start
15  with that.
16    A.   Yes.
17    Q.   And so when you were overseas, though, you
18  still followed all the rules and regulations when you
19  were there?
20    A.   Yes.
21    Q.   And while you're in the military, you're
22  issued orders from your superiors, correct?
23    A.   Yes.
24    Q.   And you had followed all of those orders,
25  correct?
```

178

```
1     A.   Yes.
2     Q.   Now, believe I heard some testimony about --
3   I don't know if I heard this but you work for
4   Financial Resources Group; is that right?
5     A.   That is correct.
6     Q.   And they are -- there is a location here in
7   Connecticut and the office is in a Webster Bank; is
8   that not right?
9     A.   That is correct.
10    Q.   And I think heard correctly that you're a
11  wealth adviser?
12    A.   Correct.
13    Q.   And that's -- you manage people's
14  investments, correct?
15    A.   Yes.
16    Q.   And as part of that job, you have continuing
17  education requirements; is that right?
18    A.   Yes.
19    Q.   And you have always been in compliance with
20  those continuing education requirements, correct?
21    A.   Yes.
22    Q.   Now, I think I also heard on direct
23  examination that you've never been disciplined by
24  your current employer, the Financial Resources Group,
25  right?
```

179

```
1     A.   Yes.
2     Q.   And you've never been disciplined by any
3   employer in the past, correct?
4     A.   That's correct.  So our current --
5     Q.   That's a yes or no.
6     A.   Okay.
7     Q.   Thank you.
8          And I think I heard during direct that you
9   said you're a law-abiding citizen, correct?
10    A.   Yes.
11    Q.   And you've never been convicted of a felony,
12  right?
13    A.   Correct.
14    Q.   You've never been convicted of a misdemeanor,
15  right?
16    A.   Correct.
17    Q.   And you've never been arrested before, right?
18    A.   Correct.
19    Q.   Now, I think I also heard that you have a
20  pistol permit, correct?
21    A.   Yes.
22    Q.   All right.  And I don't know if this came out
23  on direct, but you have 13 firearms, right?
24    A.   I believe that's the correct number.
25    Q.   And so you would consider yourself fairly
```

180

```
1   knowledgeable about firearms laws here in
2   Connecticut, right?
3     A.   Reasonably so.
4     Q.   Would you consider yourself more
5   knowledgeable than most, correct?
6     A.   Yes.
7     Q.   So you're generally familiar with the laws
8   regarding gun ownership, correct?
9     A.   Yes.
10    Q.   And I think I heard you say you're also
11  familiar with the law requiring that you have to have
12  your pistol permit on you when you're carrying a
13  firearm, correct?
14    A.   Correct.
15    Q.   So you're familiar then with the laws
16  regarding the possession of firearms, right?
17    A.   Yes.
18    Q.   And you abide by all of those laws that you
19  know of, correct?
20    A.   Yes.
21    Q.   And I think I also heard that you know that
22  there's a law requiring the safe storage of a firearm
23  in a motor vehicle, correct, here in Connecticut?
24    A.   I don't think that came up today but I am
25  generally aware of it.
```

App.147

181

```
 1    Q.    I'll rephrase that.
 2          You are aware that there's a law in
 3    Connecticut, right, regarding the safe storage of a
 4    firearm in a motor vehicle, correct?
 5    A.    Yes.
 6    Q.    Isn't it also true that you actively try to
 7    ensure that you're complying with gun laws here in
 8    Connecticut?
 9    A.    I'm sorry.  Can you ask that again?
10    Q.    Isn't it true that you actively try to ensure
11    that you are compliant with gun laws here in
12    Connecticut?
13    A.    Yes.
14    Q.    So for example, when you discover that your
15    conduct might implicate a gun law here in
16    Connecticut, you conduct research to ensure that
17    you're compliant with that law, correct?
18    A.    I did in this particular instance, yes.
19    Q.    Are you familiar -- you're familiar with the
20    assault weapons ban, correct?
21    A.    Yes.
22    Q.    So when you became -- do you own a weapon --
23    you own a weapon that would fall within the assault
24    weapons ban in Connecticut, right?
25    A.    I do.
```

182

```
 1    Q.    So when you became aware of the assault
 2    weapons ban in Connecticut, didn't you research that
 3    issue to ensure that you were compliant with that
 4    law?
 5    A.    I didn't actually need to do research.  When
 6    the law was passed, you were required to register
 7    anything that fell into that category.
 8    Q.    When you became aware of that law, you
 9    actively took steps to comply it with, right?
10    A.    That is correct.
11    Q.    And you do not have any intent to violate any
12    law in the future; is that right?
13    A.    That is correct.
14    Q.    Now, I'd like to switch gears slightly if I
15    could and ask about where you actually carry a
16    firearm.
17          Isn't it true that there's times where you
18    live -- that you leave your house and you do not
19    carry a firearm with you?
20    A.    Yeah.
21    Q.    All right.  So I think I heard on direct
22    examination that you carry a firearm with you every
23    day, right?
24    A.    Yes.
25    Q.    But there are times when you leave your house
```

183

```
 1    and you do not carry a firearm, correct?
 2    A.    That is correct.
 3    Q.    Okay.  And so you're a military veteran,
 4    right?
 5    A.    Yes.
 6    Q.    All right.  And you receive your health care
 7    through the Veteran's Affairs Hospital otherwise
 8    known as the VA here in Connecticut; is that not
 9    right?
10    A.    Yes.
11    Q.    And so isn't it true that when you go to the
12    VA here in Connecticut, you leave your firearm at
13    home?
14    A.    I do.
15    Q.    And the reason you do that is because you
16    cannot carry on your person a firearm in the VA
17    hospital, right?
18    A.    You're not permitted to have a firearm on the
19    property.
20    Q.    The property meaning the parking lot,
21    correct?
22    A.    Correct.  Anything that falls into that
23    envelope of VA property.
24    Q.    So when you leave your home to go to the VA
25    Hospital, you leave your firearm at home, correct?
```

184

```
 1    A.    Yes.
 2    Q.    Now, we discussed very briefly at the
 3    beginning here that you had a deposition in
 4    connection with this case and at that -- that
 5    deposition took place in Hartford at the Office of
 6    the Attorney General, correct?
 7    A.    Yes.
 8    Q.    And isn't it true that when you left your
 9    home that day, you left your firearm at home?
10    A.    I did.
11    Q.    And do you recall without speculating the
12    specific reasons why you stated that you left your
13    firearm at home when you attend the deposition?
14    A.    I'm not sure exactly what I said during the
15    deposition, but --
16    Q.    Let me stop you right there.  So the question
17    was without speculating, do you know?
18    A.    You are going to have to start over because
19    I've lost track of what you're asking me.
20    Q.    Sure.  I can ask the question again.
21          So do you recall without speculating the
22    specific reasons that you stated as to why you left
23    your firearms at home when you attended your
24    deposition on April 27, 2023?
25    A.    I would say no, I can't.
```

185

```
1          MR. BOCHAIN:  May I approach the witness,
2   Your Honor?
3          THE COURT:  You may.
4   BY MR. BOCHAIN:
5       Q.   I'm showing you what has been marked as
6   Plaintiff's Exhibit 15.  Can you just take a moment
7   to look at that?
8          Have you had a moment to look at that?
9       A.   Well --
10      Q.   Just look at the first page and let me know.
11      A.   It's my deposition.
12      Q.   So you're familiar with what that document
13  is?
14      A.   Yes.
15      Q.   Now, I'm going to ask you to turn to
16  page 149, lines 20 to 25, and it's also going to go
17  onto page 150, lines 1 to 2?
18      A.   Okay.
19      Q.   All right.  Did you have a moment to review
20  those lines?
21      A.   You said 22?
22      Q.   So page 149.
23      A.   Yup.
24      Q.   And then it's lines 20 through 25 on 149 and
25  then onto page 150 lines 1 and 2.
```

186

```
1       A.   Yes.
2       Q.   So does that refresh your recollection?
3       A.   It does.
4       Q.   So isn't it true that the first -- you gave
5   two reasons as to why you left your firearm at home;
6   is that not right?
7       A.   Well, I think of it as one, but you can call
8   it two.
9       Q.   So we'll just say it's two.  The first reason
10  then that you left your firearm at home when you
11  traveled to your deposition was because firearms are
12  prohibited at the Office of the Attorney General,
13  correct?
14      A.   Correct.
15      Q.   And the second reason that you left your
16  firearm at home is really because you didn't know two
17  things, first, if you were going to be parking at the
18  Office of the Attorney General premises, and the
19  second thing is whether that premises where you'd be
20  parking is a location where firearms are prohibited,
21  correct?
22      A.   Yeah.  I see that.  That's what I said.
23      Q.   All right.  So you left your guns at home
24  because you were unsure whether firearms were
25  prohibited at the Office of the Attorney General
```

187

```
1   premises where you'd be parking your car on the date
2   of your deposition, correct?
3       A.   Yes.
4       Q.   You can keep that in front of you but you can
5   just close that for now.
6          Now, let me ask this:  So at your deposition,
7   you were represented by Attorney Atkinson, right?
8       A.   Yes.
9       Q.   And he was with you at all times during the
10  deposition?
11      A.   Yes.
12      Q.   And you were placed under oath much like you
13  were today at that deposition, right?
14      A.   Yes.
15      Q.   And at the start of the deposition, I asked
16  -- you were asked whether you were under the
17  influence of any drugs, correct?
18      A.   Yes.
19      Q.   And you were asked whether you were under the
20  influence of any alcohol, correct?
21      A.   Yes.
22      Q.   And there was nothing that would have
23  prohibited your ability to think clearly, correct?
24      A.   That's correct.
25      Q.   And you testified truthfully in that
```

188

```
1   deposition, right?
2       A.   I did.
3       Q.   Now, earlier you testify that you have a
4   Connecticut Pistol Permit and you carry that in your
5   wallet, right?
6       A.   Yes.
7       Q.   And that's the only place that you keep it,
8   right?
9       A.   Yes.
10      Q.   Now, there are times, though, that you do not
11  carry your wallet on your person, right?
12      A.   Yes.
13      Q.   And so for example, when you go for a run,
14  you do not carry your wallet with you, right?
15      A.   That is correct.
16      Q.   And I think I heard you go for a run about
17  three to four times per week; is that right?
18      A.   Yes.
19      Q.   And when you go for a run, it's around your
20  neighborhood, correct?
21      A.   Yes.
22      Q.   And I think you mentioned the Farmington
23  Canal Trail, it's very close to your house, isn't it?
24      A.   It is.
25      Q.   And you go for runs on the Farmington Canal
```

189

```
1    Trail, right?
2       A.    Yes.
3       Q.    And the reasons that you run -- go for a run
4    on the Farmington Canal Trail is because of the
5    proximity to where you live and it's visually pretty,
6    correct?
7       A.    Correct.
8       Q.    So you don't need to run there, you just
9    chose to do so because of those reasons, correct?
10      A.    Correct.
11      Q.    And isn't it true that you do not carry your
12   firearm on your person when you do not have your
13   pistol permit on you?
14      A.    Yes.  That is correct.
15      Q.    So you do not carry it when you have your --
16   when you don't have a pistol permit on you, right?  I
17   just want to be clear about that?
18      A.    Which one are you referring to, the gun or
19   the pistol permit?
20      Q.    You do not carry a firearm on your person
21   when you do not have your pistol permit on you,
22   right?
23      A.    That is correct.
24      Q.    And isn't it also true that you never carry a
25   firearm on your person when you go for a run?
```

190

```
1       A.    That is correct.
2       Q.    In fact, it's never been your practice to
3    carry a firearm on your person when you go for a run?
4       A.    Correct.
5       Q.    Now, isn't it also true that there's other
6    places that you go to that you don't carry your
7    firearm?
8       A.    Yes.
9       Q.    All right.  In fact, as a gun owner, you
10   sometimes choose not to carry a firearm on your
11   person because there are certain places where you
12   can't have a firearm; isn't that right?
13      A.    That is correct.
14      Q.    So for example, at Financial Resources Group,
15   you don't bring a gun to Webster Bank, correct?
16      A.    That is correct.
17      Q.    And you go into that office five times per
18   week, right?
19      A.    Generally, yes.
20      Q.    I'm going to ask you to take a look at
21   deposition -- your transcript in front of you there,
22   page 27 to 28.
23      A.    All right.  I'm on that page.
24      Q.    Lines 2 to 3, isn't it true that you go into
25   the office five days per week?
```

191

```
1       A.    What page are you referring to?
2       Q.    Page 28.  I'm sorry.
3       A.    Twenty-eight, okay.  Yes.
4       Q.    All right.  So -- and that's what you
5    testified in your deposition?
6       A.    Yeah.
7       Q.    So it's five days per week you go into the
8    office?
9       A.    Yes.
10      Q.    And you never carry your gun when you go into
11   the office, right?
12      A.    That is correct.
13      Q.    And the reason for that is Webster Bank
14   prohibits firearms on their premises, right?
15      A.    That is correct.
16      Q.    And Webster Bank had a holiday party in
17   December 2002 at a brewery in Southington, correct?
18      A.    Yes.
19      Q.    And you didn't carry your firearm to that
20   holiday party, correct?
21      A.    I didn't carry it inside, no.
22      Q.    I'm sorry?
23      A.    I did not carry it inside, no.
24      Q.    And the reason you didn't carry it is because
25   Webster Bank prohibits you from carrying a firearm at
```

192

```
1    their functions, correct?
2       A.    That is correct.
3       Q.    Now, you have two brothers; is that not
4    right?
5       A.    I do.
6       Q.    And they both live in Hamden, Connecticut,
7    right?
8       A.    Yes.
9       Q.    And you visit the home of one of those
10   brothers once per month, correct?
11      A.    Yes.
12      Q.    And when you go to that brother's house, the
13   one that you visit once per month, isn't it true you
14   don't carry a firearm into that house?
15      A.    That is correct.
16      Q.    And the reason you don't carry a firearm into
17   that house is because your sister-in-law, so your
18   brother's wife, prohibits guns in their house, right?
19      A.    That is correct.
20      Q.    And you always honor that request, don't you?
21      A.    I do.
22      Q.    And you have a girlfriend, do you not?
23      A.    Yes.
24      Q.    Her first name is Colleen, right?
25      A.    Yes.
```

193

```
 1    Q.   And she has a son, correct?
 2    A.   Yes.
 3    Q.   Now, you -- when you go to pick up the son at
 4  school, you don't bring your gun there, correct?
 5    A.   That is correct.
 6    Q.   And isn't -- and Colleen has family down in
 7  Florida, right?
 8    A.   Yes.
 9    Q.   And you visit her family occasionally, do you
10  not?
11    A.   Yes.
12    Q.   And you leave your gun at home when you go
13  visit the family, correct?
14    A.   I do.
15    Q.   I think you also mentioned on the direct
16  there's certain places that you don't go to with your
17  gun.  I can't recall.  But you don't take your gun to
18  a post office, right?
19    A.   No.
20    Q.   When you go to vote, you don't bring a gun,
21  correct?
22    A.   Correct.
23    Q.   And when you visited your brother at a
24  courthouse in the past, you haven't brought a gun
25  there, correct?
```

194

```
 1    A.   That is correct.
 2    Q.   And that's because you can't bring a gun into
 3  a courthouse, right?
 4    A.   Correct.
 5    Q.   And in the past, you've seen signs in various
 6  places that say no guns allowed, right?
 7    A.   Yes.
 8    Q.   And so when you've seen those signs, you
 9  comply with them, don't you?
10    A.   Yes.
11    Q.   Now, I want to circle back, if I can to
12  social -- let me ask it this way -- withdrawn.
13         When you go visit your brother, it's for
14  social gatherings, right?
15    A.   Yes.
16    Q.   And so you're familiar with a family with the
17  last name Greens, right?
18    A.   Yes.
19    Q.   They're friends of yours, right?
20    A.   Yes.
21    Q.   And you occasionally go to their house for
22  dinner, don't you?
23    A.   Yes.
24    Q.   But you bring your gun to their house, don't
25  you?
```

195

```
 1    A.   I do.
 2    Q.   Now, if the Greens were to ask you not to
 3  carry a gun in their house, you would not do so,
 4  isn't that right?
 5    A.   That is correct.
 6    Q.   And you would not bring a gun into their
 7  house because you want to respect their request,
 8  don't you?
 9    A.   That is correct.
10    Q.   And if you brought a gun into their house
11  against their wishes, that would be trespassing,
12  wouldn't it?
13    A.   It would.
14    Q.   It would?
15    A.   It would be trespassing.  Well, once they ask
16  me to leave, I believe that would be the trespass.
17    Q.   I'm going to ask you to take a look at
18  page 159 of your deposition, please.
19    A.   159?
20    Q.   159, correct.
21    A.   Line 7?
22    Q.   Correct.  So isn't it true that you testified
23  -- well, does that refresh your recollection of what
24  you said in response to that question at your
25  deposition?
```

196

```
 1    A.   It does.
 2    Q.   All right.  So isn't it true that you said
 3  that would be trespassing if you brought a gun into
 4  their house, correct, against their wishes?
 5    A.   I did say that.
 6    Q.   If you went to a restaurant while you were
 7  carrying a firearm and the restaurant's owner told
 8  you that there were no guns allowed, isn't it true
 9  that you wouldn't bring your firearm to that
10  restaurant?
11    A.   That is correct.
12    Q.   In fact, you'd leave your firearm in the car
13  under those circumstances, wouldn't you?
14    A.   Yes.
15    Q.   And if that restaurant owner saw you with a
16  gun and asked you to leave because they said no guns
17  allowed on the premises, you would leave, wouldn't
18  you?
19    A.   I would.
20    Q.   Now, do you recall being asked a similar
21  question during your deposition about why you would
22  leave your firearm in the car if that restaurant's
23  owner told you that no guns were allowed?
24    A.   I don't recall that question, no.
25         THE COURT:  I'm sorry.  What was your answer?
```

197

1    THE WITNESS:  I don't recall that.
2  BY MR. BOCHAIN:
3    Q.   All right.  If you can look at your
4  deposition transcript there, I'm going to ask you to
5  turn to page 159 again, lines 22 to 25, and then it's
6  going to carry onto 160 to line 1.  Let me know when
7  you've had a chance to review that.
8    A.   So again, we're on page 159?
9    Q.   Yeah.  159, lines -- let's go 22 to 25 and
10  then onto line 1 on page 160.
11    A.   Okay.
12    Q.   Okay.  Have you had a chance to review that?
13    A.   Yes.
14    Q.   All right.  Does that refresh your
15  recollection as to why you said you wouldn't bring
16  it?  And I'll ask the follow-up question.  I'm just
17  asking if that refreshes your recollection.
18    A.   It does.
19    Q.   Okay.  So isn't it true that the reasons
20  you'd leave your firearm in your car under those
21  circumstances is because it's the restaurant owner's
22  property and if you wanted to stay, you would have to
23  follow his rules?
24    A.   Yes.  That's correct.
25    Q.   I think I heard you say this on direct, but

198

1  isn't it true would you not carry a firearm or
2  handgun, a handgun or a pistol, into any Connecticut
3  state park or forest?
4    MR. ATKINSON:  Objection, Your Honor.  It
5  seems very vague of a question to me.
6    THE COURT:  Why don't you ask the question
7  straight out.  If the deposition is inconsistent with
8  it, you can use that to --
9    MR. BOCHAIN:  I was actually -- I can ask it
10  into two questions, Your Honor.
11  BY MR. BOCHAIN:
12    Q.   So isn't it true that you would not carry a
13  handgun or pistol into a Connecticut state park or
14  forest?
15    A.   It is true --
16    Q.   Yes or no?
17    A.   That is true.
18    Q.   And didn't you testify on direct examination
19  that you made a determination that you will not bring
20  a gun into any state park or forest while the
21  regulation is on the books?
22    A.   Correct.
23    Q.   So you don't carry a firearm on your person
24  when you go to a post office, right?
25    A.   Correct.

199

1    Q.   You don't carry a firearm when you go to a
2  school, right?
3    A.   Right.
4    Q.   You don't carry a firearm when you go to a
5  government building, right?
6    A.   Correct.
7    Q.   You wouldn't carry a firearm on your person
8  into a restaurant if the restaurant's owner said that
9  firearms are prohibited, right?
10    A.   That is correct.
11    Q.   You'd also leave the restaurant if the
12  restaurant's owner asked you to leave the
13  establishment because you had a gun, right?
14    A.   Correct.
15    Q.   You don't carry a firearm when you go to work
16  in your office which is located in Webster Bank,
17  right?
18    A.   When I go into the office, that's correct.
19    Q.   You don't carry a firearm when you go to work
20  functions, correct?
21    A.   When I what?
22    Q.   You do not carry a firearm when you go to
23  work functions hosted by Webster Bank, right?
24    A.   I don't carry them in those function.
25    Q.   That's because Webster Bank has a prohibition

200

1  about bringing guns --
2    A.   Yes.
3    Q.   Thank you.
4    You don't carry a firearm at your brother's
5  house, right?
6    A.   Correct.
7    Q.   And isn't it true that you would not carry a
8  firearm and you don't carry a firearm into
9  Connecticut state parks and forests, correct?
10    A.   Correct.
11    Q.   And isn't it true that you would not carry a
12  firearm in any of those locations I just mentioned?
13    A.   Correct.
14    Q.   Now, I want to switch gears if I can.  I know
15  there was some discussion about the regulation at
16  issue here which is Section 23-4-1(c).  That
17  regulation has never been enforced against you,
18  correct?
19    A.   Correct.
20    Q.   And you're familiar with the Environmental
21  Conservation Police, correct?
22    A.   I am.
23    Q.   And you're aware that they are the law
24  enforcement arm of the Department of Energy and
25  Environmental Protection, right?

201

```
1    A.   Yes.
2    Q.   And they had never threatened you with
3  enforcement of that regulation, correct?
4    A.   Correct.
5    Q.   No police officer has threatened you with
6  enforcement of that regulation, correct?
7    A.   Correct.
8    Q.   Now, there was some discussion about the
9  state parks and forests that -- two state parks that
10 you go to and one state forest, the two state parks,
11 Sleeping Giant State Park and the Farmington Canal
12 Trail, right?
13   A.   Yes.
14   Q.   And the third is the Naugatuck State Forest,
15 right?
16   A.   Yes.
17   Q.   Okay.  Over the past 12 months, you have not
18 visited the Naugatuck State Forest, isn't that
19 correct?
20   A.   I don't believe so.
21   Q.   The answer is no?
22   A.   To the best of my recollection, I don't think
23 in the last 12 months.
24   Q.   Okay.  If I showed you something, would that
25 refresh your recollection?
```

202

```
1    A.   It would.
2    Q.   Okay.  If you could turn to page 181 on the
3  deposition transcript there and lines 11 through 13.
4    A.   I see that, yes.
5    Q.   So isn't it true that you have not visited
6  the Naugatuck State Forest within the past 12 months?
7    A.   Yes.
8    Q.   Now, I think I heard you correctly, over the
9  past two years, you visited Sleeping Giant State Park
10 approximately, you said, once a month; is that
11 correct?
12   A.   I believe that's correct.
13   Q.   So would it be about eight -- 10 to 12 times
14 maybe in a two-year period, past two years?
15   A.   I think I missed the math on that.
16        THE COURT:  Once a month for a two-year
17 period is a lot more than 10 to 12.
18        MR. BOCHAIN:  I'm not greatest at math, Your
19 Honor.  I apologize.
20        THE COURT:  There are 12 months in a year.
21        MR. BOCHAIN:  Yeah.  I apologize, Your Honor.
22 BY MR. BOCHAIN:
23   Q.   Let me ask it this way:  You visited Sleeping
24 Giant approximately 12 times in 2023, correct?
25   A.   Correct.
```

203

```
1    Q.   And isn't it true that visited Sleeping Giant
2  State Park approximately eight times in 2022?
3    A.   I think that's correct.
4    Q.   And I think I heard correctly on direct, but
5  you don't have any plans, specific plans to visit
6  Sleeping Giant State Park, correct, in the future,
7  correct?
8    A.   That is correct, yup.
9    Q.   And you visited the Farmington Canal Trail
10 approximately -- is it two to four times per week?
11 Is that you said?
12   A.   That is correct, yes.
13   Q.   Now, I'd like to draw your attention to
14 Defendant's Exhibit 141 which is --
15        MR. BOCHAIN:  If I can just approach the
16 witness, Your Honor.
17        THE COURT:  You may.
18        MR. BOCHAIN:  Your Honor, I see we're coming
19 up on four o'clock.  I've been trying to move quickly
20 for Your Honor.
21        THE COURT:  Thank you.  We really are going
22 to stop at four o'clock.
23        MR. BOCHAIN:  I understand, Your Honor.
24        THE COURT:  And we can go till five tomorrow.
25 The calendar is okay if you need it.
```

204

```
1        MR. BOCHAIN:  Okay.  If I needed some more
2  time?
3        THE COURT:  Yes.  If you need time, you'll
4  get it tomorrow.
5        MR. BOCHAIN:  Thank you, Your Honor.  I'm
6  trying to move quickly here.
7  BY MR. BOCHAIN:
8    Q.   Have you had a -- Exhibit 141 in that binder,
9  if you can just turn to it.
10   A.   Yes.  I have it.
11   Q.   All right.  And that has been admitted as a
12 full exhibit just for the Court's convenience.
13        Are you familiar with that document?
14   A.   Yes.
15   Q.   Okay.  And what is it?
16   A.   It is a list of all state parks in
17 Connecticut.
18   Q.   So you're familiar with that, correct?
19   A.   Yes.
20   Q.   Now, you see it's in alphabetical order and
21 so you see the Farmington Canal State Park Trail, the
22 Naugatuck State Forest, and Sleeping Giant State Park
23 on that list?
24   A.   Yes.
25   Q.   Do you see Bigelow Hollow State Park in Union
```

205

```
1   on that list?  It's in alphabetical order.
2       A.   Yes.
3       Q.   You've never been there before, right?
4       A.   No.
5       Q.   Isn't it true you have no specific plans to
6   go there this summer?
7       A.   That is correct.
8       Q.   You also don't have any specific plans to go
9   there in the future; isn't that right?
10      A.   Correct.
11      Q.   And at the time you filed in this case, you
12  did not have any specific plans to visit Bigelow
13  Hollow State Park, correct?
14      A.   Correct.
15      Q.   Do you see Dinosaur State Park on that list
16  in Rocky Hill?
17      A.   I do.
18      Q.   And you haven't visited that location within
19  the past ten years, right?
20      A.   That one was the one I wasn't sure about.
21      Q.   I'm going to have you turn to page 192.  You
22  also have your deposition transcript in front of you
23  and I'm going to ask you to take a look at that.
24      A.   Yeah.  I do see that.
25      Q.   So isn't it true that you haven't visited
```

206

```
1   that location in the past ten years?
2       A.   That is true, yeah.
3       Q.   Isn't it true that you have no specific plans
4   to go there this summer?
5       A.   That is true.
6       Q.   You also don't have any specific plans to go
7   there in the future; isn't that correct?
8       A.   That is true.
9       Q.   At the time you filed your complaint in this
10  case, you did not have any specific plans to visit
11  Dinosaur State Park, right?
12      A.   That is correct.
13      Q.   All right.  Do you see Fort Griswold on that
14  list in Groton?
15      A.   I do.
16      Q.   You have not visited that location in the
17  past ten years either, right?
18      A.   Correct.
19      Q.   And isn't it true that you have no specific
20  plans to go there this summer?
21      A.   Correct.
22      Q.   You don't have any specific plans to go there
23  in the future; isn't that right?
24      A.   Correct.
25      Q.   And at the time you filed your complaint in
```

207

```
1   this case, you did not have any specific plan to
2   visit Fort Griswold, right?
3       A.   That is correct.
4       Q.   Do you see Fort Trumbull in New London on
5   that list?
6       A.   I do.
7       Q.   And you have no recollection of going there
8   before, right?
9       A.   That's correct.
10      Q.   Isn't it true that you have no specific plans
11  to go there this summer?
12      A.   That is correct.
13      Q.   And you also don't have any specific plans to
14  go there in the future; isn't that right?
15      A.   That is correct.
16      Q.   And at the time you filed your complaint in
17  this case, you did not have any specific plans to
18  visit Fort Trumbull, right?
19      A.   That is correct.
20      Q.   Do you see  Hammonasset Beach State Park on
21  that list in Madison?
22      A.   Yes.
23      Q.   And you have not visited Hammonasset Beach
24  State Park in more than ten years; isn't that right?
25      A.   I don't believe so.
```

208

```
1       Q.   The answer is yes or no?
2       A.   No.
3       Q.   So you haven't been there in more than ten
4   years?
5       A.   Correct.
6       Q.   Isn't it true that you have no specific plans
7   to go there this summer?
8       A.   That is true.
9       Q.   And you don't have any specific plans to go
10  there in the future; isn't that right?
11      A.   That is correct.
12      Q.   You -- at the time you filed your complaint
13  in this case, you did not have any specific plans to
14  visit Hammonasset Beach State Park, right?
15      A.   That is correct.
16      Q.   Do you see Harkness Memorial State Park in
17  Waterford, Connecticut on this list?
18      A.   I do.
19      Q.   You've never been to Harkness Memorial State
20  Park before; isn't that right?
21      A.   Correct.
22      Q.   Isn't it true that you have no specific plans
23  to go there this summer?
24      A.   That is correct.
25      Q.   And you also don't have any specific plans to
```

209

```
1   go there in the future; isn't that right?
2       A.    That is correct.
3       Q.    And at the time you filed your complaint in
4   the case, you did not have any specific plans to
5   visit Harkness Memorial State Park, correct?
6       A.    That is correct.
7       Q.    So let's put aside Farmington Canal State
8   Park, Naugatuck State Forest and Sleeping Giant State
9   Park, the locations we have discussed.  Isn't it true
10  that within the past 12 months, you have not visited
11  any of the other location on the list?
12      A.    That is correct.
13      Q.    Isn't it true that you have no specific plans
14  to visit any of those locations other than the three
15  that we just mentioned?
16      A.    That is correct.
17      Q.    So you have no intention of visiting any of
18  those other state parks or forests, correct?
19      A.    Yes.
20            THE COURT:  Are you going to a new subject?
21            MR. BOCHAIN:  It might be a good time to
22  break.
23            THE COURT:  Very good.  I'll see you tomorrow
24  then at ten o'clock.  Thank you.
25            (Proceedings adjourned, 3:59 p.m.)
```

210

```
1               C E R T I F I C A T E
2
3       RE:  DAVID J. NASTRI v. KATIE DYKES
             No. 3:23-cv-00056-JBA
4
5           I hereby certify that the within and
6   foregoing is a true and accurate transcript taken in
7   the aforementioned matter to the best of my skill and
8   ability.
9
10          /s/ Corinne T. Thomas
11          CORINNE T. THOMAS, RPR
            Official Court Reporter
12          United States District Court
            141 Church Street
13          New Haven, Connecticut 06510
            (203) 809-0848
14
15
16
17
18
19
20
21
22
23
24
25
```

212

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2

 3     _____
                                      )
 4     DAVID NASTRI,                  )
                                      ) No. 3:23-cv-00056-JBA
 5                    Plaintiff,      )
                                      ) May 10, 2023
 6     v.                             )
                                      ) 10:06 a.m.
 7                                    )
       KATIE DYKES,                   ) 141 Church Street
 8                                    ) New Haven, Connecticut
                      Defendant.      )
 9     _____)

10

11        PRELIMINARY INJUNCTION HEARING
                    VOLUME II
12

13     B E F O R E :

14        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

15

16     A P P E A R A N C E S :

17     For the Plaintiff:

18        ATKINSON LAW, LLC
              122 Litchfield Road
19            P.O. Box 340
              Harwinton, CT 06791
20            (203) 677-0782
              E-mail: catkinson@atkinsonlawfirm.com
21        BY: CAMERON LEE ATKINSON, ESQ.

22

23     (Continued)

24            Corinne Thomas, RPR
              Official Court Reporter
25              (203) 809-0848
```

```
 1     For the Defendant:

 2        OFFICE OF THE ATTORNEY GENERAL
              165 Capitol Avenue
 3            Hartford, CT 06106
              (860) 808-5296
 4            E-mail: blake.sullivan@ct.gov
                      thadius.bochain@ct.gov
 5                    timothy.holzman@ct.gov
          BY: BLAKE THOMAS SULLIVAN, ESQ.
 6            THADIUS LATIMER BOCHAIN, ESQ.
              TIMOTHY J. HOLZMAN, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

213

```
 1            I N D E X

 2     WITNESS:  DAVID NASTRI                    PAGE

 3     Continued Cross Examination by Mr. Bochain   214

 4     Redirect Examination by Mr. Atkinson         221

 5     Recross Examination by Mr. Bochain           235

 6

 7     WITNESS:  CHRISTOPHER LEWIS               PAGE

 8     Direct Examination by Mr. Atkinson           240

 9     Cross-Examination by Mr. Bochain             291

10     Redirect Examination by Mr. Atkinson         332

11     Recross-Examination by Mr. Bochain           345

12     Further Direct Examination by Mr. Atkinson   348

13     Further Cross-Examination by Mr. Bochain     349
```

214

```
 1          (Call to Order, 10:06 a.m.)

 2          THE COURT:  Good morning, counsel, ladies and

 3     gentlemen.  Please be seated.  We are ready to resume

 4     our hearing in Nastri v. Dykes, 23-cv-56.

 5          And I will invite Mr. Nastri to return to the

 6     stand for further cross-examination recalling, sir,

 7     that you are under oath.

 8          All right.  Mr. Bochain, you may proceed.

 9     I've jumped right into this because I didn't -- I

10     didn't ask if you have what you call housekeeping

11     issue.  Do you have housekeeping issues?

12          MR. BOCHAIN:  I don't believe we have any

13     housekeeping issues, but I will defer if we do.

14          MR. ATKINSON:  I will just note that it was

15     not said on the record before we closed yesterday,

16     but after we adjourned, I did advise Mr. Nastri not

17     that he was -- that he was still under oath and not

18     to discuss his testimony while he was still under

19     oath with anybody.  So I just wanted to make the

20     Court aware that even though that wasn't admitted on

21     the record, he did get that advisement from me.

22          THE COURT:  Thank you very much.

23          CONTINUED CROSS-EXAMINATION OF DAVID NASTRI

24     BY MR. BOCHAIN:

25     Q.   Good morning, again, Mr. Nastri.
```

215

```
1    A.    Good morning.
2    Q.    Again, it's Thadius Bochain on behalf of
3  commissioner Katie Dykes.  So I just wanted to go
4  over, kind of a refresher of where we left off
5  yesterday in case you forgot.  So what we were
6  talking about, where we ended was various locations
7  in the Connecticut state park and forest system that
8  you do not go to.  Do you recall that?
9    A.    I do.
10   Q.    And you recall that you testified that you do
11 not carry your gun in various locations, right?
12   A.    I do.
13   Q.    And you recall that one of those locations
14 was -- you don't carry it in a state park or forest,
15 correct?
16   A.    That is correct.
17   Q.    And you wouldn't carry it in a state park or
18 forest, correct?
19   A.    Correct.
20   Q.    And so what I'd like do, I had asked you some
21 questions about parks that you had visited within the
22 past 12 months and I think I had asked you the
23 question of whether or not you had any specific plans
24 to go to any of the state parks or forests that were
25 on -- that was on the list that I had showed you
```

216

```
1  yesterday at some point in the future.  Do you recall
2  that testimony?
3    A.    The specific parks that you pointed out, not
4  the ones that I have already identified.
5          MR. BOCHAIN:  Let's do it this way.  If I can
6  just approach the witness, Your Honor.
7          THE COURT:  You may.
8  BY MR. BOCHAIN:
9    Q.    I'm showing you what has been -- if you just
10 turn to Defense Exhibit 141, please.
11   A.    Yes.
12   Q.    All right.  And so yesterday, I had asked
13 you -- I want to make sure you get there.  Do you see
14 it?
15   A.    Yes, I do.
16   Q.    So I had asked you some questions about --
17 there's quite a few parks on this list, correct?
18   A.    Yes.
19   Q.    And we had been discussing three particular
20 parks:  Naugatuck State Forest, Sleeping Giant State
21 Park and Farmington Canal, correct?
22   A.    Yes.
23   Q.    I had also asked you some questions about all
24 of the other parks on this list, right?
25   A.    Yes.
```

217

```
1    Q.    All right.  And so you recall testifying that
2  you have no plans in the future to visit any of these
3  other state parks or forests on that list at some
4  point in the future, correct?
5    A.    That is correct, yes.
6    Q.    And I just wanted to clarify a couple of
7  points on that, if I may.
8          And so at the time that you filed this
9  complaint -- the complaint in this lawsuit, you had
10 no specific plans to visit any of those other state
11 parks and forests, correct?
12   A.    That is correct.
13   Q.    And today, you have no specific plans to
14 visit any of those state parks and forests, correct?
15   A.    That is also correct.
16   Q.    All right.  Now, I'd like to, if I could
17 just, circle back to the Farmington Canal State Park
18 Trail.  And you testified that you go jogging on that
19 trail, correct?
20   A.    Yes.
21   Q.    And you do that about three to four times a
22 week, right?
23   A.    Yes.
24   Q.    And isn't it also true that you tend to avoid
25 the Farmington Canal Trail when it gets crowded?
```

218

```
1    A.    Yes.
2    Q.    And it gets crowded pretty frequently in the
3  summer months, correct?
4    A.    Yes.
5    Q.    And so you avoid it at that time, correct?
6    A.    When it's crowded, yes.
7    Q.    Now, I believe you testified on direct
8  examination yesterday that you learned of the
9  existence of Section 23-4-1(c), which is the
10 regulation at issue in this case, you testified that
11 you learned of the existence of that regulation on
12 November 16th or November 17, 2022; is that not
13 correct?
14   A.    Yes.
15   Q.    But since learning of that regulation's
16 existence, you've continued to use the Farmington
17 Canal Trail, right?
18   A.    Yes.
19   Q.    And in fact, you've used it in the week of
20 your deposition, which would have been April 24,
21 2023, you used it a few times, correct?
22   A.    I believe I did, yes.
23   Q.    Do you recall?
24   A.    I know I used it.  I don't remember what the
25 dates are.
```

App.157

219

```
1     Q.    But you recall that you had used it a few
2  times at the time?
3     A.    Yes.
4     Q.    Or that week of the deposition, correct?
5     A.    I do, yes.
6     Q.    Now, I believe you testified during direct
7  examination that -- Attorney Atkinson had asked you
8  some questions about whether you had planned visits
9  on your calendar.  Do you remember that?
10    A.    Say that again.
11    Q.    Do you recall that Attorney Atkinson
12 yesterday during direct examination asked you some
13 questions about whether you planned visits and put
14 them on your calendar for Farmington Canal Trail.  Do
15 you remember that?
16    A.    Yes.
17    Q.    And you testified, correct, that you don't
18 have any specific plans on your calendar, correct?
19    A.    That is also correct.
20    Q.    And he also asked you some questions --
21 similar question about planned visits to Sleeping
22 Giant State Park, correct?
23    A.    Yes.
24    Q.    And you testified that you do not have any
25 specific plans to visit Sleeping Giant State Park,
```

220

```
1  correct?
2     A.    Yes.
3     Q.    And I think he also asked you a similar
4  question about Naugatuck State Forest.  Do you
5  remember that?
6     A.    I do.
7     Q.    And you testified that you do not have any
8  specific plans to visit Naugatuck State Forest in the
9  future, correct?
10    A.    Also correct.
11    Q.    Yesterday you testified -- I believe you
12 testified that you -- do you recall testifying about
13 a U4 report in connection with your employment as a
14 wealth advisor?  Do you recall that testimony?
15    A.    Yes, I do.
16    Q.    And I believe you testified that that report
17 documents violations of certain kind, correct?
18    A.    It is a full record of your employment
19 licenses you hold, but it does include violations and
20 complaints.
21    Q.    Okay.  And I believe you testified on direct
22 examination that you feared that a violation of
23 Section 23-4-1(c) might show up on that U4 form,
24 correct?
25    A.    It would be reportable, yes.
```

221

```
1     Q.    But isn't it true that you have no plans to
2  bring a gun to a state park or forest?
3     A.    That is correct.
4     Q.    So it's really a hypothetical that that would
5  show up on a form, correct?
6     A.    It's not hypothetical that --
7     Q.    Yes or no, please.
8     A.    If I was found in violation, that it would go
9  on my U4.
10    Q.    But you're never going to bring a gun to a
11 state park or forest, correct?
12    A.    I will not do so as long as this prohibition
13 is in place.
14          MR. BOCHAIN:  If I can just have one moment,
15 Your Honor.
16          THE COURT:  Yes.
17          MR. BOCHAIN:  Nothing further at this time,
18 Your Honor.
19          THE COURT:  Redirect.
20          MR. ATKINSON:  Yes, Your Honor.
21          REDIRECT EXAMINATION OF DAVID NASTRI
22 BY MR. ATKINSON:
23    Q.    Good morning, Mr. Nastri.
24    A.    Good morning.
25    Q.    Do you recall yesterday Attorney Bochain
```

222

```
1  asking you some questions about leaving your gun at
2  home when you go to the VA?
3     A.    I do.
4     Q.    And do you also recall explaining why you
5  left -- leave your gun at home when you go to the VA?
6     A.    I do, yes.
7     Q.    Can you repeat that reason for us?
8     A.    Having a firearm on VA property is a
9  violation, so I can't even lock it in my car.  I have
10 to leave it at home.
11    Q.    And just to make the record clear that the
12 parking lot at the VA, is that considered part of the
13 VA premises?
14    A.    Yes, it is.
15    Q.    And your understanding is you're not
16 permitted to have a firearm on that property?
17    A.    That is correct.
18    Q.    When you go to another place where a firearm
19 is not permitted, another building per se, do you
20 always leave your firearm at home?
21    A.    No.
22    Q.    If you're aware that you're going into a
23 building where a firearm is not permitted, what do
24 you do with your firearm?
25    A.    I lock it in a gun safe in my vehicle.
```

223

1    Q.    When you -- you've also testified that you've
2    visited three state parks, the Farmington River Canal
3    Trail, the Sleeping Giant State Park, and the
4    Naugatuck State Forest.
5         When you visited the Sleeping Giant State
6    Park over the past year, did you see any signs at the
7    state park saying no guns?
8    A.    I did.
9    Q.    When did you see that sign?
10   A.    I believe it was on a visit in March of this
11   year.  We had gone for a hike and I specifically was
12   searching for some notice that firearms were not
13   permitted in the park.
14   Q.    And that's -- just so the record's clear,
15   when you say, "March," that's March of this year,
16   2023?
17   A.    That's correct.
18   Q.    Prior to noticing it in March of 2023, had
19   you ever noticed it at Sleeping Giant State Park?
20   A.    No.
21   Q.    Where did you find the sign?
22   A.    There was posted regulations on the back side
23   of the sign that has the maps for the trails in the
24   park.
25   Q.    Where is the sign that has the maps for the

224

1    trails in the park?
2    A.    It is on the north side of the parking lot as
3    you come into the park.
4    Q.    Would it be fair to describe that sign as
5    being located at what's known as a trail head?
6         MR. BOCHAIN:  Objection, Your Honor.
7    Leading.
8         MR. ATKINSON:  I can rephrase, Your Honor.
9    BY MR. ATKINSON:
10   Q.    Where is that sign located more specifically,
11   Mr. Nastri?
12   A.    There are two parking lots when you enter the
13   park.  The first one is in the -- I'm trying to think
14   of the cardinal direction.  It would be on the south
15   side of the park.  And from there, there's a road
16   that goes up into a larger parking lot and then up to
17   the northeast is where the trails begin, and this
18   sign is between that first parking lot and when the
19   trails begin.
20   Q.    So if I'm understanding your testimony
21   correctly, you -- would you go in and you would park
22   your vehicle first?
23   A.    Yes.
24   Q.    And then would you go -- would you start
25   walking to where the attractions would be?

225

1    A.    Yes.
2    Q.    And as you're walking to where the
3    attractions would be?
4         THE COURT:  I'm sorry.  What's a "traction"?
5         MR. ATKINSON:  I'll piece that out, Your
6    Honor.
7    BY MR. ATKINSON:
8    Q.    Mr. Nastri, we just talked about the
9    attractions.  What is your understanding of the
10   activities that you may pursue at Sleeping Giant
11   State Park?
12        THE COURT:  You were saying "attraction."  Is
13   that the word you were using, "attraction"?
14        MR. ATKINSON:  I'm sorry.
15        THE COURT:  I thought you were just saying
16   "traction" and I did not recognize that word.  Go
17   ahead.
18        MR. ATKINSON:  Do you need me to flush it
19   out?
20        THE COURT:  No.  I got it.
21        MR. BOCHAIN:  Your Honor, I do have an
22   objection.  I've given a little bit of leeway here
23   but this is going outside the scope of
24   cross-examination.
25        THE COURT:  What is your claim as to its

226

1    relationship to cross-examination?
2         MR. ATKINSON:  There has been testimony
3    elicited when Mr. Nastri first became aware of the
4    regulations at issue in this case.  He had been
5    visiting state parks and forests for quite some time
6    and he's been asked repeatedly of when he learned
7    about the regulation.  So I'm simply exploring where
8    the times that he could have learned of the
9    regulations and the state didn't make it available to
10   him.
11        MR. BOCHAIN:  Your Honor, and I believe -- if
12   I may, I believe that has -- he's already testified
13   as to when he became aware of that.
14        THE COURT:  He became aware on November 26,
15   '22.  Is your question how did he become aware?
16        MR. ATKINSON:  My question, I believe he's
17   testified to how he became aware of it yesterday.
18   What I'm trying to explore is why he didn't become
19   aware of it sooner.
20        THE COURT:  I'll permit it.  Go ahead.
21        MR. ATKINSON:  Thank you.
22   BY MR. ATKINSON:
23   Q.    So Mr. Nastri, we were discussing where the
24   exact location of the sign was at Sleeping Giant
25   State Park and you had testified, if I understand you

App.159

227

1  correctly, is it was on the way as you were walking
2  from the parking lot to the attractions in the park,
3  correct?
4     A.   Yes.
5     Q.   Approximately how far a -- how far of a walk
6  is it from the parking lot that you -- the parking
7  lots that you described to that sign?
8     A.   No more than maybe 25 meters.
9     Q.   And for those of us who aren't familiar with
10 the metric system, can you give that to us in yards?
11    A.   Approximately 25 yards.
12    Q.   Okay.  Can you describe what the sign looks
13 like to us?
14    A.   Yes.  It's a sign that's mounted on posts.
15 It's approximately, I would say maybe, four by six,
16 four high, six wide.
17    Q.   When you say, "four by six," are you meaning
18 feet?
19    A.   Yes.
20    Q.   Okay.  Continue, please.
21    A.   And on the side that's facing the parking lot
22 is a map of all the trails in the park.
23    Q.   And -- withdrawn.
24         When you previously went to -- when you went
25 to Sleeping Giant State Park, did you ever look at

228

1  the back of that sign?
2     A.   Not until that day I just mentioned in March.
3     Q.   When you're leaving, when you're walking back
4  to the parking lot at Sleeping Giant State Park, can
5  you see the back of that sign as you're walking back
6  to the parking lot?
7     A.   Yes.
8     Q.   Okay.  Prior to the day you went around and
9  looked at that sign, had you ever looked at the back
10 of that sign as you were leaving Sleeping Giant State
11 Park?
12    A.   No.
13    Q.   You also testified yesterday that you access
14 Naugatuck State Forest by hiking through a municipal
15 park known as Roaring Brook State Park.  Do you
16 recall that testimony?
17    A.   I do.
18    Q.   When you enter Naugatuck State Forest from
19 Roaring Brook Municipal Park, are there any signs
20 posted at that point where you enter at saying no
21 guns allowed?
22    A.   No.
23    Q.   You also testified yesterday that you enter
24 the Farmington River Canal Trail down the street from
25 your house or a short distance from your house.  Do

229

1  you recall that?
2     A.   I do.
3     Q.   Can you describe for us what the entry point
4  that you use to enter the Farmington River Canal
5  trail looks like?
6     A.   Yes.  There are two and they're both
7  virtually identical but on different streets.
8  There's a crosswalk painted on the street.  There are
9  some barriers to prevent vehicles from the traveling
10 down the trail.  There are benches at each corner.
11 There is a distance marker at each location.  I'm not
12 actually sure what that makes reference to.  It never
13 quite made sense to me.  So it must be from some
14 certain point on the trail that delineates how far
15 you've gone.  That's pretty much it.
16    Q.   Are there any signs posted at those two entry
17 points that you've described?
18    A.   No.
19    Q.   And that -- does that absence of signs that
20 you just stated, that absence, does that absence of
21 signs include the absence of a sign saying no guns
22 allowed?
23    A.   It -- yes.  That is also included in what's
24 not there.
25    Q.   Yesterday you were asked if you were familiar

230

1  with the EnCon Police.  Do you recall that testimony?
2     A.   I do.
3     Q.   And you also testified that you're familiar
4  with what a -- withdrawn.
5         How long have you been using Connecticut
6  state parks and forests?
7         MR. BOCHAIN:  Objection Your Honor.  That's
8  been asked and answered.
9         THE COURT:  It has been.  Sustained.
10 BY MR. ATKINSON:
11    Q.   Mr. Nastri, in the time that you've been
12 using Connecticut state parks and forests, have you
13 ever encountered an EnCon police officer?
14    A.   No.
15    Q.   Yesterday Attorney Bochain asked you about a
16 list of state parks.  Do you recall that?
17    A.   I do.
18    Q.   And do you also recall him asking you about
19 specific state parks on that list?
20    A.   I do.
21    Q.   Do you still have State's Exhibit 141 in
22 front of you, Mr. Nastri?
23    A.   I do.
24    Q.   Do you recall Attorney Bochain asking you
25 about Bigelow Hollow State Park?

231

```
1    A.   I think so.  I don't remember exactly which
2  ones he mentioned.
3    Q.   Okay.  Do you see Bigelow State Park on --
4  Bigelow Hollow State Park on Exhibit 141 in front of
5  you right now?
6    A.   I do.
7    Q.   What town does that list indicate Bigelow
8  Hollow State Park is located in?
9    A.   Union, Connecticut.
10   Q.   Do you know where Union, Connecticut is,
11 Mr. Nastri?
12   A.   I would guess -- I don't specifically know.
13 I think it's up by UConn in that area, but I don't
14 know.
15   Q.   Have you ever been to Union, Connecticut?
16   A.   Not that I can recall.
17   Q.   Do you recall Mr. Bochain asking you about
18 Dinosaur State Park yesterday?
19   A.   I do.
20   Q.   Do you see -- do you -- what town on State's
21 Exhibit 141 is Dinosaur State Park located in?
22   A.   In Rocky Hill.
23   Q.   Do you know where Rocky Hill is?
24   A.   I do.
25   Q.   How far in relation to where you live is
```

232

```
1  Rocky Hill away from you?
2    A.   It's approximately a 35-minute drive.
3    Q.   Do you recall Attorney Bochain asking you
4  about Fort Griswold State Park yesterday?
5    A.   I do.
6    Q.   Do you see Fort Griswold State Park on
7  State's Exhibit 141 in front of you?
8    A.   I do.
9    Q.   What town does that -- does State's
10 Exhibit 141 list Fort Griswold State Park as being
11 in?
12   A.   Groton, Connecticut.
13   Q.   Do you know where Groton, Connecticut is?
14   A.   I do.
15   Q.   How far in relation to where you live away is
16 Groton from you?
17   A.   Approximately an hour and 15 minutes.
18   Q.   Do you recall Attorney Bochain asking you
19 about Fort Trumbull State Park yesterday?
20   A.   I do.
21   Q.   Do see you Fort Trumbull State Park on
22 State's 141?
23   A.   I do.
24   Q.   What town does it indicate state -- Fort
25 Trumbull State Park as being located in?
```

233

```
1    A.   New London.
2    Q.   Do you know where New London is, Mr. Nastri?
3    A.   I do.
4    Q.   How far is New London from where you live,
5  approximately?
6    A.   I believe about the same as Groton, about an
7  hour and 15 minutes.
8    Q.   Do you recall Attorney Bochain asking you
9  yesterday about Hammonasset Beach State Park?
10   A.   I do.
11   Q.   Do you see Hammonasset Beach State Park on
12 State's 141?
13   A.   I do.
14   Q.   What town does State's 141 indicate
15 Hammonasset Beach State Park as being located in?
16   A.   Madison.
17   Q.   Do you know where Madison is, Mr. Nastri?
18   A.   I do.
19   Q.   How far away from where you live is Madison,
20 approximately?
21   A.   Approximately 45 minutes.
22   Q.   Do you recall Attorney Bochain asking you
23 about Harkness Memorial State Park yesterday?
24   A.   I do.
25   Q.   Do you see Harkness Memorial State Park on
```

234

```
1  State's 141?
2    A.   Yes.
3    Q.   Where does State's 141 indicate that Harkness
4  Memorial State Park is located?
5    A.   In Waterford.
6    Q.   Do you know where Waterford is, Mr. Nastri?
7    A.   Yes.
8    Q.   Where is Waterford located?
9    A.   It's down in the same area as New London and
10 Groton.
11   Q.   Approximately how far away from where you
12 live is Waterford?
13   A.   Approximately an hour and 15 minutes.
14   Q.   Do you recall Attorney Bochain asking you
15 about all of the parks we listed and asking you if
16 you had specific plans to go there?
17   A.   Yes.
18   Q.   Do you recall your answer to those questions?
19   A.   Yes.
20   Q.   What was your -- in your -- withdrawn.
21        And I believe your testimony was that you had
22 no specific plans to go there?
23        MR. BOCHAIN:  Objection Your Honor, it's been
24 asked and answered.
25        THE COURT:  It has been.  You know, when
```

235

1   you're repeating back what was asked him, it is asked
2   and answered.  So let's move on.
3          MR. ATKINSON:  I apologize, Your Honor.
4   BY MR. ATKINSON:
5      Q.   Why do you have no specific plans to visit
6   those state parks, Mr. Nastri?
7      A.   My visits to state parks, as I testified, are
8   impromptu and generally limited to the ones that I've
9   identified as where I go to regularly.
10     Q.   What informs your decision as to what parks
11  you go to regularly?
12     A.   Their proximity primarily.
13     Q.   Do you recall Attorney Bochain asking you
14  about your plans to bring a gun to a state park in
15  the future?
16     A.   I do.
17     Q.   Why won't you bring a gun to a state park in
18  the future?
19     A.   Because it's currently against the law to do
20  so.
21         MR. ATKINSON:  No further questions, Your
22  Honor.
23         THE COURT:  Any recross?
24         MR. BOCHAIN:  Very briefly, Your Honor.
25         RECROSS EXAMINATION OF DAVID NASTRI

236

1   BY MR. BOCHAIN:
2      Q.   Mr. Nastri, you comply with the gun laws that
3   you know about, correct?
4      A.   I do.
5      Q.   You also comply with signs that prohibit guns
6   on certain locations, correct?
7      A.   Yes.
8      Q.   There's testimony and there's questions about
9   whether you knew EnCon.  You've never been arrested
10  by an EnCon officer, correct?
11     A.   Correct.
12     Q.   And you've never been threatened with
13  enforcement of the particular regulation at issue in
14  this case by an EnCon officer, correct?
15     A.   Also correct.
16     Q.   And you've never been threatened with
17  enforcement of the regulation by any police officer,
18  correct?
19     A.   Correct.
20         MR. BOCHAIN:  Nothing further at this time,
21  Your Honor.
22         THE COURT:  I have one question referring
23  back to U4 reporting responsibilities.  The
24  regulation at issue provides for certain sanctions,
25  although I'm not actually seeing it in the regulation

237

1   itself but somewhere it exists.
2          MR. ATKINSON:  Your Honor, if I may, if
3   you're referring to Connecticut agencies, the
4   prohibition regulation, and it would be helpful, I do
5   believe we laid out the punishment in paragraph 14 of
6   Plaintiff's Exhibit 1 and we provided a citation to
7   the statute that's the penalty.
8          THE COURT:  Okay.  So my question is:  The
9   sanctions or consequences of being apprehended with a
10  firearm in a Connecticut state park or forest is a
11  fine, a 24-hour ban, a longer ban, are those
12  reportable under your U4.
13         THE WITNESS:  In the annual compliance
14  questionnaire that I'm required to fill out, the
15  questions are, I think, purposely overbroad and --
16         THE COURT:  Let's -- don't -- my question is:
17  From your standpoint if you got a fine for carrying a
18  firearm in a state park, would that be a reportable
19  event on your U4?
20         THE WITNESS:  It is.
21         THE COURT:  If you get a parking ticket?
22         THE WITNESS:  No.  Not a parking ticket.
23         THE COURT:  If you get a traffic summons?
24         THE WITNESS:  Specifically those are not
25  reportable.

238

1          THE COURT:  Are you aware yourself of anybody
2   who has had this regulation enforced against them.
3          THE WITNESS:  No, I'm not.
4          THE COURT:  Thank you.
5          Questions on my question.
6          MR. ATKINSON:  None from the plaintiff, Your
7   Honor.
8          MR. BOCHAIN:  Nothing from the defense, Your
9   Honor.
10         THE COURT:  Okay.  Thank you very much then.
11  You may step down.  You are excused.
12         MR. ATKINSON:  Your Honor, may I have a
13  moment to confer with Attorney Bochain, please.
14         THE COURT:  Sure.
15         MR. ATKINSON:  Your Honor, my discussion with
16  Attorney Bochain was about the stipulation that I
17  filed prior to beginning yesterday that was located
18  at ECF 35.  I had asked you to adopt it at this time
19  prior to me calling Colonel Lewis because I do intend
20  to use it in my questioning of Mr. Lewis.
21         THE COURT:  All right.  So the parties'
22  proposed stipulation for this hearing relates to the
23  number of firearm hunting licenses issued since
24  January 2017 by year and the statistic for 2022 of
25  DEEP's harvest tagging system documenting that

App.162

239

```
1    hunters harvested 611 deer and -- during the 2022
2    hunting season, and 257 turkeys on that land during
3    the fall and spring hunting seasons.  All right.  We
4    can adopt that as facts not in dispute.
5        MR. ATKINSON:  Thank you, Your Honor.
6        MR. BOCHAIN:  Correct, Your Honor.
7        MR. ATKINSON:  Can we also have that document
8    marked as Plaintiff's 18 for identification only?
9        THE COURT:  But it's not identification, is
10   it?
11       MR. ATKINSON:  I was doing that just for
12   logistical purposes of being able to put that in
13   front of Colonel Lewis as he was testifying.  I can
14   just hand him an ECF stamp.
15       THE COURT:  I thought I just adopted this
16   document which we would call a joint exhibit.
17       MR. ATKINSON:  Okay.
18       THE COURT:  All right.  It will be joint
19   Exhibit A.
20       Okay.  And is Colonel Lewis ready?
21       MR. ATKINSON:  Yes, Your Honor.
22       THE COURT:  Are you calling him or are you
23   resting?
24       MR. ATKINSON:  I'm calling him, Your Honor.
25   I would also ask for permission to clear the exhibits
```

240

```
1    off the witness --
2        THE COURT:  Good idea.
3        All right.  Sir, if you raise your right
4    hand, you will be sworn.
5        (Christopher Lewis, sworn.)
6        THE WITNESS:  I do.
7        THE CLERK:  Please be seated, state your name
8    for the record spelling your last name and please
9    state the town of your residence.
10       THE WITNESS:  Christopher Lewis, town of
11   residence Avon, Connecticut.
12       THE COURT:  You may proceed.
13       MR. ATKINSON:  Thank you, Your Honor.
14       DIRECT EXAMINATION OF CHRISTOPHER LEWIS
15   BY MR. ATKINSON:
16   Q.    Good morning, Colonel Lewis.  How are you?
17   A.    Good.  Good morning.
18   Q.    Have we met before?
19   A.    Yes.
20   Q.    Where did we meet?
21   A.    Attorney General's office during deposition.
22   Q.    Okay.  When approximately was that?
23   A.    I can't recall.  It's been recent.
24   Q.    Fair enough.  Fair enough.  Can you state for
25   the record who your employer is?
```

241

```
1    A.    Yes.  It's State of Connecticut Department of
2    Energy and Environmental Protection.
3    Q.    And what is your position?
4    A.    I'm the division director for the
5    Environmental Conservation Police Division.
6    Q.    Are you familiar with the defendant in this
7    action?
8    A.    No.
9    Q.    Do you know who she is?
10   A.    I'm sorry.  The defendant, yes, the
11   commissioner.
12   Q.    What's her name?
13   A.    Katie Dykes.
14   Q.    And who is Katie Dykes to you?
15   A.    She is commissioner to the Department of
16   Energy and Environmental Protection.  She's our
17   appointed authority.
18   Q.    Would it be a fair characterization to
19   describe her as your boss?
20   A.    Yes.
21   Q.    Okay.  You've served as director of the
22   Environmental Conservation Police since approximately
23   November '19, correct?
24   A.    Correct.
25   Q.    And prior to serving in that position, you
```

242

```
1    worked for the Alabama Wildlife Freshwater Fisheries?
2    A.    Correct.
3    Q.    And you held a variety of positions there,
4    didn't you?
5    A.    Yes.
6    Q.    Okay.  You were a conservation officer first?
7    A.    Yes.
8    Q.    Approximately how long were you a
9    conservation officer?
10   A.    Five years.
11   Q.    And at some point, did you -- were you
12   promoted?
13   A.    Yes.
14   Q.    And what were you promoted to?
15   A.    Conservation enforcement officer sergeant.
16   Q.    How long did you hold that position?
17   A.    Approximately five years.
18   Q.    And were you promoted again?
19   A.    Yes.
20   Q.    What were you promoted to?
21   A.    Lieutenant conservation enforcement officer
22   lieutenant.
23   Q.    And how long did you hold that position?
24   A.    Approximately four years.
25   Q.    And were you promoted again?
```

App.163

243

```
 1      A.    Yes.
 2      Q.    And what were you promoted to?
 3      A.    District captain conservation enforcement
 4  officer.
 5      Q.    How long did you hold that position?
 6      A.    Approximately two years.
 7      Q.    And were you promoted again?
 8      A.    Yes.
 9      Q.    And what were you promoted to?
10      A.    Assistant chief of enforcement for wildlife
11  freshwater fisheries.
12      Q.    And all of these positions were within the
13  Alabama Wildlife Freshwater Fisheries, correct?
14      A.    Yes.
15      Q.    And how long did you hold your position as
16  assistant chief?
17      A.    Approximately five years.
18      Q.    And you left that position to take your
19  current position now, correct?
20      A.    Correct.
21      Q.    And throughout all of the positions that
22  you've held, your responsibilities were basically to
23  enforce conservation laws, correct?
24      A.    Correct.
25      Q.    In these positions, the conservation laws
```

244

```
 1  that you were responsible for enforcing included game
 2  laws?
 3      A.    Yes.
 4      Q.    And by "game laws," do you mean hunting laws?
 5      A.    Yes.  Hunting, trapping.
 6      Q.    And you were also responsible in these
 7  positions to enforce state law or park laws in
 8  Alabama too, correct?
 9      A.    Correct.
10      Q.    And during that -- those positions and your
11  experience in those positions, you were responsible
12  for interacting with members of the public, correct?
13      A.    Correct.
14      Q.    And those members of the public included
15  members of the public who were carrying firearms too,
16  correct?
17      A.    Yes.
18      Q.    Did those responsibilities change in any
19  substantial way when you obtained your current
20  position?
21      A.    No.
22      Q.    Were you familiar with Connecticut agency's
23  regulation 23-4-1?
24      A.    Yes.
25      Q.    Did Alabama have a similar prohibition --
```

245

```
 1  withdrawn.
 2           What is your understanding of Connecticut
 3  Agency's Regulation 23-4-1?
 4      A.    It governs behavior and actions in state
 5  parks and forest.
 6      Q.    Is your understanding of it that it also
 7  prohibits the carrying of firearms in state parks and
 8  forests?
 9      A.    Yes.
10      Q.    Did Alabama have a similar prohibition on
11  carrying firearms in state parks and forests in your
12  understanding while you were working there as a
13  conservation officer?
14           MR. BOCHAIN:  Objection, Your Honor.
15  Relevance.
16           THE COURT:  What is the relevance?
17           MR. ATKINSON:  Your Honor, I'm attempting to
18  basically establish whether he had prior
19  experience --
20           THE COURT:  Why is that relevant?
21           MR. ATKINSON:  I think in terms of the issues
22  in this case, if he had prior experience in enforcing
23  this type of law in Alabama, some of the questions I
24  intend to ask him later that go to how he enforced --
25  how he enforces that law to hunters, this prior
```

246

```
 1  experience would be relevant.
 2           THE COURT:  Why would it be relevant?
 3           MR. ATKINSON:  Well, in terms of how he would
 4  approach that person, we do have an exhibit, his
 5  declaration here in which he makes statements that
 6  the ban -- the Connecticut's ban not being in place
 7  would change the way Connecticut's Environmental
 8  Conservation Police interact with members of the
 9  public.
10           THE COURT:  I think we should stick to
11  Connecticut.
12           MR. ATKINSON:  I will, Your Honor.
13           THE COURT:  Okay.
14  BY MR. ATKINSON:
15      Q.    Colonel, DEEP employs law enforcement
16  officers, current?
17      A.    Yes.
18      Q.    Those law enforcement officers are referred
19  to as EnCon officers, correct?
20           MR. BOCHAIN:  Your Honor, objection.  I've
21  given Attorney Atkinson some leeway.  It's a lot of
22  leading questions here.
23           MR. ATKINSON:  Your Honor, may I be heard as
24  to that?  Under Federal Rule of Evidence 611, I think
25  I've established that Colonel Lewis is an employee of
```

247

```
1    DEEP, is sufficiently identified with an adverse
2    party such that it's within Your Honor's discretion
3    to allow me to ask leading questions.
4         THE COURT:  All right.  I'm hopeful that that
5    might actually facilitate the testimony.  You are,
6    however, proposing that he be described as a hostile
7    witness because he is an officer of, an employee of
8    the defendant; is that correct?
9         MR. ATKINSON:  I'm not sure I read the rule
10   that way, Your Honor.  The case law that I had
11   researched on it and the actual text of the rule
12   seemed to draw a distinction between a witness who
13   was hostile as in they were being uncooperative on
14   the stand and a party who was simply sufficiently
15   identified with an adverse party.  I'm not making a
16   claim that Colonel Lewis is --
17        THE COURT:  I thought you were, that that was
18   why you were --
19        MR. ATKINSON:  So I am --
20        THE COURT:  -- citing 611.
21        MR. ATKINSON:  Specifically for 611, Your
22   Honor, I'm referring to (c)(2).
23        THE COURT:  Which is when you call a hostile
24   witness, which is why I asked you whether you are
25   designating Colonel Lewis as a hostile witness.
```

248

```
1         MR. ATKINSON:  I will, Your Honor.  I will
2    then.
3         MR. BOCHAIN:  Your Honor, the one thing I'll
4    just note is Colonel Lewis is here voluntarily.  He's
5    not here by subpoena.  He's here voluntarily.
6         THE COURT:  All right.  Well, I'm going to
7    permit for now leading questions in as much as
8    Colonel Lewis is a witness identified with an adverse
9    party, that is Commissioner Dykes.  Go ahead.
10        MR. ATKINSON:  Thank you, Your Honor.
11        Can we have the last question read back,
12   madame court reporter, please?
13        THE COURT:  Yes.
14        (Record read by the Court Reporter.)
15        THE WITNESS:  Yes, that's correct.
16   BY MR. ATKINSON:
17   Q.   Those officers wear uniforms, Colonel?
18   A.   Yes.
19   Q.   And as part of their uniform, they carry
20   handguns, correct?
21   A.   Yes.
22   Q.   And DEEP employs approximately -- well, DEEP
23   employs approximately 52 of these officers including
24   you, correct?
25   A.   Correct.
```

249

```
1    Q.   DEP also employs approximately 30 park
2    rangers, correct?
3    A.   I don't know exactly how many park rangers
4    DEEP employees.  It's more than my department.
5         THE COURT:  Can you speak into the
6    microphone.
7         THE WITNESS:  I don't know how many park
8    rangers DEEP employs.
9    BY MR. ATKINSON:
10   Q.   What is your -- withdrawn.
11        The park rangers that DEEP -- withdrawn.
12        What are EnCon rangers?
13   A.   EnCon rangers are seasonal employees that we
14   hire during the summer months.
15   Q.   Okay.  And those EnCon rangers, they're
16   unarmed, correct?
17   A.   Correct.
18   Q.   But they do wear uniform shirts?
19   A.   Yes.
20   Q.   And where are they typically assigned?
21   A.   Our shoreline parks and then select inland
22   parks.
23   Q.   Is there any criteria for assigning them to
24   specific parks?
25   A.   Visitation levels, campgrounds, past history.
```

250

```
1    Q.   And within that -- withdrawn.
2         You mentioned visitation levels.  What's the
3    criteria for making an assignment on a visitation
4    level basis?
5         MR. BOCHAIN:  Objection, Your Honor.  That's
6    a little ambiguous.
7         THE COURT:  Do you understand the question?
8    When you say that you assign rangers based on the
9    visitation level, does that mean the number of people
10   who come to the park?
11        THE WITNESS:  Yes.
12        THE COURT:  Okay.  Next question.
13   BY MR. ATKINSON:
14   Q.   You also mentioned about past history,
15   Colonel.  Can you describe for us what you meant by
16   that?
17   A.   Where we've identified parks that we have a
18   continuous problem or where we need to increase our
19   presence due to -- just where we've identified where
20   we need to increase our presence.
21   Q.   When you say, "problem," what do you mean by
22   that?
23   A.   The park is overcrowded, we have parking
24   outside of the park trying to gain entry once the
25   park closes routinely, we have quality of life from
```

251

```
1   neighbors, maybe loud music.
2       Q.    EnCon rangers have the authority to write
3   tickets for low-level -- withdrawn.
4             EnCon rangers have the authority to write
5   tickets for infractions, correct?
6             MR. BOCHAIN:  Objection, Your Honor.
7   Foundation.
8             THE COURT:  Sustained.
9   BY MR. ATKINSON:
10      Q.    Colonel Lewis, do EnCon rangers have the
11  authority to enforce state park rules?
12      A.    Yes.
13      Q.    What rules do they have the authority to
14  enforce?
15      A.    Twenty-three regulations of state parks and
16  forests.
17      Q.    Pardon me?
18      A.    The 23 regulations for state parks and
19  forest.
20      Q.    Does the -- do the regulations that they have
21  the authority to enforce include the prohibition on
22  carrying a handgun in -- carrying a firearm in state
23  parks and forests without permission to do so?
24      A.    Yes.
25      Q.    So if I understand your testimony correctly,
```

252

```
1   if an EnCon ranger came across a person carrying an
2   unauthorized firearm in a state park or forest, they
3   could write that person a -- they could enforce the
4   park rule against that person?
5       A.    They could.
6       Q.    Do they typically -- and to your knowledge,
7   do they typically enforce that rule against such a
8   person?
9       A.    To my knowledge, no.
10      Q.    Why don't they enforce that rule against a
11  person under those circumstances?
12      A.    I can't recall it happening since I've known
13  them.
14      Q.    Pardon me?
15      A.    I can't recall that charge coming up since
16  they -- since the program's -- since I've been here
17  with the program.
18      Q.    Understood.  Do you know how many state parks
19  and forests Connecticut has?
20      A.    Not exactly.
21      Q.    If I may show you what's been marked as
22  Defendant's Exhibit 141.
23            Colonel, have you reviewed Defendant's
24  Exhibit 141?
25      A.    Yes.
```

253

```
1       Q.    Would it be helpful for you to move the mic a
2   little closer if that's okay and that might make it
3   easier.
4       A.    Thank you.
5       Q.    Thank you.
6             What is that, Colonel?
7       A.    It appears to be a printout of our state park
8   web page listing the state parks.
9       Q.    Do you see the first paragraph above the
10  list?
11      A.    Yes.
12      Q.    Have you read that paragraph?
13      A.    Yes.
14      Q.    I'll ask you again, based on that, how many
15  state parks does Connecticut have, approximately?
16      A.    139 state parks and forests.
17      Q.    Thank you.  Is it possible for you to assign
18  an EnCon officer to every park in the state at all
19  times?
20            MR. BOCHAIN:  Objection, Your Honor.
21  Argumentative.
22            MR. ATKINSON:  I've simply --
23            THE COURT:  I'm going to sustain the
24  objection because you can lead but you can't argue.
25  The concept that is suggested in your question is
```

254

```
1   there's so many state parks and forests they
2   couldn't.  Why don't you just ask him how many of
3   these 139 state parks and forests have EnCon officers
4   assigned to them and does that include rangers.
5             MR. ATKINSON:  Not -- I was trying not to ask
6   a compound question, Your Honor.
7             THE COURT:  Let's get straight at this.
8   BY MR. ATKINSON:
9       Q.    Colonel, how many parks have an EnCon officer
10  assigned to them?
11      A.    How do you mean assigned to them?  It's hard
12  for me to answer that question like that.
13      Q.    Well, let me ask it this way, do you assign
14  EnCon officers to specific state parks and forests?
15      A.    To only a state park?
16      Q.    Correct.
17      A.    To a specific park, no, they are not assigned
18  to a specific state park.
19      Q.    Do you assign EnCon rangers to a specific
20  state park?
21      A.    Rangers, yes, are assigned to a specific
22  state park.
23      Q.    In the assignment of a ranger to a specific
24  state park, is a ranger assigned to just one state
25  park?
```

255

1    A.    Generally speaking, yes.  There are a couple
2  of exceptions.
3    Q.    Let's talk about the exceptions.  Can you
4  describe those for us, please?
5    A.    So an exception would be we typically staff,
6  we call it a unit in state parks, a management unit
7  under state park's division.  So we'll staff that
8  with a ranger or two rangers in that unit and that
9  unit may contain three, four, five different state
10 parks or forests within that management unit.
11   Q.    Okay.  Does DEEP have any technology that
12 would assist its human employees in monitoring state
13 parks and forests?
14   A.    Not to my knowledge.
15   Q.    Do other Connecticut law enforcement agencies
16 have the authority to enforce the firearms
17 prohibition in Connecticut state parks and forests?
18   A.    They do.
19   Q.    Do those other law enforcement agencies
20 include the state police?
21   A.    Yes.
22   Q.    Do those other law enforcement agencies
23 include local police departments?
24   A.    Yes.
25   Q.    Does DEEP take any steps to coordinate how to

256

1  enforce that prohibition with local law enforcement
2  officials?
3    MR. BOCHAIN:  Objection, Your Honor.
4  Relevance.
5    THE COURT:  What is the relevance?
6    MR. ATKINSON:  Your Honor, he's just
7  testified that other -- other law enforcement
8  agencies have the ability to enforce that --
9    THE COURT:  I understand that, but what's the
10 relevance?
11   MR. ATKINSON:  What I'm getting at is
12 somewhat to the standing issues, Your Honor, when
13 Mr. Nastri was asked earlier whether a local law
14 enforcement officer had ever -- or police officer had
15 ever asked -- threatened to enforce the law
16 against --
17   THE COURT:  And he said no.
18   MR. ATKINSON:  Correct.  And I'm simply
19 completing the loop that they have that authority and
20 that DEEP -- this also goes to my broader argument of
21 how DEEP has not informed the public of this
22 prohibition and it has chosen not to take steps to
23 the lack of --
24   THE COURT:  I don't think that this question
25 gets at all to that, so I'm going to sustain the

257

1  objection.
2  BY MR. ATKINSON:
3    Q.    Colonel Lewis, you submitted an affidavit in
4  this case, correct?
5    A.    Yes.
6    Q.    Would you know that affidavit or recognize
7  that affidavit if I showed it to you?
8    A.    Yes.
9    MR. ATKINSON:  I am going -- may I approach
10 the witness, Your Honor?
11   THE COURT:  Yes.
12 BY MR. ATKINSON:
13   Q.    I am going to show you, after I show counsel,
14 what's been marked as Plaintiff's Exhibit 4 --
15   MR. ATKINSON:  Actually, Your Honor, I'm
16 going to use Defense 136, which I understand is
17 already in the binder there in front of him.
18   THE COURT:  Is it the same thing?
19   MR. ATKINSON:  Yes, Your Honor.
20   THE COURT:  So the declaration of Colonel
21 Chris Lewis is going to be marked as Defendant's 136?
22   MR. ATKINSON:  Correct.
23   MR. BOCHAIN:  It's already introduced into
24 evidence, Your Honor.  It's a full exhibit.
25   THE COURT:  That may be.  I want to make sure

258

1  we got the right number on it, that's all.
2    MR. BOCHAIN:  I'm sorry.  It is Defense
3  Exhibit 136, Your Honor.
4  BY MR. ATKINSON:
5    Q.    Have you had a chance to review that, Colonel
6  Lewis?
7    A.    Yes.
8    Q.    Is that your affidavit?
9    A.    Yes.
10   Q.    Can I turn your attention to what is ECF
11 stamped page 6 and a paragraph 16.
12   A.    Okay.
13   Q.    In that -- your affidavit, Colonel Lewis, you
14 gave a number of reasons for the prohibition on
15 carrying firearms in state parks and forests without
16 state permission, correct?
17   A.    Yes.
18   Q.    And the first reason that you listed was that
19 the presence of firearms particularly if alcohol is
20 involved increases the risk of confusion, alarm and
21 conflict among visitors, correct?
22   A.    Correct.
23   Q.    Are you familiar with Connecticut General
24 Statute 54-206d?
25   A.    Say the statute again, please.

259

```
1      Q.   Sure.  Connecticut General Statute 54-206d?
2      A.   I'd have to review it.
3           MR. ATKINSON:  Okay.  If I may, Your Honor,
4  approach the witness to show him what's been marked
5  as Plaintiff's Exhibit 7 for identification.
6           THE COURT:  You may.
7           MR. ATKINSON:  Just to correct, Your Honor, I
8  did misspeak, that's 53-206d is the statute.
9  BY MR. ATKINSON:
10     Q.   Have you had a chance to review that,
11 Colonel?
12     A.   Yes.
13          MR. ATKINSON:  What is -- well, I'm going to
14 do it this way, Your Honor.  I would ask since what
15 I've handed Colonel Lewis is the Westlaw printout of
16 that statute, I would ask Your Honor to take judicial
17 notice of the content of that statute.
18          THE COURT:  Any objection?
19          MR. BOCHAIN:  No, Your Honor.  But I may have
20 objections based on his line of questioning that
21 might be coming up but I don't have objection to that
22 right now.
23          THE COURT:  All right.  We have admitted
24 53-206d.
25          MR. ATKINSON:  Correct, Your Honor.
```

260

```
1           THE COURT:  As Plaintiff's 7.
2           MR. ATKINSON:  May I proceed, Your Honor?
3           THE COURT:  Yes.
4  BY MR. ATKINSON:
5      Q.   Is your understanding of that statute,
6  Colonel, that it prohibits individuals from carrying
7  a firearm while under the influence of alcohol?
8      A.   Correct.
9      Q.   Is it also your understanding that it
10 prohibits individuals from carrying a firearm while
11 under the influence of another intoxicant?
12     A.   Yes.
13     Q.   Is it your understanding also that it
14 prohibits an individual from carrying a firearm while
15 under the influence of alcohol in a state park or
16 forest?
17          MR. BOCHAIN:  Objection, Your Honor.  I'm
18 going to ask for the relevance at this point.
19          MR. ATKINSON:  Your Honor, he states in his
20 declaration that one of the reasons for the agency
21 regulation at issue in this action is that it reduces
22 -- as I read it, it reduces the risk of confusion,
23 alarm, conflict, particularly for people with
24 alcohol, and I'm simply demonstrating that there are
25 other applicable laws.  So I think it's highly
```

261

```
1  relevant.
2           THE COURT:  I'm sorry.  Because there are
3  other applicable laws, his testimony that this is his
4  objective is not credible.  What is the issue you are
5  getting at?
6           MR. ATKINSON:  I am simply trying to show
7  that there are other laws that are tailored to
8  accomplish the purpose that he's claiming for 23-4.
9           THE COURT:  All right.  You may proceed.
10 BY MR. ATKINSON:
11     Q.   Colonel, I'll ask my question again.  Is it
12 your understanding that this prohibition on
13 individuals carrying a firearm under the influence of
14 alcohol also applies to individuals carrying it under
15 the influence of alcohol in a state park or forest?
16     A.   Yes.
17     Q.   Is that the same -- is your understanding the
18 same when it comes to a person carrying a firearm
19 under the influence of another intoxicant in a state
20 park or forest?
21     A.   Yes.
22     Q.   Do EnCon officers receive training?
23     A.   Yes.
24     Q.   What type of training do they receive?
25     A.   Basic police academy training followed by
```

262

```
1  field training officer program.
2      Q.   Okay.  When you say, "basic field academy
3  training," are you referring to POSTC training?
4      A.   Yes.  It's POSTC-approved academy.
5      Q.   What is Post-approved education?
6      A.   Police Officer Standards Training Commission,
7  they're the governing body for police officers, state
8  of Connecticut.  So they designate what training,
9  what hours and what classes is held at a basic police
10 academy.
11     Q.   As part of a POSTC-approved training, would
12 officers receive training to enforce Connecticut
13 General Statute 53-206d?
14     A.   I don't know.
15     Q.   Could DEEP -- could DEEP itself provide them
16 training on the enforcement of 53-206d?
17     A.   Yes.
18     Q.   Does DEEP currently provide them with
19 training on the enforcement of 53-206d?
20     A.   I don't know.
21     Q.   Does DEEP provide training to EnCon rangers
22 on the enforcement of 53-206d?
23     A.   No.
24     Q.   If I may have the Exhibit 7 back from you,
25 Colonel, please.
```

263

1    A.    Yup.
2         MR. ATKINSON:  May I have a moment to go to
3    counsel's table, Your Honor?
4    BY MR. ATKINSON:
5    Q.    Thank you for bearing with me, Colonel Lewis.
6    We were discussing about the reasons you stated
7    for -- we were discussing the reasons you stated for
8    the prohibition on carrying firearms in state parks
9    and you stated that the -- the carrying a firearm
10   in -- the reason for the prohibition was that it
11   prevents an increase in the risk of confusion from
12   somebody carrying a firearm in a state park, correct?
13   A.    Correct.
14   Q.    Do you recall telling me previously that you
15   believe that the mere presence of a firearm in a
16   place can increase the risk of confusion?
17        MR. BOCHAIN:  Objection, Your Honor.  Asked
18   and answered.
19        THE COURT:  I'm going to permit it.
20        THE WITNESS:  Can you state the question
21   again?
22   BY MR. ATKINSON:
23   Q.    Sure.  Do you recall previously telling me
24   that you believe that the mere presence of firearms
25   in a place can increase the risk of confusion?

264

1    A.    Yes.
2    Q.    Do you recall previously telling me that you
3    believe the mere presence of a firearm in a place can
4    increase the risk of alarm?
5    A.    Yes.
6    Q.    Do you recall previously telling me that you
7    believe the mere presence of firearms in a place can
8    increase the risk of conflict?
9    A.    I don't recall that.
10   Q.    Okay.  Do you recall that you also stated
11   that people are generally confused if they saw a
12   firearm where they're not expecting to see one?
13   A.    Yes.
14   Q.    What do you base that opinion on?
15   A.    It's personal experience, professional
16   experience.
17   Q.    Okay.  Can you describe the personal
18   experience that you base that opinion on to us?
19   A.    So personal experience, so someone -- I've
20   been places, someone is paying for something and
21   they're fishing out a wallet and they pull out a gun
22   and throw it on the counter and people -- at a store
23   and people kind of got shocked by it, like what's
24   going on, stepping back.  So that was a confusing
25   moment.

265

1    Q.    You also spoke about your professional
2    experience that you based your -- that opinion on.
3    Can you describe your -- what professional
4    experiences you've had that gave rise to your
5    opinion?
6    A.    Answer calls where someone is seen with a
7    firearm in a place where it would not be allowed or
8    just being seen with a firearm period in public
9    whether it's allowed or not.  They receive 9-1-1
10   calls and answered those.
11   Q.    Did you also previously tell me that --
12   did -- withdrawn.
13        Do you recall us previously discussing
14   where you'd expect to see a firearm is?
15   A.    Yes.
16        MR. BOCHAIN:  Objection, Your Honor.
17   Foundation.  I'm trying to understand that.
18        THE COURT:  I'm going to sustain that.  If
19   what you're doing is asking him a question, he either
20   answers contrarily or needs his recollection
21   refreshed from the deposition, that's fine, but not
22   this indirect essentially parroting of his deposition
23   testimony.  Ask him straight out the question.  If it
24   differs from what he said in his deposition, you can
25   show him his deposition, and if he wishes to adjust

266

1    his testimony, he can.
2         MR. ATKINSON:  Okay.
3    BY MR. ATKINSON:
4    Q.    Colonel Lewis, do you expect to see a firearm
5    at a gun store?
6    A.    Yes.
7    Q.    At a shooting range?
8    A.    Yes.
9    Q.    At a fish and game hunting area?
10   A.    Yes.
11   Q.    Do you expect to see a firearm at a gas
12   station?
13   A.    No.
14   Q.    Do you expect to see a firearm at a
15   restaurant?
16   A.    No.
17   Q.    Do you expect to see a firearm on the street?
18   A.    I -- professionally, I would look for it.  I
19   would not expect to see one laying in the street,
20   though.
21   Q.    Would you expect to see a person carrying a
22   firearm on the street?
23   A.    No.
24   Q.    Does a person carrying a firearm concealed
25   reduce the risk of confusion over a firearm being

267

1   present in a place?
2       MR. BOCHAIN:  Objection, Your Honor.
3   Argumentative.
4       MR. ATKINSON:  Let me rephrase that, Your
5   Honor.
6       THE COURT:  So are you asking him whether his
7   paragraph 16 in his affidavit related to presence of
8   firearms is related to public or concealed carry?
9   Maybe you should clarify.
10      MR. ATKINSON:  I don't think he drew that
11  distinction.
12      THE COURT:  I'm wondering if your question is
13  attempting to do that.
14      MR. ATKINSON:  Yes.  I am attempting to do
15  that.
16      THE COURT:  Go ahead.
17  BY MR. ATKINSON:
18      Q.   Colonel Lewis, would you agree with me that
19  somebody open carrying a firearm is highly likely to
20  cause confusion in a certain place?
21      A.   Yes.
22      Q.   Would you agree with me that someone carrying
23  a firearm concealed is less likely to cause the risk
24  of confusion in a place?
25      MR. BOCHAIN:  Objection, Your Honor.

268

1   Argumentative and speculation.
2       THE COURT:  Overruled.
3       THE WITNESS:  If it was carry concealed, less
4   risk, yes.
5   BY MR. ATKINSON:
6       Q.   Why does -- withdrawn.
7       Does -- would you agree with me that someone
8   carrying a firearm was more likely to -- carrying a
9   firearm openly is more likely to cause alarm to other
10  people?
11      A.   Carrying openly?
12      Q.   Correct.
13      A.   Yes, that's correct.
14      Q.   Would you agree with me that a person
15  carrying a firearm concealed is less likely to cause
16  alarm to people?
17      A.   Yes.
18      Q.   Going back to your affidavit for a second,
19  why does a firearm increase the risk of conflict by
20  its mere presence?
21      A.   So if a fight breaks out and there's a
22  firearm present, the opportunity for a gun fight or
23  gun to be involved increases dramatically because
24  there's actually a gun there versus when there's no
25  gun there, a fight breaks out, there's not going to

269

1   be a gun involved.
2       Q.   But there would have to be a fight first?
3       A.   Fight, conflict, verbal, any type -- when I
4   say, "fight," I'm not saying physical fight.  A
5   conflict could be verbal in nature.
6       Q.   Understood.  Do you -- the second reason you
7   gave -- withdrawn.
8       The second reason that you gave for the
9   firearms prohibition in state parks and forests is
10  that there's a substantial risk that discharging a
11  firearm even in self-defense would strike a bystander
12  unintentionally particularly in the middle of many
13  parks that can become crowded in the summer months,
14  correct?
15      A.   Correct.
16      Q.   Are you familiar with Connecticut General
17  Statute 53-203?
18      A.   I'd have to review it to be 100 percent.
19      MR. ATKINSON:  Your Honor, if I may, I'd like
20  to show Colonel Lewis what's been marked as
21  Plaintiff's Exhibit 6 for identification.
22      While Colonel Lewis is reviewing that, Your
23  Honor, I'd also ask you to take judicial notice of
24  the content of Connecticut General Statute
25  Section 53-203.

270

1       THE COURT:  All right.  And you've marked
2   this as?
3       MR. ATKINSON:  As Plaintiff's Exhibit 6, Your
4   Honor.
5       THE COURT:  It's in evidence.
6       MR. ATKINSON:  For identification only.
7       THE COURT:  Is it not in evidence?  Are you
8   offering it?
9       MR. ATKINSON:  So what I'm doing is because
10  these are Westlaw printouts based on discussions I
11  had with the state, we decided the best way to
12  proceed was to ask you to take judicial notice rather
13  than entering it into evidence as a full exhibit.
14      THE COURT:  So the judicial notice is that
15  there exists a statute denominated Connecticut
16  General Statute 53-203 captioned "Unlawful Discharge
17  of Firearms."  Go ahead.
18      MR. ATKINSON:  Thank you, Your Honor.
19  BY MR. ATKINSON:
20      Q.   Colonel Lewis, have you had a chance to
21  review what's been marked as Plaintiff's Exhibit 6?
22      A.   I have.
23      Q.   What is that, Colonel Lewis?
24      A.   It's a state law for unlawful discharge of
25  firearms.

271

```
 1    Q.   Can you read for us what that copy says?
 2    A.   Sure.  The statute, "Any person who
 3  intentionally, negligently or carelessly discharges
 4  any firearm in such a manner as to be likely to cause
 5  bodily injury or death to persons or domestic
 6  animals, or the wanton destruction of property, shall
 7  be guilty of a Class C misdemeanor."
 8    Q.   As part of the EnCon officer's POSTC-approved
 9  training that you mentioned earlier, do officers
10  receive training to enforce 53-203?
11    A.   I don't know.
12    Q.   Does the same risk of striking a bystander
13  with an errant shot apply to a hunter?
14    A.   Yes.
15    Q.   Is that same risk present on a crowded
16  street?
17    A.   Yes.
18    Q.   How about a movie theater?
19    A.   Yes.
20    Q.   A restaurant?
21    A.   Yes.
22    Q.   A gas station?
23    A.   Yes.
24         MR. ATKINSON:  If I may I approach Colonel
25  Lewis to take back Exhibit 6, Your Honor.
```

272

```
 1         THE COURT:  You may.
 2  BY MR. ATKINSON:
 3    Q.   The third reason you gave in your affidavit
 4  for the prohibition on carrying a firearm in state
 5  parks was that there are no areas in many state parks
 6  and forests including beaches and swimming areas to
 7  properly store firearms, correct?
 8    A.   Correct.
 9    Q.   And would you be able to give us, as you sit
10  here today, an example of a park where that concern
11  would be present?
12    A.   Hammonasset Beach State Park.
13    Q.   What is the primary basis for this concern,
14  Colonel?
15    A.   That if someone was going to Hammonasset
16  Beach State Park, the primary proper use is going to
17  the beach, swimming, wading in the beach, sunbathing,
18  and then carrying concealed while wearing a bathing
19  suit does not -- is very difficult.
20    Q.   Do you also have a concern that a child could
21  gain access to an unattended firearm in such a
22  situation?
23    A.   If a person chose to leave the firearm
24  unattended because they went swimming, yes.
25         MR. ATKINSON:  If I may, Your Honor, I'd like
```

273

```
 1  to show Colonel Lewis what has been marked as
 2  Plaintiff's Exhibit 5.
 3         MR. BOCHAIN:  Your Honor, just for
 4  expediency, we wouldn't object to this coming in.
 5         THE COURT:  After we finish this exhibit,
 6  we'll take a brief recess.
 7  BY MR. ATKINSON:
 8    Q.   And have you reviewed that, Colonel?
 9    A.   Yes.
10    Q.   What is it?
11    A.   It's a state -- state law 53-21 which is
12  injury or risk of injury to or impairing morals of
13  children and sale of children.
14    Q.   And according to your understanding, what
15  does that law prohibit?
16    A.   Endangering a child or allowing -- or as the
17  guardian or parent of a child, allowing that child to
18  be placed in danger.
19    Q.   And based on your understanding of that law,
20  leaving a firearm on a beach unattended where a child
21  could access it would pose a risk of injury to a
22  minor, wouldn't it, correct?
23    A.   If the minor retrieved the gun.
24    Q.   Do you know as a part of the POSTC education
25  you mentioned earlier, if EnCon officers receive
```

274

```
 1  training to enforce Section 53-21?
 2    A.   I do not know.
 3         MR. ATKINSON:  Your Honor, that's all the
 4  questions I have as to that exhibit.
 5         THE COURT:  Let's take a five-minute recess.
 6         (Recess taken.)
 7         (Call to Order, 11:46 a.m.)
 8         THE COURT:  Please be seated.  Continue
 9  direct examination of Colonel Lewis.
10         MR. ATKINSON:  Thank you, Your Honor.
11  BY MR. ATKINSON:
12    Q.   Colonel, do you recall that before the break,
13  we were talking about your concern about the proper
14  storage of firearms in state parks and forests?
15    A.   Yes.
16    Q.   To the best of your knowledge, is there --
17  has DEEP enacted any rule that would prohibit people
18  from leaving firearms unattended in a state park or
19  forest?
20    A.   No.
21    Q.   To the best of your knowledge, does DEEP post
22  a notification at a state park or forest warning
23  people not to leave firearms unattended?
24    A.   No.
25    Q.   To the best of your knowledge, is there
```

275

```
1   anything that would prevent DEEP from posting a sign
2   at the entrance to a state park or forest telling
3   people not to leave firearms unattended?
4       A.   No.
5       Q.   Going back to your affidavit, the fourth
6   reason that you gave for the prohibition on the
7   carrying of firearms in state parks and forests was
8   that it serves DEEP's conservation goals particularly
9   with respect to hunting, correct?
10      A.   Correct.
11      Q.   There are laws -- to your knowledge, are
12  there laws in Connecticut that prohibit out-of-season
13  hunting in Connecticut state parks and forests?
14      A.   Yes.
15      Q.   As you sit here today, do you know how many
16  state parks and forests Connecticut permits hunting
17  in?
18      A.   No.
19      MR. ATKINSON:  Your Honor, if I may show
20  Colonel Lewis what has been marked as Plaintiff's
21  Exhibit 17 which I believe's a full exhibit to which
22  no objection was made.
23      THE COURT:  You may.
24  BY MR. ATKINSON:
25      Q.   Colonel, have you had a chance to review
```

276

```
1   Plaintiff's Exhibit 17?
2       A.   Yes.
3       Q.   What is that?
4       A.   It's a -- appears to be a list from one of
5   our web pages where -- listing state parks where some
6   hunting may occur at, yeah.
7       Q.   Okay.  Pardon me.
8       Can you count for us the number of parks that
9   are listed on that exhibit, Colonel?
10      MR. BOCHAIN:  Your Honor, objection.  The
11  document speaks for itself.
12      MR. ATKINSON:  I'll move on, Your Honor.
13  BY MR. ATKINSON:
14      Q.   Colonel, is it your understanding that
15  Connecticut permits hunting year-round for coyote?
16      A.   Generally speaking, yes.
17      Q.   Is it also your understanding that hunters
18  can use firearms to hunt for coyote year-round?
19      A.   Yes.
20      Q.   Going back to your affidavit, another reason
21  that you give for the firearms prohibition is it
22  helps DEEP to maintain parks and forests as places of
23  peace, relaxation and quiet enjoyment, correct?
24      A.   Correct.
25      Q.   Would those objectives be substantially
```

277

```
1   affected by someone carrying a concealed firearm?
2       A.   If it's concealed and not noticed, no.
3       Q.   Going back to hunting for a minute, is it
4   your understanding that -- let me ask it this way --
5   withdrawn.
6       DEEP currently permits hunters to use
7   22-caliber rimfire handguns in some state parks and
8   forests to hunt certain types of game, correct?
9       A.   For small game hunting where authorized, yes.
10      Q.   Would a 22 -- withdrawn.
11      Would a 22-caliber handgun cause the same
12  risk of confusion as someone carrying -- withdrawn.
13      Would a 22-caliber handgun carried by a
14  hunter for purposes of hunting cause the same risk of
15  confusion as someone carrying a concealed handgun in
16  a state park or forest?
17      MR. BOCHAIN:  Objection, Your Honor.
18  Speculation.
19      THE COURT:  I'm going to ask you to revise
20  your question to --
21      MR. ATKINSON:  Okay, Your Honor.
22      THE COURT:  -- his knowledge and/or
23  experience.
24      MR. ATKINSON:  I will, Your Honor.
25  BY MR. ATKINSON:
```

278

```
1       Q.   Colonel Lewis, have you had experience with
2   the confusion that could arise when someone notices
3   another person carrying a firearm in state parks and
4   forests?
5       A.   Do I have personal experience, you're asking?
6       Q.   Yes.
7       A.   No, I do not.
8       Q.   By virtue of your position in -- as director
9   of the EnCon Police, do you have professional
10  experience in the confusion that could result from
11  someone noticing someone carrying a firearm in state
12  parks and forests?
13      A.   Yes.
14      Q.   Does your professional experience in that
15  regard extend to the confusion over someone carrying
16  a handgun in state parks and forests?
17      A.   Can you repeat the question.
18      Q.   Sure.  Does your professional experience with
19  the confusion that could result from someone noticing
20  someone carrying a firearm in state parks and
21  forests, does that professional experience also
22  include experience with the confusion that could
23  arise from someone carrying a 22-caliber handgun --
24  withdrawn -- someone carrying a handgun in state
25  parks and forests?
```

279

```
 1      A.    Yes.
 2      Q.    Okay.  How would you describe the confusion
 3  that you have encountered in your professional
 4  experience over someone carrying a handgun in state
 5  parks and forests?
 6      A.    It's not been allowed, to my knowledge, since
 7  state parks have been in existence and it's not
 8  expected, so we receive calls to our dispatch center
 9  for -- requesting calls for service because someone
10  has a firearm or someone hears shooting in a state
11  park or forest.
12      Q.    Colonel, a person can become the victim of a
13  crime almost anywhere, correct?
14      A.    Correct.
15      Q.    And that includes becoming the victim of a
16  violent crime, correct?
17      A.    Correct.
18      Q.    And that would include that someone could
19  become a victim of a crime in a Connecticut state
20  park or forest, correct?
21      A.    Correct.
22           MR. ATKINSON:  Your Honor, if I may approach
23  Colonel Lewis to show him what's been marked as
24  Plaintiff's Exhibit 10 to which I believe we agreed
25  to admit this as a full exhibit.
```

280

```
 1           THE COURT:  All right.
 2           THE WITNESS:  Okay.
 3  BY MR. ATKINSON:
 4      Q.    Colonel, do you recognize that exhibit?
 5      A.    It appears to be a blurry copy of a NIBRS
 6  report for past couple of years from our agency.
 7      Q.    I apologize for the blurriness.  So if we
 8  need to slow down at any point, just let me know and
 9  we'll take our time with that.  All right?
10      A.    Yes.
11      Q.    What does the term "NIBRS" stand for?
12      A.    To the best of my knowledge, National
13  Incident Based Reporting System.
14      Q.    What do you understand this exhibit to
15  depict?
16      A.    This is what we report to FBI Department of
17  Justice for our annual crime statistics for
18  misdemeanor felony arrests from our division.
19      Q.    So just to be clear, the data that is shown
20  in this exhibit is only -- only applies to matters
21  handled by the EnCon Police Department?
22      A.    Yes.  If I can clarify, I said, "arrested."
23  I mean crimes reported to us that we investigated,
24  but they don't all necessarily end in an arrest.
25      Q.    Thank you.
```

281

```
 1      A.    But yes, our division only.
 2      Q.    If I may direct your attention, and we can
 3  stick to the first page of this, to the right side
 4  where there's the column that says, "reported,"
 5  underneath "offenses," do you see that?
 6      A.    Yes.
 7      Q.    What does the term "reported" mean in this
 8  context?
 9      A.    So that would be in our case management
10  system, that means one of these categories of crimes
11  was reported either officer initiated or received a
12  report from another agency or the public, got
13  referred to us somehow, so we -- an officer is
14  assigned a case that contained one of these elements.
15      Q.    Do you see a column next to that with the
16  label "cleared"?
17      A.    Yes.
18      Q.    What does the term "cleared" stand for in
19  this context?
20      A.    So in our system, that means -- so it's the
21  case is either open under investigation or it's
22  cleared.  So "cleared" can mean by -- it can be
23  cleared by arrest, it can be cleared by warrant, it
24  can be cleared by other means.  So it can be cleared
25  by no criminal action or no criminal aspect.  It just
```

282

```
 1  means that it's not under -- the case is closed,
 2  we're not currently investigating it.
 3      Q.    So just so we're clear, none of the crimes
 4  that are reported on this list were handled by the
 5  state police?
 6      A.    I can't say that 100 percent.
 7      Q.    Let's go to the page that depicts the 2019
 8  printout.
 9      A.    Okay.
10      Q.    Do you see any crimes on there that in your
11  professional experience you believe a person might
12  have benefitted from having a handgun to protect him
13  or herself with?
14           MR. BOCHAIN:  Objection, Your Honor.
15  Speculation.
16           THE COURT:  I don't understand that question.
17           MR. ATKINSON:  So, Your Honor, I'm basically
18  asking him if --
19           THE COURT:  You want him to look at these
20  numbers and opine whether having a handgun would have
21  prevented these crimes.
22           MR. ATKINSON:  So I have asked him generally.
23  I can get more specific.  I didn't ask him whether it
24  would have prevented the crime.  I asked him whether
25  a person might have benefitted.  I have not asked
```

283

```
1    him --
2           THE COURT:  I think that's speculative.
3    You're going to have to find another way to ask that
4    that will relate to these statistics and what is
5    known about the circumstances.
6           MR. ATKINSON:  Understood, Your Honor.  I
7    will move on.
8    BY MR. ATKINSON:
9       Q.    Colonel, were you in the courtroom earlier
10   when my colleagues and I stipulated to certain facts
11   being accurate?
12      A.    Yes.
13          MR. ATKINSON:  I believe we marked that as
14   Joint Exhibit A, Your Honor.  I would like to place
15   that in front of Colonel Lewis at this time.
16   BY MR. ATKINSON:
17      Q.    Can I have Exhibit 17 back?
18      A.    Seventeen is here and 10 is right there.
19          MR. ATKINSON:  Your Honor, if the record
20   could just reflect, I did take Exhibits 10 and 17
21   back from Colonel Lewis.
22          THE COURT:  Eventually counsel will have to
23   put all the exhibits that were used or admitted in
24   the hands of Ms. Barry.
25          MR. ATKINSON:  I will coordinate that with
```

284

```
1    her.
2    BY MR. ATKINSON:
3       Q.    Colonel Lewis, have you had a chance to
4    review the content of that stipulation?
5       A.    Yes.
6       Q.    What is your understanding of a firearms
7    hunting license?
8       A.    It's a hunting license that allows people to
9    hunt with a firearm.  It's the base license and
10   there's other permits that people can purchase for
11   additional privileges.
12      Q.    Does a firearm -- withdrawn.
13          A firearms hunting license, to your
14   understanding, does that constitute permission to
15   carry a firearm into a state park or forest?
16          MR. BOCHAIN:  Objection, Your Honor.
17   Relevance.
18          THE COURT:  Overruled.
19          THE WITNESS:  Repeat the question, please.
20   BY MR. ATKINSON:
21      Q.    Yes.  To your understanding, does a firearm
22   hunting license constitute permission by DEEP to
23   carry a firearm into a state park or forest?
24      A.    Only under certain conditions in an area, so
25   generally, no.
```

285

```
1       Q.    What conditions would be placed on that in an
2    area?  Can you give us an example?
3       A.    The area would have to be listed as
4    designated acreage open to -- as a public hunting
5    area and designated for a species that would infer --
6    for a firearm hunting season species, like small
7    game, shotgun deer; in spring, firearms turkey, you
8    know, those seasons species.  So when we designate
9    our seasons in public lands, we get very -- very in
10   the minutia in Connecticut.
11          So one parcel of public hand could only be
12   open to archery hunting.  Another parcel of land can
13   be open to small game with firearms, shotgun deer,
14   archery deer, spring turkey, fall turkey.  It depends
15   on the individual, individual property.
16      Q.    Okay.  Let's talk about a -- so withdrawn.
17          There are state parks and forests that permit
18   hunting deer with firearms, correct?
19      A.    Yes.
20      Q.    And they permit that within certain seasons,
21   correct?
22      A.    For the state land shotgun season, yes.
23      Q.    A firearms hunting license gives a person
24   permission to carry a firearm into those state parks
25   during hunting season, correct?
```

286

```
1       A.    So shotgun deer season, public land, a
2    firearms hunting license by itself is not enough.
3       Q.    What else does a person need to have in
4    shotgun hunting season for deer to carry a firearm
5    onto -- into that area?
6       A.    They would need the public land shotgun no
7    lottery permit license.
8       Q.    Would the combination of the firearms hunting
9    license and the shotgun no lottery deer hunting
10   license together give a person permission to carry a
11   firearm into that specific area during that specific
12   season?
13      A.    So then you have to go under the hunting
14   regulations, what is the allowable firearms and
15   ammunition.  So that's restricted to ten-gauge or
16   smaller, no basically slugs, no buckshot allowed.
17      Q.    So --
18      A.    And no rifles, sorry.
19      Q.    The combination of the deer hunting license
20   that you described, the firearms hunting license,
21   give a person permission to carry a shotgun that's
22   compliant with the regulations onto a state park land
23   within a specific season for hunting deer, correct?
24      A.    Yes.
25      Q.    Colonel, do you also see on the stipulation
```

App.174

287

1  the portion where we referred to -- paragraph 2 is
2  what I'm referring to.  Have you had a chance to
3  review that?
4      A.   Our harvest report?
5      Q.   Yes.
6      A.   Yes.
7      Q.   What is your understanding of the DEEP's
8  harvest tagging system?
9      A.   It's a self-reporting system.  So hunters
10 while they're deer hunting, they're required to have
11 a harvest record on their person.  They harvest the
12 deer, they immediately fill out that harvest
13 information, and then they have to call and report it
14 to DEEP within 24 or 72, I can't remember the exact
15 hours, but there's a short deadline they have to
16 actually report it to DEEP.  That can be through the
17 website or telephone-based system where then we enter
18 that data into pour departmental harvest report data
19 system.
20     Q.   As you sit here today, do you know what
21 information needs to be reported on, I believe you
22 said, that harvest record?
23     A.   So your harvest record, to the best of my
24 knowledge, it's the conservation ID number that
25 belongs to the person, it's the town location where

288

1  it's at, state land, public land, method of take, if
2  it's deer, the section of the deer, and there's a
3  couple other questions that filter off of the deer,
4  sex of the deer.
5      Q.   When you reference "method of take," can you
6  explain to us what you mean by "method of take"?
7      A.   Firearms, archery, muzzleloader.
8      Q.   Does that require a hunter to list the
9  specific firearm that they used?
10     A.   Not to my knowledge.
11     Q.   Would the same reporting requirements apply
12 for a hunter harvesting turkey?
13     A.   Yes.  Very similar for turkey.
14     Q.   To harvest a deer, a hunter would have to
15 kill it, correct?
16     A.   Yes.
17     Q.   And if a hunter was using a firearm, he'd
18 have to discharge that firearm at a deer to kill it,
19 correct?
20     A.   Correct.
21     Q.   And the same thing would apply for a turkey
22 hunter?
23     A.   Yes.
24          MR. ATKINSON:  May I have a moment to confer
25 with Mr. Nastri, Your Honor?

289

1          No further questions for Colonel Lewis, Your
2  Honor.
3          THE COURT:  Thank you.  Cross-examination.
4          MR. BOCHAIN:  Your Honor, while Attorney
5  Atkinson is just organizing his things, I see it's
6  about 12:15.  I'll ask what Your Honor's preference
7  is if we want to take an early lunch.
8          THE COURT:  I'll turn it around and ask was
9  your preference is.
10         MR. BOCHAIN:  I can always eat and I'm a
11 little hungry.
12         THE COURT:  Why don't we take a lunch until
13 one.  And is Colonel Lewis our last witness?
14         MR. ATKINSON:  From the plaintiff's
15 perspective, yes.
16         THE COURT:  From the defendants?
17         MR. BOCHAIN:  I believe that will be the
18 case, Your Honor.  I'm going to confer with my
19 colleagues, but I believe that's going to be the
20 case.
21         THE COURT:  And then when he is finished,
22 will we be moving into argument?
23         MR. ATKINSON:  That would be our preference,
24 Your Honor.
25         MR. BOCHAIN:  The only thing I would request

290

1  is as soon as we're done with examination, just maybe
2  a brief recess so we could confer with one another.
3          THE COURT:  Sure.  That's fine.  Let's be
4  back at one.
5          (Recess taken.)
6          (Call to Order, 1:06 p.m.)
7          THE COURT:  Please be seated.  And Colonel
8  Lewis, you remain under oath.
9          THE WITNESS:  Yes.
10         THE COURT:  All right.  Examination of
11 Colonel Lewis.
12         MR. BOCHAIN:  All right.  And, Your Honor,
13 before I begin, I would just ask the Court's
14 permission, he is one of our witnesses.  So I would
15 ask permission to just go a little bit beyond the
16 scope of examination.
17         THE COURT:  We like to have witnesses called
18 only once and so -- so the answer to your question is
19 yes.  I don't know whether you can divide that up,
20 but as if he were being presented by you versus
21 cross-examination, but we would like to hear
22 everything from Colonel Lewis.
23         MR. ATKINSON:  Your Honor, perhaps to make it
24 a little bit easier, I recognize that he is also the
25 state's witness but this is cross.  I will not raise

291

```
1   leading question objections, so if that makes it
2   easier for Attorney Bochain.
3        THE COURT:  He doesn't get to lead no matter
4   what.
5        MR. BOCHAIN:  Without objection, Your Honor.
6   I appreciate that, Attorney Atkinson.
7   BY MR. BOCHAIN:
8    Q.   Colonel, if I could just ask you what
9   documents do you have in front of you currently?
10       MR. BOCHAIN:  May I approach the witness,
11  Your Honor?
12       THE COURT:  Yes.
13       THE WITNESS:  That's the hunting license
14  report.
15       MR. BOCHAIN:  So I'm just going to return the
16  part -- it's the stipulation, Your Honor, I'm just
17  going to return that back to Attorney Atkinson.
18       CROSS-EXAMINATION OF CHRISTOPHER LEWIS
19  BY MR. BOCHAIN:
20   Q.   Good afternoon, Colonel.
21   A.   Good afternoon.
22   Q.   How are you?
23   A.   Good.
24   Q.   So I believe Attorney Atkinson asked you some
25  questions about your professional experience, but I
```

292

```
1   just want to take it one step back, if I could, just
2   to give some better context.
3        Can you tell us where you're from originally?
4    A.   Born in Columbus, Ohio, moved around there a
5   little bit, went to Tennessee, graduated high school
6   in Tennessee, and then college, went to Auburn.
7    Q.   Auburn and where is that?
8    A.   University in Alabama.
9    Q.   And when did you graduate?
10   A.   Graduated there in '97.
11   Q.   And did you have a particular major?
12   A.   Wildlife science.
13   Q.   Okay.  And you graduated, you said, in '98 or
14  '97?
15   A.   '97, yes.
16   Q.   All right.  And then after that, is that when
17  you started working in Alabama as a conservation
18  officer?
19   A.   Shortly thereafter, I started in Alabama in
20  January of 1998.
21   Q.   Okay.  And that's where you stayed for, it
22  seemed like, 15, 20 years or so?
23   A.   About 22 years.
24   Q.   Twenty-two years.  And then after that, you
25  assumed the role that you're currently in?
```

293

```
1    A.   Correct.
2    Q.   And that was in November 2019?
3    A.   2019, yes.
4    Q.   And can you just describe your role -- what
5   is your current role again?
6    A.   So I'm the division director for
7   environmental conservation police division.
8    Q.   Is that within a particular department?
9    A.   It is within the Department of Energy and
10  Environmental Protection.
11   Q.   Can you just describe your role for the Court
12  a little bit?
13   A.   Overseeing the environmental conservation
14  police division, responsible for enforcement,
15  regulating hunting, fishing, boating, ATV use, state
16  lands and state park forest patrols and enforcement.
17   Q.   And I think on examination you had mentioned
18  -- how many staff do you oversee?
19   A.   There's -- I oversee 51 officers and
20  approximately 10 civilian non-sworn staff.
21   Q.   And those non-civilian sworn staff, what are
22  their roles?
23   A.   Eight are dispatchers, two are administrative
24  assistants.
25   Q.   Okay.  So the 51 officers, are those EnCon
```

294

```
1   officers?
2    A.   Yes.
3    Q.   And are they all in the same location?
4    A.   No.  We're -- we divide up our state by
5   district.  So each geographical region of the state
6   is a separate district and we have a headquarters
7   sector.
8    Q.   How many districts is that?
9    A.   We divide up the state ourselves in three
10  districts.
11   Q.   All right.  And where are those districts?
12   A.   Marine district which is every town along the
13  coast of Long Island Sound, and then we have a
14  western district which is, generally speaking, those
15  towns above the marine district west of the
16  Connecticut River, and eastern district is the towns
17  east of the Connecticut River above the marine zone
18  district.
19   Q.   All right.  And are there a certain number of
20  officers in each district?
21   A.   Yes.
22   Q.   All right.  How many are in the west
23  district?
24   A.   The west district is 17 officers currently.
25   Q.   All right.  How about the marine district?
```

App.176

295

```
1      A.    Marine district will be 16 officers right
2  now.
3      Q.    All right.  And how about the east district?
4      A.    Fifteen officers.
5      Q.    All right.  So if my math is correct, and
6  I know my math yesterday wasn't really correct, but
7  if my math is correct, that adds up to 48.  Does that
8  sound about right?
9      A.    Yes.
10     Q.    So is there -- it sounds like there's 33
11 others.  Where are they located?
12     A.    Our headquarters in Hartford.
13     Q.    Okay.  And do those individuals in Hartford
14 serve in a particular capacity?
15     A.    One is an assistant director which is a rank
16 of major, and then I have a training sergeant, a
17 sergeant that's responsible for our training, and
18 then I have an administrative sergeant that handles
19 various administrative duties, purchasing equipment,
20 that type of stuff.
21     Q.    And you are in that office as well?
22     A.    Yes.  Myself in the office.
23     Q.    All right.  So the four of you serve in an
24 administrative capacity?
25     A.    Yes.  Administrative capacity.
```

296

```
1      Q.    Now, I'd like you to turn, if you could,
2  there's an exhibit binder in front of you, to
3  Defendant's 136 which is in evidence.  I would just
4  ask you to turn to that if you could.
5      A.    Okay.
6      Q.    You have that in front of you?
7      A.    Yes.
8      Q.    I'd ask you to turn to page 4, the
9  paragraph 12.
10     A.    Okay.
11     Q.    All right.  And so I'm going to direct your
12 attention to three lines from the bottom to the
13 sentence beginning with, "In February 2023."  Do you
14 see that there?
15     A.    Yes.
16     Q.    All right.  And so it says, "In
17 February 2023," which is few months ago, you received
18 approximately 1400 -- EnCon received approximately
19 1,400 calls.  Can you just explain what you mean by
20 "calls" there?
21     A.    Calls for service or individual -- in our
22 records management system, we -- CSF numbers are
23 calls for service.  So that can be a call we received
24 from the public through our dispatch line, a call
25 that's transferred from a 9-1-1 answering service, or
```

297

```
1  it could be an officer-initiated call.
2      Q.    All right.  So those calls get routed through
3  dispatch?
4      A.    Yes.  Even the officer initiated calls get
5  reported to dispatch.
6      Q.    So once a call comes in, what's EnCon's
7  response to that?
8      A.    So the dispatcher determines what the nature
9  of the call is, complaint, what service it needs, and
10 if it requires an officer response, then dispatch
11 will dispatch it to the closest available officer.
12     Q.    All right.  And then are those calls, would
13 they come from across the state?
14     A.    Yes.
15     Q.    All right.  And going -- again, if my math is
16 correct, so we had 1,400 calls for February 2023, if
17 my math is correct, that's about 350 calls per week.
18 Does that sound about right?
19     A.    It sounds about right.
20     Q.    And again, you have 48 officers in the field,
21 so to speak, for EnCon?
22     A.    Yes.
23     Q.    Now, if you look a little bit further, again,
24 on page 4 of the document in front of you, the
25 sentence that says, "In busier" -- it's two
```

298

```
1  sentences, "In busier summer months, EnCon may
2  receive approximately 2,000 calls per month."  And
3  then it continues, for instance, "In June 2022, EnCon
4  received approximately 1,900 calls."  Do you see
5  that?
6      A.    Yes.
7      Q.    And again, if my math is correct, that's
8  about 475 calls per week?
9      A.    It sounds about right.
10     Q.    Can things get rather busy for EnCon?
11     A.    Yes.
12     Q.    Is there a particular month -- a particular
13 season that gets really busy for you?
14     A.    It would be our summer season.
15     Q.    Why is that?
16     A.    Calls for service increase, we have more
17 visitors to the outdoors during the summer months.
18 It's more activity.  We're juggling our tasks between
19 state parks, state forests, boat, fishing.  In
20 Connecticut, the summers are nice, people are
21 outside.
22     Q.    And can you maybe explain, give some context
23 to the Court as to maybe the day-to-day operations
24 for, let's just start with the east district.
25     A.    Okay.  Depending on what time of year it is,
```

299

```
1   it can vary greatly.  So our focus in the spring will
2   be completely different in the summer.  Springtime,
3   we're working on spring fishing season.  Fishing
4   typically opens February, March.  We're focusing on
5   that, fishing enforcement.  Transition to turkey
6   hunting season in the spring.  Then we roll into the
7   summer months which is what we call our recreation
8   season.  Our campgrounds open.  Visitors come into
9   our swimming areas, our beaches, our parks.  That
10  rolls through nowadays past Labor Day.
11        And then once we get to end of September, the
12  beginning of fall, we transition to our fall hunting
13  season which is focused on, you know, we start out
14  with like, our pheasant hunting, archery hunting,
15  rolling into November or December where we get into
16  our bulk of our deer hunting season.  And then we go
17  into the winter which is a little bit slower, but we
18  have ice fishing, then some snowmobile depending on
19  the year, and then we also continue, the archery
20  season rolls through January.
21     Q.   All right.  So a couple of times you
22  mentioned "focus."  And so is it fair to say that the
23  focus of EnCon ebbs and flows with the particular
24  season?
25     A.   Yes.
```

300

```
1      Q.   So I had asked questions about day-to-day
2   operations for the east district.  Would that be the
3   same for the western district?
4      A.   Yes.
5      Q.   All right.  And is there any difference in
6   terms of day-to-day operations for the marine
7   district?
8      A.   No.  But the marine district has additional
9   responsibilities for federal fisheries enforcement on
10  Long Island Sound.  So that requires additional work
11  for those officers to complete those tasks as well.
12  So that's a year-round commercial fisheries, they
13  work on.
14     Q.   So that's a year-round focus?
15     A.   Yeah.
16     Q.   All right.  And just so I'm clear, though,
17  the focus -- the EnCon focuses on certain things in
18  certain seasons?
19     A.   Yes.
20     Q.   Now, I can't recall if you had mentioned this
21  on direct from Attorney Atkinson's questions, but are
22  EnCon officers trained police officers?
23     A.   Yes.
24     Q.   All right.  Does EnCon conduct itself as a
25  traditional police force?
```

301

```
1      A.   No.
2      Q.   Can you please explain that?
3      A.   So traditionally, conservation officers,
4   really around the country, really historically, like,
5   the oldest state law enforcement agency, pretty much
6   every agency, because you had hunting and fishing
7   before you had cars and driving.  So conservation
8   enforcement has been around for, you know, hundreds
9   of years.  Within that, so it started out and it's
10  still that way.  It's one officer in a community or
11  several communities that's responsible for
12  interacting with the community, being the ambassador
13  to the outdoors, working with the sportsmen, the
14  sporting club, the landowners, to kind of achieve a
15  common mission which kind of the North American
16  wildlife model where the user pays, the user supports
17  the overall conservation of the species.
18        So the goal is to conserve and protect our
19  natural resources.  So just by enforcement only
20  doesn't get that done.  We're far more effective
21  through education and outreach.  So that's kind of
22  the goal of our officers is serve as ambassadors to
23  the outdoors, educate people, do outreach, make those
24  contacts with the public.
25     Q.   All right.  So let me ask a follow-up
```

302

```
1   question, two questions about the education.  Can you
2   just unpack that a little bit?  What do you mean by
3   "education"?
4      A.   So education can be as simple as speaking to
5   a sporting group, you know, go to a sporting group
6   club, they want to hear about a concern or something
7   that's interesting, like currently black bears are
8   very -- a popular topic in Connecticut.  So we might
9   get requests to speak on black bears or how do we
10  live with black bears.
11        Other education can be just as we contact
12  people individually, it can be as simple as, say,
13  someone is fishing, we can offer them advice, we can
14  advise the creel limits.  Some bodies of water have
15  certain gear restrictions.  So we can provide that
16  education at that point.  That's on a one-on-one
17  basis.
18     Q.   How would you describe the approach that
19  EnCon officers take in interacting with people
20  within -- let me back up.  Withdrawn.
21        Does EnCon have jurisdiction over state parks
22  and forests?
23     A.   Yes.
24     Q.   How would you describe the approach that
25  EnCon takes when interacting with members of the
```

303

```
1   public in a state park and forest?
2       A.    Within a state park, forests, so we kind of
3   take on the traditional park ranger model, the park
4   police model of, like, a customer service, you know,
5   guide to the outdoors-type interaction, you know,
6   contacting someone, ensuring their enjoying their
7   time in the outdoors and that they're comfortable and
8   do they need any assistance to take advantage of the
9   resources we have.
10      Q.    Since you've been in charge, since 2019 when
11  you've been in charge, has that been the approach
12  that EnCon has taken?
13      A.    Yes.  With the exception of the 2020 COVID.
14      Q.    Okay.  Let's put 2020 COVID aside.  So to
15  your knowledge, has EnCon always taken that approach
16  to its functions?
17      A.    Yes.
18      Q.    All right.  How would you describe -- is that
19  different in any way from a traditional police
20  officer?
21      A.    In my opinion yes.  So we're contacting
22  people not looking -- not actually responding to a
23  crime in progress, not responding to a call for
24  service.  We initiate contacts to assist people to
25  try to see if there's something we can do to make it
```

304

```
1   better, more customer service-type interaction versus
2   traditional officer dispatched to a call for service.
3   If someone's in trouble, someone's in crisis, someone
4   needs arrested, that's a completely different
5   approach.
6       Q.    So in carrying out that approach, does EnCon
7   actively take steps to portray a certain image to
8   members of the public?
9       A.    Yes, we do.
10      Q.    Can you describe that?
11      A.    We try to take a non-confrontational
12  approach.  We try to take a conversational approach
13  to engage people in conversation, less command
14  presence, if you will, more try to get the image of,
15  you know, I'm your neighbor, I'm your friend, I'm in
16  the community, we know each other, how you doing type
17  of stuff.
18      Q.    So an informal approach?
19      A.    Yes.  Very informal.
20      Q.    To your knowledge, has EnCon always taken
21  that approach?
22      A.    Yes, to my knowledge.
23      Q.    Let me rephrase that.  Has EnCon always
24  sought to portray that image to members of the
25  public?
```

305

```
1       A.    Yes.
2       Q.    Now, Attorney Atkinson had asked you some
3   questions about your knowledge pertaining to
4   Section 23-4-1c of the Connecticut State Regulations.
5   Do you recall that?
6       A.    Yes.
7       Q.    All right.  I'm going to ask you to turn --
8   take, again, a look at page -- Defendant's 136 which
9   is in front of you and turn to page 6, paragraph 16,
10  subparagraph A.  Let me know when you get there.
11      A.    I'm here.
12      Q.    All right.  So I believe Attorney Atkinson
13  had asked you some questions about certain statements
14  here.  I'm not going to go through every single one
15  but I was hoping we could get some clarity on a few
16  of them.
17          So I believe he asked you some questions
18  about in your experience as an officer, why the
19  presence of alcohol and firearms could lead to
20  confusion and alarm.  Do you recall that?
21      A.    Yes.
22      Q.    Can you just unpack that a little bit more?
23  Why you have come to that conclusion?
24      A.    Definitely when alcohol is involved, it
25  impairs people's judgment, people will act as they
```

306

```
1   would not normally act.  So oftentimes firearms
2   involved where a normal, you know, average person,
3   even though they did have a firearm, would not pull
4   the firearm or handle the firearm, sometimes alcohol
5   is involved, people will want to handle a firearm and
6   they can act irresponsibly because they're under the
7   influence.
8       Q.    And when you say, "act irresponsibly," does
9   that mean escalate the situation?
10      A.    Escalate situations, you know, act in a
11  reckless manner, you know, shooting in the air,
12  shooting just to be shooting, where, you know, in my
13  experience, that can be attributed to being under the
14  influence of alcohol.
15      Q.    All right.  Could the risk of confusion and
16  alarm still exist just by the mere presence of a gun
17  putting aside alcohol?  Could the presence of a
18  firearm lead to those things that you just mentioned?
19      A.    Confusion and alarm, yes, someone sees a gun.
20  In our parks, we don't allow people to have guns,
21  generally speaking, in parks.  So that causes alarm
22  and generates calls to our dispatch and 9-1-1.
23      Q.    And I believe Attorney Atkinson asked you
24  some questions about where you might expect to see a
25  firearm.  Do you recall that?
```

307

```
1      A.    Yes.
2      Q.    All right.  And one of the questions he asked
3   was whether you would expect to a see a firearm on a
4   public street.  Do you recall that?
5      A.    Yes.
6      Q.    Can you just explain why you wouldn't expect
7   to see that on a public street, say in Connecticut?
8      A.    Yeah.  So I wouldn't expect to see one
9   because there's not a purpose to have one.  I would
10  not expect to see someone target shooting or hunting
11  on a public street.
12     Q.    And as an average citizen, would you expect
13  to see a firearm in a Connecticut state park, let's
14  say with a handgun or a pistol?
15     A.    No.
16     Q.    And why is that?
17     A.    Because it hasn't been, it's not allowed
18  currently, and it's a state park.
19     Q.    I think I just want to make sure I heard your
20  testimony correctly.  So since you've taken -- you
21  were in charge of EnCon in 2019.  Has EnCon ever
22  received calls about the presence of a firearm in a
23  state park or forest?
24     A.    Yes, we have.
25     Q.    Has EnCon responded to those calls?
```

308

```
1      A.    Yes.
2      Q.    And what would that response look like?
3      A.    We would try to send a minimum of two
4   officers or more if there's more officers available.
5      Q.    You said a minimum of two officers?
6      A.    Yes.
7      Q.    All right.  And you said if more were
8   available, you would send more?
9      A.    Yes.  Until we knew what the situation was.
10     Q.    Okay.  So there's a possibility that you
11  could send more -- when you say -- how many could you
12  send?
13     A.    So on -- say, one sector has four officers
14  working at that time and they're all available, we
15  would send all four.
16     Q.    You would send all four?
17     A.    Yes.
18     Q.    When you say, "sector," what do you mean by
19  "sector"?
20     A.    Each district is divided into two sectors.
21  So we have -- like, for the east, we have a north
22  sector and the south sector, kind of a quarter of the
23  state.
24     Q.    Okay.  And so presently if EnCon received a
25  call about the presence of a firearm, there's a
```

309

```
1   possibility you could send all four officers in one
2   sector to respond to that call?
3      A.    Yes.
4      Q.    Now, in your declaration, I'm going to have
5   you take a look again, it's page 6 again,
6   paragraph 16, subparagraph A, the portion -- it's the
7   second sentence dealing with the risk of conflict
8   that could be increased.  Do you see that?  It's the
9   second sentence in subparagraph A.
10     A.    Yes.
11     Q.    All right.  And are there any safety concerns
12  that go along with the risk of conflict?
13     A.    Well, the risk of a firearm being present
14  during a conflict increases the chance that that
15  firearm may be used.
16     Q.    And let's just assume for a second that
17  someone -- you know, someone sees a gun, they make a
18  call to EnCon, how would that -- unpack it a little
19  bit more.  How would that impact EnCon's focus in a
20  particular season?
21     A.    So depending what the officers are focusing
22  on, they're going to be -- even if they're on a call,
23  if it's not a public safety emergency call, like a
24  gun, like a person with a gun, unknown situation,
25  then they'll be pulled from that call and sent to the
```

310

```
1   other call.
2      Q.    All right.  So let's talk about the summer
3   for a moment.  And remind me again what the focus for
4   -- let's stick with the marine division for a minute.
5   What's the focus of the marine division or marine
6   sector in the summer?
7      A.    So marine sector, it's the parks, park
8   enforcement, park patrol, boating patrol, and then
9   fisheries enforcement.
10     Q.    And so that's what they're focused on
11  currently, like, in the summer, right?
12     A.    Yes.
13     Q.    All right.  And so if a call came in about
14  the presence of a gun in the summer, am I hearing you
15  correctly that that could pull perhaps four officers
16  or more from their focus to respond to that one call?
17     A.    Yes.
18     Q.    Now, I believe Attorney Atkinson also asked
19  you some questions about concerns that you might have
20  about proper storage of a firearm.  Do you recall
21  that?
22     A.    Yes.
23     Q.    All right.  And I think he asked you a
24  question about Hammonasset Beach State Park not
25  having facilities for proper storage, correct?
```

311

```
1    A.    Yes.
2    Q.    All right.  To your knowledge, does any
3  facility across the state park and forest system have
4  what you would consider to be adequate facilities for
5  properly storing a firearm?
6    A.    No.
7    Q.    And can you just explain a little bit more
8  the risks that you see in your current -- based on
9  your experience about the unattended firearm?  Like,
10 what are those risks that you see?
11   A.    It could be stolen.  It could be picked up by
12 a child, so there's a risk there.  It can be picked
13 up by a good Samaritan who is not familiar with
14 firearms and could have a negligent discharge.
15   Q.    I'm sorry.  What was the last thing you said?
16   A.    Could be picked up by a good Samaritan and if
17 they're not familiar with firearms, they could
18 accidentally discharge it.
19   Q.    Now, Attorney Atkinson also asked you some
20 questions about the conservation and environmental
21 goals that are furthered by this particular
22 regulation that we're talking about.  Do you recall
23 that?
24   A.    Yes.
25   Q.    All right.  Can you just help explain to the
```

312

```
1  Court a little bit more as to how this particular
2  regulation furthers EnCon's conservation goals?
3    A.    This is our main regulation that says you
4  don't hunt in state parks.  So, you know, the actual
5  regulation starts hunting or carrying a firearm in
6  the state parks are prohibited except, and then we
7  carve out certain areas where we can allow hunting
8  within, you know, limited areas, limited different
9  means.
10   Q.    All right.  So I'm going to ask you some more
11 questions about hunting in a moment, but when you
12 said this particular regulation is the primary
13 regulation that you use to enforce those conservation
14 goals, so when you -- why is that?  Why is this the
15 primary one?
16   A.    So we have seasons for hunting, and so, like,
17 if it's private property, it's easier to enforce
18 private property because you have to have permission
19 from the landowner.  So state parks are public
20 property, anybody can be there, and so because of the
21 use of the land, it doesn't -- most parks don't
22 support hunting, so we don't allow hunting there.  So
23 even though there's a season within that area
24 elsewhere within -- as the property owner, the state
25 owns the property, manages the wildlife, does not
```

313

```
1  close the seasons and does not allow hunting on that
2  property, even though if the season is in, it could
3  be hunted outside of the property.
4           And then furthermore, just for officers
5  enforcing the hunting or what we would call poaching,
6  hunting illegally, it's easier to stop poaching
7  activity, like, in a state park if there's no
8  firearms allowed.  If it's treated as a wildlife
9  sanctuary, no weapons capable of taking game animals
10 are allowed or supposed to be present, that's easy to
11 enforce because if someone is hiking and they see a
12 poacher/hunter with a firearm in that area, they're
13 going to report that because they know that's not
14 something they're expecting to see.  So that kind of
15 furthers our conservation mission.
16   Q.    And can you just explain a little bit more as
17 to how the presence, the general right to have
18 firearms, a handgun or a pistol, in a state park or
19 forest might impact EnCon's ability to enforce or
20 carry out its conservation and environmental goals?
21   A.    So can you rephrase the question or try that
22 again?  I didn't quite get all that.
23   Q.    Sure.  And I stumbled a little bit there and
24 that's my mistake.
25           So can you just explain to the Court how the
```

314

```
1  presence of firearms, the general presence of
2  allowing someone to have a handgun or a pistol in a
3  state park or forest might make it more difficult for
4  EnCon to advance its environmental or conservation
5  goals?
6    A.    Because where we have areas we don't allow
7  hunting, it's easier to enforce the antihunting when
8  we can also start out from the get-go saying there's
9  no weapons allowed in that area.  So that's an easier
10 metric to enforce.  We don't have to wait for someone
11 to take the action of taking an animal to enforce
12 that.  We can stop that action before an animal is
13 taken.
14   Q.    Now, I want to switch gears slightly and
15 follow up on some of the questions that Attorney
16 Atkinson had asked you about several statutes.
17           And do you recall some questions about
18 General Statute 53-206d?
19   A.    Yes.
20   Q.    All right.  And if I can show you what has
21 been marked as -- it's Plaintiff's -- I think it's 7.
22         MR. BOCHAIN:  May I approach the witness,
23 Your Honor?
24         THE COURT:  You may.
25         THE WITNESS:  Okay.
```

315

```
1   BY MR. BOCHAIN:
2       Q.   Is that the -- I've showed you, it's General
3   Statute 53-206d?
4       A.   Yes.
5       Q.   Now, are there reasons why that particular
6   statute might not sufficiently address your concerns
7   that you identified in your declaration?
8       A.   Because as an enforcement officer, we would
9   use this statute in addition to other charges.  This
10  means someone has already been injured, there's
11  already been a negligent discharge, there's already
12  been a domestic animal, you know, shot negligently.
13  So the damage is already done at this point.
14      Q.   And -- well, let me ask you this:  So this
15  statute is carrying under the influence?
16      A.   Yes.
17      Q.   And so --
18      A.   Oh, I'm sorry.  Yes.
19      Q.   Yeah.  So maybe you can explain why this
20  particular statute wouldn't necessarily address the
21  concerns that you had identified.
22      A.   So yeah.  So it's kind of the same answer.
23  So this is something -- the carry under the influence
24  is something we typically use like it's an additional
25  charge.  So they drew attention -- someone drew
```

316

```
1   attention to themselves in some way to be contacted
2   to figure out, A, they're intoxicated, and B, they
3   have a firearm.  So some action has already occurred
4   for typically this going.
5           The common thing in -- you see this in is if
6   someone's driving under the influence and they have a
7   weapon on them, then that's usually an additional
8   charge because, A, they're not supposed to be driving
9   under the influence, and then B, they're not supposed
10  to have a firearm while they're intoxicated.  We --
11  EnCon uses this particular statute, there's
12  additional penalty for hunting under the influence,
13  so if we contact somebody for hunting, they are
14  involved in a hunting accident, they negligently shot
15  someone while hunting, and then in the course of that
16  investigation, we determine they're under the
17  influence, this would be an additional charge that we
18  would use.
19      Q.   Okay.  So it's an after the fact?
20      A.   Yes.
21      Q.   Okay.  Now, I'd like to ask you some
22  questions based on your experience as a trained law
23  enforcement officer and particularly I want to ask
24  you some questions about the statute's applicability.
25           And so would this particular statute in your
```

317

```
1   experience apply to a situation where an unarmed
2   drunk person starts screaming and pushing another
3   person who is sober but that sober person has a gun
4   on them?  Would this statute apply to the conduct of
5   the drunk person who starts pushing and shoving a
6   person to their particular conduct?
7       A.   No.
8       Q.   Why is that?
9       A.   Intoxication and carrying a pistol or
10  revolver, so I would have to -- the drunk person has
11  to have the weapon.
12      Q.   Right.  So okay.  So how about let's take a
13  sober individual who's walking on the beach and
14  they're open carrying.  Okay.  Would this particular
15  statute apply to that conduct?
16      A.   No.
17      Q.   Why is that?
18      A.   You don't have the element of intoxication or
19  under the influence.
20      Q.   All right.  So based on your experience, if
21  you had a sober person who is walking on the beach
22  open carrying, would that result, in your opinion, in
23  a phone call to EnCon?
24      A.   Yes.
25      Q.   And is that because there's a -- it's
```

318

```
1   confusion, alarm, that kind of thing?
2       A.   Yes.
3       Q.   Now, I'm going to ask you to turn to, I
4   believe it's Plaintiff's 6 which is General Statute
5   53-203.  Do you see that?
6       A.   Yes.
7       Q.   All right.  And I think this was what you
8   were getting at before.  So can you just explain
9   again the reasons why this particular statute
10  wouldn't sufficiently address the concerns you
11  identified in your declaration?
12      A.   Yeah.  It's an add-on charge.  The -- there's
13  already been an action taken.  There could have
14  already been a violation.  This could be the only
15  violation, but there's already been an action taken,
16  the firearm has been discharged.  In my professional
17  experience, we do this at EnCon, we have hunters
18  shoot domestic animals inadvertently or on purpose
19  and that's a charge that we use.  So we will also
20  typically dive into that, we'll have other
21  hunting-related charges in addition to this charge.
22      Q.   All right.  And again, this is an after the
23  fact?
24      A.   Yes.
25      Q.   Okay.  And I'm going to give you the same
```

319

```
1   example that I kind of gave you a minute ago which is
2   would a person who is open carrying a firearm on a
3   beach be in violation of this statute?
4        A.   No.
5        Q.   Would a person who is open carrying in any
6   state park or forest be in violation of that statute?
7        A.   No.
8        Q.   And in those circumstances, could that again
9   result in confusion, alarm in your experience?
10       A.   Yes.
11       Q.   Now, I'm going to ask you to turn to -- I
12  think it's Plaintiff's Exhibit 5, which is General
13  Statute 53-21, the risk of injury statute.  Let me
14  know when you get there.
15       A.   I got it.
16       Q.   Okay.  Now, are the reasons why that
17  particular statute would not sufficiently address the
18  concerns you identified in your declaration?
19       A.   Yes.
20       Q.   And what are those reasons?
21       A.   Well, this is a larger statute, first of all,
22  it covers several items, but the primary issue is,
23  you know, did you place a minor at risk of a
24  situation where life or limb of a child is in danger.
25  The statute also further goes on to impair the morals
```

320

```
1   of a child, sale of children.  So it's a large --
2   covers a large area, but none of those would apply.
3        Q.   Now, I believe you testified that there are
4   risks associated with an unattended firearm?
5        A.   Yes.
6        Q.   All right.  Are those just limited to
7   children?
8        A.   No.  They're to anybody.
9        Q.   So anybody could have -- there could be a
10  risk for anyone who is in the presence of an
11  unattended firearm?
12       A.   Yes.
13       Q.   All right.  Now, I believe Attorney Atkinson
14  had asked you some questions about concealed carried
15  and its impact.  Do you recall that?
16       A.   Yes.
17       Q.   Can you just explain just for the record what
18  open carry means?
19       A.   Open carry means carrying a handgun on one's
20  person visible, usually outside the clothing, a
21  holster or physically carrying it in their hand.
22       Q.   And can you explain just for the record what
23  concealed carry means?
24       A.   Concealed carry is where the handgun is
25  concealed under clothing, under a jacket, in, like, a
```

321

```
1   fanny pack or a purse.
2        Q.   To your knowledge, does Connecticut draw a
3   distinction between open carrying and concealed
4   carrying?
5        A.   No.
6        Q.   And so does that mean that a person -- let's
7   say somebody has a concealed pistol permit or a
8   pistol permit in Connecticut, does that particular
9   person have the ability to open carry in Connecticut?
10       A.   Yes.  With the pistol, Connecticut Pistol
11  Permit.
12       Q.   And so does that mean they have the choice to
13  then conceal carry in Connecticut?
14       A.   Yes.
15       Q.   So they can do -- they can do either/or?
16       A.   Correct.
17       Q.   Now, I believe Attorney Atkinson had asked
18  you some questions about how concealed carrying might
19  reduce some of the risks that you had identified in
20  your declaration.  Do you recall that?
21       A.   Yes.
22       Q.   Are there still -- is concealed carry always
23  perfect?
24       A.   No.
25       Q.   And can you just explain why it's not?
```

322

```
1        A.   Inadvertently, even though it's concealed
2   carry, people move a certain way, clothing shifts and
3   the presence of the firearm is revealed to bystanders
4   or others.
5        Q.   In your professional experience, have you
6   seen that sort of inadvertent display before?
7        A.   Yes.
8        Q.   Approximately how many times?
9        A.   While working, probably less than six.
10       Q.   How about in your, personal life, because you
11  said, "while working"?  Have you seen it in your
12  personal life?
13       A.   Yes.  While off duty, I have.
14       Q.   All right.  How many times have you seen it
15  that?
16       A.   Around five, five or six.
17       Q.   All right.  So combined, maybe 10 or 11
18  times?
19       A.   Possibly, yeah, around there.
20       Q.   When's the most -- the last time you saw that
21  sort of thing happen?
22       A.   Last month during my school -- my child's
23  school spring break traveling back from a trip.
24       Q.   Can you just explain a little bit more?
25  Where was that?
```

323

```
1   A.   It was in Virginia.  We were traveling back
2   from Tennessee to Connecticut.
3   Q.   Can you just explain the circumstances a
4   little bit more, how you saw that inadvertently?
5   A.   Sure.  Stopped at -- me and my son were
6   driving back.  We stopped at a convenience store to
7   get gas, drinks, snacks.  While entering the store, a
8   gentleman, a nice gentleman, got out of the car in
9   front of me, got out, and held the door open for us
10  so we could go in.  When he did that, by moving his
11  thing, his shirt lifted a little bit and you could
12  see he had a pistol that he had kind of in the inside
13  waistband of his pants.
14  Q.   When you said move the thing, is that the
15  door?
16  A.   Yeah.  He was holding the door open for us.
17  Q.   He was holding the door open and he was
18  holding the door open and it showed --
19  A.   Yeah.  He had a T-shirt on and -- kind of a
20  short T-shirt and it kind of raised up and you could
21  see the belt and his pistol inside his waistband.
22  Q.   Okay.  So before he moved his arm in that
23  certain way, you hadn't seen the firearm?
24  A.   No.
25  Q.   Is that the reason why you thought he was
```

324

```
1   trying to conceal it?
2   A.   Yes.
3   Q.   And so again, you've seen that sort of thing
4   happen 10 to 11 times in your career?
5   A.   Yes.
6   Q.   Professional life and personal life?
7   A.   Uh-huh.
8   Q.   And I think you had testified during Attorney
9   Atkinson's questioning that people can be shocked by
10  seeing a firearm.  Can you just explain a little bit
11  more about that?
12  A.   So when they're not expecting to see a gun,
13  it interrupts their process, you know.  People's
14  brains think differently.  Their -- their brain is
15  programmed to expect something.  I'm in a courtroom;
16  I'm expecting to see a courtroom.  I'm not expecting
17  to see, like, a pink gorilla march across the room,
18  but research has shown you can have a pink gorilla
19  march across the room and nobody will pay attention
20  to it because they're focused on that, but oftentimes
21  people do -- if you do see that pink gorilla and
22  you're not expecting that situation, it triggers
23  alarm bells in people's brains.
24  Q.   Okay.  And in this circumstance, the alarm
25  bells in that they wouldn't expect to see the
```

325

```
1   firearm?
2   A.   Yes.
3   Q.   Now, I want to go back to, if I can, a little
4   bit about -- talk a little bit more about EnCon
5   patrols.  I think Attorney Atkinson had asked you
6   some questions about that.  Do you recall that?
7   A.   Yes.
8   Q.   So are EnCon officers, do they patrol certain
9   areas?
10  A.   So I think I mentioned they're assigned to
11  sectors which are half a district, and within those
12  sectors, they have a set of towns that -- that
13  they're responsible for patrolling.  So they are the
14  primary officer for those sets of towns.
15  Q.   And by "towns," do you mean state parks and
16  forests in those towns?
17  A.   I mean towns in Connecticut.  So an officer
18  might have five towns, he's the primary responsible
19  for those towns.  He's the officer for those towns.
20  Other officers will work those towns, but those are
21  his or her town.
22  Q.   I see.  Does local law enforcement ever
23  patrol state parks and forests?
24  A.   To my knowledge, just occasionally.  I would
25  say rarely.
```

326

```
1   Q.   Okay.  But some of them do?
2   A.   Yes.
3   Q.   All right.  If a 9-1-1 call came in at a
4   state park or forest, who would respond first?
5   A.   It depends on the nature of the call.  If
6   it's a serious public safety call, the closest
7   available officer will respond.
8   Q.   And by "closest available officer," what do
9   you mean by that?
10  A.   I mean any officer that hears the dispatch,
11  so if the 9-1-1 call, that 9-1-1 dispatch center will
12  notify us, but they will also send it out to their
13  agencies they're dispatching for.
14       MR. BOCHAIN:  If I can just have one moment,
15  Your Honor.
16  BY MR. BOCHAIN:
17  Q.   I want to follow up on some questions about
18  just hunting briefly.  There was some questions about
19  coyote hunting.  Do you recall?
20  A.   Yes.
21  Q.   Is coyote hunting common?
22  A.   No.
23  Q.   What are the most common animals that people
24  hunt?
25  A.   Pheasant is very popular, then deer, turkey.
```

327

1    Q.   And are they for particular seasons?
2    A.   Are they what?
3    Q.   Do those animals -- are they hunted in
4 certain seasons?
5    A.   Yeah.  Each has a set season.
6    Q.   Is hunting allowed in all locations across
7 the state park and forest system?
8    A.   No.
9    Q.   And I think there was some questions about
10 the ability to hunt small game with 22 rimfire
11 weapon.  Do you recall that?
12   A.   Yes.
13   Q.   Is that the only instance when a 22 can be
14 used?
15   A.   On state parks or forests?
16   Q.   Correct, yeah.
17   A.   Yes.
18   Q.   And so is there a particular small game
19 season?
20   A.   Yes.
21   Q.   Is that all year-round?
22   A.   No.  It depends on the species.  So it goes
23 back to what is the animal being hunted.
24   Q.   Okay.  So but the animal that's being hunted
25 has a particular season?

328

1    A.   Yes.
2    Q.   All right.  If I can turn just a little bit
3 more about how the presence of firearms would impact
4 EnCon operations.  So can you just explain if
5 individuals were allowed to carry handguns or pistols
6 in state parks or forests, how that would impact
7 EnCon's operations?
8    A.   It would -- we would have to take a more
9 proactive approach and presence in our state parks
10 than we currently do.
11   Q.   Can you just explain?  When you said,
12 "proactive approach," what do you mean?
13   A.   We would increase our officers' presence in
14 our state parks.  So by if we're being somewhere
15 here, if we're staying in the state parks, then that
16 means we're less available to do boating patrols, we're
17 less available to do fishing enforcement, less
18 available for patrolling private property for hunting
19 enforcement.
20   Q.   Anything else?
21   A.   I'm sure there's stuff but I can't think of
22 it right now.
23   Q.   Let me ask this question:  Would EnCon
24 consider implementing any responsive measures to this
25 new change?

329

1    A.   We would do in-house training.  So we would
2 have to educate officers on the change that, you
3 know, people can carry in state parks.  Then as a
4 department, there would be discussions on what type
5 of outreach and education we need to do to our
6 visitors to inform people of this change.
7    Q.   How long would that kind of -- how long might
8 that kind of thing take to roll out?
9    A.   It's hard to say.  I can speak to my
10 division, in-house training could take, you know, two
11 weeks to four weeks depending on scheduling.
12   Q.   Let's talk about the approach that EnCon
13 takes to -- when an EnCon officer interacts with an
14 average member of the public.  Would the presence of
15 firearms in state parks or forests impact how EnCon
16 has always approached members of the public?
17   A.   I believe it would, yes.
18   Q.   Can you explain?
19   A.   In those situations, I think we're almost
20 pushing ourselves into more of the traditional police
21 officer role where we -- there's a chance people are
22 going to be armed, and so even though that chance is
23 always out there, now we would expect it to be more
24 prevalent, and then it changes our communication with
25 our visitors.  It's -- you know, in that traditional

330

1 -- a little bit more traditional role, it pushes more
2 towards a response to we're going to respond to calls
3 for service, we're going to wait until we get a
4 complaint of a conflict before we respond.
5         It's going to limit our voluntary, cordial
6 interactions with our visitors, like, hey, how are
7 you doing today type of stuff.  It will push us more
8 towards the security side of the business, which we
9 do, but we try to tamper that with more -- currently
10 with more outreach.
11   Q.   All right.  How might that shift impact how
12 people look at parks?
13   A.   So conservation officers, we try really hard
14 to put forth the approachable image.  We don't want
15 to be a standoffish person with the badge and a gun
16 where we're just a police officer.  We want to be,
17 hey, this is, you know -- this is the game warden,
18 this is Officer Smith, he's my game warden or he's my
19 officer in my area, but that's done over time with
20 constant interaction, engaging the community, talking
21 to visitors, talking to people using the outdoors.
22         They see the same person again and again and
23 they get to know that person versus if we shift more
24 towards traditional policing where, you know, it's --
25 we have a different role as conservation officers, so

331

```
1   we're trying to protect our natural resource and
2   support that, and within that mission, we ensure
3   public safety on our state parks, but focusing more
4   public safety state parks with the firearms, which
5   this change would dictate, puts us more in a
6   traditional police officer mindset where we're solely
7   focused on public safety and less on the community
8   engagement.
9           MR. BOCHAIN:  Can I just have one moment,
10  Your Honor?
11          THE COURT:  Yes.
12  BY MR. BOCHAIN:
13      Q.   Attorney Atkinson had asked you some
14  questions about the NIBRS data.  Do you recall that?
15      A.   Yes.
16      Q.   I think he had asked the question about
17  whether crime happens in state parks or forests.  Do
18  you remember that?
19      A.   Yes.
20      Q.   Crime happens everywhere, right?
21      A.   Correct.
22      Q.   Would you say that crime in state parks and
23  forests is less common than just in the general
24  community?
25      A.   Yes.
```

332

```
1           MR. BOCHAIN:  Your Honor, I have no further
2   questions at this time.
3           THE COURT:  All right.  Is there redirect?
4           MR. ATKINSON:  Yes, Your Honor.
5           REDIRECT EXAMINATION OF CHRISTOPHER LEWIS
6   BY MR. ATKINSON:
7       Q.   Good afternoon, Colonel Lewis.
8       A.   Good afternoon.
9       Q.   Attorney Bochain just asked you whether crime
10  was lower in -- less common in state parks and
11  forests than it is in other places, correct?
12      A.   Correct.
13      Q.   How would you know that?
14      A.   Just professional experience and personal
15  experience.  So our reportable misdemeanors and
16  felonies are rare.  My officers might do one domestic
17  violence call a year, where a municipal officer might
18  do one a week or multiple, you know, one or two a
19  day.
20      Q.   When you gave your answer to Attorney Bochain
21  to that question and he asked you in public, can you
22  tell us what your understanding of the term in public
23  or other places meant as you answered that question?
24      A.   For crime report --
25      Q.   So when you were answering Attorney Bochain's
```

333

```
1   question and he said -- he asked you more crime
2   occurred -- withdrawn.
3           When you were answering Attorney Bochain's
4   question and he asked you is crime less common in
5   state parks and forests as opposed to other places,
6   what I'm asking you to explain to us is when he said
7   other places, what was your understanding of what he
8   was referring to by other places?
9       A.   Other jurisdictions and other areas in the
10  state.
11      Q.   So that would include a house, for instance,
12  a private house?
13      A.   Yeah.  If it was outside the state parks,
14  yes.
15      Q.   Okay.  When he discussed the NIBRS data
16  prior, you testified that it was only for the
17  incidents that EnCon dealt with, correct?
18      A.   Yes.
19      Q.   Apart from that data, do you have any other
20  data -- do you have access to any other data
21  regarding crimes that occur in state parks and
22  forests that are handled by another law enforcement
23  agency?
24      A.   Not that I can think of.
25      Q.   You testified earlier state parks are public
```

334

```
1   property and anyone can be there, correct?
2       A.   Yeah.  Within -- yeah.  We have hours of
3   operations, but yes, they're open to the public.
4       Q.   What's the typical hours of operation for a
5   state park or forest?
6       A.   Daylight hours, morning to sunset.
7       Q.   And just to give us a rough approximation of
8   when that would be, that could ebb and flow with the
9   season, correct?
10      A.   Correct.
11      Q.   So it would -- just so the record's clear,
12  that could be longer in the summer and shorter in the
13  fall and the spring?
14      A.   Yes.
15      Q.   During the time that state parks are open to
16  the public, is there anyone guarding the entrance to
17  the state parks who decides who gets in and who is
18  not let in?
19          MR. BOCHAIN:  Objection, Your Honor.
20  Relevance.
21          THE COURT:  Your claim?
22          MR. ATKINSON:  My claim, Your Honor, is he
23  testified that anyone can get in.  What I'm
24  attempting to establish is there's little or no
25  control over who walks in and who doesn't.
```

335

```
1        THE COURT:  And what relevance does that
2  have?
3        MR. ATKINSON:  It goes to the sensitive
4  places doctrine, Your Honor.
5        THE COURT:  In what way?
6        MR. ATKINSON:  We're standing in a courthouse
7  right now.  I have to go through the metal detector
8  out front.  It's a characteristic of a sensitive
9  place that they're --
10       THE COURT:  Are you saying if it doesn't have
11 some kind of guarding, it's not a sensitive place?
12       MR. ATKINSON:  I'll leave that for legal
13 argument, Your Honor, but as to the relevance of the
14 question I'm asking, I'm getting --
15       THE COURT:  Go ahead.
16 BY MR. ATKINSON:
17  Q.   So Colonel Lewis, I'll ask the question
18 again.  Is there anyone who stands guard outside the
19 entrance to a state park or forest who decides who
20 gets in and who doesn't?
21  A.   So we have -- some parks have gatehouses with
22 attendants, but I guess who gets in and who doesn't
23 get in, if you -- for those that need to pay to park,
24 they get in; if they don't choose to pay to park,
25 they don't get in.
```

336

```
1   Q.   So there is a parking restriction?
2   A.   For some parks, yes.
3   Q.   If I chose to park on the street outside a
4  state park and then walk in, would I be able to get
5  in one of those areas?
6   A.   Yes.
7   Q.   Apart from the parking enforcement, are there
8  any other criteria that some -- a DEEP employee
9  guarding a park would use to either tell someone they
10 can't come in or that they can come in?
11  A.   By foot?
12  Q.   Yes.
13  A.   No.  If it's within hours, no.
14  Q.   Is there anyone at the entrance to a state
15 park or forest who inspects what a person might bring
16 into a state park or forest?
17  A.   In certain areas in certain times, yes.
18  Q.   Okay.  According to your understanding of
19 that, what would such an inspection look like?
20  A.   We do -- in some areas, our officers or
21 seasonal rangers do inspections of coolers and gear
22 bags.
23  Q.   Why do you do inspections of coolers and gear
24 bags?
25  A.   To -- primary alcohol enforcement.  We have
```

337

```
1  prohibited areas where alcohol possession is
2  prohibited, so we try to stop that at the gate.
3   Q.   How common are those areas where alcohol is
4  prohibited?
5   A.   Out of 139 state parks and forests, it's a
6  small handful of them.
7   Q.   Barring -- putting the places where alcohol
8  is prohibited out of the question, in those areas,
9  putting those out of this question, are there any
10 other areas in which -- withdrawn.
11       Putting the alcohol out of the equation,
12 those areas out of the equation, what other reasons
13 would an EnCon officer inspect somebody's gear or
14 cooler?
15  A.   The only reason we would inspect someone's
16 gear or cooler would be if it was involved in hunting
17 or fishing enforcement.
18  Q.   And why would you do that?
19  A.   Just if we had just suspicion that someone
20 was hunting or fishing or transporting game or fish,
21 then that would be part of our compliance check
22 because there's creel limits, size limits that we
23 regulate when someone fishes.  So that's why we would
24 check those areas.
25  Q.   Would you do that when somebody's entering a
```

338

```
1  park?
2   A.   No.
3   Q.   So it would be more so when they're leaving a
4  park?
5   A.   With the caveat if we had suspicion that they
6  were fishing or transporting fish or game.
7   Q.   So just to make sure I'm understanding you
8  correctly, it's not like we're lining up to a ticket
9  booth and give me your ticket, I'm going to inspect
10 it, you have to have a suspicion in order to go ahead
11 and search those?
12  A.   Yes.
13  Q.   I was a bit confused by some of your
14 testimony earlier relating to the dispatch system.
15 If someone -- so withdrawn.
16       If I want to report -- or withdrawn.
17       Do you have any knowledge as to how a report
18 from a state park or forest gets to your dispatchers?
19  A.   Yes.
20  Q.   All right.  What would that process typically
21 look like?
22  A.   Typically it takes one of three different
23 paths.  The first path would be a call to 9-1-1 which
24 goes to a public safety answering point within that
25 region geographically, you know, their cell phone
```

App.187

339

```
1   transmission goes to the closest one.  The second
2   path would be they call our dispatch directly.  We do
3   post our dispatch numbers around.  Still some people
4   have that direct number.  And then third would be
5   employee notification like another -- like another
6   officer or a park employee or any of our DEEP
7   employees.
8       Q.   If a report came into your dispatch center
9   saying there's somebody out in the middle of a state
10  park carrying a firearm, do you have any knowledge of
11  how a dispatcher would react to that report?
12      MR. BOCHAIN:  Objection, Your Honor.
13  Speculation.
14      THE COURT:  This is his job.  This is his
15  work.  Go ahead.
16  BY MR. ATKINSON:
17      Q.   Colonel, do you need that read back?
18      A.   No.  So how dispatchers would react, they
19  would categorize that as a public safety call,
20  unknown person with a weapon, and they would start
21  dispatching officers to it.
22      Q.   Would a dispatcher attempt to gather as much
23  information as possible from the reporting caller?
24      A.   Yes.  But they would do that with every call.
25      Q.   Okay.  Are dispatchers trained to triage
```

340

```
1   calls of reports?
2       A.   Yes.
3       Q.   And can you define the term "triage" for us?
4       A.   They rank them in order of importance or
5   urgency.  So less important stuff gets put on hold to
6   deal with the more urgent calls.
7       Q.   Would they triage certain -- would they
8   triage reports of a firearm?
9       A.   They would -- as far as triage, they would
10  elevate that.  If it's a public safety call, that
11  goes to the top of our list.
12      Q.   Okay.  You've testified a lot today about the
13  storage of firearms and the adequacy of storage
14  facilities at DEEP state parks and forests.  In your
15  professional experience, do you believe that storing
16  a firearm in a motor vehicle constitutes adequate
17  storage?
18      A.   Within the parameter of the law, so locked
19  safe or unloaded outside the passenger compartment.
20      Q.   Do you recall Attorney Bochain asking you
21  about your usage or application, I should say, of
22  Connecticut General Statute 206d.
23      A.   Yes.
24      Q.   Do you have discretion to enforce that law,
25  Colonel?
```

341

```
1       A.   Yes.
2       Q.   Let's talk about the man you testified to
3   that you saw have -- having a firearm in Virginia.
4   Did you expect to see him holding a firearm in the
5   place you encountered him?
6       A.   No.
7       Q.   Did his carrying of a firearm in that place
8   make you uncomfortable?
9       A.   It did not make me uncomfortable.
10      Q.   You -- I didn't quite get everything you said
11  when you testified about this during Attorney
12  Bochain's examination of you, but can you please
13  repeat for me what you consider to be the most -- the
14  most animals folks hunt in state parks and forests?
15      A.   In state parks and forests?
16      Q.   Yes.
17      A.   Probably the most common in state parks and
18  forests, probably going to be, to the best of my
19  knowledge, I'm going to say deer, turkey and water
20  fowl within state parks and forests.
21      Q.   May I approach, Colonel Lewis?  I'm going to
22  show you what's been marked as Plaintiff's Exhibit
23  Number 9.
24      MR. ATKINSON:  Your Honor, I'm going to take
25  the other exhibits.
```

342

```
1       THE COURT:  That's fine.
2   BY MR. ATKINSON:
3       Q.   Colonel, have you had a chance to look at
4   that again?
5       A.   Yes.
6       Q.   Okay.  There's a section on the right side of
7   that entitled "White-Tailed Deer."  Do you see that?
8       A.   Yes.
9       Q.   And I believe it's in the second column, the
10  second box down, the second row, there's a section
11  entitled "Deer Shotgun State Controlled Areas."  Do
12  you see that?
13      A.   Yes.
14      Q.   And there's a sub row under that that says,
15  "No Lottery Season."  Do you see that?
16      A.   Yes.
17      Q.   What is the no lottery deer season?
18      A.   So those are areas you don't have to apply
19  for the lottery for the permit for the -- versus our
20  lottery season has limited tags or permits for those
21  lands and you have to enter a lottery to be selected
22  for one of those tags.
23      Q.   What are the dates listed for the hunting
24  season for deer shotgun in state-controlled areas?
25      A.   On this, it's November 16th through
```

343

1 December 8th -- my eyes fail me -- or 6th.
2     Q.    It's close enough.  The document will speak
3 for itself.
4           I want you to go to the last row in that
5 section.  Do you see where it says, "Deer Muzzle
6 Loader"?
7     A.    Yes.
8     Q.    And then there's a sub row that says, "State
9 Land," correct?
10    A.    Yes.
11    Q.    What's the sub row for state land say?
12    A.    State land December 7th through the 20th of
13 December.
14    Q.    I am now going to direct your attention up to
15 April -- withdrawn.
16          I'm going to direct your attention to the top
17 of that same right hand of the page under the section
18 that says, "Wild Turkeys."  Do you see that?
19    A.    Yes.
20    Q.    Do you see a row there, the first row that
21 says, "Spring Turkey"?
22    A.    Yes.  "Spring Turkey."
23    Q.    And a subrow under that that says, "State and
24 Private Lands," correct?
25    A.    Yes.

344

1     Q.    What's the season for spring turkey?
2     A.    This was April 27th through May 28th.
3     Q.    Do you know if hunting for spring turkey
4 during spring turkey season permits individuals to
5 hunt turkeys with firearms?
6     A.    With shotguns, with -- number ten --
7 ten-gauge or smaller and then there's some more
8 ammunition restrictions, basically size, that's a
9 number two to number six, something like that, off
10 the top of my head.
11    Q.    Moving down to the last row in that section,
12 do you see the row that's entitled, "Fall Turkey
13 Firearms"?
14    A.    Yes.
15    Q.    And the subrow that says, "State and Private
16 Lands"?
17    A.    Yes.
18    Q.    What's the season there?
19    A.    It's October 1st through October 31st.
20    Q.    What is your understanding of what the
21 seasons are for water fowl?
22    A.    Water fowl will start -- depending on the
23 season, it's kind of all over the map.  They are set
24 by the federal government.  So we don't publish those
25 the same time we publish these, but you could have an

345

1 earlier goose season in September, but generally
2 speaking, duck hunting is December and going right up
3 to January.  So it's just primarily in the winter.
4           MR. ATKINSON:  Okay.  May I have a moment to
5 confer with Mr. Nastri, Your Honor?
6           THE COURT:  Yes.
7           MR. ATKINSON:  No further questions at this
8 time, Your Honor, or no further questions period.
9           MR. BOCHAIN:  Can I just have one brief
10 moment, Your Honor?
11          THE COURT:  Yes.
12          MR. BOCHAIN:  Just very briefly, Your Honor.
13    RECROSS-EXAMINATION OF CHRISTOPHER LEWIS
14 BY MR. BOCHAIN:
15    Q.    With respect to hunting, Colonel Lewis, so
16 when is the busiest time again for EnCon?
17    A.    Summer recreation season.
18    Q.    And does the hunting season sort of
19 correspond with the busiest time of year?  In other
20 words, hunting doesn't occur during the busiest time
21 of year?
22    A.    Correct, yes.
23    Q.    And hunting is very regulated, right?
24    A.    Yes.
25    Q.    And it's not across all state parks and

346

1 forests, right?
2     A.    Correct.
3           MR. BOCHAIN:  No further question, Your
4 Honor.
5           THE COURT:  So this is perhaps a rather naive
6 question, but you've been describing with respect to
7 the hunting season, for instance the spring turkey,
8 where people are authorized to use ten-gauge
9 shotguns, and my question is:  Are handguns
10 authorized for use for hunting in Connecticut parks
11 and forests?
12          THE WITNESS:  Handgun hunting is only
13 authorized on private land.  Let me correct myself.
14 For small game yes, but for anything else, it's only
15 private lands and it's an additional permit.
16          THE COURT:  So when you say handgun hunting
17 is authorized for small game --
18          THE WITNESS:  Yes.  Small game only.
19          THE COURT:  Small game consists of what?
20          THE WITNESS:  Squirrel, fox, so coyote,
21 rabbit.  And then -- sorry.  Raccoon and possum also.
22 Sorry.  I forgot those two.
23          THE COURT:  So for instance, what kind of
24 hunting would a Glock 42 be authorized for?
25          THE WITNESS:  I don't know what caliber that

347

```
1   Glock 42 is, but for handgun hunting, it has to be a
2   357, larger for deer on private land.
3         THE COURT:  Three feet what?
4         THE WITNESS:  So if it's for deer hunting, a
5   revolver has -- a pistol revolver deer permit
6   regulation for hunting in Connecticut is private land
7   only and it has to be a 357 or larger caliber.
8         THE COURT:  And do you have in front of you
9   that list by year, it's Exhibit 10, and it's the
10  NIBRS Agency Crime Overview?  Would you put that in
11  front of him?
12        THE WITNESS:  Thank you.
13        THE COURT:  Second from the bottom of each of
14  the pages is something called "weapon law
15  violations."  Do you know what's included in that?
16        THE WITNESS:  So those are -- so those
17  are other offenses against society.  So that's a
18  stolen handgun, an altered handgun, possession
19  without a permit, those will be -- it's not a crime
20  against a person.  It's not a crime against property.
21  So it would be one of those other.  So possessing a
22  pistol without a permit would be an other weapons law
23  violation or a felon in possession of a handgun or a
24  firearm would be another one.
25        THE COURT:  And would it always involve a
```

348

```
1   firearm of some type or does it include other
2   weapons?
3         THE WITNESS:  It can include other dangerous
4   weapons.  So certain knives, gravity knives,
5   switchblades knives, brass knuckles, those could be
6   included in weapon laws.
7         THE COURT:  So you had some testimony that
8   I'm a little unclear about.  When you get calls
9   regarding firearms, do you or do you not enforce the
10  regulations prohibiting firearms in the parks and
11  forests or do you only give warnings?
12        THE WITNESS:  If we find someone carrying a
13  weapon in the state park, we typically charge
14  them with -- if there's no other extenuating
15  circumstances, it's the 23-4-1c charge of possession
16  with a weapon in a state park.  If there's other
17  issues going on, we may have other charges.
18        THE COURT:  Thank you.  Any questions on my
19  questions?
20        MR. ATKINSON:  I have a few, Your Honor.
21  FURTHER DIRECT EXAMINATION OF CHRISTOPHER LEWIS
22  BY MR. ATKINSON:
23  Q.    Colonel Lewis, on state land in -- on state
24  land, state forests and parks, a person can use a
25  22-caliber rimfire handgun to hunt coyote
```

349

```
1   A.    Yes.
2         MR. ATKINSON:  No further questions, Your
3   Honor.
4         MR. BOCHAIN:  Just very briefly, Your Honor.
5         FURTHER CROSS-EXAMINATION
6   BY MR. BOCHAIN:
7   Q.    Can you just explain what rimfire means?
8   A.    Rimfire is a type of ammunition where center
9   fire, which the primer is in the center of the case.
10  And then rimfire, the primer is on the rim or outside
11  of the case and the powder is there in a -- it's a
12  smaller, traditionally lower power projectile.  You
13  don't see them much bigger than 22.
14  Q.    So for the small game hunting that we've been
15  discussing, the only thing that's authorized would be
16  22-caliber rimfire hunting, right?
17  A.    For small game?
18  Q.    For small game which we have been referring
19  to.
20  A.    Certain shot sizes and shotguns would be
21  permissible, like a seven or eight shot.
22  Q.    But in terms of handguns?
23  A.    Handguns would just be the 22-caliber or
24  smaller then a 22-caliber.
25  Q.    And again, that's only for certain animal
```

350

```
1   species, right?
2   A.    Yes, correct.
3   Q.    And those are less common in terms of what
4   people would hunt than the other things that we've
5   discussed, correct?
6   A.    Correct.
7   Q.    And so from where people can hunt, that's
8   only for certain locations within the state parks and
9   forests, right?
10  A.    Yes.
11  Q.    So it's not the whole state park or forest,
12  right?
13  A.    No.  It will be spelled out and then our
14  website has like a GIS map that actually delineates,
15  you know, the zones that hunting is allowed.
16  Q.    So it's discrete locations?
17  A.    Yes.
18        MR. BOCHAIN:  Nothing further, Your Honor.
19        THE COURT:  So when you say that handguns may
20  be used for hunting only if authorized on private
21  land and you went on to describe the small game, I'm
22  a little confused on what DEEP's jurisdiction is over
23  private land.
24        THE WITNESS:  So for hunting, hunting and
25  fishing, so anywhere the wildlife goes, we have
```

351

```
1    jurisdiction to manage the populations.
2           THE COURT:  You follow the fish.
3           THE WITNESS:  Yeah.  Or the deer or the
4    turkey, yes.
5           THE COURT:  In the list that we have in the
6    stipulation of the number of firearm hunting licenses
7    issued, what kind of animals require a firearm
8    hunting license?
9           THE WITNESS:  So generally, every game
10   species if one chooses to use a shotgun or a rifle to
11   hunt those would need the firearms license.  So
12   that's the basic license to use a firearm to hunt.
13   There's also archery licenses and we have additional
14   species specific licenses/permits.
15          THE COURT:  So if you're going to use a rifle
16   or a shotgun to hunt anything, you have to have a
17   firearms hunting license?
18          THE WITNESS:  Yes.  With the asterisk if
19   you're a landowner, you can get a free one, landowner
20   permit.
21          THE COURT:  And then you have a harvest
22   tagging system?
23          THE WITNESS:  Yes.
24          THE COURT:  That documents turkeys.  Do you
25   document harvesting hunting of -- killing any other
```

352

```
1    animals?
2           THE WITNESS:  We report deer and turkey and
3    then we have a fur bearers report.  So fur bearers
4    would be our fur-bearing species, so skunk, raccoon,
5    coyote, mink, anything that's a fur bearer that can
6    be hunted or trapped, we also track those numbers as
7    well.
8           THE COURT:  And is that also a self-reporting
9    system?
10          THE WITNESS:  Yes.  And then we also have a
11   requirement where our DEEP employees will physically
12   tag some of those animals with CITES tags.
13   Threatened or endangered species animals, if they
14   look like a certain animal that might be threatened
15   or endangered, we have to tag them to verify that
16   it's not that species, it came from Connecticut
17   legally.  So we would tag those.
18          THE COURT:  How would you get them to tag
19   them?
20          THE WITNESS:  They'll come to our offices, or
21   if it's a trapper that has several, they'll make an
22   appointment with a biologist or an officer and
23   they'll actually go to their location and tag them.
24          THE COURT:  All right.  Anything further?
25          MR. ATKINSON:  Nothing from me, Your Honor.
```

353

```
1           THE COURT: All right then.  We will excuse
2    you, Colonel Lewis.  Thank you very much.  You may
3    step down.
4           All right.  We are in great shape time-wise.
5    How much time would you like to collect your thoughts
6    for your final argument and presentation?
7           MR. ATKINSON:  I would suggest 15 minutes,
8    Your Honor, primarily because, as you can see, I have
9    a lot.
10          THE COURT:  You can have more than 15 minutes
11   to get organized.  How about a half an hour?
12          MR. ATKINSON:  I would greatly, greatly
13   appreciate that.
14          THE COURT:  Will that be enough?
15          MR. ATKINSON:  Yes, Your Honor.
16          THE COURT:  Is that enough?
17          MR. BOCHAIN: Yes, Your Honor.
18          THE COURT:  Then we'll be back at three.
19   Thank you.
20          (Recess taken.)
21          (Call to Order, 3:03 p.m.)
22          THE COURT:  Please be seated, counsel.  I'll
23   hear you then on standing and I will invite
24   Mr. Atkinson to begin.
25          MR. ATKINSON:  Thank you, Your Honor.  And
```

354

```
1    before I begin, I'd certainly like to express my
2    appreciation to the Court staff for their courtesy
3    and graciousness over the past two days as well as to
4    Your Honor.
5           With respect to the defendant's motion to
6    dismiss, my reading of the briefs, Your Honor, seem
7    to be teeing -- this issue seems to be teed up for a
8    battle between the *Lujan* case and *Steffel v.*
9    *Thompson*, 415 U.S. 4452.  We understand the
10   defendant's claim to be that Mr. Nastri's future
11   visits to Connecticut state parks are not adequately
12   pled, they're not adequately expressed, particularly
13   on the point of his intention to both visit state
14   parks and to carry a handgun into state parks
15   without -- in violation of the regulation at issue
16   here.
17          We believe *Steffel* is most accurate and most
18   applicable to this case based on the testimony that's
19   been educed before Your Honor today and the
20   pleadings.  Just to set the context of *Steffel*, in
21   *Steffel*, the Supreme Court held that a plaintiff had
22   sufficient standing to bring a pre-enforcement
23   challenge when he was protesting and police
24   threatened him with arrest and he seized protesting
25   and he waked away because he didn't want to be
```

355

1  arrested. And our understanding of the *Steffel*
2  holding was that a cessation or a ceasing of desired
3  conduct based on a threat of prosecution was
4  sufficient.
5      We recognize that nobody -- there's no
6  testimony to the effect that Mr. Nastri was
7  approached by a police officer or an EnCon officer
8  saying if you carry a handgun in state parks, we're
9  going to prosecute you, but the statute itself, the
10 accompanying counts of the regulation itself, the
11 accompanying consequences of that regulation are
12 sufficient notice to Mr. Nastri that he does face a
13 threat of prosecution if he carries his handgun into
14 a state park or forest in violation of that
15 regulation.
16     THE COURT: So if that's the regulation that
17 he's challenging, are you saying that he doesn't
18 actually need to state that he intends to violate the
19 regulation in order to show an intent to engage in
20 proscribed conduct under the *Susan B. Anthony List*?
21     MR. ATKINSON: I think he does not need to be
22 held to saying the exact words I intend to violate
23 it. My understanding of *Susan B. Anthony* is a
24 continued desire to engage in that conduct even
25 though he testified truthfully today that while the

356

1  law exists, he has no intention of violating it. But
2  he also testified today that this is his continued
3  desire to do that, that is his intention to do that
4  provided he can do that legally and without the
5  consequences to his career as a financial adviser
6  without the consequences of having this regulation
7  enforced against him.
8      THE COURT: How does this differentiate him
9  from anyone with a generalized grievance against a
10 law or a regulation who say I would act differently
11 if the law were different?
12     MR. ATKINSON: That's why we believe *Steffel*
13 is analogous here, Your Honor. Like *Steffel*, we're
14 dealing with a situation where prior to becoming
15 aware of that regulation, Mr. Nastri was engaged in
16 the very conduct that it prohibits and that he could
17 be punished for. He testified that he had carried
18 his handgun into Sleeping Giant State Park, onto the
19 Farmington River Canal trail. He was engaged in the
20 conduct that -- the prohibited conduct right up until
21 the moment he learned that there was a credible
22 threat of prosecution.
23     We believe that under *Steffel*, that
24 engagement in a conduct and then ceasing of that
25 conduct as soon as one learns of a threat of

357

1  prosecution, a threat of enforcement, is sufficient
2  to confer standing.
3      In terms of his intent, Your Honor, I think
4  Mr. Nastri in one of the interesting components of
5  the standing doctrine is he finds himself in a tough
6  position today between conflicting and imperatives.
7  Under one imperative, he's compelled to testify
8  truthfully which basically amounts to as long as I
9  don't want to be prosecuted, I don't intend to carry
10 a handgun into a state park while this regulation is
11 at issue, and on the other hand, there are the --
12 there is -- there are cases like *Susan B. Anthony*
13 *List* that seem to imply that he has a duty to say I
14 intend to violate the law.
15     We believe that a reading like that would put
16 plaintiffs in an untenable position between
17 committing perjury and having standing to bring a
18 case. We don't think the Supreme Court intended do
19 that. We think *Steffel* itself describes
20 circumstances under which plaintiffs like Mr. Nastri
21 can bring claims like this and have standing.
22     With respect to *Lujan*, Your Honor, this is
23 not an obstruction like *Lujan*. Mr. Nastri testified
24 that he lives in incredible close proximity to parks,
25 one, in fact, down the street from him. He can

358

1  access it virtually at will. He testifies to a
2  regular habit of accessing that park, whereas *Lujan*,
3  we had two residents of the United States talking
4  about safaris in Sri Lanka and Egypt and safaris
5  naturally require sufficient planning, require
6  preparation to travel overseas. They're not
7  something that you can wake up and say, yeah, this
8  morning I want do that. There's stuff that you have
9  to plan out. They require money. They require
10 expenses, et cetera.
11     None of that is present here. Mr. Nastri
12 just has to get up as he's been doing for the last
13 number of years and go for a run or go for a walk and
14 we believe that his pattern and practice of doing
15 that is sufficiently concrete to confer him standing.
16     So on those bases, we would ask Your Honor to
17 deny the motion to dismiss. Thank you.
18     MR. SULLIVAN: Your Honor, if it's all right,
19 I'll take this from the podium so my notes are a
20 little closer.
21     THE COURT: That's fine. You may proceed.
22     MR. SULLIVAN: Thank you. And good
23 afternoon, Your Honor. To begin, there's not a
24 disagreement between *Lujan* and *Steffel* in this
25 matter. *Lujan* is the standard that applies

359

1  particularly with respect to a preliminary injunction
2  where the plaintiff bears the burden of establishing
3  standing in all instances of his complaint and in
4  this instance is obligated to show some basis or some
5  level of evidence sufficient to grant him the relief
6  that he's seeking here.
7          He can't simply rely on these generalized
8  allegations of an intent or a desire to carry which
9  ultimately is what he's advocating here for by merely
10 pointing to his allegations in the complaint.  That
11 would be more towards, I think, the *Warth v. Seldin*
12 case which was cited in plaintiff's opposition brief
13 to the motion to dismiss which is again irrelevant in
14 the preliminary injunction contention.
15         The plaintiff -- despite the fact that the
16 plaintiff may disagree with Connecticut Agency
17 Regulation Section 24 -- 23-4-1c, he still observes
18 it, and for that reason, and I think it's been
19 demonstrated at great length, and frankly, initially
20 from plaintiff's verified complaint, from his
21 deposition testimony that was attached to the
22 defendant's reply brief on the motion to dismiss, and
23 now for two days as he's been testifying to his
24 conduct and the way he actually uses Connecticut
25 state parks, it is very clear that is has not alleged

360

1  a concrete and particularized injury sufficient to
2  grant him standing under the Second Amendment to
3  challenge the statute because he has been, again,
4  abundantly clear that he will not carry his pistol or
5  revolver in Connecticut state parks while
6  Section 23-4-1c is in effect.
7          He said it at least five times and that's
8  consistent with his testimony, frankly, with every
9  other location where he understands that a law is --
10 prohibits the carry of firearm on that location.  It
11 is his practice as a law-abiding citizen not to carry
12 that and that, frankly, is admirable, the fact that
13 he intends to follow those laws and comports himself
14 in the way he does so, and it's what's expected of
15 what, I would say, all citizens.  And for that
16 reason, it doesn't get past the generalized grievance
17 that he is now claiming on behalf of the public at
18 large who may have some interest in carrying when
19 they go to a Connecticut state park or forest despite
20 the fact they intend to obey the laws at all times.
21         Furthermore, because, frankly, plaintiff has
22 not alleged any intent or demonstrated any evidence
23 of an actual intent to engage in the conduct, which,
24 again, is not just visiting state parks but actually
25 carrying a pistol in those state parks, there's

361

1  really no reason to even get to the second prong of
2  what he's required to demonstrate for standing which
3  would been an actual or imminent, not a conjectural
4  or hypothetical injury leading to a threat of
5  prosecution.
6          THE COURT:  Before you get to threat of
7  prosecution, I want to understand how you are
8  regarding the Second Circuit's knife rights when the
9  plaintiffs there had done something in the past,
10 carried a knife, wished to carry again, why isn't
11 this like Mr. Nastri who has carried in the past in
12 the parks and wishes to do it again?  Why is that not
13 enough to show he has an intent to engage in what
14 would currently be prohibited conduct?
15         MR. SULLIVAN:  Well, Your Honor, this
16 question, at least in terms of Second Circuit
17 precedent, had been addressed in two other district
18 court decisions in New York -- at least two other
19 district court decisions in New York, *Antonyuk v.*
20 *Bruen*, which is *Antonyuk I*, and *Antonyuk v. Hochul*,
21 which is *Antonyuk II*, where the Court, particularly
22 in the first *Antonyuk* case, was branded with the very
23 question of an individual who wished or desired to
24 engage in this conduct but wouldn't do so because he
25 similarly wished to remain himself a law-abiding

362

1  citizen, that was not enough to establish the injury
2  that was necessary for standing to bring a Second
3  Amendment challenge under *Bruen*.
4          That stands, I would say, in kind of good
5  comparison with what that Court in that later
6  decision in *Antonyuk II* found was necessary where a
7  group of plaintiffs, again, essentially tried to
8  bring those same claims as to a number of places that
9  were subject to the New York state statute and that
10 prohibited the carrying of arms in those places and
11 the Court in that decision walked through each
12 plaintiff as their stated interests applied to each
13 place and found that for the majority of them, the
14 mere intent to carry in those places or the wish or
15 desire to carry in those places absent some
16 demonstrable specific and concrete intent to do so
17 was not enough to establish standing.
18         THE COURT:  That's my question.  Why hasn't
19 the plaintiff demonstrated from his past carrying in
20 the parks and forests sufficiently alleged that
21 intent?  I wonder if you could help me understand
22 where *Holder v. Humanitarian Project* fits into this.
23         MR. SULLIVAN:  With apologies, I'm not sure I
24 could specifically address *Holder* on this point,
25 which, again, I mean, this is why I tend to be

363

```
1   looking to the more recent decisions in the Antonyuk
2   cases.  And the way -- in the Antonyuk II case where
3   the Court did find that certain defendants -- or
4   certain plaintiffs, rather, had sufficiently alleged
5   intent, it was based on the fact that they -- there
6   was a likelihood that they would actually carry their
7   pistols in those parks and particularly in Catskills
8   -- I think in Catskills State Park in New York there
9   where a volunteer firefighter had credibly stated
10  that he would be carrying his pistol in that park
11  despite the law was in effect and he understood that
12  conduct to be illegal, and also for an outdoorsman
13  who had concrete plans to visit a park within the
14  next several months of his declaration where he would
15  be carrying his pistol while he did so.
16          The other plaintiffs who did not have such
17  concrete plans or anything more than a generalized
18  interest were not found to have sufficiently alleged
19  that intent under -- at least according to
20  Antonyuk II.
21          So in this sense, the plaintiff is like
22  Mr. Antonyuk in Antonyuk I and simply hasn't even
23  reached the point where we can make any assessment of
24  what was credible threat of prosecution would be.  If
25  he's not engaging in the conduct, it is by definition
```

364

```
1   a remote possibility, I would say more than remote
2   possibility, that he could ever actually be concerned
3   about a threat of prosecution here particularly
4   where, as was demonstrated in today's testimony that
5   the -- EnCon's ability to police and enforce the
6   regulations is limited by circumstance in large part
7   and they don't have a constant presence in these
8   places and can only respond to calls as they come in.
9          So I think it becomes very attenuated and
10  speculative to say that the mere carry in a park
11  particularly if it were concealed is likely to invite
12  any sort -- any credible threat of prosecution under
13  this particular regulation.
14          THE COURT:  So why should it be insufficient
15  if it's an open carry in the park, another citizen in
16  the park sees it, calls it in, isn't it -- wasn't it
17  DEEP's testimony that they would send out one of
18  their enforcement officers?
19          MR. SULLIVAN:  Yes.  That was their
20  testimony, Your Honor, but I think it's still in
21  terms -- and I would -- I won't push back too hard on
22  it, but I think ultimately it's still speculative as
23  to whether the interaction is going to lead to
24  arrest.  I suppose it assumes that the report leads
25  to an actual interaction with the person who's being
```

365

```
1   reported and there's not clear evidence that that's
2   likely to happen here.
3          Your Honor, I'd also briefly like to address,
4   I think what plaintiff was getting at in
5   referencing what apparently is a First Amendment case
6   and perhaps the exercise of the chilling doctrine as
7   grounds for claiming standing to bring a Second
8   Amendment challenge.  There's no Court that's applied
9   the chilling doctrine to a Second Amendment case and
10  that was again -- the notion that that would be
11  enough here, I think, runs again counter to frankly
12  the actual regulation which gives very clear notice
13  of where it is in effect which is the boundary lines
14  surrounding Connecticut state parks and forests.
15          Additionally, it's -- in light of -- I think
16  there's no record here that would support, I think,
17  the expansion of the chilling doctrine into the
18  Second Amendment in the way that the plaintiff
19  apparently is advocating for and certainly not in a
20  way that should lead this Court to disregard the
21  existing standing doctrine with respect to Lujan.  I
22  would note there are existing district court
23  decisions particularly in Oliver v. University of
24  Connecticut out of the District of Connecticut where
25  that Court noted and cited to circuit courts from
```

366

```
1   several other jurisdictions that chilling is really a
2   First Amendment doctrine and is not generally applied
3   outside that and I would argue that it should not be
4   here particularly where -- it's very clear where the
5   government regulation applies and what conduct the
6   government regulation is intended to prevent or
7   enforce against and that is simply carrying within
8   the lines of Connecticut state parks and forests.  So
9   there are none of the vagueness or overbreadth
10  concerns that may -- would normally be attendant in a
11  classic First Amendment scenario.
12          I would just add that the plaintiff's
13  argument, again, that -- I think it's been clear that
14  the Supreme Court in Carney v. Adams recognizes that
15  disagreeing with a statute, even one he believes to
16  be unconstitutional, is not enough to challenge that
17  statute in court.  The plaintiff testified that he
18  believes that as an officer of the court, he has some
19  constitutional obligation to see that the laws, I
20  suppose, are interpreted in accordance with his --
21  what I take to be his understanding of what the
22  Constitution says.
23          Again, that would -- if followed, that would
24  run strongly against the directives that the Supreme
25  Court has given and limits that the Supreme Court has
```

App.194

367

```
1   set on the Court's jurisdiction, you know, where it's
2   been observed that courts are not roving commissions
3   assigned to pass judgment on the validity of the
4   nation's laws and that's a concept that was -- has
5   been adopted in the '70s that has been continued all
6   the way on through up to, you know, recent precedent
7   including, frankly, most recently in a Justice Thomas concurrence in United
8   recently in a Justice Thomas concurrence in United
9   States v. Sineneng-Smith where he, again, was also
10  casting doubt on the application of the First
11  Amendment chilling doctrines in other constitutional
12  conducts as an excuse to expand the Court's
13  jurisdiction and in his opinion, he came down firmly
14  against it.
15       So I would be skeptical and I would frankly
16  reject any claim that Second Amendment doctrine
17  particularly under Bruen, whatever affect Bruen may
18  have had on constitutional law is -- was one that
19  would permit the plaintiff to bring a claim in this
20  manner.
21       And finally, I would just direct the Court
22  and perhaps maybe to the plaintiff's argument, again,
23  to his concept that there's a perception of
24  unconstitutionality is enough to challenge a law.
25  That was also addressed in the Southern District of
```

368

```
1   New York in the recent Tavares decision which was
2   cited in our briefs.
3        So with that, Your Honor, for those reasons,
4   plaintiff simply has not alleged the intent to engage
5   in the conduct sufficient to claim an injury or any
6   credible threat of prosecution here and his claim
7   should be dismissed.
8        THE COURT:  Mr. Atkinson, do you wish to
9   respond?
10       MR. ATKINSON:  Yes, please, Your Honor.
11       Mr. Nastri would be thrilled if the rule was
12  carry until you're caught.  I think the testimony
13  shows otherwise --
14       THE COURT:  I'm sorry.  Why would he be
15  thrilled by that?
16       MR. ATKINSON:  Because it would essentially
17  be I can go out and carry and unless somebody bothers
18  me and there's nobody out there to bother me, I can
19  carry it.  That would give him more freedom than he
20  currently has.
21       THE COURT:  It assumes the regulation is not
22  in effect?
23       MR. ATKINSON:  Correct.  But where we stand
24  right now is Colonel Lewis testified, obviously, to
25  calls coming in, an increased risk of confusion, and
```

369

```
1   those calls stemming from that confusion in coming in
2   because someone saw a firearm in a place they didn't
3   expect it and he virtually went down a list of every
4   place he wouldn't expect to see a firearm including
5   state parks.  And he testified that they send
6   officers to respond and he testified they would issue
7   citations and enforce the regulation at issue here.
8        With respect to Mr. Nastri's actions, he just
9   didn't learn of the law and stop.  His complaint
10  indicates, and that is sworn testimony, again, I
11  would bring to Your Honor's attention, he went to
12  Defendant Dykes and he asked -- sent her an e-mail
13  and he said is my understanding of the law right and
14  why did he do that, because he still wanted to keep
15  engaging in the same conduct that he had been
16  engaging up until -- up to and to that point and the
17  response he got back led him to conclude that it was
18  no longer permitted.
19       He may -- he didn't -- he just didn't stop,
20  Your Honor.  He made efforts to continue what he was
21  doing, to continue to engage in the course of conduct
22  that he was pursuing.  Again, I will reiterate, he
23  has testified that this is his desire to do so.  He
24  stated that in his complaint.  He stated that when
25  the regulation no longer poses the risk of a
```

370

```
1   consequence upon him, he's going to go back to doing
2   what he was doing before.  That's more than
3   sufficient to confer him standing and we would ask
4   you to find that he has standing.
5        THE COURT:  With respect to the requirement
6   that he show that there is a risk of enforcement, et
7   cetera, he talks about the regulation never having
8   been enforced against him, although he has carried
9   firearms in the parks before, I wasn't quite clear
10  whether his deposition said knowing he was not
11  permitted to but saying he is not aware of it ever
12  having been enforced against anyone.  So where is the
13  credible threat of prosecution or enforcement
14  required to show standing?
15       MR. ATKINSON:  I think we get that from
16  Colonel Lewis' testimony which I recollect being that
17  if he went out and he responded to a report of an
18  individual carrying similar to Mr. Nastri, that they
19  would enforce the law on that.  Given the unique
20  staffing shortages, for a lack of a better term, that
21  Colonel Lewis described, the lack of reporting data
22  that he has as to local law enforcement, state
23  police, et cetera, we simply don't know the universe
24  of how other law enforcement agencies have enforced
25  this law, but what is clear from Colonel Lewis's
```

371

```
 1   testimony is that the law will be enforced and we
 2   believe that is sufficient.
 3         THE COURT:  Why is that different from any
 4   other entity or person charged with enforcing the
 5   law?  Would you expect any different testimony other
 6   than we will enforce the law?
 7         MR. ATKINSON:  I go back to a similar thing
 8   that I asked Professor Cornell in his testimony about
 9   not having knowledge of every individual's knowledge
10   in the universe, all the facts in the universe, and
11   going -- and would respond to Your Honor that I
12   simply don't know which police officer has enforced
13   the law at this juncture, but we do know it's been
14   enforced.  From Colonel Lewis' testimony, we do know
15   that it will be enforced going forward, and that if
16   Mr. Nastri violates the law and he's caught doing so,
17   it's going to be enforced against him.
18         I don't think --
19         THE COURT:  But doesn't that risk have to be
20   more particularized to Mr. Nastri?
21         MR. ATKINSON:  I think it's sufficiently
22   particularized right now if he violates the law and
23   he's caught doing so, the law is going to be enforced
24   against him.
25         THE COURT:  As it would be against anyone
```

372

```
 1   acting similarly, right?
 2         MR. ATKINSON:  Correct.  And we're also
 3   looking at the standing doctrine saying it needs to
 4   be a credible threat, not that it has to be enforced
 5   against him.  I think Colonel Lewis' testimony
 6   clearly establishes that the threat to Mr. Nastri if
 7   he violated this law, was caught doing it, it's
 8   credible, it's going to happen, and he is going to
 9   face consequences for it.
10         THE COURT:  We have no evidence of any call
11   and we have no evidence of anybody responding to that
12   call.  Why is he any different from anybody else who
13   just is in the park either not carrying or carrying
14   but the regulation will be applied to that other
15   person similarly to Mr. Nastri?
16         MR. ATKINSON:  I think that goes back to what
17   his track record of prior conduct was, he had been
18   carrying for the purpose of self-defense in state
19   parks and his expressed intent desire to do so if he
20   doesn't face consequences for it, his efforts to find
21   out if he could, bottom line, he was doing this, that
22   he -- that's such evidence in our view that going
23   forward if he didn't face consequences, he would do
24   it.
25         This gets back to what I said when I first
```

373

```
 1   stood up, carry until you're caught.  I don't think
 2   the state can tease it' way out of answering a Second
 3   Amendment challenge in this context simply because it
 4   claims it never caught anybody.  The threat is there.
 5   The threat is particularized to Mr. Nastri because of
 6   his past conduct and --
 7         THE COURT:  And you say because of his past
 8   conduct, how do you get to the imminent threat from
 9   his past conduct that they -- that DEEP doesn't know
10   about?
11         MR. ATKINSON:  Well, DEEP does know about it
12   as of today, but leaving that aside, it's from my
13   reading of the case law, he's -- he's shown that a
14   credible threat of that prosecution if he goes into a
15   state park carrying a handgun and somebody spots him
16   and an officer responds, he's going to face
17   consequences by Colonel Lewis' testimony.
18         Our view is that we have to accept that
19   testimony at face value.  There's nobody out there
20   patrolling consistently and it would frustrate the
21   purposes of our judicial system if the state could
22   simply wiggle out of meeting a Second Amendment
23   challenge in its face because there's just not enough
24   officers out there actively patrolling it, there's
25   nobody in there checking your ticket on the door as
```

374

```
 1   you come in and saying do you have a firearm.  The
 2   state shouldn't be allowed to slip out of that.  We
 3   don't think current standing doctrine allows them to.
 4         THE COURT:  So you were relying on Steffel
 5   which was a man who was handbilling with antiwar
 6   stuff.  Do I have the right case?
 7         MR. ATKINSON:  Yes, Your Honor.
 8         THE COURT:  And he had twice been warned not
 9   to do that.  Isn't that rather a distinguishing
10   feature than in this case?
11         MR. ATKINSON:  We think Mr. Nastri got
12   similar warnings, the first being he went and read
13   the statutes which are the -- the regulations which
14   in of themselves serve as a warning, don't do that.
15   Then he contacted Defendant Dykes and he asked for
16   clarification, as his testimony indicates, I
17   wanted -- basically, he said I wanted to go and see
18   if there was another provision of the Connecticut law
19   that allowed me to do what I want to do and the
20   answer he got back was essentially confirming the
21   warning the law itself gave him.  We think those are
22   analogous enough to the warnings in Steffel, thou
23   shalt not do this, and he complied.
24         THE COURT:  So if you're a taxpayer and you
25   disagree that a particular provision of the code
```

375

```
1   applies to you or should be enforced against you, is
2   that enough to show imminent injury through threat of
3   enforcement?
4           MR. ATKINSON:  Your Honor, I am doing my best
5   to follow your question here.
6           THE COURT:  That might be difficult.  So I'm
7   really back to this question of how Mr. Nastri is
8   different from John Q. Public, Jane Q. Public, who
9   wants to carry their handguns in the parks and knows
10  they can't do it, defers doing it because it is
11  illegal.  What's different about Mr. Nastri's
12  situation that would allow him to bring the challenge
13  as opposed to anyone who has a desire to carry
14  firearms in the park and can't?
15          MR. ATKINSON:  Well, I think that starts with
16  past conduct, the efforts he made, again, to continue
17  that conduct and his testimony that he intends to do
18  so when the law is lifted but doesn't because of the
19  consequences.  With respect to John Q. Public, I'm
20  not sure we would have that past conduct.  The other
21  issue I think in that instance that may be a -- John
22  Q. Public may be under an obligation under the
23  standing precedence to allege that they intend to
24  violate the regulation despite it being there, but I
25  think the case law provides for people who are in
```

376

```
1   Mr. Nastri's circumstances and that's sufficient to
2   cover him.
3           THE COURT:  Anything further on standing from
4   the defendant?
5           MR. SULLIVAN:  Your Honor, just briefly, and
6   I think that your question touched on it, the fact
7   that there may have been some past conduct that
8   violated the statute does not bear on the question of
9   imminence.  There is no imminence of enforcement if
10  Mr. Nastri is not engaging in the conduct.
11          I'd add that I think that the
12  characterization that the e-mail is somehow
13  sufficient to establish standing here also falls
14  short.  Plaintiff's -- the e-mail that plaintiff
15  sent, which I believe is in evidence at 1A, to DEEP
16  is just one more example of a general inquiry
17  regarding whether a law -- whether a law is enforced
18  in a manner that he can't carry his firearm there.
19          The inquiry -- his e-mail was not identifying
20  any particular state park, it was not identifying any
21  future intent of his to visit any state parks.  It
22  was merely an open question of whether he could carry
23  there and whether there was any statute that allowed
24  him to do so, followed up by a request that DEEP
25  amend the regulation to come in line with the
```

377

```
1   plaintiff's understanding of what the Constitution
2   required under Bruen and that is simply not
3   sufficient to establish any imminence or certainly
4   not to seek the broad relief that plaintiff is
5   seeking here in a facia challenge where he is arguing
6   -- the effect would be striking down this law as to
7   all parks.
8           THE COURT:  So you don't think inferentially
9   when he says that he wants to bring Bruen to the
10  commissioner's attention because it demonstrates the
11  unconstitutionality of this regulation evinces some
12  kind of intent on his part?
13          MR. SULLIVAN:  I don't see it as different
14  from requesting legislature for -- that the law ought
15  to be changed for a reason that, again, he may
16  believe to be the case or not.  It's -- and in any
17  case, it's, I think, putting this Court in the
18  position where it would be the ultimate arbiter of
19  whether simply being able to kind of decide a
20  constitutional question as plaintiff seems to have
21  taken it upon himself to do which is simply not
22  appropriate in these cases and so there should be no
23  standing here.
24          THE COURT:  You're not claiming that his
25  correspondence with the defendant and her staff is --
```

378

```
1   includes an expression of an intent to engage in that
2   conduct; is that right?
3           MR. SULLIVAN:  Your Honor, if I understand
4   your question --
5           THE COURT:  I'm trying to understand how far
6   you are going with what is inferable from Mr.
7   Nastri's communications to DEEP about this regulation
8   and its constitutionality.
9           MR. SULLIVAN:  I don't think it can go any
10  further than the fact that he would like to see the
11  law change and that's not the type of conduct that
12  would be sufficient to establish standing.
13          Your Honor, I'd just add that's especially
14  true at the preliminary injunction level where we
15  can't simply rely on, I think, the more favorable
16  inferences that one might be entitled to on a
17  12(b)(1) motion to dismiss when it's just on the
18  pleadings.
19          THE COURT:  All right.  Let's move to the
20  merits and that implicating the substantial
21  likelihood of success on the merits.  Mr. Atkinson.
22          MR. ATKINSON:  Thank you, Your Honor.
23          I don't think there's any dispute that we all
24  understand that the Bruen's history test is where we
25  need to start here and our view is that test is
```

379

1　relatively straightforward in this case.  I'd like to
2　start with what Professor Cornell testified that
3　particularly the efforts to enact broad public carry
4　restrictions that follows the Statute of Northampton
5　model were made both pre-1791 and post-1791, as I
6　recall his testimony, but that *Bruen* itself found
7　those efforts to lack a more well-established
8　historical foundation.
9　　　　　　And with that context in mind, we believe
10　that the Connecticut Supreme Court's decision in
11　*State v. Ball*, which is 260 Conn 275, it's a 2002
12　case, Your Honor, takes on a unique importance in
13　this case because that case, the Connecticut Supreme
14　Court found, and I quote as narrowly as I can from
15　tying in memorial, The State's uninhabited and
16　undeveloped land traditionally has been used for
17　hiking, picnicking, camping, hunting, trapping and
18　fishing, end quote, and even though the management of
19　those lands has shifted to the State of Connecticut,
20　we don't think that changes anything about this
21　equation.
22　　　　　　What the historical record we believe is in
23　front of you shows that at least in Connecticut under
24　the Connecticut history, there were simply no
25　restrictions on the carrying of firearms on

380

1　inhabited, undeveloped lands at the time referred to
2　as the woods from the Founding Era until our
3　calculation being 1924 based on the Entry 68 in the
4　excerpted statutes that the state supplied at ECF
5　23-2.
6　　　　　　We also believe that particularly telling in
7　Professor Cornell's testimony was that there were no
8　modern-style parks in the Founding Era, but what we
9　derived from his testimony is that there were --
10　there was a tradition at least in the New England
11　area of reserving common spaces for specific --
12　various specific purposes and that would have
13　occurred in the Colonial and Founding Era, and the
14　only law that Professor Cornell, as I recollect,
15　could testify to restricting the carry of firearms in
16　those spaces was they -- the law pertaining to
17　bringing a loaded musket to militia muster and I do
18　believe I asked him if he could identify any laws
19　from the Colonial or Founding Era that prohibited the
20　carrying of firearms in those areas and he couldn't
21　and I'm not aware of any such general restrictions in
22　the record that's been presented to you.
23　　　　　　Our position is that the reservation of those
24　public spaces in the Colonial and Founding Era is
25　directly analogous to the public spaces that were

381

1　reserved today particularly in light of the *Ball*
2　decision that we've already referenced.  And we would
3　submit that the absence of such regulations for those
4　spaces in the Founding and the Colonial Eras is
5　dispositive of this case under *Bruen* primarily
6　because of Bruen's treatment of history, the rules of
7　weight as Professor Cornell described them.  I
8　recollect a passage from *Bruen* saying the further
9　away we get from the time of the adoption of the
10　Second Amendment and the less weight needs -- can be
11　given to history, it's like a decreasing sliding
12　scale and one of the things that strikes me from the
13　*Bruen* decision is it's looking for an enduring and
14　representative tradition.
15　　　　　　THE COURT:  But doesn't that purpose have
16　difficulty of application where the item to be
17　regulated doesn't exist at that time?  I mean, that's
18　what I thought Professor Cornell was talking about,
19　that ever since Connecticut had state parks, that the
20　modern park movement which started in 1850, that
21　there has been regulation or that the parks have been
22　used as forums to -- for the exercise of other kinds
23　of constitutional rights, assembly, free speech,
24　exercise of religion, et cetera.
25　　　　　　So is there a conflict between someone's

382

1　Second Amendment right being exercised in a park
2　that's been used for that purpose?  How should the
3　Court be looking at that, resolving that conflict?
4　　　　　　MR. ATKINSON:  The conflict between
5　somebody's Second Amendment right and their First
6　Amendment right?
7　　　　　　THE COURT:  That someone seeking to exercise
8　his or her Second Amendment right in a place which
9　has been long recognized as a place where other
10　constitutional rights are exercised by people.
11　　　　　　MR. ATKINSON:  If I understand your question
12　properly, Your Honor, I think the *Bruen* analysis
13　looks -- doesn't factor that into play as much.  I
14　think what it's doing is it's kind of streamlining
15　the analysis into is there an enduring tradition of
16　prohibitions on firearms in these places and then the
17　key thing that we believe *Bruen* focuses on is where
18　is the starting point for that, where does the
19　starting point have to be for that in order for it to
20　be relevant, and we think that's particularly
21　appropriate from *Bruen* in light of the Supreme
22　Court's lack -- for lack of a better way of putting
23　it, how slow they were as to the incorporation
24　doctrine with the Second Amendment not being
25　incorporated until 2010, in my understanding.

383

1    So we believe the starting point is relevant.
2  If something started in the early 1900s, there's no
3  Second Amendment scrutiny.  There's no tradition of
4  it stretching back to the Founding and the Colonial
5  Era.  We believe that's a situation where *Bruen's*
6  instruction is to look to analogs, and so that is
7  what I mean by analogizing to spaces reserved like
8  the town greens that Professor Cornell described.
9  The town commons that Professor Cornell described.
10   These were spaces set apart for some of the
11  things that Your Honor mentioned in your question of
12  right to assembly, right to free speech, et cetera.
13  These were all places where it was encompassed and
14  there were -- in the historical record before you at
15  the time of the Founding, in most of the antebellum
16  period, neither Professor Cornell nor the record
17  that's in front of you supplies any examples of a ban
18  on -- a wholesale ban on thou shalt not carry a
19  firearm in these spaces.  The one example -- the one
20  restriction on firearms carrying that I believe was
21  supplied to you again was bringing a musket loaded to
22  militia practice.
23   So in terms of drawing that analog with that
24  starting point and *Bruen's* rules of construction and
25  looking for an enduring constitutional tradition that

384

1  stretches back to the Founding Era, et cetera, there
2  simply is none.  And so we believe in all relevant
3  characteristics that town commons, town greens are
4  relevantly similar to modern-style state parks in
5  that regard.
6     THE COURT:  So I have a further question, if
7  you don't mind.
8     MR. ATKINSON:  Sure.
9     THE COURT:  I take it you have not a made
10  challenge to the state's ability to prohibit firearms
11  in their attorney general's office.  It was the
12  testimony that he didn't bring it there because he
13  knew it was prohibited.
14     MR. ATKINSON:  We do not have a challenge to
15  that, Your Honor.  We view that as a sensitive place.
16  It's a government --
17     THE COURT:  All right.  So then you have
18  *Bruen* recognizing that there may not be a tradition
19  of a particular type of regulation since the Founding
20  since it's a response to a more modern problem.
21  Aren't public parks a response to urbanization,
22  modern congestion, all the things that Professor
23  Cornell was talking about?
24     MR. ATKINSON:  Well, we read that passage of
25  *Bruen* slightly differently, Your Honor.  When we

385

1  understand what *Bruen* was referring to as a response
2  to a modern problem to be a regulation that restricts
3  the Second Amendment right that's in response to
4  something that popped up in the Modern Era.  We do
5  not believe that passage of *Bruen* encompasses we're
6  going to address some other social problem and that
7  means a new set of rules et, cetera.  We believe
8  particularly in this context that there has to be an
9  analog to something that was in place and well
10  established and representative back and was an
11  enduring tradition from the Founding Era.  That's
12  what we believe from *Bruen*, if that answers your
13  question.
14     THE COURT:  So we have a long history of what
15  the open space that has become the parks is used for.
16  We then have what -- I'm sorry.  This is just getting
17  funky here.
18     I take it you don't disagree that defendant
19  has shown there's a tradition of prohibiting firearms
20  in parks since the modern parks movement began.  Is
21  that a fair statement?
22     MR. ATKINSON:  I'd qualify that, Your Honor,
23  in the sense of I believe Professor Cornell said that
24  the parks movement started with the first park in
25  1858.  Then there were parks that were developed

386

1  after the Civil War but they were still popping up in
2  isolated instances.
3     So for purposes of *Bruen*, we would not agree
4  that they have established an enduring tradition from
5  the start.  These were experiments at the time.  We
6  view they should be treated as experiments.  And they
7  were municipal experiments.  They were not state
8  experiments.  These were isolated experiments on a
9  small scale.  They did not reach the level of
10  being -- of covering an entire state.  They weren't
11  necessarily widespread at the time.  And then going
12  back to my argument as to *Bruen* requiring them to be
13  well established, by my count there were only seven
14  municipal parks by the year 1878 that had the
15  prohibition.
16     We think the fact that they were municipal,
17  they were small scale experiments doesn't meet the
18  definition of representative and well established by
19  *Bruen*.  I take your point, though, that it has been
20  going on for a long time.  We just don't think that
21  at the time the history was most relevant to
22  understanding the meaning of the Second Amendment
23  that it was well established enough for anyone to
24  conclude that they established what *Bruen* is
25  referring to is that well-established and

387

```
1   representative historical analog or tradition.
2        THE COURT:  How can you establish an enduring
3   tradition of regulating modern parks if they only
4   just are recent and popped up?
5        MR. ATKINSON:  I think Bruen instructs us to
6   go to analogs which is why I opened my argument with
7   the analog to the reserved spaces, such as the Boston
8   Common that Professor Cornell testified about, the
9   town greens that Professor Cornell testified about,
10  and our position is the absence of regulation here
11  shows that there is no such well-established
12  historical analog.
13       And then circling back to my point about
14  incorporation and Professor Cornell's testimony that
15  he was not aware of any state constitutional
16  challenges to these laws in any courts and personally
17  as an officer of the court representing that I've
18  been unable the find any as well, we think the
19  historical records bare of any scrutiny under a
20  state's arms bearing provision or a state -- or the
21  Second Amendment and that would be probative that
22  this is not a well-established tradition.
23       THE COURT:  So can you have a sensitive place
24  that's broader than what are the examples that Bruen
25  or Heller set out?
```

388

```
1        MR. ATKINSON:  So we did contemplate this,
2   Your Honor.  I believe the examples that Bruen set
3   out were schools, voting places, government buildings
4   and courthouses.
5        THE COURT:  Legislative assemblies, yes?
6        MR. ATKINSON:  Correct.  And I apologize for
7   missing that one, but we see a common theme running
8   in all of these.  These are places where core
9   government functions are performed, and I know I have
10  a little bit of explaining to do as to the schools,
11  but understanding the history of schools in America
12  and that being a community responsibility as far as
13  back as the ye Old Deluder Satan law in
14  Massachusetts, we believe that fits immediately in
15  there.  So the definition we're proposing for
16  sensitive places is where a core functions of
17  government take place and that includes
18  self-government which would cover voting places.
19       With respect to -- one of the examples that I
20  thought about in order to expecting this hypothetical
21  is the post office and we understand that there's the
22  authority to establish a postal system in Article I
23  of the United States Constitution.  We believe that
24  the placement of a responsibility in the United
25  States Constitution is sufficient enough to say
```

389

```
1   that's a core government function.
2        So we don't see any inconsistency with
3   Supreme Court precedent or the nature of the
4   sensitive places doctrine if the Court chooses to
5   adopt the core government functions test for the
6   sensitive places and we would urge the Court to adopt
7   that.
8        Under that test, I go specifically to Colonel
9   Lewis' testimony today where he testified largely
10  that the same concerns about firearms that would be
11  present in the state park are virtually present
12  everywhere.  He also testified that there are laws in
13  place, and we walked through some of them, that
14  protect the state's interest without barring them
15  from carrying firearms completely.  And I would also
16  note his testimony that there's no gateway, there's
17  nothing to monitor somebody of are you carrying a
18  firearm there, et cetera.  We've had argument today
19  about the actual extent to which DEEP goes to enforce
20  these laws.  He's testified about the -- the limited
21  resources that he has, et cetera.
22       We believe that state parks and forests do
23  not meet the definition of sensitive places and we go
24  back to our argument about State v. Ball, that these
25  are undeveloped lands.  These are the woods.  This is
```

390

```
1   the wild.  Stuff happens in the wild.
2        THE COURT:  But they're not the wild once
3   they have been recognized and used as parks and
4   places where people are going to be tranquil and in
5   harmony with nature, et cetera, or to publicly
6   assemble for the purpose of exchanging of political
7   views or the other purposes.  So that's what I'm
8   having a hard time understanding is why the
9   historical analog of the wild, it seems that you are
10  using it as a regulatory straightjacket.
11       MR. ATKINSON:  We wouldn't just limit
12  ourselves to the historical analog of the wild and
13  the woods as they were referred to back then.  We
14  would also make the comparison to -- back again to
15  the sensitive places we've already discussed that are
16  well established and we would also compare state
17  parks and forests to the rest of the world,
18  restaurants where people go to eat, to be
19  entertained, movie theaters.
20       THE COURT:  But doesn't that just blur the
21  whole concept of sensitive spaces, sensitive places,
22  if you're going to say, oh, it's like a restaurant or
23  it's like a movie house or something like that?
24  Don't we have to look at how -- what it is being used
25  for?  I mean, even State V. Ball talked about state
```

391

```
1   parks and forests being used for Native American
2   celebrations, for historical reenactments, and some
3   other things, not just that the purpose of the parks
4   was to be wild.
5         MR. ATKINSON:  Well, Your Honor, I would -- I
6   don't think it blurs the distinctions.  I think what
7   it shows is there is no distinction even though the
8   purposes are different.  People are gathering there;
9   they're using them for purposes of recreation whether
10  that's getting out in nature or not.  I think Colonel
11  Lewis' testimony clearly demonstrates that while the
12  parks are open for business, there's no restriction
13  on who can come in there.
14        You just walk in and there's a few checks
15  here and there as to alcohol, et cetera.  There's a
16  check as to fishing gear when you're leaving, et
17  cetera, game limits, et cetera.  But there is really
18  no restrictions on come in and use.  That's like
19  walking down the street, for lack of a better way of
20  putting it, and then that also -- the purpose
21  question leads me to a brief detour, Your Honor, as
22  to what I believe the state advance is a state
23  property theory.
24        As Your Honor is familiar with in First
25  Amendment case law, there's a doctrine of forums.
```

392

```
1   There are quintessential public forums.  There are
2   limited purpose public forums which is forums that
3   would otherwise be private but are opened up to
4   specific kinds of speech.  We don't -- we think that
5   state parks are closer to -- this is a public forum
6   because there's an absence of restrictions or very
7   few restrictions on what you can do there.  It's open
8   for business.
9         And we would point to purpose-driven
10  discrimination on the carrying of firearms is much
11  like a content regulation on speech.  It gets
12  exacting scrutiny under the First Amendment, it's
13  presumptively unconstitutional, and the record that
14  we have here is that the state permits quite a
15  substantial number of people, according to the
16  stipulation that we have, gives them permission to
17  carry firearms by way of firearms hunting licenses,
18  we have Colonel Lewis' testimony that you can use
19  22-caliber handguns to hunt coyotes and his further
20  testimony that you can use them year-round in certain
21  state parks and forests.
22        Handguns, the most popular self-defense
23  weapon in America according to *Heller*, are already in
24  state parks and forests, and in some of them, they're
25  permitted to be there year-round.  Just because
```

393

```
1   Mr. Nastri wants to carry in a firearm for purposes
2   of self-defense as opposed to hunting, that's what we
3   would characterize as purpose-driven discrimination.
4   It's not appropriate especially when you have the
5   allowance of firearms in state parks and forests
6   already which circling back to the sensitive places
7   laws, the public is typically not allowed into
8   sensitive places with firearms.  That's been the
9   tradition at polling places, schools, et cetera, and
10  it's been the tradition for quite a substantial
11  amount of time.
12        So we think the very presence of firearms for
13  any purpose defeats a conclusion that it is -- that
14  it is a sensitive place.
15        THE COURT:  Isn't that a little bit circular?
16        MR. ATKINSON:  I think in terms of making
17  analogs, we're certainly looking for relevant
18  considerations.  We don't -- I don't necessarily view
19  that as circular, Your Honor.  I think we have
20  relevant characteristics of well-established and
21  recognized sensitive places that modern-style parks
22  simply don't have in this case.  They're permitting
23  firearms in for hunting.
24        THE COURT:  You said you would touch on
25  education.
```

394

```
1         MR. ATKINSON:  Yes, Your Honor.  I believe I
2   spoke about the Old Deluder Satan law in
3   Massachusetts.  I do know in our briefs we reference
4   the constitutionalization of education here in
5   Connecticut as a core government function, et cetera.
6   Again, schools fit well within the confines of what
7   we've understood sensitive places to be in our
8   nation's history.  We believe with respect to
9   education, that's on a firm footing in sensitive
10  places doctrine.  We just don't think there are any
11  relevant analogs there to modern state parks and
12  forests.
13        And if I may address the affidavits of the
14  two school principals who want -- who were speaking
15  as to the effect on field trips in state parks and
16  forests, et cetera, first of all, we believe that the
17  interjection of that into this case would -- in a
18  broader context would be impermissible interest
19  balancing that's prohibited by *Bruen*.
20        Second, with respect to that, we see nothing
21  by law, logic or reason or common sense that the
22  state can simply coordinate with the schools if
23  you're coming in to do some education with students,
24  let's help -- we understand you're bringing the
25  classroom out into the woods, let's secure that as a
```

395

```
1   sensitive place for a day.  Colonel Lewis already --
2   either Colonel Lewis or Mr. Nastri already testified
3   as to Civil War reenactments being done.  We would
4   point the state to that process as to that concern.
5        If I may move on, Your Honor, and I'm
6   reaching -- and I'm reaching the end here.  Another
7   thing that I would like to point out to Your Honor is
8   in Mr. Nastri's verified amended complaint at
9   paragraphs 41 through 47, there's sworn testimony or
10  allegations there that have not been contradicted in
11  these proceedings at all that law enforcement would
12  face a significant response time to respond to
13  someone who's being made the victim of a crime out in
14  a state park or forest and our view is that those
15  response -- and couple that with Colonel Lewis'
16  testimony that the EnCon officer may be coming from a
17  different location to render assistance there, our
18  view is that those circumstances defeat the
19  characterization of those places as sensitive places
20  because there's simply very little regulation or
21  enforced regulation out there and it creates a
22  situation where you're a victim before law
23  enforcement ever gets there.
24       With respect to closing, Your Honor, I'd like
25  to discuss Mr. Nastri for a second.  He's a
```

396

```
1   law-abiding citizen.  He served his community and his
2   country for a long, long time.  He has an ample --
3   what I would characterize as an ample nature of
4   common sense.  Nothing in his testimony today or the
5   record shows that he would pose a risk of harm to
6   anyone by carrying a firearm.
7        All he simply wants in this case is to
8   peacefully carry a handgun for purposes of
9   self-defense.  If he has to conceal it, that's where
10  he will.  As he grows over -- older, his physical
11  strength, his physical abilities are going to
12  decrease and he's going to become more vulnerable.  I
13  think Mr. Nastri's going the way of every person in
14  life and we'd submit the right to self-defense is
15  older than America.  *Heller* recognizes that handguns
16  are the most popular tool to engage in self-defense.
17       The regulation at issue here denies
18  Mr. Nastri the tools to defend himself in state
19  parks.  We'd ask that you issue a preliminary
20  injunction enjoining its enforcement and restore to
21  Mr. Nastri the means to avoid becoming a victim of a
22  crime in a place where law enforcement can't prevent
23  it.  Thank you, Your Honor.
24       THE COURT:  Thank you.
25       MR. HOLZMAN:  Good afternoon, Your Honor.
```

397

```
1   Unless the Court has a preference, I was planning on
2   just starting at the top if that's okay.
3        THE COURT:  That's fine.
4        MR. HOLZMAN:  So, Your Honor, we're asking
5   the Court deny plaintiff's motion for a preliminary
6   injunction and preserve the status quo in this case.
7   We have worked pretty hard to give the Court a full
8   historical and factual record that it needs to decide
9   these issues.  This firearm restriction is more than
10  a century old and it's part of the essential
11  character of our parks and forests.
12       The plaintiff hasn't shown any of the
13  requirements necessary to get a preliminary
14  injunction.  He hasn't shown that he has a right to
15  carry in these locations.  The restriction is well
16  supported by the history and tradition of firearm
17  regulation in this country and he hasn't come
18  anywhere close to meeting his burden of showing the
19  equities weigh in his favor.
20       If I can address a couple preliminary issues,
21  Your Honor.  The burden that the plaintiff has to
22  carry on the likelihood of success prong, it is the
23  higher burden because this is something that would
24  upset rather than preserve the status quo.  So it is
25  a mandatory injunction.
```

398

```
1        Colonel Lewis has testified today as well as
2   in his declaration about certain affirmative actions
3   that would likely be taken, as has Tom Tyler as well.
4   So but in any event, Your Honor, it would be subject
5   to the higher standard for the independent reason
6   that it seeks to enjoin government action and that's
7   this Court's -- Your Honor's decision in *Lawrence &
8   Memorial Hospital* which is 986 F. Supp 2d 124 at page
9   131.
10       And the other preliminary point, Your Honor,
11  is that this claim is a facia challenge.  That's how
12  he's framed it in his complaint, in his motion, in
13  his reply brief.  He acknowledges that he's seeking
14  to enjoin this regulation as to all state parks and
15  forests, and moreover, this is a pre-enforcement
16  claim which means that it has to be a facia claim and
17  the Eleventh Circuit addressed that in the
18  *GeorgiaCarry I* decision which we cite which is 687
19  F.3d 1244 at 1260.  So in other words, he bears the
20  extraordinary burden of showing that in all of its
21  applications, this regulation is unconstitutional and
22  he hasn't met that burden.
23       Turning to prong one of *Bruen*, Your Honor,
24  first of all, plaintiff acknowledges on page 3 of his
25  reply brief that it his burden of showing that the
```

399

```
1   Second Amendment covers the proposed course of
2   conduct, but he doesn't really do anything at all to
3   meet his burden.  He basically just says that he
4   wants to carry in public for self-defense which Bruen
5   concludes is covered conduct.  That's completely
6   insufficient to meet his burden, Your Honor, because,
7   first of all, it misstates what the conduct at issue
8   even is.  The conduct isn't carrying in public for
9   self-defense because you can do that in Connecticut.
10  General Statute 29-28b permits you to engage in that
11  conduct.
12          This regulation, all it applies to is a
13  specific discrete locations that plaintiff himself
14  has testified that he goes only for recreational
15  purposes.  And I would point the Court to what Judge
16  Posner wrote in Moore v. Madigan which is that when a
17  state bans guns merely in particular places, a person
18  can preserve an undiminished right of self-defense by
19  not entering those places.
20          So in Bruen, it was a completely different
21  case because that case involved a jurisdiction-wide
22  ban and so the issue in front of the Supreme Court
23  was whether the Second Amendment covered a general
24  right to carry in public.
25          Here, the Court -- the question before this
```

400

```
1   Court is very different.  The question here is
2   whether it covers the specific act of bringing guns
3   into these locations, namely state parks and forests,
4   and that raises a number of different considerations
5   that Bruen had no occasion to address in that case,
6   namely the distinction between when the government is
7   acting as a proprietor rather than as a regulator and
8   also sensitive places.  And I don't -- we set out
9   these points in our brief, Your Honor.
10          THE COURT:  So are you arguing that the state
11  can ban firearms, carrying of firearms on any
12  property it owns or manages?
13          MR. HOLZMAN:  No.  We're not arguing that it
14  can ban firearms on any property.  I wouldn't be
15  making this argument in the context of a state-owned
16  road, for example, because that would be a
17  thoroughfare that would probably implicate Bruen's
18  conclusion that you have a right to carry in public
19  generally because if you can't carry on the road, you
20  wouldn't be able to bring it out of the house.
21          THE COURT:  So what's your limiting principle
22  on what kind of government property the state could
23  ban firearms on?
24          MR. HOLZMAN:  So the limiting principle is
25  when there's a historical tradition of a public use
```

401

```
1   that this type of land has been dedicated for that is
2   inconsistent with the carrying of firearms, and so
3   that principle has been applied in a number of
4   contexts, in particular the First Amendment context
5   where the Supreme Court has said that in that limited
6   type of circumstance, the state has the same property
7   rights as private owners do to regulate the conduct
8   on their property which -- even if the conduct might
9   otherwise be constitutionally protected, and that's
10  Greer v. Spock as well where the Court upheld a ban
11  on distributing political leaflets of public property
12  because it was owned by the United States Army and
13  traditionally it hadn't been dedicated for that type
14  of public use.
15          THE COURT:  So if legislative assemblies and
16  courthouses and polling places and so forth which
17  serve very specific functions are permitted without
18  challenge here to prohibit firearms, what is your
19  argument that parks that can be used for all sorts of
20  things from quiet hikes to political rallies?  How do
21  you -- what's the issue that defines a park as a
22  category of sensitive place given this variety of
23  things that happen in a park?
24          MR. HOLZMAN:  So just to be clear, the
25  proprietary argument, Your Honor, that's different
```

402

```
1   from sensitive places.  So those are two different
2   reasons why the conduct would not be protected.  But
3   the reason that parks are sensitive places, Your
4   Honor, is -- so what the courts have recognized after
5   Heller identified sensitive places as a place where
6   firearms could be prohibited was that it essentially
7   depends on, to use the words of United States v.
8   Class, which is a D.C. Circuit decision that we cite
9   in our brief, places are sensitive because of the
10  people found there or the activities that take place
11  there.
12          And we've found a number of cases, Your
13  Honor, that have held that public parks that serve
14  similar functions are sensitive places.  If you look
15  at Nordyke I, which is a Ninth Circuit decision, 563
16  F.3d at 460, it upheld a prohibition county-owned
17  parks and recreation areas and said that they were
18  sensitive places because they were gathering places
19  where high numbers of people might congregate, they
20  host high numbers of events, and they, therefore,
21  quote, Fit comfortably in the definition of sensitive
22  places.
23          THE COURT:  But aren't those cases largely
24  pre-Bruen?
25          MR. HOLZMAN:  So those sensitive places cases
```

403

1  are pre-*Bruen*, but *Bruen* doesn't do anything to limit
2  or abrogate the sensitive places analysis.  If
3  anything, *Bruen* expands it because was it does is,
4  first of all, it adds those two additional examples
5  of sensitive places.  I think it adds polling places
6  and legislative offices.  But then it has the
7  explicit language where it encourages quotes -- to
8  identify, quote, New and analogous sensitive places,
9  and that's at page 2133 in *Bruen*.
10  THE COURT:  So that leaves us out of *Bruen*,
11  right?
12  MR. HOLZMAN:  No.  I don't think so.  I think
13  it's perfectly acceptable for the Court to rely on
14  the pre-*Bruen* cases that analyze sensitive places and
15  those cases have concluded that these types of parks
16  are sensitive places because of the events held
17  there, the children that go there, schools, high
18  gatherings, crowds of people.
19  THE COURT:  What do you do about the Statute
20  of Northampton that you rely on that *Bruen* did not?
21  MR. HOLZMAN:  That's prong two, Your Honor.
22  So sensitive places is -- just to be clear, *Bruen*
23  wasn't clear about whether sensitive places are prong
24  one or prong two.  We think it's more properly
25  recognized as a prong one issue as the D.C. Circuit

404

1  concluded in Class.
2  But -- so we can talk about prong two, Your
3  Honor.  So the Statute of Northampton in 1328, so it
4  generally prohibits -- and I'm paraphrasing here, but
5  it prohibits people from going armed and it uses
6  fairs and persuades.  So the Supreme Court didn't find
7  it persuasive in *Bruen* because the law at issue in
8  *Bruen* was completely different.  The law at issue in
9  *Bruen* was a general jurisdiction-wide prohibition on
10  carrying in public absent a showing of an
11  individualized need.
12  So when you engage in the historical analysis
13  that *Bruen* requires which is the -- it requires you
14  to look at how the regular -- how burdensome the
15  regulation was, and number two, what was the
16  justification for it when you're looking at whether
17  it's similar.  Given how different the law at issue
18  in *Bruen* is, how *Bruen* treated the historical
19  evidence in that case really doesn't have any bearing
20  at all in this case because of how different the law
21  is in this case, and so the quote, unquote, how and
22  why analysis under *Bruen* is going to come out
23  completely different.
24  And so that's exactly why the D.C. -- the
25  district court in *Frey v. Nigrelli* when -- similar to

405

1  this case -- it did have restrictions that were
2  cabined to specific locations, that it was on public
3  transportation, it was in Times Square and parks as
4  well, but they stayed that part of the analysis
5  because of the pending *Antonyuk* decision.  But that
6  Court relied on the Statute of Northampton as well as
7  the Virginia and North Carolina laws from 1786 and
8  1792, the ones that basically adopt the Statute of
9  Northampton and kind of codify it into their law.
10  The Court said about those laws in that
11  context that it shows a historical tradition of
12  banning firearms in locations where large groups of
13  people are congregated for commercial, social and
14  cultural activities, and that's page 149 of the *Frey*
15  decision.
16  And so that shows that when you're looking at
17  a historical comparison involving very different
18  laws, one of which is cabined to a specific location,
19  how significant the historical evidence is, it's
20  completely different.  And Professor Cornell
21  testified in person just yesterday about the Statute
22  of Northampton and those two statutes and conclude
23  that they provided strong evidence that these park
24  regulations, even though they were very, very
25  different, that it's part of this overarching history

406

1  of the state regulating firearms in discrete
2  locations where large people gather for education and
3  social and cultural purposes.
4  And that's shown also if you go -- and I want
5  to get to the park stuff in a second, Your Honor, but
6  if you look beyond those Founding Era North Carolina,
7  Virginia laws and you start going into antebellum
8  which at this point we have the urbanization that
9  starts taking place, more and more people start
10  flocking to cities, Professor Young and Professor
11  Glazer testified about that dynamic in their
12  affidavits in this case, you get more and more states
13  banning firearms in all kinds of locations that are
14  similar to that.
15  So you've got Louisiana and ballrooms.
16  You've got 1869 Tennessee and fairs, race courses,
17  other public assemblies; 1870 Texas, places where any
18  public gathering -- has this very broad language of
19  any public gathering.  And then you keep going on --
20  and these are all in evidence, Your Honor.  These are
21  Exhibits 82 through 88.
22  And so if you just go based on that tradition
23  alone, that in and of itself would arguably justify
24  DEEP's park firearm restriction in this case because
25  similar to those, they are used for social and

407

```
1   education purpose.  I mean, we have in Mr. Tyler's
2   declaration, he talks about the large crowds, 17
3   million people visited in 2022, and it's only going
4   up.  You have a substantial portion are children and
5   families at paragraph 57 of his declaration.  Schools
6   use them all the time as places to go on field trips
7   and for educational purposes, he talks about that at
8   length at paragraph 58 where he lays out all the
9   bussing permits that had been granted last year, the
10  hundreds of them, and the different kinds of programs
11  that are specifically tailored towards children and
12  families.
13          THE COURT:  The cases that you were talking
14  about before, the pre-Bruen cases, aren't those cases
15  focused on the function of those places as opposed to
16  any historical analog for permitting that kind of
17  regulation?
18          MR. HOLZMAN:  The sensitive places cases,
19  Your Honor?  Yes, that's correct, but I think that's
20  how that analysis should go under Bruen.  I think all
21  that Bruen did was determine that there is a
22  historical tradition of regulating firearms in
23  sensitive places.  The only question is it a
24  sensitive places.  And so you look at the facts and
25  characteristics about those locations and that's what
```

408

```
1   allows you to determine whether it's sufficiently
2   similar to be considered a sensitive place and that's
3   how those cases very frequently had done it, Your
4   Honor, and there's nothing in Bruen that calls that
5   analysis into question.
6           And there's good reason for that also, Your
7   Honor, because if it was based entirely on a
8   historical analysis, the sensitive places and the
9   historical analog under prong two, they would
10  basically merge and be indistinguishable, but Bruen
11  recognizes them as distinct concepts and so that's
12  how they should be treated.
13          All right.  So I talked about some of the
14  older Statute of Northampton and the public gathering
15  laws going all the way up through the Reconstruction
16  Era.  So with respect to parks, Your Honor, so they
17  emerge kind of right in the middle of that for the
18  first time in around 1858 and the record in this case
19  establishes that they were completely new and
20  different.  That's what the record shows.  It was --
21  to use Professor Young's words in paragraph 10 of his
22  declaration, "The American park movement launched in
23  the 1850s."
24          I mean, these were places, they were
25  basically viewed as kind of these sanctuary-type
```

409

```
1   places.  They were supposed to be serene where people
2   could go for peace and quiet enjoyment and escape
3   from city life.  There had been no places in
4   existence prior to that.
5           They -- so this is exactly the kind of
6   unprecedented societal concern that Bruen is talking
7   and that requires a more nuanced approach from this
8   Court when conducting prong two and what that means
9   is that when you have a context for prohibiting
10  firearms that didn't exist at the founding, the Court
11  can substantially broaden the types of historical
12  evidence that it will consider sufficient.
13          And so I already talked about the Statute of
14  Northampton and the old Texas statutes and how they
15  would encompass this situation, but this Court can
16  view them even more broadly, so even more compelling
17  examples of historical analogs.  And so after Olmsted
18  opened New York Central Park in 1858 which is ten
19  years before the Fourteenth Amendment, you have these
20  low -- they were local issues, and so local
21  governments, for the most part, had control over them
22  and they were -- and so they were predominantly the
23  ones that imposed these firearm restrictions, but as
24  we've shown, as these parks emerged, the firearms
25  restrictions followed and that's what Professor
```

410

```
1   Cornell testified to clearly in his declaration and
2   in his testimony yesterday and we've submitted more
3   than 60 of them, Your Honor.  They're Exhibits 1
4   through 69.  There's a few additional ones in there
5   from cities at various points.
6           So between 1858 and 1886, you have 11 cities
7   that had banned guns in their parks, some of the most
8   populous cities in the country, and Professor Cornell
9   lays that out in his declaration.  By 1900, we've got
10  regulations that cover -- as parks were expanding and
11  popping up in more and more places, we have
12  regulations in more than 60 cities across almost two
13  dozen states.
14          As I mentioned, these were primarily local
15  issues, but, Your Honor, but I want to point out that
16  in 1868 which is the year the Fourteenth Amendment
17  was adopted, and this is Exhibit 3, the Pennsylvania
18  state legislature passed a statute that prohibited
19  the firearms in Fairmount Park.  So there you have a
20  situation where the restriction wasn't local; it was
21  state imposed.  You had elected representatives from
22  the entire state that had all agreed that there
23  shouldn't be any firearms in those parks.
24          And I want to talk about the local -- I think
25  counsel made an argument that they should basically
```

411

1  be disregarded because they were imposed by local
2  government bodies rather than states. I just
3  mentioned there was one state right at the time the
4  Fourteenth Amendment was adopted, but there's nothing
5  wrong at all with considering local restrictions, and
6  again, *Frey v. Negrelli*, it upheld a restriction
7  based entirely on local restrictions and it's
8  important to keep in mind when looking in this
9  particular case in this park movement that these
10 local state actors were operating in full view of
11 their legislatures.
12      So often you had these local commissions that
13 were established with legislative approval, so
14 they're acting pursuant to legislative authority.
15 That was the case in New York and that was the case
16 in Connecticut as well. And these parks were -- I
17 mean, they were incredibly well-known and
18 influential. I mean, it was -- as Professor Young
19 testified, it was a movement and it was expensive.
20 They had to find the money for it. So the state
21 governments, everybody knew what was going on. They
22 were all well aware of it and they all acquiesced and
23 agreed with those restrictions.
24      And then in early 1900s, as Young testifies
25 in his declaration, paragraph 38, it starts to get

412

1  widespread enough where states actually start getting
2  involved. So there we see Minnesota banning guns in
3  all of its parks in 1905, Wisconsin in 1917, and
4  these are all in our exhibits, Your Honor.
5  Connecticut did it in 1918; North Carolina 1921.
6      So national parks, same trend, Your Honor.
7  1897, they were banned in Yellowstone. A bunch of
8  other individual parks followed and eventually they
9  were banned -- as soon as they had a national body to
10 impose a nationwide regulatory scheme, they were
11 banned nationally in 1936.
12      And the last point I want to say on that,
13 Your Honor, is that nobody challenged these. Nobody
14 disputed the constitutional authority of the state to
15 impose these restrictions. We have more than
16 150 years that passed since Olmstead opened -- or
17 designed and New York City opened Central Park and
18 there were no challenges. The federal nationwide ban
19 was in place for 70 years from 1936 to 2010, and
20 what's interesting about that actually, Your Honor,
21 is that in 2008 when Congress went to repeal that ban
22 to allow the individual states to determine whether
23 you can carry firearms in their respective national
24 parks, that repeal was challenged in court and far
25 from suggesting that the repeal was constitutionally

413

1  required, the Court actually enjoined it and
2  prohibited them from repealing the nationwide firearm
3  ban and that's the *Brady v. Salizar* ban and we cite
4  that in footnote four of our brief.
5      So taking it back to *Bruen*, Your Honor, that
6  is very, very strong evidence because if you look at
7  *Bruen*, and I'm talking about page 2133, it's talking
8  about sensitive places and historical analysis and it
9  says that it acknowledges that there was relatively
10 few records from the 18th and 19th century about
11 sensitive places, but then stated that since we are
12 aware of no disputes regarding the lawfulness of such
13 prohibitions, we therefore can assume it settled, end
14 quote, that such prohibitions are valid. So the
15 absence of a dispute can be strong evidence that
16 everybody knew and believed and nobody questioned the
17 constitutionality of that kind of regulation and so
18 that exact same logic applies in this case.
19      Sorry. I'm jumping around a little bit, Your
20 Honor. I think we're getting a little short of time.
21 So the other thing I just wanted to emphasize with
22 some -- I wanted to emphasize here is the
23 restrictions on hunting that we submitted, Your
24 Honor, those restrictions go all the way back from
25 the Founding Era through reconstruction and we

414

1  submitted laws from five states from 1721
2  through 1869 and those hunting laws, I think, provide
3  a completely independent basis for affirming this
4  regulation under prong two of *Bruen* because a number
5  of those restrictions, they basically prohibit
6  carrying on lands that are not your own and in woods
7  or other enclosed lands without the land owner's
8  permission and that would certainly encompass -- even
9  though the state owned kind of lands at that time,
10 that would encompass them if they had. I mean, it's
11 lands not their own and they prohibited carrying in
12 the case of the New Jersey and Louisiana laws.
13      And so that's comparable to this case because
14 one of the original justifications of Connecticut's
15 ban of firearms in state parks and forests is that it
16 assists in the conservation goals and regulating
17 poaching and the proper hunting, and Professor Glazer
18 testified about that in paragraph 15 of her
19 declaration. And Tom Tyler and Colonel Lewis also
20 testify about how that restriction that remains in
21 place continues to serve that purpose and that's
22 Mr. Tyler's declaration at paragraph 89 and Lewis at
23 paragraph 18.
24      So the last thing I wanted to just mention
25 about that -- about prong two of *Bruen*, Your Honor,

415

```
1   before I move on is just that -- and the Court
2   mentioned this earlier -- Bruen made very clear that
3   the standard that it was announcing wasn't intended
4   to be a regulatory straightjacket and it leaves room
5   for numerous kinds of firearm restrictions, Your
6   Honor, and I do not see -- based on the record that
7   we've presented, I don't see how this Court could
8   enjoin this century-old law in this preliminary
9   posture without saying that Bruen essentially imposes
10  a regulatory straightjacket.
11         That's not what Bruen is and it stills leaves
12  room for regulation that is supported by history and
13  tradition and we're asking the Court to recognize
14  that in this case.
15         So with respect to balance of the equities,
16  Your Honor, I don't have a ton to say beyond what's
17  in our brief, but I did just want to highlight a
18  couple of things.  So on the one hand, Your Honor, if
19  you're looking at the harm that the plaintiff would
20  sustain in this case if the injunction were denied
21  and the case were allowed to proceed to trial , the
22  harm would not be substantial because these are not
23  restrictions that impose upon his general right to
24  carry in public.  These are places that he goes
25  voluntarily.
```

416

```
1          As Judge Posner said, when locational
2   restrictions are cabined to schools, for example, it
3   doesn't impede on the right of self-defense because
4   you can simply avoid it easily and fully exercise
5   your right of self-defense simply by not going there.
6   And so that's relevant to that and that's -- and
7   Judge Posner made that observation with respect to
8   schools which are more, I guess you would say,
9   essential to everyday life, whereas here, this is
10  purely a recreational location.
11         So at the very least what we have, Your
12  Honor, is that even if the plaintiff were to prevail
13  at a full trial, the most harm that would befall him
14  is that he'd be temporarily unable to carry arms in
15  these parks when he goes hiking or whatever, engages
16  in whatever recreational activity he's engaging in,
17  but that harm pales in comparison to the harm the
18  state would sustain if this Court were to enjoin this
19  century=old regulation on this preliminary basis.
20         First of all, Your Honor, I mean, it's just
21  true as a matter of law that when the state is
22  enjoined from enforcing its laws, that's considered
23  irreparable harm and that is especially true where it
24  implicates the state's public safety interests which
25  certainly this law does here.  And what has to be
```

417

```
1   noted is that we are in May now, Your Honor.  We have
2   summertime approaching when a lot of these locations
3   and parks reach their peak capacity, you have people
4   flocking to the beaches and to Sleeping Giant and
5   hiking trails, and enjoining this at this stage, it
6   would be a big problem and it wouldn't leave DEEP or
7   EnCon with sufficient time to plan for it to make the
8   necessary changes they would need to make to
9   accommodate a right to carry.
10         And so I guess the point that I want to
11  emphasize, Your Honor, is that this isn't a new
12  restriction.  This has been in place for 100 years.
13  And when that happens, you have all these other
14  things that develop around it in reliance on that
15  restriction being in place.  And so when you simply
16  remove it and join it on a preliminary basis, it's
17  going to cause all kinds of collateral damage to
18  other people and other areas of law.
19         So for example, Mr. Tyler testified about
20  that it was likely that if there was a right to
21  carry, DEEP would have to make changes to other
22  aspects of law including the regulation that
23  prohibits alcohol or that -- sorry, that permits
24  alcohol in most locations.  There may have to be some
25  new regulation about safe storage or any enumerable
```

418

```
1   other safety restrictions that would have to
2   accompany a general right to carry in these 142 state
3   parks and forests.  And so --
4          THE COURT:  I think in the time remaining, we
5   should give Mr. Atkinson a chance to respond to all
6   of your arguments.  Is there anything that you feel
7   compelled to bring up that's new?
8          MR. HOLZMAN:  You're asking me, Your Honor?
9          THE COURT:  I am.
10         MR. HOLZMAN:  No, Your Honor.  I'll just end
11  by saying that we'd ask that the plaintiff's motion
12  be denied.  He'll have an opportunity to prove his
13  case at trial, but he's not entitled to the
14  preliminary relief that he's seeking.  Thank you.
15         THE COURT:  Thank you.
16         All right.  Mr. Atkinson.
17         MR. ATKINSON:  Thank you, Your Honor.  I only
18  have a few points in rebuttal.
19         First, Bruen specifically rejected the highly
20  populated area rational as a basis for justifying a
21  restriction on carry.  With respect to the textual
22  right established by the combination of Bruen,
23  McDonald and Heller, our understanding is it didn't
24  cabin us to forcing plaintiffs like Mr. Nastri to
25  find a textual right to carry just in state parks or
```

419

1    something of that or specific places.  The Second
2    Amendment's plain text as recognized by *Heller* and
3    *Bruen* and *McDonald* is a general right to carry in
4    public.  We have testimony from Colonel Lewis that
5    the parks are generally open to the public within
6    their normal business hours.  They are a public
7    place.  It is the definition of public.
8          With respect to pre-*Bruen* cases, we would
9    sound a cautionary trumpet or a tuba if necessary.
10   All of those cases were typically interest-balancing
11   cases either down a strict scrutiny line or an
12   intermediate scrutiny line.  *Bruen* forbids the
13   interest balancing.  As I said earlier, this is a
14   case that demands an independent historical analysis
15   under *Bruen*.
16         With respect to English history and the
17   Statute of Northampton in particular, *Bruen* rejected
18   the -- or cautioned courts against the use of English
19   history that wasn't adopted in the colonies in the
20   Founding Era.  My understanding of the record before
21   the Court is we only have two states or two colonies
22   that adopted some version of the Statute of
23   Northampton in some fashion or another.  Two simply
24   isn't enough to establish the well-established and
25   representative historical analog required by *Bruen*.

420

1         And I believe that's all I have, Your Honor.
2    Thank you.
3         THE COURT:  All right.  I want to thank
4    counsel for your tour de force in taking -- in
5    developing a record in the area of the sensitive
6    places in part but all the other arguments that
7    you've made that means that the hard work that you've
8    done is over for the time being; it's now mine.  All
9    right.  I thank you very much and we will stand in
10   recess.
11         (Proceedings adjourned, 4:52 p.m.)
12
13         C E R T I F I C A T E
14
15   RE:  DAVID J. NASTRI v. KATIE DYKES
          No. 3:23-cv-00056-JBA
16
17         I hereby certify that the within and
18   foregoing is a true and accurate transcript taken in
19   the aforementioned matter to the best of my skill and
20   ability.
21
22         */s/ Corinne T. Thomas*
23         CORINNE T. THOMAS, RPR
          Official Court Reporter
24         United States District Court
          141 Church Street
25        New Haven, Connecticut 06510
          (203) 809-0848

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DAVID NASTRI, | |
| *Plaintiff*, | Civil No. 3:23-cv-0056 (JBA) |
| *v.* | |
| KATIE DYKES, Commissioner for the Department of Energy and Environmental Preservation, | July 12, 2023 |
| *Defendant*. | |

**RULING ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S PRELIMINARY INJUNCTION**

Plaintiff David Nastri filed an amended complaint on January 28, 2023, alleging pursuant to 42 U.S.C. § 1983 that Conn. Agencies Reg. § 23-4-1(c) violates his Second Amendment rights because it prevents him from carrying a pistol or revolver for the purpose of self-defense in case of confrontation in Connecticut state parks and forests, and because the regulation has no "historical analogue" that would justify it under the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (Jun. 23, 2022). (Am. Compl. [Doc. # 13] ¶¶ 50-64.) Plaintiff seeks a permanent injunction barring Defendant Katie Dykes, Commissioner of the Connecticut Department of Energy and Environmental Protection ("DEEP") from enforcing the regulation, as well as costs and attorneys' fees. However, Plaintiff has also filed a preliminary injunction motion seeking to bar Defendant from enforcing the regulations "until such time as the Court makes a final determination on the merits in this matter" or in the alternative, for the Court to "consolidate the preliminary injunction hearing with the trial on the merits in this matter pursuant to Fed. R. Civ. P. 65." (Pl.'s Prelim. Inj. Mot. ("Pl.'s PI") [Doc. # 14].)

1

Defendant's opposition argues among other things that Plaintiff cannot show a likelihood of succeeding on the merits because (1) he brings a facial rather than as-applied challenge, and cannot show that the regulation is invalid in all its applications; (2) he has not shown that the plain text of the Second Amendment covers his proposed course of conduct; (3) the regulation is consistent with historical traditions of firearm regulation and has historical analogues. (Def.'s Opp'n to Pl.'s PI [Doc. # 23].) Additionally, Defendant has moved to dismiss the Amended Complaint for lack of standing, arguing that Plaintiff lacks a sufficiently concrete intent to engage in proscribed conduct and fails to show any imminent and credible threat of prosecution (Def.'s Mot. to Dismiss ("Def.'s MTD") [Doc. # 20]); Plaintiff maintains that he plausibly alleges that he has and will continue to visit Connecticut state parks and forests, and that he "seeks" to do so while carrying a firearm, which is sufficient to confer standing. (Pl.'s Opp'n to MTD [Doc. # 27].)

I.    **Background**

    A.    **Conn. Agencies Regs. § 23-4-1(c)**

DEEP was established by Conn. Gen. Stat. § 22a-2d, which defines its goals as "(A) Conserving, improving and protecting the natural resources and environment of the state, and (B) preserving the natural environment while fostering sustainable development." Conn. Gen. Stat. § 22a-5(3) specifically requires the Commissioner to "provide for the protection, enhancement and management of the public forests, parks, open spaces and natural area preserves." Conn. Agencies Regs. § 23-4-1(c), issued pursuant to DEEP's regulatory authority under Conn. Gen. Stat. § 23-4 regulating "hunting/weapons", states that "[h]unting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection. All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted

2

thereunder." Penalties for violating the provision include a fine of thirty-five dollars, eviction for a period of twenty-four hours or, if convicted of a violation under the provisions of Conn. Gen. Stat. § 51-164n, a violator may be prohibited from entering any state park by the Commissioner for up to a year. Conn. Agencies Regs. § 23-4-5; Conn. Gen. Stat. § 23-4.

### B.   Plaintiff David Nastri

Plaintiff is a Connecticut Army National Guard veteran who received "comprehensive training" on the safe and effective use of firearms. (Am. Compl. ¶¶ 25, 28.) He has passed "rigorous background checks" in order to obtain his FINRA licenses as a financial advisor, holds a clean disciplinary record as a financial advisor, and has no record of disciplinary history since being licensed to practice law in Connecticut in November 2018. (*Id.* ¶ 29-30.) Plaintiff has a pistol permit that he estimates was issued 30 years ago (his current permit does not reflect its initial issue date), completed the associated safety training and has "held it in good standing since receiving it." (*Id.* ¶ 32.)

Plaintiff's complaint alleges that he "intends to and will continue to make use of Connecticut state parks and forests in the immediate and foreseeable future for the purpose of recreation such as hiking," and that his prospective use of Connecticut state parks and forests is "not speculative" because he has gone to Sleeping Giant State Park for a hike twice since the filing of the original complaint in January 2023; once by himself, and once with his girlfriend. (*Id.* ¶ 34-35.) At the preliminary injunction hearing, Plaintiff testified that he uses Sleeping Giant State Park once a month during the year to hike, Naugatuck State Forest once or twice a year to hike, and Farmington River Canal Trail to walk or run four or five times a week. (Prelim. Inj. Hrg. Day 1 Tr., May 9, 2023 [Doc. # 37] at 148-149.) He has been using Sleeping Giant State Park since he was 15 years old, Naugatuck State Forest for 40 years, and Farmington River Canal Trail for 10 years. (*Id.* at 149.) He does not have specific plans to visit Naugatuck State Forest or Sleeping Giant State Park in the future, but he does not

<div align="center">3</div>

typically put a date in his calendar when he is planning to go to a state park or forest because his visits are "impromptu" and the state parks he typically visits are close to his home. (*Id.* at 203, 172-174.)

Plaintiff "actively carries his handgun almost every time he leaves his home and almost every place that he goes, but he abides by the laws and rules that govern where he may carry it," and so "[w]hen he must go to a place where the law does not permit him to carry a firearm," Plaintiff "secures his firearm in a locked safe that he has bolted to the floor of his motor vehicle." (Am. Compl. ¶¶ 34-36.) Prior to learning of the regulation, Plaintiff carried his handgun into Sleeping Giant State Park and Naugatuck State Forest "[e]very time [he] went there," and had been carrying his handgun on the Farmington River Canal Trail about three times a week, all for the purpose of self-defense. (Prelim. Inj. Hrg. Day 1 Tr. at 150-151.) Plaintiff became aware of the challenged regulation in the summer of 2022 when he got his hunting license and read through the DEEP regulations related to firearms in state parks, including the prohibition on carrying firearms in state parks and forests for purposes other than hunting in designated areas. (*Id.* at 145, 147.)

Plaintiff is "aware" of a procedure to "request permission to carry firearms into a state park or forest," but believes that the context is "normally not self-defense," and the only instance he was aware of where an exception was made was for a Civil War reenactment. (*Id.* at 171.) He has seen the form that DEEP provides for individuals to request permission to bring a firearm into the park but does not know where he could find one for the purposes of submitting it and has never submitted the form himself. (*Id.* at 171-172.) In November of 2022, Plaintiff stopped carrying his firearm in state parks and forests. (Pl.'s Dep. Tr. [Doc. # 33-1], Exh. A, to Def.'s MTD Reply, at 202:5-10.) Because under Conn. Agencies Regs. § 23-4-1(c), storing his handgun in a locked container in his motor vehicle at a state park or forest parking lot would still be "within the confines of a Connecticut state park or forest and would

4

be in violation of the law," he also leaves his handgun at home "every time" that he "intends to visit a state park or forest." (Am. Compl. ¶¶ 36, 38.) Plaintiff testified that he was aware the violation could result in a $35 fine or being banned from state parks and forests for between 24 hours to a year. (Prelim. Inj. Hrg. Day 1 Tr. at 163-64.) Plaintiff also testified that it was his understanding that violating the regulation might jeopardize his pistol permit, and that he would have to report the penalties to FINRA as a licensed financial advisor, which in turn would result in the violations being noted on his U4 (permanent record as a financial advisor), and possibly his discharge from his job. (*Id.* at 164-165, 168.)

Plaintiff testified that he has never encountered an Environmental Conservation Police Division ("EnCon") police officer while visiting a state park, and that he not aware of anyone else who has had the regulation enforced against them. Plaintiff also confirmed that the regulation has never been enforced against him, nor has any EnCon officer or other police officer threatened him with enforcement of that regulation. (Prelim. Inj. Hrg. Day 1 Tr. at 200-201.) Plaintiff stated that "until such time that this regulation is overturned," he "will not carry a firearm in a state park or forest" because as a licensed attorney, he "will not willfully disobey a law[.]" (*Id.* at 169.) Although he currently abides by Conn. Agencies Regs. § 23-4-1(c) and states no intention to discontinue doing so, Plaintiff alleges that he "seeks to carry a handgun for the purpose of self-defense" while "making such regular use of Connecticut state parks and forests." (Am. Compl. ¶ 38.)

## II.    Procedural History

Plaintiff filed an emergency motion for preliminary injunction and temporary restraining order on January 17, 2023; the Court denied the TRO at the telephonic status conference held on January 27, 2023 and directed the Plaintiff to file an amended complaint responsive to Defendant's forthcoming motion to dismiss, as well as to file an amended motion for preliminary injunction incorporating any relevant information new to the

5

amended complaint. (*See* Doc. # 12.) An amended motion for preliminary injunction was filed on January 28, 2023, and Defendant filed her motion to dismiss on March 30, 2023. The Court held an evidentiary hearing and oral argument on May 9, 2023, and May 10, 2023, providing both sides the opportunity to submit evidence relevant to both standing and the substantive issues raised by the motion for preliminary injunction. The parties were granted permission to submit supplemental briefing on May 31, 2023, and briefing concluded on June 14, 2023.

## III.  Legal Standard

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction will be granted "when the court lacks the statutory or constitutional power to adjudicate the case." *Soundkeeper, Inc. v. A & B Auto Salvage, Inc.*, 19 F. Supp. 3d 426, 428 (D. Conn. 2014).[1] "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists," which includes the burden to prove his own standing. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 56 (2d Cir. 2016). When "the Rule 12(b)(1) motion is facial, *i.e.,* based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the plaintiff has no evidentiary burden," *id.*, but the complaint must "allege facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue" and courts "need not credit a complaint's conclusory statements without reference to its factual context." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145-46 (2d Cir. 2011). However, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering

---

[1] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

evidence beyond the Pleading," at which time a plaintiff is required to "come forward with evidence of [his] own to controvert that presented by the defendant" if defendant's evidence reveals factual disputes. *Carter,* 822 F.3d at 57. "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Id.*

Because Defendant submitted Plaintiff's deposition transcript in her reply to Plaintiff's opposition to the motion to dismiss, the Court will evaluate the motion to dismiss under 12(b)(1) as a fact-based motion and consider all evidence relevant to standing that was submitted as part of the preliminary injunction proceeding in resolving factual questions and determining whether Plaintiff has established his standing.

## IV.   Discussion

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)). An "injury in fact" must be "concrete, particularized, and actual or imminent," *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016), rather than "conjectural" or "hypothetical." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992).

Although Conn. Agencies Reg. § 23-4-1(c) has not been enforced against Plaintiff, he may establish that an injury in fact is "imminent" such that he has standing to bring a "pre-enforcement" challenge to the Challenged Regulation "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 159.

7

"Courts apply a three-prong test to assess the existence of a cognizable injury in fact in the context of pre-enforcement challenges," requiring a plaintiff to show "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'proscribed by' the challenged law; and (3) that 'there exists a credible threat of prosecution thereunder.'" *Vitagliano v. Cnty. of Westchester*, No. 23-30, 2023 WL 4095164, at \*5 (2d Cir. June 21, 2023) (quoting *Driehaus*, 573 U.S. at 159.) Plaintiff "need not first expose himself to liability before bringing suit to challenge . . . the constitutionality of a law threatened to be enforced," *Picard*, 42 F.4th at 97, but he must show an "actual and well-founded fear that the law will be enforced against [him]." *Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376, 382 (2d Cir. 2000).

Because neither side disputes that Plaintiff's conduct is proscribed by the Challenged Regulations, the only issues in dispute are whether Plaintiff demonstrates an intent to engage in the proscribed conduct and whether there is a credible threat of prosecution under the challenged law.

### A. Intention to Engage in Proscribed Conduct

Plaintiff's counsel argues that because Plaintiff has a prior history of engaging in the proscribed conduct, ceased that conduct based on a fear of prosecution or legal consequences, and actively maintains a desire to re-engage in that conduct once it becomes legal, he has demonstrated an intent to engage in conduct proscribed by the statute. Defendant argues that Plaintiff must intend to "engage in the prohibited conduct" by bringing his firearm to the park with him *despite* the regulation prohibiting it—in other words, by actually violating the law—and that based on Plaintiff's representations at his April 27, 2023 deposition stressing that "his practice is not to carry a firearm in state parks and forests" and that he intends to continue this practice "while § 23-4-1(c) remains in place," he cannot make that showing. (Def.'s MTD Reply at 4.)

8

Defendant's position is contrary to both Supreme Court and Second Circuit precedent. In *Steffel v. Thompson*, 415 U.S. 452, 460 (1974), a plaintiff sought to distribute handbills against the war in Vietnam after having been twice warned to stop doing so by the police; although he did not name a date and time certain that he intended to distribute handbills again, the Supreme Court found that he had standing to challenge the law prohibiting him from doing so. More recently, the Supreme Court held in *Holder v. Humanitarian L. Project,* 561 U.S. 1, 15–16 (2010), that plaintiffs had standing when they claimed they "provided support to the [allegedly foreign terrorist groups] before the enactment of § 2339B and that they would provide similar support again if the statute's allegedly unconstitutional bar were lifted" but had not been yet threatened with enforcement against them. Second Circuit cases applying *Driehaus* have resulted in similar outcomes. *See Knife Rights v. Vance,* 802 F.3d 377, 386 (2d Cir. 2015) (finding that the plaintiffs demonstrated an intent to engage in proscribed conduct by asserting that they had "in the past carried, and wish again to carry, common folding knives, but do not do so because they cannot confidently determine which such knives . . . [are] prohibited . . . and they do not wish to risk prosecution" after already being prosecuted once for the same conduct); *Silva v. Farrish*, 47 F.4th 78, 87 (2d Cir. 2022) (finding that plaintiffs had standing even without outlining their plans to engage in proscribed conduct "with specificity" because they had previously fished in a particular area in violation of state fishing regulations, had "already been subjected to enforcement actions" for the conduct, and alleged that they were "deterred and chilled" from doing so again because they feared prosecution).

Most recently, the Second Circuit held in *Vitagliano*, 2023 WL 4095164, at *4, that a plaintiff who had a "desire to engage in sidewalk counseling" outside abortion clinics had standing even though she "had not engaged in sidewalk counseling prior to the Act's passage" or "alleged concrete plans to do so at any point in the future." *Id.* at *5. The Second Circuit

9

explained that "a plaintiff asserting a pre-enforcement challenge need only allege 'an intention to engage in a course of conduct,' which does not necessarily require specification of the date and time she plans to do something of constitutional significance." *Id.* (citing *Picard*, 42 F.4th at 97). Describing "the origin of her desire to become a sidewalk counselor, the steps she took to train and prepare to serve as a sidewalk counselor, the abortion clinic outside which she intends to provide sidewalk counseling, and the approach she plans to take when having sidewalk-counseling conversations," the Second Circuit held, "more than suffice[d]" to demonstrate her intent. *Id.* at *6.[2]

Under this standard, Plaintiff has satisfied the requirement of pleading that he would intend to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" if not for the challenged regulation. In his deposition, Plaintiff testified that at one point, it was his practice to carry his firearm in state parks in forests until he became aware that the regulation prohibited his conduct, (Pl.'s Dep. Tr. at 202), and that it would be his practice not to carry his firearm in a state park or forest only "until the end of this case" when he presumes the regulation will be enjoined. (*Id.*) Plaintiff also reached out

---

[2] The Court is aware that some other district courts in this circuit have relied on *Driehaus*, in which the plaintiffs pled with specificity the statements they intended to make in future election cycles that would violate the law, 573 U.S. at 149, to find that a plaintiff must plead exactly how and when he or she intends to engage in proscribed conduct. *See Antonyuk v. Bruen*, No. 1:22-CV-0734 (GTS/CFH), 2022 WL 3999791 at *17 (N.D.N.Y. Aug. 31, 2022) (*Antonyuk* I) (holding that a plaintiff alleging that he "desires," "wants," "wishes" or "would like" to continue to carry a concealed handgun is not enough if he does not indicate an "*intent*" to do so in violation of the statute), *and Frey v. Bruen*, No. 21 CV 05334, 2022 WL 522478 at *5 (S.D.N.Y Feb. 22, 2022) (holding that a signed, sworn declaration that the plaintiffs "intend" to carry their handguns for all lawful purposes was insufficient to show standing when it did not allege "concrete plans to violate the New York Penal laws."). However, *Vitagliano* clarifies that neither prior engagement in the conduct nor enforcement of the statute is required so long as plaintiffs plead with an adequate level of detail their "earnest desire" and the steps they had taken to engage in the proscribed conduct "but-for" the statute, 2023 WL 4095164 at *6. In this Court's view, *Vitagliano* forecloses the interpretation of *Driehaus* advanced in cases like *Antonyuk* and *Frey.*

10

to an agent of Defendant to inquire whether the challenged regulation prohibited members of the public from carrying licensed pistols or revolvers into state parks, which further suggests that he is actively seeking ways in which to lawfully bring his firearm to currently proscribed locations. (*See* Am. Compl. Exh. M).[3] Under *Vitagliano* and *Knife Rights,* his pleadings and testimony are sufficiently detailed to satisfy this part of the test. *See also Angelo v. D.C.*, No. CV 22-1878 (RDM), 2022 WL 17974434, at *6 (D.D.C. Dec. 28, 2022) (finding that the plaintiffs alleged an intent to engage in proscribed conduct when they alleged that "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution," although ultimately dismissing for a lack of standing based on the absence of a credible threat of prosecution.)[4]

---

[3] Defendant cites in support to *Lujan*, 504 U.S. at 560, in which the Supreme Court held that the plaintiff's visitation to the areas in which endangered animals could be observed in the past and professed intent to return to those places in the future was "simply not enough" because "'some day' intentions—without any description of concrete plans, or indeed even any specification of **when** the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564 (emphasis in original). Based on *Lujan,* Defendant contends that the fact Plaintiff "had visited" state parks and forests in the past "proves nothing," because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects," (Def.'s MTD at 7-8) (quoting Am. Compl. ¶¶ 34-38 and *Lujan,* 504 U.S. at 564.) However, Plaintiff persuasively distinguishes the present case from *Lujan* by pointing out that taking a trip to embark on a safari in Sri Lanka and Egypt requires a level of planning that made it unlikely any trips were imminent without evidence of definite steps to visit, unlike Plaintiff's ability to visit a state park or forest by walking a few minutes from his house without the need for buying tickets or arranging transportation.

[4] To the extent Defendant is concerned that nothing distinguishes Plaintiff from the average citizen with a "generalized grievance common to any other member of the public who may disagree with the rule but follows it anyway," (Def.'s MTD Reply at 7), the second prong of the *Driehaus* test alleviates these concerns by requiring a showing of the imminent nature of future injury particularized to Plaintiff's circumstances. *See infra* at 16-17.

11

The Court also rejects the notion "that Plaintiff[] must allege the precise date and time on which [he] intend[s] to next visit" a place in which firearms are prohibited if they were "visited as part of their ordinary, daily routines" because "people's lives do not necessarily lay out into a scheduling book that run[s] six months or a year . . . into the future." *Koons v. Platkin*, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604, at *43 (D.N.J. May 16, 2023); *see also Vitagliano*, 2023 WL 4095164 at *5. Plaintiff alleges that he "intends to and will continue to use" Connecticut state parks and forests "in the immediate and foreseeable future," (Pl.'s MTD Opp'n at 9), and made clear in his testimony at the preliminary injunction hearing that he has regularly visited Sleeping Giant State Park, Naugatuck State Park, and Farmington Canal Trail for some time now, and that he has no plans to stop even if he does not mark the specific dates he intends to go on a calendar.

### B.      Credible Threat of Prosecution

Any specific threats directed at Plaintiff, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016), and "the extent of [] enforcement" of the challenged law, or lack thereof, *Adam v. Barr*, 792 F. App'x 20, 23 (2d Cir. 2019), are both relevant in evaluating the credibility of any threat of enforcement. While Plaintiff is obviously not at current risk of being prosecuted under the Challenged Regulation because he is not currently violating it, Plaintiff's counsel argued that Plaintiff's email exchange with Deputy DEEP Commissioner Mason Trumble gave him reason to believe the regulation would be enforced against him if he were to violate it. Plaintiff wrote to Defendant in November of 2022 to "obtain clarity on DEEP regulations concerning the carrying/possession of firearms in state parks and forests," explaining that his inquiry was related to "possessing a properly licensed pistol or revolver for the purpose of self-defense in those locations," and that it was his "expectation" that a rule existed that "specifies that a person who is licensed to carry pistols or revolvers in the state of Connecticut is authorized to do so in a state park or forest." (Am. Compl. Exh. M. [Doc. # 13-

13] at 3.) Trumble responded by writing "Thanks for reaching out . . . I believe this resource addresses the questions you posed regarding the regulation," and attached a hyperlink directing him to a report by Connecticut Office of Legislative Research's Chief Attorney Janet Kaminski Leduc titled "Carrying Handguns in Connecticut State Parks or Forests" ("Leduc Report") (Am. Compl. Exh. N [Doc. # 13-14].)

The Leduc Report states that a person may legally possess a handgun in a state park or forest "only when carrying the handgun for hunting small game . . . or participating in other authorized activities, such as at a firearms range or during a hunter education class," and only if they have a permit to do so under Conn. Gen. Stat. § 29-28. *Id.* It also includes information on the penalties for illegally carrying weapons in violation of the regulations, DEEP's authority over parts of the Appalachian Trail, and federal law on the carrying of handguns on the Appalachian trail.[5] Perhaps Mr. Trumble's response could have been construed as a threat if, for example, he had specifically pointed out or excerpted the section on potential penalties to Plaintiff, or cautioned him against violating the regulation. However, he did neither; Plaintiff frames his inquiry as a general one, rather than a specific statement of intent on his part to carry firearms in the park, giving Trumble no reason to respond with a threat or warning.

Even absent a particularized threat against Plaintiff, courts are "generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund," *Cayuga Nation*, 824 F.3d at 331, especially if the government entity in question "decline[s] to represent that [government] officials would not enforce the law."

---

[5] In response to this email, Plaintiff asked Mr. Trumble to convey his request to Defendant Dykes to "take immediate steps" to amend the regulation to bring state law into compliance with the Supreme Court's decision in *Bruen*; neither Defendant nor Mr. Trumble responded or took action on his request. (Am. Compl. ¶ 23-24.)

13

*Vitagliano*, 2023 WL 4095164, at *6. Colonel Lewis, the division director for the Environmental Conservation Police Division, testified on the second day of the preliminary injunction hearing that if EnCon found someone carrying a weapon in the state park, absent extenuating circumstances, they would issue a charge of possession of weapon in a state park under the challenged regulation. However, in *Vitagliano,* it was significant that the plaintiff was seeking to enjoin "a newly enacted law aimed specifically at Westchester County reproductive health care facilities and designed to curb the very conduct in which she intends to engage outside such facilities." 2023 WL 4095164 at *7. In cases where the statute or regulation has not been recently passed, the presumption the government will enforce its own laws "in and of itself, is not sufficient to confer standing, as courts also consider the extent of that enforcement in determining whether a credible threat of prosecution exists." *Adam v. Barr*, 792 F. App'x 20 (2d. Cir. 2019). In *Adam,* because the plaintiff "was unable to marshal examples of enforcement actions that involved" the proscribed conduct, *Vitagliano* at *7, the Second Circuit found that there was no "particularize[d]" threat of enforcement. *Adam,* 792 F. App'x at 23. To the contrary, plaintiff was "simply. . . at risk just like any other person in the country who might violate the [the statute]," and so "the threat of enforcement against him [was] insufficiently imminent to confer Article III standing." *Id.*

The case at hand is more like *Adam* than *Cayuga Nation* and *Vitagliano.* The Challenged Regulation is not "recent"—it has been in place since 1918, and there is no evidence in the record of any instance in which the law has *ever* been enforced. EnCon's Agency Crime Review statistics (Pl.'s Exh. 10), list only 4 "Weapon Law Violations" for 2019; Colonel Lewis explained at the hearing that those violations might encompass improper possession of a firearm, but could also encompass possession without a permit, or being a felon in possession of handguns, as well as offenses involving other dangerous weapons such as gravity knives or brass knuckles. Neither party's witnesses have personal knowledge of

14

the Challenged Regulation being enforced; Plaintiff admitted that he has never heard of this regulation being enforced against *anyone*, and Colonel Lewis testified that he could not recall a single circumstance in which an EnCon ranger or officer had been required to enforce the regulation during his time working with EnCon. As a practical matter, one of the factors affecting the likelihood of enforcement is EnCon's staffing levels. Colonel Lewis testified that EnCon regularly experiences staffing challenges, and that EnCon does not have the capacity to station an officer at every one of Connecticut's state parks and forests at the same time, and Plaintiff testified during his preliminary injunction testimony that he has never encountered an EnCon officer in state parks or forests.

Finally, the case at hand is easily distinguishable from one in which the threat of enforcement is imminent based on the actions and public statements of the government agency charged with enforcing the rule. *Cf. Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *4 (W.D.N.Y. Nov. 22, 2022) (currently on appeal) (finding that public statements from the New York City governor and police department suggesting a "zero tolerance" policy, when considered in conjunction with the recency of the law, showed that plaintiff faced "sufficiently imminent" enforcement).[6] Colonel Lewis testified that EnCon officers go out of their way to take a non-confrontational approach with members of the public whenever possible; officers do not regularly search patrons upon entry for firearms, and unless an EnCon officer has a suspicion that someone was transporting illegal game or fish, or carrying a cooler containing alcohol in an area where alcohol was prohibited, officers do not search patrons upon entry to a park. Plaintiff himself argues that DEEP "does nothing

---

[6] Plaintiff also adds in a footnote that he could be charged with criminal trespass for bringing a firearm to a state park or forest, but once again, the complaint reflects neither a specific threat of enforcement nor even a general policy of the state of Connecticut from which the Court can determine that there is an "imminent" threat these statutes will be enforced against Plaintiff in that particular manner. (Pl.'s Opp'n at 7.)

to ensure that the public complies with the prohibition on firearms possession prior to entering state parks and forests." (Pl.'s PI Mot. at 35.) By his own account, the lack of inspection mechanism undermines the idea that any kind of enforcement might be "sufficiently imminent" against Plaintiff or someone like him who carries a concealed firearm in state parks or forests.

The evidence in the record shows that (1) Plaintiff has never encountered an EnCon officer while in a state park or forest; (2) the chances of encountering an EnCon officer are rare due to staffing challenges; (3) EnCon officers do not randomly search park patrons for firearms; (4) Plaintiff testified no one has noticed him carrying a concealed firearm in the last year, (Pl.'s Dep. Tr. at 142-43); and (5) Plaintiff was never stopped and ticketed during the period he was unknowingly carrying his firearm in state parks and forests in violation of the regulation. On these facts, it becomes clear that Plaintiff's theory of standing is nothing more than the sort of "highly attenuated chain of possibilities" that the Supreme Court has found "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. While "'[t]he identification of a credible threat sufficient to satisfy the imminence requirement . . . necessarily depends on the particular circumstances at issue," it "will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that prosecution is likely, or even that a prosecution is remotely possible.'" *Picard,* 42 F.4th at 98 (2d Cir. 2022); *see Angelo*, 2022 WL 17974434, at *6 (finding that the threat of enforcement was "speculative" and thus insufficient to confer standing when plaintiffs did not allege prior threats of enforcement against them, and they could not "identify a single person" who had ever been arrested under the challenged law "while not engaged in another crime.") Plaintiff's "imaginary" and "speculative" conjecture is insufficient to show an actual "impending" and "credible" threat of prosecution, and so he lacks standing. *Knife Rights, Inc.*, 802 F.3d at 384.

16

"If a plaintiff fails to establish standing, the court 'need not address the factors to be considered in deciding whether to award a preliminary injunction' and should instead deny the motion and dismiss the case for lack of subject matter jurisdiction." *Do No Harm v. Pfizer Inc.*, No. 1:22-CV-07908 (JLR), 2022 WL 17740157, at *6 (S.D.N.Y. Dec. 16, 2022) (quoting *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015)). When a complaint is "dismissed for lack of Article III standing, the dismissal must be without prejudice." *Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535, 545 (W.D.N.Y. 2018).[7]

## V. Conclusion

The motion to dismiss is GRANTED, and the case is dismissed without prejudice; because the Plaintiff lacks standing, the motion for preliminary injunction is DENIED for lack of subject matter jurisdiction.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of July, 2023

_____

[7] In *Antonyuk I,* the district court chose to address in "judicial dictum" the merits of the preliminary injunction motion "out of an abundance of caution, because at least a conceivable chance exists that Plaintiffs may take an immediate appeal of this Decision and Order to the Second Circuit and be found to, in fact, possess standing, in which case what follows would constitute the Court's holding." *Antonyuk I* at *25. However, because "[b]oth the Supreme Court and Second Circuit have held that a lack of standing deprives the Court of subject-matter jurisdiction," *Antonyuk I* at *23, the Court's view is that it is required to dismiss this case rather than preemptively address the merits.

17

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | July 12, 2023 |

## NOTICE OF APPEAL

The Plaintiff, David J. Nastri, hereby gives notice of his appeal of the Court's July 12, 2023 order (Dkt. 46) granting the Defendant's motion to dismiss his amended complaint (Dkt. 22) and his motion for a preliminary injunction (Dkt. 14).

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq. (ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

1

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/

2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DAVID J. NASTRI, ESQ.,                    :
                                          :       DKT No.: 3:23-cv-00056-JBA
      Plaintiff,                   :
                                          :
v.                                        :
                                          :
KATIE DYKES, in her official capacity     :
only,                                     :
                                          :
      Defendant.                   :       July 17, 2023

**PLAINTIFF'S MOTION FOR RECONSIDERATION**

Pursuant to Fed. R. Civ. P. 52 and 59(e) and D. Conn. Local Rule 7(c), the Plaintiff,

David J. Nastri, Esq., hereby moves the Court to reconsider its order granting the

Defendant's motion to dismiss for lack of standing and denying his motion for a

preliminary injunction on the same grounds. Dkt. 46.

      The Plaintiff,

      By: /s/ Cameron L. Atkinson /s/
      Cameron L. Atkinson, Esq.
      (ct31219)
      ATKINSON LAW, LLC
      122 Litchfield Rd., Ste. 2
      P.O. Box 340
      Harwinton, CT 06791
      Telephone: 203.677.0782
      Email: catkinson@atkinsonlawfirm.com

**ORAL ARGUMENT NOT REQUESTED.**

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | MARCH 20, 2023 |

## DEFENDANT'S RESPONSES TO PLAINTIFF's INITIAL INTERROGATORIES AND REQUESTS FOR PRODUCTION

Pursuant to Fed. R. Civ. P. 33 and 34, the Defendant, Katie Dykes, in her official capacity, responds to Plaintiff's interrogatories and requests for production dated February 16, 2023, as follows:

## GENERAL OBJECTIONS

1. Defendant objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Defendant objects to each document request and interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to each document request to the extent that it calls for production of a privilege log for internal documents of Defendant. A request for such a log is unreasonable and unduly burdensome in light of the work product doctrine, governmental deliberative process privilege, attorney-client privilege, and other privileges protecting such internal documents from discovery.

4. Defendant objects to each instruction, definition, document request, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, work product doctrine, or any other applicable privilege. Should any such disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

5. Defendant objects to each instruction, definition, document request, and interrogatory as overly broad and unduly burdensome to the extent it seeks documents or information that are readily or more accessible to Plaintiff than to Defendant, are readily or more accessible to Plaintiff from Plaintiff's own files, from documents or information in Plaintiff's possession, or from documents or information that Defendant previously produced to Plaintiff. Responding to such requests and interrogatory would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests and interrogatory is substantially the same or less for Plaintiff as for Defendant.

6. Plaintiff's document requests and interrogatory call for the production of documents and information that were produced to the Defendant by other entities and that may contain confidential, proprietary, or trade secret information.

7. To the extent any of Plaintiff's document requests or its interrogatory seek documents or answers that include expert material, including but not limited to survey materials, Defendant objects to any such requests and interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

8. Defendant incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

## **INTERROGATORIES**

1.      Identify the person(s) answering these interrogatories. Include their full name and work address.

**ANSWER:    Alison Rau; 79 Elm Street, Hartford, CT 06106.**

2.      State Mason Trumble's official job title at the DEEP and his work address, and briefly describe his responsibilities and authority.

**ANSWER: Deputy Commissioner of Environmental Conservation; 79 Elm Street, Hartford, CT 06106. Deputy Commissioner Trumble oversees the Bureau of Natural Resources, which is charged with managing the state's natural resources (particularly fish, wildlife, and forests) through a program of regulation, management, research, and public education. He also oversees the Bureau of Outdoor Recreation, which is charged with the conservation and management of statewide recreation lands and resources through the acquisition of open space and the management of resources, including state parks, to meet the outdoor recreation needs of the public.**

3.      State the name, the work address, and the telephone number of the uniformed official/officer/DEEP employee who commands the Connecticut Environmental Conservation Police.

**ANSWER: Colonel Christopher Lewis; 79 Elm Street, Hartford, CT 06106; 860-424-3012.**

4.      State whether the DEEP has a process by which a member of the public who holds a valid Connecticut pistol permit may apply for permission to carry a pistol or revolver for a non-

hunting purpose in Connecticut state parks and forests. If such a process exists, describe where and how a member of the public may locate information regarding the process and what steps they must take to apply for such permission.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). There is no allegation in Plaintiff's Amended Complaint that he sought or applied for permission to carry a pistol or revolver for a non-hunting purpose in the Connecticut State Parks and Forests System.**

**ANSWER: Subject to and without waiving objection, pursuant to Conn. Gen. Stat. § 23-11, the Commissioner of Energy and Environmental Protection may grant revocable licenses for public purposes to any person for the use of any portion of any state forest or state park if said commissioner finds that such purposes are not in conflict with park or forest purposes. An overview of this process is available online at the following website:**

**https://portal.ct.gov/DEEP/State-Parks/Special-Use-License**

5. State how many times the DEEP has given permission to a member of the public to carry a pistol or revolver for a non-hunting purpose in Connecticut state parks and forests since January 1, 2017. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). There is no allegation in Plaintiff's Amended Complaint that he sought or applied for permission to carry a pistol or revolver for a non-hunting purpose in the Connecticut State Parks and Forests System. Defendant further objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. As Plaintiff notes in his Amended Complaint, certain locations within Connecticut's State Parks and Forest System have designated target shooting ranges. It is unclear whether this interrogatory seeks information pertaining to designated target shooting ranges. Additionally, the interrogatory's timeframe and lack of specificity make it overly broad and impose an undue burden on DEEP's staff.**

**ANSWER: Subject to and without waiving objection, DEEP issued a special use license for a civil war reenactment in 2022, which included participants carrying unloaded Civil War-era firearms for use as part of the reenactment, subject to numerous other conditions. DEEP is not aware of any other such permissions since January 1, 2017. Defendant reserves the**

right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.


6.      State how many times the DEEP has denied permission to a member of the public to carry a pistol or revolver for a non-hunting purpose in Connecticut state parks and forests since January 1, 2017. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). There is no allegation in Plaintiff's Amended Complaint that he sought or applied for permission to carry a pistol or revolver for a non-hunting purpose in the Connecticut State Parks and Forests System. Defendant further objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome for the same reasons described in Defendant's Objection to Interrogatory No. 5.**

**ANSWER: Subject to and without waiving objection, DEEP has informed individuals of the regulatory prohibition against pistols or revolvers in State Parks and Forests but has no record of denying requests for permission to carry a pistol or revolver for a non-hunting purpose since January 1, 2017.  DEEP is only aware of one such request, as described in response to Interrogatory No. 5. Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**


7.      State how many times the DEEP has given permission to a member of the public to carry a pistol or revolver for self-defense in Connecticut state parks and forests since January 1, 2017. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). There is no allegation in Plaintiff's Amended Complaint that he sought or applied for permission to carry a pistol or revolver for purposes of self-defense in the Connecticut State Parks and Forests System. Defendant further objects that the interrogatory is overly broad and unduly burdensome upon DEEP's staff, and vague as to the meaning of "permission".**

**ANSWER: Subject to and without waiving objection, Defendant has no record of DEEP giving permission to a member of the public to carry a pistol or revolver for self-defense in**

any State park or forest for the period of January 1, 2017-present and is not aware of any such requests for that timeframe. Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.

8.      State how many times the DEEP has denied permission to a member of the public

to carry a pistol or revolver for self-defense in Connecticut state parks and forests since January 1,

2017. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings facial challenges to Conn. Reg. § 23-4-1(c).   There is no allegation in Plaintiff's Amended Complaint that he sought or applied for permission to carry a pistol or revolver for purposes of self-defense in the Connecticut State Parks and Forests System. Defendant further objects that the interrogatory is overly broad and unduly burdensome on DEEP's staff, and vague as to the meaning of "permission".**

**ANSWER: Subject to and without waiving objection, Defendant has no record of DEEP denying permission to a member of the public to carry a pistol or revolver for self-defense in any State park or forest for the period of January 1, 2017-present and is not aware of any such requests for that timeframe.  Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

9.      State whether DEEP permits off-duty law enforcement officers to carry pistols or

revolvers in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c).  There is no allegation in Plaintiff's Amended Complaint regarding the conduct of off-duty law enforcement officers. Defendant further objects on the grounds that the interrogatory is vague, ambiguous, overly broad, and unduly burdensome. The interrogatory is unclear in that it does not define "law enforcement officers." Nor does the interrogatory distinguish between specified target shooting ranges in certain State parks and forests and State parks and forests more generally.  Moreover, this interrogatory is vague because "permits" is susceptible to many different meaning. Finally, it calls for speculation regarding the application of the Connecticut General Statutes and regulations adopted thereunder to unclear circumstances.**

**ANSWER: Subject to and without waiving objection, all carrying or use of pistols or revolvers is subject to applicable provisions of the Connecticut General Statutes and**

**regulations adopted thereunder. DEEP does not allow off-duty government employees appointed to enforce criminal laws to carry pistols or revolvers in State parks and forests unless otherwise authorized in accordance with applicable law.**

10. State how many felony crimes, excluding violations of Connecticut's conservation laws, have been committed in Connecticut state parks and forests since January 1, 2013. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Moreover, the interrogatory calls for speculation because DEEP and its law enforcement unit—the Environmental Conservation Police ("EnCon")—are only aware of "arrests" or "reported" offenses, not every time a felony is "committed." Defendant further objects on the grounds that the interrogatory is vague, ambiguous, overly broad, and unduly burdensome. It is unclear what Plaintiff means by "conservation laws." Additionally, EnCon's felony and misdemeanor crime database is principally categorized by *arrests* made by an EnCon police officer, and each *arrest* could be based on an individual committing multiple offenses, including one or more felony offenses, one or more arrestable misdemeanor offenses, and/or one or more infractions, or any combination thereof. It is unduly burdensome on EnCon to provide a complete breakdown of non-conservation law felony crimes for January 1, 2013-present in the format requested by this interrogatory, particularly when such a breakdown does not already exist. Defendant further objects to this interrogatory insofar as it requests information protected by the work-product and/or attorney-client privileges.**

**ANSWER: Subject to and without waiving objection, the table below lists the sum total of arrests known to EnCon for offenses (felonies, misdemeanors, and other criminal offenses) between 2016-present.**

| Year | Number |
|------|--------|
| 2016 | 51 |
| 2017 | 67 |
| 2018 | 66 |
| 2019 | 121 |
| 2020 | 67 |
| 2021 | 71 |
| 2022 | 95 |

**Similarly subject to and without waiving objection, the below table indicates the year and number of additional crimes that were reported to have allegedly been committed in Connecticut's state parks and forests between 2019 and 2022 that did not result in an arrest.**

| Year | Number |
|------|--------|
| **2019** | **44** |
| **2020** | **54** |
| **2021** | **49** |
| **2022** | **110** |

**Furthermore, a breakdown of offense by statute and regulation is attached as a separate spreadsheet.**

**Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information. Notwithstanding the foregoing answer to this interrogatory and Defendant's reservation, counsel for Plaintiff has agreed that, at this juncture, he only requests information responsive to this interrogatory from 2019-present.**

11. State how many misdemeanor crimes, excluding violations of Connecticut's conservation laws, have been committed in Connecticut state parks and forests since January 1, 2013. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION:** *See* **Objection to Interrogatory No. 10.**

**ANSWER: Subject to and without waiving objection, Defendant incorporates by reference its Answer to Interrogatory No. 10 in response to this interrogatory. Similar to Interrogatory No. 10, counsel for Plaintiff has agreed that, at this juncture, he only requests information responsive to this interrogatory from 2019-present.**

12. State how many arrests that the Connecticut Environmental Conservation Police have made since January 1, 2013. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION:** *See* **Objection to Interrogatory No. 10.**

**ANSWER: Subject to and without waiving objection, Defendant incorporates by reference its Answer to Interrogatory No. 10 in response to this interrogatory. Similar to Interrogatory No. 10, counsel for Plaintiff has agreed that, at this juncture, he only requests information responsive to this interrogatory from 2019-present.**

13. State how many citations that the Connecticut Environmental Conservation Police have issued since January 1, 2013 for violations of Connecticut state park and forest laws and

regulations. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200

times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects to the interrogatory on the grounds that it is overly broad, unduly burdensome, and requests information prepared by DEEP and EnCon that is protected by the work-product and/or attorney-client privileges. *See* Defendant's Objections to Interrogatories Nos. 10-12.**

**ANSWER: Subject to and without waiving objection, with respect to the years 2016 through 2022, Defendant answers as follows:**

| Year | Title 23 Citations |
|------|--------------------|
| 2016 | 2779 |
| 2017 | 2720 |
| 2018 | 2834 |
| 2019 | 2499 |
| 2020 | 2868 |
| 2021 | 2088 |
| 2022 | 2098 |

**Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

14.     Identify the standard weapons that Connecticut Environmental Conservation police

officers carry while performing their duties in Connecticut state parks and forests. For each firearm

that these officers carry, please list the make and model, the caliber of the firearm, and the number

of rounds/bullets that the officers typically carry in the firearm.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not relate to the conduct or arming of on-duty EnCon Police Officers. Defendant further objects that the interrogatory is overly broad and unduly burdensome.**

**ANSWER: Subject to and without waiving objection, EnCon Police's current issue handgun is a Glock 22, .40 caliber, with 15 round magazines (2 spare and 1 in the handgun). In addition, EnCon Police officers use a Colt LE6920 M4 (long gun), .223 caliber, 30 round magazine x2 and 1-20 round magazine. Also in use is the Mossberg 590A1 Shotgun, 12 gauge. Eight shotshells are in the magazine tube, and 6 carried in a side saddle.**

15.    State how many times that Connecticut Environmental Conservation police officers have discharged their firearms in the line of duty in Connecticut state parks and forests since January 1, 2013, excluding discharges made in the course of training or practice at a shooting range located within Connecticut state parks and forests. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not relate to the conduct or arming of on-duty EnCon Police Officers. Defendant further objects that the interrogatory is vague, overly broad, and unduly burdensome. For example, the interrogatory does not define "in the line of duty" and does not distinguish between the discharge of a firearm upon another person, upon wildlife, or otherwise while "in the line of duty."**

**ANSWER: Subject to and without waiving objection, as the need arises, EnCon Police Officers are often required to discharge their firearms in order to dispatch wildlife in the State Parks and Forest System following, for example, a motor vehicle accident involving an animal. EnCon Police does not maintain records regarding such use of firearms but estimates that there are numerous instances of such discharge, annually. Apart from discharges made to dispatch an animal or in the course of training or practice, Defendant knows of no EnCon Police Officer discharging their weapon "in the line of duty" in any Connecticut state park or forest since January 1, 2013. Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

16.    State when Conn. Agencies Regs. § 23-4-1(c) was promulgated and identify the publication that it was promulgated in. Please include the exact date of promulgation and the volume and issue of the publication that it was promulgated in.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not challenge the rulemaking authority of the Commissioner of DEEP or the rulemaking process that led to the promulgation of § 23-4-1(c). Defendant further objects that the interrogatory is overly broad, unduly burdensome, and seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, the present version of Conn. Agencies Reg. § 23-4-1(c) has been in effect since June 7, 2017. A copy is available in the Connecticut eRegulations System, accessible via search at https://eregulations.ct.gov/eRegsPortal/. Additionally, to the best of her knowledge, Defendant believes that the prohibitions set forth in the present version of § 23-4-1(c) were first established in 1924 through the Guide to Connecticut State Parks and Forests, published by the State Park and Forest Commission, the precursor entity to DEEP. Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

17.     Identify any precursor rules or regulations for Conn. Agencies Regs. § 23-4-1(c), and state the date that they established, the government agency or body that established them, their full legal citation, and where they may be located.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not challenge the rulemaking authority of the Commissioner of DEEP or the rulemaking process that led to the promulgation of § 23-4-1(c). Defendant further objects that the interrogatory is overly broad, unduly burdensome, and seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, Defendant incorporates by reference her Answer to Interrogatory No. 16. Additionally, to the best of her knowledge, precursor rules or regulations to § 23-4-1(c) include the following: § 15-2-3 of the Regulations of Connecticut State Agencies (State Park and Forest Commission; 1949); § 23-4-1 of the Regulations of Connecticut State Agencies (DEEP; 2007); and § 23-4-1 of the Regulations of Connecticut State Agencies (DEEP; 2017). As noted on the Connecticut State Library's website (https://ctstatelibrary.org/regulations-of-connecticut-state-agencies/), "[p]rior versions of regulations as printed in the Connecticut Law Journal are available for use at the Connecticut State Library." Research into the history of firearms prohibitions in Connecticut's state parks and forests is ongoing, and Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

18.     State how many times the DEEP has arrested or cited someone for a violation of Conn. Agencies Regs. 23-4-1(c) since January 1, 2013. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects to the interrogatory on the grounds that it is overly broad, unduly burdensome, and requests information prepared by DEEP and EnCon that is protected by the work-product and/or attorney-client privileges.** *See* **Defendant's Objections to Interrogatories Nos. 10-12.**

**ANSWER: Subject to and without waiving objection, with respect to the years 2016 through 2022, Defendant answers as follows:**

| Year | Conn. Reg. 23-4-1(c) Citations |
|------|-------------------------------|
| 2016 | 6 |
| 2017 | 10 |
| 2018 | 5 |
| 2019 | 1 |
| 2020 | 10 |
| 2021 | 7 |
| 2022 | 6 |

**Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.**

19.     State how many firearms hunting licenses that the DEEP has issued since January 1, 2017. Please provide the information in annual format: e.g., 2015 – 100 times; 2016 – 200 times.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the interrogatory is overly broad and unduly burdensome on DEEP's staff.**

**ANSWER: Subject to and without waiving objection, Defendant provides the following information relating to the number of firearms hunting licenses the DEEP has issued since January 1, 2017:**

- **2017 – 46,336**
- **2018 – 44,294**
- **2019 – 42,356**
- **2020 – 42,438**
- **2021 – 40,298**
- **2022 – 39,126**

Defendant reserves the right to amend or supplement this response at a later date, following completion of discovery or receipt of additional information.

20.     State all of the time periods/hunting seasons that the DEEP will permit hunting by

firearms in the state of Connecticut for the calendar year 2023.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the interrogatory seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, this information is publicly available in the 2023 Connecticut Hunting and Trapping Guide, PDF copies of which can be found online at:**

**https://portal.ct.gov/-/media/DEEP/hunting_trapping/pdf_files/2023-CT-Hunting-Guide.pdf**

21.     State all of the time periods/hunting seasons that the DEEP permitted hunting in

the state of Connecticut for the calendar year 2022.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the interrogatory seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, please find attached the relevant pages from the 2022 Hunting and Trapping Guide, which state the time periods/hunting seasons that DEEP permitted in the State for 2022.**

22.     State the total number of deer reported harvested on state land by hunters using

firearms via the DEEP's Harvest Tagging system for the calendar year 2022.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the interrogatory seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, a total of 611 deer were reported harvested on state land by hunters during the 2022 firearms season.**

23.     State the total number of turkeys reported harvested on state land by hunters using

firearms via the DEEP's Harvest Tagging system for the calendar year 2022.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the interrogatory seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, a total of 257 turkeys were reported harvested on state land by hunters during the 2022 spring and fall firearms seasons.**

24.     State whether the prohibition against carrying handguns in state parks or forests as

set forth in Conn. Agencies Regs. 23-4-1(c) is posted at all public access points to all state parks

and forests.

**OBJECTION: Defendant objects to this interrogatory on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not allege that Plaintiff lacked notice of the challenged regulation. Defendant further objects that the term "public access points" is undefined, vague, and susceptible to many meanings.**

**ANSWER: Subject to and without waiving objection, Conn. Reg. § 23-4-1(c) is not posted at all public access points to all state parks and forests but DEEP's regulations are generally available on the Secretary of State's website (https://eregulations.ct.gov/eRegsPortal/Browse/RCSA/Title_23/), and DEEP's website (https://portal.ct.gov/DEEP/Laws/DEEP-Regulations-Sorted-By-Subject). Additionally, copies of DEEP's regulations are generally posted at a publicly viewable location within State parks and forests.**

25.     Identify all witnesses, including expert witnesses, documents, and exhibits that you

intend to offer into evidence at the hearing on the Plaintiff's motion for a preliminary injunction

or at trial.

**OBJECTION: Defendant objects that the interrogatory is premature and impermissibly seeks information that, at this juncture, is protected by the work product and attorney client privileges while the trial and preliminary injunction strategy is developed.**

**ANSWER: Defendant is in the process of preparing a brief in opposition to Plaintiff's motion for a preliminary injunction and has not finalized what witnesses, documents, and/or exhibits, if any, she intends to offer at a preliminary injunction hearing or trial at this time. Therefore, Defendant reserves the right to amend or supplement this response at a later date closer to any scheduled evidentiary hearing, in a timely manner consistent with Defendant's obligations at discovery. However, Defendant notes that, in support of her opposition to Plaintiff's motion for a preliminary injunction, Defendant will likely rely on the following:**

- **Numerous historical analogues to § 23-4-1(c), which Plaintiff will receive copies of with Defendant's opposition to Plaintiff's motion for a preliminary injunction.**
- **Numerous other exhibits including, but not limited to, photographs of State parks and forests and a Centennial report prepared by DEEP describing the history of Connecticut's State parks and forests.**
- **Declarations from experts, the specifics of which are yet to be finalized and will be supplemented.**
- **Declarations from fact witnesses from DEEP including, but not limited to, Thomas Tyler.**
- **Declarations from other fact witnesses including, but not limited to, Mark Benigni.**

## REQUESTS FOR PRODUCTION

1.     All documents identified in answering or used or relied upon by you or any other person in preparing answers to any of the above Interrogatories.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, in that it requests all documents "used or relied upon by you or any person in preparing answers to any of the above Interrogatories." Defendant further objects that the request covers documents that would be protected by the attorney-client, work product, and/or deliberative process privileges, including correspondence between DEEP employees and counsel for Defendant**

**ANSWER: Subject to and without waiving objection, see attached.**

2.     Copies of any and all regulatory history for Conn. Agencies Regs. § 23-4-1(c).

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not challenge the rulemaking authority of the Commissioner of DEEP or the rulemaking process that led to the promulgation of § 23-4-1(c). Defendant further objects that the request for "any and all regulatory history" is vague, overly broad, unduly burdensome, and seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, see attached. Defendant reserves the right to amend or supplement this response at a later date.**

3.      Copies of any and all precursor statutes, regulations, rules or any other form of binding law to Conn. Agencies Regs. § 23-4-1(c) that establish the same prohibition against carrying firearms in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not challenge the rulemaking authority of the Commissioner of DEEP or the rulemaking process that led to the promulgation of § 23-4-1(c). Defendant further objects that the request is overly broad, unduly burdensome, and seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER: Subject to and without waiving objection, see attached. Defendant reserves the right to amend or supplement this response at a later date.**

4.      Copies of any documents and forms that the DEEP uses to process requests for permission to carry firearms in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege.**

**ANSWER:    Subject to and without waiving objection, see attached example of a Special Use License from 2022.  Defendant reserves the right to amend or supplement this response at a later date.**

5.      Copies of any documents, videos, or any other form of material that DEEP uses to train its employees and officials on whether to grant or deny permission to carry firearms in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege.**

**ANSWER:     Subject to and without waiving objection, no such materials exist.**

6.      Copies of any documents or communications establishing DEEP policy on whether to grant or deny permission to carry firearms in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege.**

**ANSWER:     Subject to and without waiving objection, see the 2023 Hunting and Trapping Guide, as well as the Special Use License from 2022.  Defendant reserves the right to amend or supplement this response at a later date.**

7.      Copies of any non-privileged communications and documents within DEEP', its employees', or your possession regarding the constitutionality and lawfulness of Conn. Agencies Regs. § 23-4-1(c).

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks privileged materials, as conversations regarding the "constitutionality and lawfulness" are paradigmatic examples of subjects likely to be discussed with an attorney that would be protected from disclosure under the attorney-client, work product, or deliberative process privilege.  Moreover, this request improperly calls for a legal conclusion and seeks publicly available information that can be acquired by Plaintiff as easily as it can be acquired by Defendant.**

**ANSWER:     Subject to and without waiving objection, DEEP's testimony from 2018 and 2023 opposing legislative proposals to allow carrying of firearms in state parks and forests**

is attached. Defendant reserves the right to amend or supplement this response at a later date.

       8.      Copies of any documents, communications, and regulatory history regarding the decisions to establish and maintain four public shooting ranges in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, in that it requests "any" documents that concern a highly regulated recreational activity, itself subject to extensive contracting or leasing requirements, none of which is relevant to the instant action or likely to lead to probative information. Voluminous paper records exist that cannot be converted to PDF or electronic files without considerable expense and effort by a staff whose resources are limited. Defendant further objects that the request covers documents that would be protected by the attorney-client, work product, and/or deliberative process privileges, including correspondence between DEEP employees and counsel for Defendant.**

**ANSWER: Subject to and without waiving objection, certain materials pertinent to a shooting range in a State forest are attached.**

       9.      Copies of any documents, communications, studies, or reports regarding the impact that the carrying of firearms would have in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege. The term "impact" is unclear and susceptible to different meanings, particularly in light of the diverse public interests and uses that DEEP considers in its management of state parks and forests.**

**ANSWER:    Subject to and without waiving objection, DEEP testimony from 2018 and 2023 opposing legislative proposals to allow carrying of firearms in state parks and forests is attached. Defendant reserves the right to amend or supplement this response at a later date.**

      10.    Copies of any documents, communications, studies, or reports regarding the impact that hunting with firearms would have on Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge**

to Conn. Reg. § 23-4-1(c). Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege. The term "impact" is unclear and susceptible to different meanings, particularly in light of the diverse public interests and uses that DEEP considers in its management of state parks and forests.

**ANSWER:** Subject to and without waiving objection, see 2023 Hunting Guide information, available at: https://portal.ct.gov/DEEP/Hunting/2023-Connecticut-Hunting-and-Trapping-Guide. Defendant reserves the right to amend or supplement this response at a later date.

11.    Copies of any documents, videos, and any other form of communication pertaining to the training that the Connecticut Environmental Conservation Police receive on the use of firearms.

**OBJECTION:** Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not relate to the conduct or arming of on-duty EnCon Police Officers. Defendant further objects that the request is overly broad, vague, unduly burdensome, and seeks materials privileged by the attorney-client, work product, or deliberative process privilege. The term "pertaining to" is unclear and susceptible to different meanings, particularly in light of the diverse public interests and uses that DEEP considers in its management of state parks and forests.

**ANSWER:**    Subject to and without waiving objection, see attached DEEP February 2023 Use of Force Policy.

12.    Copies of any documents setting forth the DEEP's policy on when the Connecticut Environmental Conservation Police may use firearms in the line of duty, its policy on the use of force, and its policy on the use of deadly force.

**OBJECTION:** Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c) and does not relate to the conduct or arming of on-duty EnCon Police Officers.

**ANSWER:**    Subject to and without waiving objection, see attached DEEP February 2023 Use of Force Policy.

13.    Copies of any Connecticut statute, regulation, rule, or other form of binding law that regulates the storage of unattended firearms in Connecticut state parks and forests.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to DEEP's enforcement of Conn. Reg. § 23-4-1(c). Defendant further objects to this request on the grounds that it improperly calls for a legal conclusion and is impermissibly vague in its use of the word "storage." Moreover, Defendant objects to this request as overly broad and unduly burdensome to the extent it seeks documents or information that are readily or more accessible to Plaintiff than to Defendant, are readily or more accessible to Plaintiff from Plaintiff's own files, or from documents or information in Plaintiff's possession. Responding to such requests and interrogatory would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests and interrogatory is substantially the same or less for Plaintiff as for Defendant.**

**ANSWER: Subject to and without waiving objection, see Conn. Regs. § 23-4-1(c), Connecticut Public Act 19-7, and the 2023 Connecticut Hunting and Trapping Guide, copies of which are available online.**

14. Copies of any non-privileged document or communication pertaining to the potential amendment or recission of Conn. Agencies Regs. § 23-4-1(c) since January 1, 2017.

**OBJECTION: Defendant objects to this request on the ground that the information sought is not relevant to the issues in this case, as the Amended Complaint brings a facial challenge to Conn. Reg. § 23-4-1(c), which is presently in effect. Defendant further objects that the request is speculative, overly broad, vague, unduly burdensome, and seeks privileged materials, as conversations regarding the "potential amendment or recission" on a regulation currently in effect, are paradigmatic examples of subjects likely to be discussed with an attorney that would be protected from disclosure under the attorney-client, work product, or deliberative process privileges.**

**ANSWER: Subject to and without waiving objection, DEEP testimony from 2018 and 2023 opposing legislative proposals to allow carrying of firearms in state parks and forests is attached. Defendant reserves the right to amend or supplement this response at a later date.**

15. Copies of any non-privileged document, communication, or social media posting that you have made supporting the regulation of the carrying of firearms in public since January 1, 2013.

**ANSWER: DEEP testimony from 2018 and 2023 opposing legislative proposals to allow carrying of firearms in state parks and forests is attached. Defendant reserves the right to amend or supplement this response at a later date.**

16. Copies of any exhibits and/or reports, including any reports prepared by any expert, that you intend to offer into evidence in this case.

**OBJECTION: Defendant objects that the request is premature and impermissibly seeks information that, at this juncture, is protected by the work product and attorney-client privileges while the trial and preliminary injunction strategy is developed.**

**ANSWER: Defendant is in the process of preparing a brief in opposition to Plaintiff's motion for a preliminary injunction and has not finalized what witnesses, documents, and/or exhibits, if any, she intends to offer at a preliminary injunction hearing or trial at this time. Therefore, Defendant reserves the right to amend or supplement this response at a later date closer to any scheduled evidentiary hearing, in a timely manner consistent with Defendant's obligations at discovery. However, Defendant notes that, in support of her opposition to Plaintiff's motion for a preliminary injunction, Defendant will likely rely on the following:**

- **Numerous historical analogues to § 23-4-1(c), which Plaintiff will receive copies of with Defendant's opposition to Plaintiff's motion for a preliminary injunction.**
- **Numerous other exhibits including, but not limited to, photographs of State parks and forests and a Centennial report prepared by DEEP describing the history of Connecticut's State parks and forests.**
- **Declarations from experts, the specifics of which are yet to be finalized and will be supplemented.**
- **Declarations from fact witnesses from DEEP including, but not limited to, Thomas Tyler.**
- **Declarations from other fact witnesses including, but not limited to, Mark Benigni.**

Respectfully submitted,

DEFENDANT-COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY:   */s/Blake T. Sullivan*_____
Timothy J. Holzman (ct30420)
Blake T. Sullivan (ct30289)
Thadius L. Bochain (ct31367)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
Timothy.Holzman@ct.gov
Blake.Sullivan@ct.gov
Thadius.Bochain@ct.gov
Attorneys for the Commissioner

Page 21 of 22

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023 a copy of the foregoing was served by e-mail to all parties.

*/s/ Blake T. Sullivan*
Assistant Attorney General

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## OATH OF RESPONDENT

I, _____Alison Rau_____, being of sound mind and legal age, and having been duly sworn, do hereby depose and state that:

1.  I am a respondent identified in Interrogatory no. 1 above.

2.  The answers and documents provided in response to the attached interrogatories and requests for production are true, accurate, and complete to the best of my knowledge and belief.

_____Alison Rau_____

Subscribed and sworn to before me this ___20th___ day of ___March___, 2023

_____Blake Sullivan_____
~~Notary Public~~/
Commissioner of the Superior Court
Juris No 443852

App.253

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DAVID NASTRI,<br><br>*Plaintiff,*<br><br>*v.*<br><br>KATIE DYKES, Commissioner for the Department of Energy and Environmental Preservation,<br><br>*Defendant.* | Civil No. 3:23-cv-0056 (JBA)<br><br>August 16, 2023 |

**RULING ON PLAINTIFF'S MOTIONS FOR RECONSIDERATION**

Plaintiff moves for reconsideration [Doc. # 49] of this Court's order dismissing the case for lack of standing, arguing that the Defendant and the Court did not make clear that the issue of whether there was a credible threat of prosecution was at issue, and as a result, he failed to submit evidence he now asks the Court to consider. (*See* Pl.'s Mem. in Support of Mot. to Recon. [Doc. # 50].) Plaintiff's proposed evidence is Defendant's response to his interrogatories regarding DEEP's recorded enforcement of the Challenged Regulation.[1] Defendant opposes, arguing that the Court lacks jurisdiction to consider the motion, that the evidence is not appropriate for consideration because Defendant did not have the opportunity to address it at the evidentiary hearing, and that it would not have changed the outcome of the motion. (Def.'s Object. to Pl.'s Mot. to Recon [Doc. # 54].)

---

[1] Specifically, the evidence responds to Interrogatory # 18, which sought the number of times "DEEP has arrested or cited someone for a violation" of the Challenged Regulation "since January 1, 2013" (Pl.'s Mot. to Recon., Exhibit A, Def.'s Answers to Pl.'s Interrogatories [Doc. # 50-1] at 11.) Defendant objected to the interrogatory on multiple grounds, but provided the information "[s]ubject to and without waiving objection." *Id.* at 12. The format of the data was a two-column chart showing the year and the number of times that the Challenged Regulation was enforced, and provided no further information on its source.

For the reasons set forth below, Plaintiff's motion is DENIED.

## I.    Background

The Court assumes familiarity with the facts and procedural background of this case. Relevant to this motion, Defendant filed a motion to dismiss [Doc. # 20] on March 30, 2023 based solely on the grounds that Plaintiff did not plausibly allege the various requirements necessary to establish pre-enforcement standing under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). In her motion to dismiss, Defendant noted that "Plaintiff does not allege that he has ever been arrested, fined, evicted, or subject to any other adverse action for carrying handgun in a state park or forest, or that the State has threatened to take any such action against him." (Def.'s Mot. to Dismiss at 2.) Defendant acknowledged that "[w]hen an individual is subject to such a threat [of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *Driehaus,* 574 U.S. at 158-159, so long as the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder[.]" *Id.* at 159. Defendant further noted that the "threat of future enforcement must also be 'sufficiently imminent.'" (Def.'s Mot. to Dismiss at 4) (quoting *Driehaus*, 574 U.S. at 59).

In his opposition, Plaintiff argued that "[i]f he violates the law, he will face punishment. Thus, the Court should find that he has plausibly alleged a particularized injury," and supported that argument with examples of the penalties and consequences he could face for violating the Challenged Regulation. (Pl.'s Opp'n to Mot. to Dismiss [Doc. # 27] at 7.) In her reply, Defendant reemphasized the need for Plaintiff to demonstrate a credible threat of enforcement for violating the Challenged Regulation, asserting that "Plaintiff cannot establish concrete intent *or a credible threat of prosecution*" (Def.'s MTD Reply [Doc. # 33] at 6) (emphasis added), discussing several supporting cases. (*See id.* at 6-7.) The Court

informed the parties in advance via email that it would be hearing argument on the issue of standing at the scheduled preliminary injunction hearing; both parties, as well as the Court, asked questions of the witnesses regarding whether and how often the Challenged Regulation was enforced.

The Court issued its ruling dismissing the case for lack of standing on July 12, 2023 [Doc. # 46]. Plaintiff filed a notice of appeal with the Second Circuit on July 12, 2023 and filed a motion to reconsider the order of dismissal on July 17, 2023; the Second Circuit issued an order holding the appeal in abeyance until the resolution of this motion.

## II.    Legal Standard

"The major grounds justifying reconsideration" under both Second Circuit precedent and D. Conn. Loc. R. 7(c) "are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790.) "A motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made," *Caires v. Adams,* No. 3:17-CV-1993(AWT), 2019 WL 8807865, at *1 (D. Conn. Apr. 23, 2019),[2] nor to "advance new facts, issues or arguments not previously presented before the [c]ourt." *Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001). The standard for granting a motion for reconsideration is "strict," *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995), and a motion for reconsideration is not "a vehicle for relitigating old issues," *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), *as amended* (July 13, 2012).

---

[2] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

## III. Discussion

### A. Jurisdiction

"A federal district court and a federal court of appeals should not assert jurisdiction over a case simultaneously." *Rich v. Associated Brands, Inc.*, No. 08-CV-666S, 2009 WL 236055, at *1 (W.D.N.Y. Jan. 30, 2009). A timely motion for reconsideration "renders an otherwise final decision of a district court not final for purposes of appeal." *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 717 (2019). "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982).

Defendant asserts that this Court lacks jurisdiction to consider the motion to reconsider because Plaintiff has already filed a notice of appeal. (Def.'s Object. at 2.) In *Miller v. Superintendent of the Shawangunk Corr. Facility*, No. 18-CV-1762 (RA), 2020 U.S. Dist. LEXIS 198711, at *2 (S.D.N.Y. Oct. 26, 2020), the district court dismissed a motion for reconsideration for lack of jurisdiction because "[a]lthough a district court may retain jurisdiction over a motion for reconsideration that is filed *before* a notice of appeal, here, where the motion for reconsideration was filed four days *after* the notice of appeal, that rule does not apply," based on the general rule that a "federal district court and a federal appellate court may not maintain simultaneous jurisdiction over a case." *Id.*

However, because the Second Circuit is holding the appeal in abeyance pending this ruling, there is no simultaneous assertion of jurisdiction; the Second Circuit will not rule on the judgment until it is final following the Court's ruling on this motion. Further, the Second Circuit has recognized that "[t]he divestiture of jurisdiction rule is . . . not a per se rule. . . its application is guided by concerns of efficiency and is not automatic." *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir.1996). Following *Rodger's* guidance, one district court has

determined that it was appropriate to issue "clarification to aid the appeal process and to serve the interests of judicial economy" even when motion for clarification of the judgment in the case was filed after the notice of appeal had already been filed. *In re M/V DG HARMONY*, No. 98 CIV. 8394 (DC), 2007 WL 895251, at *2 (S.D.N.Y. Mar. 16, 2007).

Because the Second Circuit has held the appeal in abeyance pending resolution of this motion rather than asserting exclusive jurisdiction over Plaintiff's appeal, the Court concludes that as in *In re M/V DG HARMONY*, it is appropriate to consider the merits of Plaintiff's motion for reconsideration and that it retains the jurisdiction to do so.

### B. Merits

Plaintiff seeks reconsideration on the basis that "the Defendant never raised a claim that it did not enforce the law or that Nastri had not alleged a credible threat of prosecution," and that he "fairly relied on the parties' framing", which "led him to reasonably believe that the issue of whether he faced a credible threat of prosecution based on the Defendant's record of enforcing the law was not in dispute." (Pl.'s Mem. at 2-3.) Plaintiff acknowledges that the Court may take up the issue of standing *sua sponte,* but he submits that if he had known the credible threat of prosecution was disputed, he would have introduced interrogatory responses from Defendant showing that "the number of times that [DEEP] enforced" the Challenged Regulation was between 1 and 10 per year between 2016 and 2022. (*Id.* at 2, 5.) In Plaintiff's view, these statistics "weigh in favor of the Court revisiting its finding" that there was no credible threat of prosecution, and failure to consider this evidence would be a "manifest" injustice. (*Id.* at 2, 4.) Defendant maintains that the Court should decline to consider the evidence because it was available at the time the substantive motion was decided, and because it was not offered, Defendant was given no opportunity to challenge its admissibility or offer arguments as to its weight; even if considered, however, Defendant argues that the evidence is consistent with testimony that the regulation was only

5

rarely enforced, and does not rise to the level of establishing a credible threat of prosecution sufficient to demonstrate standing. (Def.'s Opp'n at 1.)

Plaintiff's position that the lack of a credible threat of prosecution was not raised by Defendant, and that the Court's ruling was a manifest injustice because it dismissed the case *sua sponte* based without giving Plaintiff a chance to be fully heard on that issue, is without merit. "Plaintiffs bear the burden of alleging facts that demonstrate standing," *Ellington Credit Fund, Ltd. v. Select Portfolio Servs., Inc.*, No. 08 CIV. 2437 (RJS), 2012 WL 13065889, at *2 (S.D.N.Y. Feb. 3, 2012), and Defendant's motion to dismiss put Plaintiff on notice that she was challenging the complaint's sufficiency as to his pre-enforcement standing claim. The Court recognizes that Defendant's motion to dismiss focused more attention on whether Plaintiff's intention to engage in the proscribed conduct was sufficiently concrete, and whether he planned to visit state parks and forests in the immediate future, than on the issue of credible threat of prosecution. However, both of those questions are inherently tied to the question of whether a credible and imminent threat of enforcement existed under the *Driehaus* test. The core premise of pre-enforcement challenges, which are exceptions to the general rule that a plaintiff must already have suffered an injury to have standing, is that a plaintiff need not actually commit an illegal act and wait until what he believes is an unlawful regulation or statute is enforced against him to challenge it if—and *only* if—he would be in real danger of having the law enforced against him were he to engage in that conduct. *See Driehaus*, 573 U.S. at 159 ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent").

The record demonstrates that Plaintiff recognized the need to show a credible threat of enforcement. His briefing acknowledges that the need to show that a threatened injury is "*certainly impending*" under *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013), "largely aligns" with the "concreteness requirement of a 'credible threat of prosecution'"

(Pl.'s MTD Opp'n at 5) (quoting *Driehaus,* 573 U.S. at 159). The Court opened the hearing by reminding counsel that "standing is jurisdictional and therefore required to be established." (Prelim. Inj. Day 1 Hrg. Tr. [Doc. # 37] at 10.) In addition to numerous questions about the potential threat of enforcement from Defendant's counsel, the Court also questioned Plaintiff on whether he was aware of anyone who had had the regulation enforced against him, to which he replied he was not. (Prelim. Inj. Day 2 Hrg. Tr. [Doc. # 44] at 238.) In closing statements, Plaintiff's counsel analogized his case to *Steffel v. Thompson*, arguing that in both cases, "a cessation or ceasing of desired conduct *based on a threat of prosecution*" should be sufficient to confer standing. (*Id.* at 355) (emphasis added). Counsel directly acknowledged the question as to whether there was a credible threat of prosecution:

> We recognize that nobody -- there's no testimony to the effect that Mr. Nastri was approached by a police officer or an EnCon officer saying if you carry a handgun in state parks, we're going to prosecute you, but the statute itself, the accompanying counts of the regulation itself, the accompanying consequences of that regulation are sufficient notice to Mr. Nastri that he does face a threat of prosecution if he carries his handgun into a state park or forest in violation of that regulation.

(*Id.* at 355.)

In sum, Plaintiff's argument that he was taken aback by the inclusion of the issue of enforcement of the Challenged Regulation is not a reasonable one, nor is it "manifest injustice" to reject it. Evidence that "was known and available" to Plaintiff when the opposition was filed "cannot be the basis for a successful motion for reconsideration," nor is it evidence of manifest injustice—instead, it demonstrates only that Plaintiff had evidence that he may have strategically determined was not necessary, and that he now regrets his choice.[3] *Gladstein v. Goldfield*, No. 3:18-CV-0926 (VAB), 2021 WL 1049898, at *5 (D. Conn.

---

[3] The Court also notes that the complaint was dismissed without prejudice, as required for a dismissal for lack of standing, leaving Plaintiff with the option of seeking to file an amended complaint incorporating the additional facts he now marshals.

Mar. 19, 2021). A chance to relitigate an issue under a different strategy or with different evidence is instead exactly the sort of "second bite at the apple" that makes reconsideration inappropriate. *Analytical Survs., Inc.*, 684 F.3d at 52. Motions for reconsideration "are not to be used as a means to reargue matters already disposed of by prior rulings or to put forward additional arguments that could have been raised prior to the decision," *Rich*, 2009 WL 236055, at *1, and "shall be granted only if the court has overlooked controlling decisions or factual matters *that were put before it on the underlying motion* and which, had they been considered, might have reasonably altered the result before the court," *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) (emphasis added).[4]

## IV. Conclusion

Plaintiffs' motion for reconsideration is DENIED. The Clerk is directed to notify the Second Circuit that a decision has been issued on the motion and to close this case.

---

[4] Plaintiff cites no cases in which the court granted a motion to reconsider premised on evidence available at the time the substantive motion was decided. The Court located one case in which a district court considered evidence newly brought to its attention despite there being "no legitimate reason" why it was not cited to or proffered during the substantive briefing on the issue, but only because it was "unambiguous" and definitively settled the legal question, leading the court to reconsider and dismiss the claims in question "for the sake of judicial efficiency." *Fund Liquidation Holdings LLC v. UBS AG*, No. 15 CIV. 5844 (GBD), 2022 WL 3904556, at *4 (S.D.N.Y. Aug. 30, 2022). Here, the evidence does not unambiguously decide the question of standing but would instead require the Court to resolve the objection to the admissibility of the produced information, reopen the hearing, and conduct further legal analysis on whether the evidence is sufficient to confer standing; *Fund Liquidation Holdings LLC* is thus distinguishable.

IT IS SO ORDERED.

_____ /s/ _____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of August, 2023

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID J. NASTRI,
*Plaintiff,*                                              Civil No. 3:23-cv-00056 (JBA)

v.

KATIE DYKES
*Defendant.*                                              August 22, 2018

## JUDGMENT

This matter came on for consideration on the Defendant's Motion to Dismiss (Doc. #22) before the Honorable Janet Bond Arterton, United States District Judge. On July 12, 2023, the Court entered an Order (Doc. #46) granting that motion and dismissing the case without prejudice. The Order also denied the Motion for Preliminary Injunction (Doc. #14) for lack of subject matter jurisdiction because the Plaintiff lacks standing.

It is therefore ORDERED, ADJUDGED, and DECREED that judgment is entered for the Defendant and the case is closed.

Dated at New Haven, Connecticut, this 22nd day of August 2023.


Dinah Milton Kinney, Clerk


By: _____/s/_____
Liana Barry, Deputy Clerk

EOD: _August 22, 2023_

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| | : | DKT No.: 3:23-cv-00056-JBA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KATIE DYKES, in her official capacity only, | : | |
| | : | |
| Defendant. | : | August 28, 2023 |

## AMENDED NOTICE OF APPEAL

Pursuant to Fed. R. App. P. 3 and 4, the Plaintiff, David J. Nastri, hereby amends his notice of his appeal. Dkt. 47.

The Plaintiff, David J. Nastri, hereby gives notice of his appeal to the United States Court of Appeals for the Second Circuit of the Court's July 12, 2023 order (Dkt. 46) granting the Defendant's motion to dismiss his amended complaint (Dkt. 22) and his motion for a preliminary injunction (Dkt. 14) as well as its order denying his motion for reconsideration (Dkt. 56).

The Plaintiff,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

1

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/

2

Case 23-1023, Document 42, 11/22/2023, 3592752, Page268 of 273

APPEAL,CLOSED,EFILE,RMS

## U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00056-JBA

Nastri v. Dykes
Assigned to: Judge Janet Bond Arterton
Referred to: Judge Robert M. Spector
Cause: 42:1983 Civil Rights Act

Date Filed: 01/14/2023
Date Terminated: 08/22/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

### Plaintiff

**David J. Nastri**      represented by **Cameron Lee Atkinson**
Atkinson Law, LLC
122 Litchfield Road
P.O. Box 340
Ste. 2
Harwinton, CT 06791
203-677-0782
Email: catkinson@atkinsonlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Katie Dykes**      represented by **Blake Thomas Sullivan**
*in her official capacity only*
Office of the Attorney General
165 Capitol Ave
Ste 5th Fl
Hartford, CT 06106
860-808-5296
Fax: 860-808-5347
Email: blake.sullivan@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thadius Latimer Bochain**
Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
860-808-5020
Fax: 860-808-5347
Email: thadius.bochain@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy J. Holzman**
State of CT, Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5210
Email: timothy.holzman@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/14/2023 | 1 | COMPLAINT *(Verified)* against Katie Scharf Dykes ( Filing fee $402 receipt number ACTDC-7200066.), filed by David J. Nastri. (Attachments: # 1 Exhibit A - List of Connecticut State Parks, # 2 Exhibit B - Conn. Agencies Reg. 23-4-1, # 3 Exhibit C - Conn. Agencies Reg. 23-4-5, # 4 Exhibit D - DEEP FAQ About Hunting, # 5 Exhibit E - |

App.266

| | | |
|---|---|---|
| | | DEEP Sleeping Giant State Park Overview, # 6 Exhibit F - Sleeping Giant Park Association Overview, # 7 Exhibit G - DEEP Resources Web Page For Sleeping Giant State Park, # 8 Exhibit H - Sleeping Giant Park Association Recreational Activities, # 9 Exhibit I - DEEP Official Map of Sleeping Giant State Park, # 10 Exhibit J - DEEP List of State Parks & Forests With Recreational Activities, # 11 Exhibit K - DEEP Official Map of Naugatuck State Forest, # 12 Exhibit L - DEEP List of State Shooting Ranges, # 13 Exhibit M - Correspondence Between Nastri & DEEP, # 14 Exhibit N - Oct. 29, 2020 Legislative Research Report Adopted By DEEP)(Atkinson, Cameron) (Entered: 01/14/2023) |
| 01/14/2023 | | Request for Clerk to issue summons as to Katie Scharf Dykes. (Atkinson, Cameron) (Entered: 01/14/2023) |
| 01/14/2023 | 2 | Notice: Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 7.1, any nongovernmental corporate party must electronically file a disclosure statement that identifies any parent corporation and any publicly held corporation owning 10% or more of its stock or states that there is no such corporation. Such disclosure statement must be filed with a party's first appearance, pleading, petition, motion, response, or other request addressed to the Court and must be supplemented if any required information changes during the case.<br>Signed by Clerk on 1/14/23.(Hushin, Z.) (Entered: 01/17/2023) |
| 01/14/2023 | | Judge Janet Bond Arterton and Judge Robert M. Spector added. (Oliver, T.) (Entered: 01/17/2023) |
| 01/14/2023 | 3 | Order on Pretrial Deadlines: Amended Pleadings due by 3/15/2023 Discovery due by 7/16/2023 Dispositive Motions due by 8/20/2023<br>Signed by Clerk on 1/14/2023.(Sichanh, Christina) (Entered: 01/17/2023) |
| 01/14/2023 | 4 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Janet Bond Arterton on 1/14/2023.(Sichanh, Christina) (Entered: 01/17/2023) |
| 01/14/2023 | 5 | STANDING PROTECTIVE ORDER<br>Signed by Judge Janet Bond Arterton on 1/14/2023.(Sichanh, Christina) (Entered: 01/17/2023) |
| 01/17/2023 | 6 | NOTICE TO COUNSEL/SELF-REPRESENTED PARTIES : Counsel or self-represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 4 Electronic Filing Order, 3 Order on Pretrial Deadlines, 2 Notice re: Disclosure Statement,, 5 Protective Order, 1 Complaint, filed by David J. Nastri.<br>Signed by Clerk on 1/17/2023.(Sichanh, Christina) (Entered: 01/17/2023) |
| 01/17/2023 | 7 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Katie Dykes* with answer to complaint due within *21* days. Attorney *Cameron Lee Atkinson-Atkinson Law, LLC* *122 Litchfield Road* *P.O. Box 340 Ste. 2* *Harwinton, CT 06791*. (Sichanh, Christina) (Entered: 01/17/2023) |
| 01/17/2023 | 8 | Emergency MOTION for Preliminary Injunction *(Ex Parte Relief Not Sought)* (Responses due by 2/7/2023, ), Emergency MOTION for Temporary Restraining Order *(Ex Parte Relief Not Sought)* by David J. Nastri. (Attachments: # 1 Memorandum in Support, # 2 Supplement FRCP 65 Certification of Counsel)(Atkinson, Cameron) (Entered: 01/17/2023) |
| 01/18/2023 | | A telephonic scheduling conference will be held 1/27/23 at 3:00 p.m. as follows: 1-877-402-9753; access code 3535720. (Tooker, Aimee) (Entered: 01/18/2023) |
| 01/26/2023 | 9 | NOTICE of Appearance by Blake Thomas Sullivan on behalf of Katie Dykes (Sullivan, Blake) (Entered: 01/26/2023) |
| 01/26/2023 | 10 | NOTICE of Appearance by Timothy J. Holzman on behalf of Katie Dykes (Holzman, Timothy) (Entered: 01/26/2023) |
| 01/26/2023 | 11 | NOTICE of Appearance by Thadius Latimer Bochain on behalf of Katie Dykes (Bochain, Thadius) (Entered: 01/26/2023) |
| 01/27/2023 | 12 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Telephonic Scheduling Conference held on 1/27/2023. TOTAL TIME: 52 minutes(Court Reporter Corrine Thomas.) (Sichanh, Christina) (Entered: 01/27/2023) |
| 01/28/2023 | 13 | AMENDED COMPLAINT *(Verified)* against Katie Dykes, filed by David J. Nastri. (Attachments: # 1 Exhibit A - List of Connecticut State Parks, # 2 Exhibit B - Conn. Agencies Reg. 23-4-1, # 3 Exhibit C - Conn. Agencies Reg. 23-4-5, # 4 Exhibit D - DEEP FAQ About Hunting, # 5 Exhibit E - DEEP Sleeping Giant State Park Overview, # 6 Exhibit F - Sleeping Giant Park Association Overview, # 7 Exhibit G - DEEP Resources Web Page For Sleeping Giant State Park, # 8 Exhibit H - Sleeping Giant Park Association Recreational Activities, # 9 Exhibit I - DEEP Official Map of Sleeping Giant State Park, # 10 Exhibit J - DEEP List of State Parks & Forests With Recreational Activities, # 11 Exhibit K - DEEP Official Map of Naugatuck State Forest, # 12 Exhibit L - DEEP List of State Shooting Ranges, # 13 Exhibit M - Correspondence Between Nastri & DEEP, # 14 Exhibit N - Oct. 29, 2020 Legislative Research Report Adopted By DEEP)(Atkinson, Cameron) (Entered: 01/28/2023) |
| 01/28/2023 | 14 | Emergency MOTION for Preliminary Injunction *(Amended Per 1/27/23 Colloquy With Court & Defendant)* by David J. Nastri.Responses due by 2/18/2023 (Attachments: # 1 Memorandum in Support, # 2 Supplement FRCP 65 |

App.267

| | | |
|---|---|---|
| | | Certification of Counsel)(Atkinson, Cameron) (Entered: 01/28/2023) |
| 01/30/2023 | 15 | SCHEDULING ORDER: Pursuant to the colloquy with counsel on the record 1/27/23, the following is ordered: 1.Plaintiff's Emergency Motion for a Temporary Restraining Order 8 is denied without prejudice in light of expedited preliminary injunction schedule; the preliminary injunction is under advisement under the schedule set forth below. 2.Plaintiff's Amended Complaint and revised Supporting Memoranda was served on 1/29/23; Defendant's opposition to the preliminary injunction is due 3/30/23 by 5:00 pm; Plaintiff's reply is due 4/14/23 by 5:00 pm. Defendant's opposition brief is not to exceed 40 pages, and the Plaintiff's response is not to exceed 14 pages. 3.The parties are directed to file a status report by 4/4/23. 4.A preliminary injunction hearing will be held from 5/1/23 to 5/4/23 from 10:00 a.m. to 3:00 p.m. daily. Signed by Judge Janet Bond Arterton on 1/27/23.(Tooker, Aimee) (Entered: 01/30/2023) |
| 01/30/2023 | 16 | Preliminary Injunction Hearing set for 5/1/2023 to 5/4/2023 10:00 AM to 3:00 PM in Courtroom Two, 141 Church St., New Haven, CT. (Tooker, Aimee) (Entered: 01/30/2023) |
| 02/11/2023 | 17 | SUMMONS Returned Executed by David J. Nastri. Katie Dykes served on 1/31/2023, answer due 2/21/2023. (Atkinson, Cameron) (Entered: 02/11/2023) |
| 02/15/2023 | 18 | Consent MOTION for Extension of Time until March 30, 2023 to respond to Plaintiff's Amended Complaint by Katie Dykes. (Holzman, Timothy) (Entered: 02/15/2023) |
| 02/22/2023 | 19 | ORDER granting Consent MOTION for Extension of Time until March 30, 2023 to respond to Plaintiff's Amended Complaint. Signed by Judge Janet Bond Arterton on 2/22/23. (Tooker, Aimee) (Entered: 02/22/2023) |
| 02/22/2023 | | Answer deadline updated for All Defendants. (Tooker, Aimee) (Entered: 02/22/2023) |
| 03/09/2023 | 20 | First MOTION for Leave to File Excess Pages by Katie Dykes. (Sullivan, Blake) (Entered: 03/09/2023) |
| 03/14/2023 | 21 | ORDER granting 20 Motion for Leave to File Excess Pages, without objection, not to exceed 55 pages. Signed by Judge Janet Bond Arterton on 3/14/23. (Tooker, Aimee) (Entered: 03/14/2023) |
| 03/30/2023 | 22 | MOTION to Dismiss for Lack of Jurisdiction *Amended Complaint 13* by Katie Dykes.Responses due by 4/20/2023 (Attachments: # 1 Memorandum in Support)(Holzman, Timothy) (Entered: 03/30/2023) |
| 03/30/2023 | 23 | Memorandum in Opposition re 14 Emergency MOTION for Preliminary Injunction *(Amended Per 1/27/23 Colloquy With Court & Defendant)* filed by Katie Dykes. (Attachments: # 1 Exhibit List, # 2 Exhibit Excerpt List, # 3 Affidavit Declaration of AAG Timothy Holzman, # 4 Exhibit 1-49 (Ordinances and Laws About Parks), # 5 Exhibit 50-70 (Ordinances and Laws About Parks), # 6 Exhibit 71-76 (Laws Addressing Hunting), # 7 Exhibit 77-103 (Laws Addressing Sensitive Places), # 8 Exhibit 104-117 (D.E.E.P.), # 9 Exhibit 118-124 (University Regulations), # 10 Exhibit 125-129 (Militias and Parades), # 11 Exhibit 130-132 (Additional), # 12 Affidavit Expert Prof. Leah Glaser, # 13 Affidavit Expert Prof. Terence Young, # 14 Affidavit Expert Prof. Saul Cornell, # 15 Affidavit DEEP Col. Lewis, # 16 Affidavit DEEP Thomas Tyler, # 17 Affidavit DECD CMO Anthony Anthony, # 18 Affidavit Superintendent Gary Highsmith_Hamden, # 19 Affidavit Superintendent Mark Benigni_Meriden, # 20 Supplement Secondary Sources, # 21 Supplement Unreported Decisions)(Bochain, Thadius) (Entered: 03/30/2023) |
| 04/03/2023 | 24 | EXHIBIT *CORRECTED 23-4: Exhibit 1-49 (Ordinances and Laws About Parks)* by Katie Dykes re 23 Memorandum in Opposition to Motion,,,,. (Attachments: # 1 Exhibit CORRECTED 23-6: Exhibit 71-76 (Laws Addressing Hunting), # 2 Exhibit CORRECTED 23-7: Exhibit 77-103 (Laws Addressing Sensitive Places), # 3 Exhibit CORRECTED 23-8: Exhibit 104-117 (D.E.E.P.))(Bochain, Thadius) (Entered: 04/03/2023) |
| 04/04/2023 | 25 | Joint STATUS REPORT by David J. Nastri. (Atkinson, Cameron) (Entered: 04/04/2023) |
| 04/10/2023 | | A telephonic status conference will be held 4/26/23 at 4:00 p.m. as follows: 1-877-402-9753; access code 3535720. (Tooker, Aimee) (Entered: 04/10/2023) |
| 04/14/2023 | 26 | NOTICE OF E-FILED CALENDAR: Preliminary Injunction Hearing is rescheduled to begin May 8, 2023 10:00 a.m., Courtroom Two, 141 Church Street, New Haven, CT. The parties are directed to confer and establish the availability of live witnesses, anticipated testimony length and other issues relevant to the efficient presentation of live testimony prior to the April 26, 2023 telephonic status conference. (Tooker, Aimee) (Entered: 04/14/2023) |
| 04/14/2023 | 27 | Memorandum in Opposition *(Oral Argument Not Requested)* re 22 MOTION to Dismiss for Lack of Jurisdiction *Amended Complaint 13* filed by David J. Nastri. (Atkinson, Cameron) (Entered: 04/14/2023) |
| 04/14/2023 | 28 | REPLY to Response to 14 Emergency MOTION for Preliminary Injunction *(Amended Per 1/27/23 Colloquy With Court & Defendant)* filed by David J. Nastri. (Atkinson, Cameron) (Entered: 04/14/2023) |
| 04/26/2023 | 29 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Telephonic Status Conference held on 4/26/2023. TOTAL TIME: 19 minutes(Court Reporter Corrine Thomas.) (Sichanh, Christina) (Entered: 04/26/2023) |
| 04/28/2023 | 30 | MOTION for Extension of Time until May 3, 2023 for Defendant to Reply to Plaintiff's 27 Memorandum in Opposition to Motion by Katie Dykes. (Sullivan, Blake) (Entered: 04/28/2023) |

App.268

| 04/28/2023 | 31 | ORDER granting on consent 30 Motion for Extension of Time until May 3, 2023 for Defendant to Reply to Plaintiff's 27 Memorandum in Opposition to Motion to Defendant's Motion to Dismiss. Defendant's Reply shall be filed by 5pm on May 3, 2023. Signed by Judge Janet Bond Arterton on 4/28/2023. (Anderson, Colleen) (Entered: 04/28/2023) |
| --- | --- | --- |
| 04/28/2023 | 32 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Preliminary injunction hearing will be held 5/9/23 and 5/10/23; 10:00 a.m. - 3:00 p.m. in Courtroom Two, 141 Church Street, New Haven, CT. (Tooker, Aimee) (Entered: 04/28/2023) |
| 05/03/2023 | 33 | RESPONSE re 27 Memorandum in Opposition to Motion *to Dismiss* filed by Katie Dykes. (Attachments: # 1 Exhibit A - Deposition of David J. Nastri Transcript, # 2 Exhibit B - Unreported Cases)(Sullivan, Blake) (Entered: 05/03/2023) |
| 05/08/2023 | 34 | Proposed Exhibit List by Katie Dykes. (Sullivan, Blake) (Entered: 05/08/2023) |
| 05/08/2023 | 35 | Joint STIPULATION *Of Facts For Purposes Of Preliminary Injunction Hearing Only* by David J. Nastri. (Atkinson, Cameron) (Entered: 05/08/2023) |
| 05/09/2023 | 36 | EXHIBIT *Defendant's Ex. 144 - Transcription of Ex. 143 taken from digital archive* by Katie Dykes. (Sullivan, Blake) (Entered: 05/09/2023) |
| 05/09/2023 | 38 | Minute Entry. Proceedings held before Judge Janet Bond Arterton: Preliminary Injunction Hearing held on 5/9/2023 re 8 Emergency MOTION for Preliminary Injunction *(Ex Parte Relief Not Sought)*Emergency MOTION for Temporary Restraining Order *(Ex Parte Relief Not Sought)* filed by David J. Nastri. Total Time: 4 hours and 56 minutes(Court Reporter Corinne Thomas) (Barry, L) (Entered: 05/22/2023) |
| 05/10/2023 | 39 | Minute Entry. Proceedings held before Judge Janet Bond Arterton: Preliminary Injunction Hearing held on 5/10/2023 re 8 Emergency MOTION for Preliminary Injunction *(Ex Parte Relief Not Sought)*Emergency MOTION for Temporary Restraining Order *(Ex Parte Relief Not Sought)* filed by David J. Nastri. Total Time: 5 hours and 19 minutes(Court Reporter Corinne Thomas) (Barry, L) (Entered: 05/22/2023) |
| 05/11/2023 | 37 | TRANSCRIPT of Proceedings: Type of Hearing: Preliminary Injunction Hearing. Held on 5/9/2023 before Judge Janet Bond Arterton. Court Reporter: Corinne Thomas. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/1/2023. Redacted Transcript Deadline set for 6/11/2023. Release of Transcript Restriction set for 8/9/2023. (Thomas, Corinne) (Entered: 05/11/2023) |
| 05/30/2023 | 40 | MOTION for Leave to File *Supplemental Brief* by Katie Dykes. (Attachments: # 1 Koons v. Platkin)(Holzman, Timothy) (Entered: 05/30/2023) |
| 05/31/2023 | 41 | ORDER granting 40 Defendant's Motion for Leave to File a Supplemental Brief, not to exceed 5 pages, addressing the recently issued decision Koons v. Platkin, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023). Defendant's brief shall be filed by June 7, 2023; Plaintiff's response brief, also not to exceed 5 pages, shall be filed by June 14, 2023. Signed by Judge Janet Bond Arterton on 5/31/2023. (Anderson, Colleen) (Entered: 05/31/2023) |
| 06/07/2023 | 42 | RESPONSE re 41 Order on Motion for Leave to File, *Defendant's Supplemental Brief* filed by Katie Dykes. (Sullivan, Blake) (Entered: 06/07/2023) |
| 06/14/2023 | 43 | RESPONSE re 41 Order on Motion for Leave to File, 42 Response filed by David J. Nastri. (Attachments: # 1 Exhibit A - Excerpted Testimony of Professor Saul Cornell)(Atkinson, Cameron) (Entered: 06/14/2023) |
| 07/04/2023 | 44 | TRANSCRIPT of Proceedings: Type of Hearing: Preliminary Injunction Hearing. Held on 5/10/2023 before Judge Janet Bond Arterton. Court Reporter: Corinne Thomas. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 7/25/2023. Redacted Transcript Deadline set for 8/4/2023. Release of Transcript Restriction set for 10/2/2023. (Thomas, Corinne) (Entered: 07/04/2023) |

App.269

| 07/07/2023 | [45](#) | NOTICE by Katie Dykes *of Supplemental Authority* (Attachments: # [1](#) MD USDC Decision)(Holzman, Timothy) (Entered: 07/07/2023) |
| 07/12/2023 | [46](#) | ORDER denying [8](#) Motion for Preliminary Injunction and [8](#) Motion for TRO as moot in light of the amended preliminary injunction [14](#) ; granting [22](#) Motion to Dismiss for Lack of Jurisdiction; and denying [14](#) Motion for Preliminary Injunction for lack of subject matter jurisdiction. Signed by Judge Janet Bond Arterton on 7/12/2023. (Anderson, Colleen) (Entered: 07/12/2023) |
| 07/12/2023 | [47](#) | NOTICE OF APPEAL as to [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, by David J. Nastri. Filing fee $ 505, receipt number ACTDC-7412024. (Atkinson, Cameron) (Entered: 07/12/2023) |
| 07/14/2023 | [48](#) | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: [47](#) Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none (Sichanh, Christina) (Entered: 07/14/2023) |
| 07/17/2023 | [49](#) | MOTION for Reconsideration re [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, by David J. Nastri. (Attachments: # [1](#) Exhibit A - Defendant's Response To Plaintiff's Interrogatories (March 20, 2023), # [2](#) Exhibit B - Excerpted Preliminary Injunction Testimony of Col. Chris Lewis)(Atkinson, Cameron) (Entered: 07/17/2023) |
| 07/17/2023 | [50](#) | Memorandum in Support re [49](#) MOTION for Reconsideration re [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by David J. Nastri. (Attachments: # [1](#) Exhibit A - Defendant's Response To Plaintiff's Interrogatories (March 20, 2023), # [2](#) Exhibit B - Excerpted Preliminary Injunction Testimony of Col. Chris Lewis)(Atkinson, Cameron) (Entered: 07/17/2023) |
| 07/19/2023 | 51 | ORDER: Defendant is requested to respond to Plaintiff's Motion for Reconsideration [49](#) , including whether the evidence submitted by Plaintiff purporting to show instances of enforcement of the Challenged Regulation between 2016 and 2022 would be sufficient to establish standing, by July 31, 2023, not to exceed 15 pages. Any reply by Plaintiff shall be filed by August 7, 2023.<br>Signed by Judge Janet Bond Arterton on 7/19/2023. (Anderson, Colleen) (Entered: 07/19/2023) |
| 07/26/2023 | [52](#) | Marked Exhibit List for the dates of 5/9/2023 and 5/10/2023. (Barry, L) (Entered: 07/26/2023) |
| 07/26/2023 | [53](#) | Supplemental Marked Exhibit List for the dates of 5/9/2023 and 5/10/2023. (Barry, L) (Entered: 07/31/2023) |
| 07/31/2023 | [54](#) | OBJECTION re [49](#) MOTION for Reconsideration re [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by Katie Dykes. (Attachments: # [1](#) Exhibit A - PI Hearing Transcripts Excerpts)(Sullivan, Blake) (Entered: 07/31/2023) |
| 08/07/2023 | [55](#) | REPLY to Response to [49](#) MOTION for Reconsideration re [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, filed by David J. Nastri. (Attachments: # [1](#) Exhibit A - [Unreported Case] Miller v. Superintendent of the Shawangunk Correctional Facility, No. 1:18-cv-01762 (S.D.N.Y. Oct. 26, 2020), # [2](#) Exhibit B - Plaintiff's Motion To Hold Appeal In Abeyance (2nd Cir.), # [3](#) Exhibit C - 2nd Circuit Order Holding Plaintiff's Appeal In Abeyance, # [4](#) Exhibit D - Excerpted Preliminary Injunction Hearing Testimony of Colonel Christopher Lewis)(Atkinson, Cameron) (Entered: 08/07/2023) |
| 08/16/2023 | [56](#) | ORDER denying [49](#) Motion for Reconsideration re [46](#) Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion to Dismiss/Lack of Jurisdiction. The Clerk is directed to notify the Second Circuit that a decision has been issued on the motion and to close this case. Signed by Judge Janet Bond Arterton on 8/16/2023. (Anderson, Colleen) (Entered: 08/16/2023) |
| 08/22/2023 | [57](#) | JUDGMENT entered in favor of Katie Dykes against David J. Nastri.<br><br>For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms<br>Signed by Clerk on 8/22/2023.(Barry, L) (Entered: 08/22/2023) |
| 08/22/2023 | | JUDICIAL PROCEEDINGS SURVEY - FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey<br>(Barry, L) (Entered: 08/22/2023) |
| 08/28/2023 | [58](#) | AMENDED NOTICE OF APPEAL amending [47](#) Notice of Appeal, [46](#) Order on Motion for Preliminary Injunction,, Order on Motion for TRO,,,, Order on Motion to Dismiss/Lack of Jurisdiction, [57](#) Judgment, [56](#) Order |

App.270

| | | on Motion for Reconsideration, by David J. Nastri. Filing fee $ 505, receipt number ACTDC-7463539. (Atkinson, Cameron) (Entered: 08/28/2023) |
|---|---|---|
| 08/29/2023 | [59](#) | ORDER of USCA as to [47](#) Notice of Appeal filed by David J. Nastri. USCA Case Number 23-1023 (Sichanh, Christina) (Entered: 08/29/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/24/2023 17:40:02 | | |
| **PACER Login:** | AtkinsonCameron | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00056-JBA |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

App.271