# 23-1023

**IN UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

DAVID J. NASTRI, ESQ.

*Plaintiff-Appellant*

v.

KATIE DYKES,

*Defendant-Appellee*,

---

On Appeal from the United States District Court for the
Connecticut, No. 3:23-cv-00056-JBA

---

**REPLY BRIEF OF THE PLAINTIFF-APPELLANT**

---

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

December 14, 2023

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................... ii

**INTRODUCTION** ...................................................................................................1

**ARGUMENT** ..........................................................................................................2

    I.   *Epperson* and *Babbitt* Demonstrate That Moribundity Only Precludes Pre-Enforcement Standing In The Most Exceptional Of Circumstances. ......2

    II.   Dykes Never Disputed Whether The State Actually Enforces Conn. Agencies Regs. § 23-4-1(c) Before The District Court. ......................................6

    III.   Courts Have Applied The Chilling Doctrine To Other Contexts Besides The Free Speech Context. ...................................................................8

**CONCLUSION** .....................................................................................................10

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION** .........................................................................................................11

**CERTIFICATE OF SERVICE** ............................................................................12

# **TABLE OF AUTHORITIES**

**Cases**

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979)......................1, 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................9

*Doe v. Bolton*, 410 U.S. 179 (1973)......................................................................2, 4

*Epperson v. Arkansas*, 393 U.S. 97 (1968)...................................................... 1, 4, 5

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D. IL. 2014) .................................................................................................................9

*Nashville, C. & St. L.R. Co. v. Browning*, 310 U.S. 362, 369 (1940).......................3

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ...9

*Poe v. Ullman*, 367 U.S. 497 (1961)......................................................... 2, 3, 4, 5, 6

*State v. Certain Contraceptive Materials*, 126 Conn. 428 (1940).............................3

*State v. Nelson*, 126 Conn. 412 (1940) .....................................................................3

*Stover v. Carlson*, 413 F.Supp. 718 (D.Conn. 1976)................................................9

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021)..........................................9

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................................9

**Other Authorities**

Conn. Agencies Regs. § 23-4-1(c)........................................................................7, 8

# **INTRODUCTION**

*Epperson*.[1] *Babbitt*.[2] Appellee Katie Dykes' arguments regarding Appellant David Nastri's standing fail to address these two cases entirely. In fact, she fails to reference *Epperson* at all in her brief. *See* Resp. Br., p. 20-21. Her failure to address these two cases underscores their inconvenient importance to the question of whether Nastri demonstrated that a credible threat of enforcement exists if he carries a handgun for self-defense in Connecticut state parks and forests. Like this case, *Epperson* and *Babbitt* each addressed a situation where a government law had aged into moribundity. In each, the Supreme Court found pre-enforcement standing. For the reasons stated in Nastri's opening brief and herein, they strongly weigh in favor of finding that he has pre-enforcement standing in this action.

Next, Dykes's arguments regarding what kind of notice that Nastri had of the standing issues to be addressed muddy the waters below. She relies on her counsel's vague assertion of standing issues at a status conference and similar vague comments about Nastri's burden of proof throughout the district court proceedings to fairly apprise Nastri that the issue of a credible threat of prosecution was on the table. These arguments miss the mark for the reasons Nastri initially articulated in his opening brief and will further articulate here as well as the reasons the district court

---

[1] *Epperson v. Arkansas*, 393 U.S. 97 (1968).
[2] *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979).

1

itself acknowledged. The vague hints provided to Nastri as to the issues underlying the credible threat of enforcement issue only touched upon the issues Dykes actually raised: "whether Plaintiff's intention to engage in the proscribed conduct was sufficiently concrete, and whether he planned to visit state parks and forests in the immediate future, than on the issue of credible threat of prosecution." Pl. App.259. Thus, Nastri was never fairly notified that a credible threat of prosecution issue was at issue.

For the reasons contained herein and in Nastri's opening brief, he respectfully asks the Court to reverse the district court's decision that he lacked standing to pursue his Second Amendment claim.

## ARGUMENT

I. ***Epperson* and *Babbitt* Demonstrate That Moribundity Only Precludes Pre-Enforcement Standing In The Most Exceptional Of Circumstances.**

Dykes' complete failure to address the actual cases establishing the rule of moribundity underscores just how weak of a foundation it provides for the district court's ruling. Start with the case that established the basis for the moribundity rule: *Poe v. Ullman*, 367 U.S. 497 (1961); *see also Doe v. Bolton*, 410 U.S. 179, 188 (1973) (pointing to *Poe* as the origin of the moribundity rule). *Poe* considered a challenge to an 1879 Connecticut statute prohibiting the use of contraceptives. 367 U.S. at 501. The Supreme Court began by acknowledging the exceptionally extraordinary nature of the facts before it. It found that, in over 75 years since the

2

statute had been on Connecticut's books, it had only once been enforced, and, even then, only in a test case to determine the constitutionality of the statute as it applied against doctors and nurses disseminated contraceptive information. *Id*. at 502 (citing *State v. Nelson*, 126 Conn. 412 (1940)). The facts then took a bizarre turn:

> We were advised by counsel for appellants that contraceptives are commonly and notoriously sold in Connecticut drug stores. Yet no prosecutions are recorded; and certainly such ubiquitous, open, public sales would mere quickly invite the attention of enforcement officials than the conduct in which the present appellants wish to engage—the giving of private medical advice by a doctor to his individual patients, and their private use of the devices prescribed.

*Id*. at 502. The Supreme Court further acknowledged that the Connecticut Supreme Court had ruled in another test case that Connecticut could not seize and destroy contraceptive devices as nuisances under Connecticut law. *Id*. at 502 n.4 (citing *State v. Certain Contraceptive Materials*, 126 Conn. 428 (1940)).

These facts led the *Poe* Court to the conclusion that Connecticut had actually nullified its own law rather than made a simple choice not to enforce it:

> The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute books bespeaks more than prosecutorial paralysis. What was said in another context is relevant here. 'Deeply embedded traditional ways of carrying out state policy * * *'—or not carrying it out—'are often tougher and truer law than the dead words of the written text.'

*Id*. at 502 (quoting *Nashville, C. & St. L.R. Co. v. Browning*, 310 U.S. 362, 369 (1940)). Thus, *Poe* held that two conditions deprive a controversy of the immediacy necessary to establish an imminent injury: (1) an express disavowal of enforcement

3

by the state or (2) a lengthy history of non-enforcement. *Id*. at 507-508. To illustrate the nature of the second condition, *Poe* stated that Connecticut's contraception ban had, for many years, "gone uniformly and without exception unenforced."[3] *Id*. at 508.

The subsequent precedents of *Epperson* and *Babbitt* illustrate how the moribundity rule is to be applied. Consider *Epperson*. A 40-year-old Arkansas law prohibited any teachers at state-supported schools or universities from teaching Darwinian evolution. *Epperson v. Arkansas*, 393 U.S. 97, 98-99 (1968); *id*. at 110 (Black, J. concurring). Notwithstanding the law, a Little Rock high school adopted a biology textbook that contained a chapter discussing evolution. *Id*. at 99. Susan Epperson faced a dilemma between not teaching from the new textbook, including its chapter on evolution, or teaching from the chapter and risking criminal charges and dismissal from her job. *Id*. at 100. The Supreme Court did not address standing even though it could have raised it *sua sponte*. Justice Black's concurrence, however, sheds important light on the "moribundity" of the law: "Although Arkansas Initiated Act No. 1, the statute alleged to be unconstitutional, was passed by the voters of

---

[3] *Poe* presented exceptional facts as the Supreme Court later noted in *Doe v. Bolton*, 410 U.S. 179, 188 (1973): "the challenged Connecticut statute, deemed to prohibit the giving of medical advice on the use of contraceptives, had been enacted in 1879, and, apparently with a single exception, no one had ever been prosecuted under it."

4

Arkansas in 1928, we are informed that there has never been even a single attempt by the State to enforce it." *Id*. at 109-10 (Black, J., concurring).

*Babbitt* also poses similar problems for Dykes. In 1972, Arizona enacted a comprehensive statutory scheme for regulating labor relations in the agricultural industry. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 292 (1979). The Supreme Court analyzed the scheme's sections individually and found that farmworkers and their union had pre-enforcement standing to many sections, including the criminal penalty section. *Id*. at 302-03. With respect to the criminal penalty section, the Supreme Court rejected Arizona's argument "the criminal penalty provision ha[d] not yet been applied and may never be applied…." *Id*. at 302. It extended this rejection to the civil penalties contemplated by the statute too. *Id*. at 302 n.13. The Court explained its finding of a credible threat of enforcement as being based upon the law's general prohibition of "dishonest, untruthful, and deceptive publicity" and Arizona's failure to disavow any intention of pursuing criminal or civil enforcement. *Id*. at 302.

These cases illustrate the outer bounds of *Poe*'s moribundity rule. In assessing the credibility of the threat at issue in *Poe*, the Court found that the many decades of silence regarding Connecticut's contraceptive law belied an apparent agreement between prosecutors and the plaintiffs to create a "clear threat of imminent prosecutions." 367 U.S. at 501. The Court strongly rebuked this apparent collusion

5

as depriving the case of the nature of "a truly adversary contest, of a collision of actively asserted and differing claims." *Id*. at 505, 508. *Epperson* – despite Justice Black's concerns – differed from *Poe* in the sense that the 40 years of silence regarding the law did not demonstrate an active policy of nullifying the law. There was no evidence that Arkansas was openly permitting the teaching of evolution in its schools like Connecticut was permitting the sale of contraceptives. In fact, *Epperson* appears to be the first case to have presented an open dilemma on whether the law would be violated. Likewise, *Babbitt* did not find 7 or 8 years of non-enforcement of Arizona's criminal and civil labor penalties to deprive the plaintiffs of pre-enforcement standing because there was no evidence that Arizona was disavowing enforcement or otherwise attempting to nullify the law.

*Poe*, therefore, represents an extraordinary case, and its moribundity rule should only be given effect in cases of a similarly extraordinary vintage where a state has actively attempted to nullify a law and permits the conduct the law prohibits to openly exist. The district court's reliance on the moribundity rule was misplaced, and the Court should reverse.

## II. **Dykes Never Disputed Whether The State Actually Enforces Conn. Agencies Regs. § 23-4-1(c) Before The District Court.**

Dykes now appears to argue on appeal that she notified Nastri at a January 17, 2023 status conference of a potential standing problem. Resp. Br., pp. 45-46. She further argues that her motion to dismiss argued that Nastri "had not faced actual or

6

threatened enforcement under § 23-4-1(c) and that he had not met his burden of pleading that the threat of future enforcement is sufficiently imminent." *Id*. at p. 46 (internal quotation marks and citations omitted). Her analysis, however, hides the ball and does not explain the reasoning underlying her arguments at the district court – reasoning that the district court itself candidly acknowledged.

Start with the district court. It recognized that Dykes's arguments regarding a credible threat of prosecution did not focus on past instances of enforcement: "The Court recognizes that Defendant's motion to dismiss focused more attention on whether Plaintiff's intention to engage in the proscribed conduct was sufficiently concrete, and whether he planned to visit state parks and forests in the immediate future, than on the issue of credible threat of prosecution." Pl. App.259.

Dykes's pleading cement the point. Her first argument in her motion to dismiss was that Nastri did not alleged that he actually intended to carry his handgun into state parks and forests. Pl. App. 98. Her second argument was that Nastri did not plausibly allege an intention to do so in the immediate future – ostensibly because he did not allege with sufficient specificity plans to visit a state park or forest in the immediate future. Pl. App. 98.

Dykes' arguments did not shift at the end of the two-day preliminary injunction hearing. While her counsel briefly discussed the apparent lack of enforcement examples, Dykes brought the issue back to her predicate argument that

Nastri had not sufficiently shown his intent to engage in the conduct proscribed by Conn. Agencies Regs. § 23-4-1(c). Pl. App. 194 (Tr. at pp. 363-64). The entirety of her arguments in the motion to dismiss portion of the argument focused solely on this predicate issue. Pl. App. 191-97 (Tr. at pp. 353-378).

While the district court did pose questions at the end of the hearing as to the risk of enforcement and past instances of enforcement, Pl. App. 195-97, those questions – coming after a very thorough and weighty two days of evidence and in the context of the case presented by the parties regarding Nastri's intent to visit state parks and forests – were far from sufficient to apprise Nastri that the Court had made a past record of enforcement the central issue to its standing analysis.

In sum, Dykes' arguments never apprised Nastri that past examples of enforcement would become a factor in the standing case that the parties presented. Dykes's apparent claim now that her arguments did provide such notice simply has no support in the record. Thus, the Court should reverse the district court's decision and consider standing in light of the overall nature of the record before it, including the evidence that Nastri sought to present in his motion for reconsideration.

### III. Courts Have Applied The Chilling Doctrine To Other Contexts Besides The Free Speech Context.

In Nastri's opening brief, the undersigned candidly informed the Court that he could not find a case that applied the chilling doctrine outside of the First Amendment context. Pl. Br., p. 28. Since filing his opening brief, the undersigned

8

located one case that applied the chilling doctrine in the Second Amendment context, relying on similar reasoning to that contained in his opening brief. *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 946 n.7 (N.D. IL. 2014).

The Supreme Court has also left open the possibility that a form of the chilling doctrine could apply to state actions that impede free communication between counsel and criminal defendants. *See Wolff v. McDonnell*, 418 U.S. 539, 577 (1974). At least one district court has applied such a rule on the merits although its analysis leaves little doubt that its chilling analysis would also apply to any standing issues. *See Stover v. Carlson*, 413 F.Supp. 718, 721 (D.Conn. 1976).

Additionally, the Supreme Court recognized that a variety of constitutional rights – "free exercise of religion, freedom of speech, the right to bear arms, or any other right" – could be chilled by laws. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021).

Given the close similarities between the First and Second Amendments noted in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), transporting the chilling doctrine into the Second Amendment standing context does not require a substantial leap for the Court. Thus, the Court should do so in this case for the reasons stated herein and in Nastri's opening brief.

Nastri will not rewrite his opening brief on why he prevails in a "chilling" analysis. Pl. Br., at pp. 29-30. The reasons are clearly set forth there, and he asks the Court to find that he has standing under the chilling doctrine even if the district court correctly applied the normal principles of pre-enforcement standing.

## CONCLUSION

For reasons contained herein and in his opening brief, the Court should reverse the decisions of the district court dismissing Nastri's case for lack of standing, denying his motion for a preliminary injunction on the same basis, and denying his motion for reconsideration.

Dated: December 14, 2023        //s//  *Cameron L. Atkinson*

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1 because it contain 2,385 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: December 14, 2023

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 14, 2023, an electronic copy of the foregoing Brief Of The Plaintiff-Appellant was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson